## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

GATEGUARD, INC.

         *Plaintiff*,

   v.

AMAZON.COM, INC.,
AMAZON.COM SERVICES, INC.,
AMAZON.COM SERVICES, LLC,
AMAZON LOGISTICS, INC.

         *Defendants*.

Civil Action No. _____

**INDIVIDUAL AND CLASS
ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff GateGuard, Inc. ("GateGuard") by and through its attorneys, Quainton Law, PLLC, for itself and on behalf of all others similarly situated, as and for its Complaint against Defendants Amazon.com, Inc., Amazon.com Services, Inc., Amazon.com Services, LLC, and Amazon Logistics, Inc.  (collectively, "Amazon" or "Defendants"), alleges and states as follows:

### INTRODUCTION

1.     This is an action for damages, documented with photographic and video evidence, resulting from Amazon's illegal pattern of tampering with intercom and access control devices in multifamily residential buildings in New York and across the nation, while lying to low-level building personnel and deceiving property owners about its authority to install its own access devices.  Amazon has interfered with GateGuard's contractual relations and prospective economic advantage, committed computer fraud, misappropriated and converted property to its own use, unjustly enriched itself—all as part of a broader scheme that attempts to monopolize the e-commerce delivery market. GateGuard is also seeking an injunction permanently enjoining

Amazon from taking any further action to tamper with any intercom devices installed in multifamily residential buildings in New York without the consent of the device owner and the building owner/manager.

2.     Founded in 2016, GateGuard is a startup company that develops, manufactures and sells security technology for multi-tenant apartment buildings.

3.     One of GateGuard's primary offerings is its "AI Doorman" intercom device, which was first released in 2016.

4.     GateGuard's intercoms offer unique features and capabilities that enable building managers to autonomously track everyone who enters, buzzes, or uses a guest code. These features alert building managers to forbidden activities such as illegal subletting, use of residential apartments as dormitories, unauthorized or non-compliant group activities and other threats to the safety and property of residents and landlords alike.

5.     GateGuard's intercoms also generate real-time logs of these activities managers can view, filter, and print from any mobile phone, tablet, or computer, which are accessible via built-in cellular modems that connect the units to the internet. GateGuard thus constitutes a valuable repository of client data of great interest to a business such as Amazon.

6.     Property managers and tenants rely on GateGuard to keep their buildings safe.

7.     Amazon is not only destroying GateGuard's business by the conduct described above: It is compromising the safety of New York City residents – and *breaking the law*.

8.     Specifically, N.Y. Multiple Dwelling Law § 50-a requires every apartment building in New York State be equipped with a working intercom system. The statute imposes **criminal** liability on anyone "who shall willfully destroy, damage, or jam or otherwise interfere with the proper operation of" such intercoms.

2

9.      This is exactly what Amazon has done. At numerous buildings throughout New York City and in this District, Amazon installed its own devices without permission of building management and has destroyed, damaged, and interfered with the proper operation of GateGuard's intercoms either making the devices appear to be defective, or actually damaging the proper functioning of GateGuard's devices in order to return to the building and propose a security "upgrade" to unsuspecting property managers and owners who did not know of Amazon's initial installation.

10.     Amazon has operated in a ruthless, cut-throat manner, pushing growth at all costs and signing up new buildings at breakneck speed, often without consent and by deceiving building superintendents that they have obtained management or ownership approval.

11.     GateGuard has brought this issue to Amazon's attention repeatedly, even directly to its founder Jeff Bezos, starting in October 2020.

12.     Yet Amazon refuses to take responsibility for its conduct or even to change its deceptive and unlawful practices, despite being on notice that its activities compromise the safety of building residents—including *Amazon's own customers.*

13.     Left with no other choice, GateGuard brings this suit to hold Amazon accountable for the damage it has caused and to prevent Amazon from monopolizing the e-commerce delivery market and further damaging GateGuard and other victims of its anti-competitive conduct.

## THE PARTIES

14.     GateGuard, Inc. ("GateGuard" or "Plaintiff") is a Delaware corporation having a principal place of business at 1521 Alton Road, #888, Miami Beach, FL 331391.

15.      Defendant Amazon.com, Inc. is a Delaware corporation having a principal place of business at 410 Terry Avenue North, Seattle, WA 98109.

3

16.     Defendant Amazon.com Services, Inc., is a Delaware corporation having a principal place of business at 410 Terry Avenue North, Seattle, WA 98109.

17.     Defendant Amazon.com Services, LLC, is a Delaware limited liability company having a principal place of business at 410 Terry Avenue North, Seattle, WA 98109.

18.     Defendant Amazon Logistics, Inc. is a Washington State corporation having a principal place of business at 410 Terry Avenue North, Seattle, WA 98109.

19.     Upon information and belief, Defendants are and were at all relevant times the agents, affiliates, alter egos, partners, assignees, successors-in-interest, or principals of each other or were otherwise responsible for or participated in the performance of the wrongful acts alleged herein, and thereby are jointly and severally responsible for such acts and incurred liability therefore.

## JURISDICTION AND VENUE

20.     This court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this case arises under various federal statutes, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, the Sherman Antitrust Act of 1890, 15 USC § 2, and the Clayton Act of 1914, 15 U.S.C. § 12 *et seq.*

21.     This Court has supplemental jurisdiction over all state law causes of action asserted herein pursuant to 28 U.S.C. § 1367, because Plaintiff's state law claims are part of the same case or controversy.

22.     This Court has personal jurisdiction over Defendants because each of them conducts business in New York and because they have committed torts in the State of New York and in this district.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part

of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district and because Defendants are subject to personal jurisdiction in this judicial district at the time this action has commenced.

## FACTUAL BACKGROUND

### *General*

24.     Amazon has achieved market power in multiple segments of the Internet-based economy.  After beginning as a lowly online bookstore, Amazon now controls 40% of the cloud storage market, 34% of the cloud hosting market, 33% of the cloud infrastructure services market, more than Microsoft, Google, IBM and Alibaba **combined**.[1]

25.     Amazon's complete dominance of the overall e-commerce market is even more striking, as the chart below illustrates. Amazon has the power to dominate markets and is acting in an increasingly cutthroat manner that has attracted the attention of the Federal Trade Commission[2] and senior members of the United States House of Representatives.



---

[1] *See* https://kinsta.com/aws-market-share.

[2] https://www.supplychainbrain.com/articles/30346-walmart-subsidizing-some-vendors-in-price-war-with-amazon (Amazon has also come under scrutiny for increasingly leaning on vendors to ensure that their products aren't offered for a lower price on Walmart.com or any other rival website.

26.     According to a recent report of the House of Representatives' Subcommittee on Antitrust, Commercial and Administrative Law, entitled Investigation of Digital Competition Markets (the "House Antitrust Report"), Amazon controls about 65% to 70% of all U.S. online marketplace sales and is the most-visited website in the world for e-commerce and shopping. In a telling phrase, the House Antitrust Report defines Amazon as the "gatekeeper" for e-commerce, because third parties are virtually compelled to use the Amazon platform for e-commerce sales.

27.     Amazon's most ambitious plan yet is to become the actual, and not merely metaphorical, gatekeeper for urban multi-family residences.

28.     Amazon's goal is nothing less that the monopolization of the e-commerce delivery market and domination of nation-wide package delivery, giving its own products a competitive advantage over rivals and forcing both e-commerce delivery services (from Shipstation.com to Walmart.com) or package delivery services (such as Fed Ex and UPS) to use the Amazon network.

***Amazon Logistics***

29.     Amazon's deliveries are effected through Amazon Logistics Inc., an Amazon subsidiary founded in 2016.  In just a few short years, Amazon Logistics now controls over 20% of the **total package shipping market in the United States** and shows no sign of slowing down. Amazon Logistics' tremendous growth has vaulted it ahead of Federal Express, one of the industry leaders with decades more experience than Amazon logistics.[3] The charts below testify to the explosive growth of Amazon Logistics.

---

[3] https://www.asicentral.com/news/newsletters/promogram/october-2021/report-amazon-surpasses-fedex-in-us-shipping-share/



30.   [4]



[4]https://www.asicentral.com/news/newsletters/promogram/october-2021/report-amazon-surpasses-fedex-in-us-shipping-share/

According to Axios, "Amazon has the potential to decimate UPS and Fed Ex."[5] Amazon's online platform is already undercutting the big players' average shipping rates by up to 33%, according to Freightwaves.  As Axios puts it, Amazon's "tactic is a modern example of putting competition through a Rockefeller-style 'good sweating.'"[6]

31.     Amazon already uses its market power to tie third party sellers on its "Amazon marketplace" platform to its fulfillment and delivery business.  As the House Antitrust report puts it,

> Due to a lack of alternatives, third-party sellers have no choice but to purchase fulfillment services from Amazon. More than 73% of all Marketplace sellers worldwide reportedly rely on FBA services. Numerous third-party sellers told the Subcommittee that they feel they have no choice but to pay for FBA to maintain a favorable search result position, to reach Amazon's more than 112 million Prime members, and to win the Buy Box—through which the vast majority of Amazon sales are made.[1780] A recent consumer survey indicated that 75% of Amazon Prime customers specifically search for products flagged as Prime-eligible. As a result, as the Online Merchant's Guild told Subcommittee staff, many sellers will "say that without Prime you are dead."
> A competing online marketplace described how Amazon effectively forcing sellers into its FBA program makes it more difficult to compete with Amazon for sellers, stating, " [T]hrough anticompetitive strategies and practices by Amazon, many . . . sellers are being pulled into Amazon's tied marketplace-and-ecommerce-fulfilment ecosystem in a manner that makes them not only less independent but directly dependent on Amazon.

### The Last-Mile Delivery Market

32.     In 2016, the year Amazon Logistics was created, industry analyst Mordor Intelligence noted:

> The last mile delivery, being a final leg of logistics is very important, time consuming and also takes a major share in the overall delivery cost. Unlike the normal shipping, where large amount of cargo is transported along a fixed route, the last mile delivery

---

[5] https://www.axios.com/amazon-shipping-bigger-than-fedex-3dc5d80d-e16a-4531-9f45-1898a6261a78.html
[6] *Id.*

involves transportation of goods in multiple routes with low parcel sizes. This cost has been vital for the retailers as the customers' expectations toward the fast and free delivery are growing. So, the companies and retailers are looking at advanced technological solutions and new delivery models to improve the overall process. According to various industrial estimates, the costs associated with the last miles stands around 50% of the overall logistics cost.

33.     Historically, the private package delivery duopoly, UPS and Fed Ex, outsourced last-mile delivery to the US Postal Service ("USPS").[7]  However, Amazon led the way in internalizing the last-mile delivery function, leading UPS and Fed Ex to follow suit.

34.     E-commerce is the major driver of last-mile delivery growth. According to the US census, e-commerce sales for the second quarter of 2021, adjusted for seasonal variation, but not for price changes, was $222.5 billion.  Unlike bricks and mortar retail sales, 100% of all e-commerce sales require last mile logistics delivery.  While Amazon's share of total last mile delivery is not publicly available, if its share of the much larger national parcel delivery market has now surpassed Fed Ex and, likely, UPS, its last mile delivery market share must be even greater.

***The E-commerce Delivery Market.***

35.     Amazon already has market power in retail e-commerce, as the House Antitrust Report recognizes.  Likewise, Amazon has market power over fulfillment logistics for third-party sellers who sell through the Amazon marketplace, as reflected in the 73% fulfillment rate for third party sales on the Amazon platform. If Amazon controls 70% of the online marketplace (with its own sales aggregated with third party sales) and its own sales amount to 50% of all online sales, this means that it must control in excess of 60% of all e-commerce deliveries. This

---

[7] https://www.savethepostoffice.com/postal-service-delivers-last-mile-almost-changing-modes-delivery/#:~:text=The%20Postal%20Service%20helps%20out%20FedEx%20and%20UPS,it%20does%20best%20%E2%80%9D%20%E2%80%94%20last%20mile%20delivery.

is a distinct delivery market, since UPS, Fed Ex and USPS have essentially zero market share in e-commerce delivery.

36.     Here, Amazon has the market power to achieve its ultimate goal—the monopolization of the entire e-commerce delivery market and the achievement of a dominant position in package delivery generally.

37.     Control of the ecommerce delivery market will feed back into and further reinforce Amazon's domination of the e-commerce market and position it to destroy FedEx and UPS as competitors as well or turn them into clients.

***Residential Apartments and the Amazon "Key" to Control***

38.     In large urban environments, the vast majority of the population lives in multi-family apartments.  In New York City, for example, 84% of the housing stock is in multi-family apartment buildings. https://furmancenter.org/thestoop/entry/report-growth-in-nycs-housing-stock-is-outpaced-by-growth-in-adult-populati.

39.     All apartment buildings are required by law to have an intercom or access control system of some kind, and the intercom market in New York alone consists of hundreds of different companies. Just a few of these companies include Computer Integrated Services of New York, Advanced iCam New York, Intercom in NYC, Hillman Intercom, CBSIntercom Systems, Johnson Integrated Security Systems, United Security Systems, Easy Intercom, Parker Intercom Service and Brooklyn Intercom.  Control of access to residential multi-family dwellings is the key to domination of the delivery market.

40.     Technologically, building access requires a door-access device.  In 2019, Amazon hit on the solution, which it calls the Amazon Key for Business, or "Key for Business" for short.

10

41.     The Key for Business is a small device that can be inserted into existing access devices or systems through an "extender" described in more detail below, or by being directly wired into an existing access system's wiring. The Key can remotely controlled and, once installed, Amazon deliverers can use it to obtain building access 24/7 without the intervention of any third parties.



42.     To install its Key for Business, Amazon lies to building superintendents, claiming to have received authorization to install its device when it has not received such consent, and then illegally tampers with already installed devices, such as the GateGuard intercoms, to place

an "extender" inside the electronic devices belonging to others, including GateGuard, enabling Amazon to "piggy back" on the authorized access granted to parties such as GateGuard, bypassing landlords, property owners and other third-party access providers.  The Amazon Key "brain" pictured above is wired directly into or onto the GateGuard circuitry, often shorting the device and lock mechanisms due to polarity or voltage mismatches, as shown in more detail below, beginning on paragraph 89.

***Key for Business is Designed so Amazon Can Dramatically and Cheaply Increase the Speed of its Deliveries, and Ultimately Control the E-Commerce Delivery Market .***

43.     Amazon's true motivations for deploying Key for Business are to control residential building access, thereby increasing the volume and speed of its deliveries to apartment buildings and becoming an essential service through which it can ultimately control the ecommerce delivery markets.

44.     By installing its Key for Business within or on top of existing intercom/access control devices of third parties, Amazon can effectively control the e-commerce delivery market entirely.  This is so because, with the priority, 24/7 access of the Amazon Key, Amazon deliveries can be made at any time, without the need to gain entry to the building from the customer, superintendent, or intercom/access controller.  Other e-commerce retailers will not be able to compete with Amazon for delivery and will be forced to use Amazon's delivery service for a fee, thus making competitors customers.

45.     Crucially, through the Key for Business, Amazon Logistics can obtain a decisive cost advantage over competitors. The chart below shows the magnitude of escalating cost issues for Amazon (and for all delivery companies).



46.   One of the main drivers of escalating costs in the congested urban environment is a lack of parking or extended standing places in the urban environment. Deliverers are forced to spend time and gas circling buildings, attempting multiple re-deliveries or cancelling deliveries altogether and incurring customer ill-will.  With the Amazon Key, deliverers can offload and deliver to a common delivery area inside the residence multiple packages in minutes.

47.   In addition, by ensuring more rapid, reliable deliveries through its Key, Amazon can market a faster, more efficient package delivery service not only for its own products, but also for third-party deliveries.  E-commerce rivals will be unable to match Amazon for speed and reliability and will be forced to use Amazon for their deliveries.  With total control of the delivery market, Amazon can engage in the other anti-competitive conduct identified by the House Antitrust Report: appropriation of third-party data, self-preferencing and extraction of anti-competitive user fees.  Amazon can then create a "feedback" loop to further reinforce its

dominance of e-commerce retail, further enhancing its market power to dictate price at the expense of consumers.

48. With a built-out "Key" network, Amazon can offer its delivery service to Fed Ex, UPS and others as an unavoidable "last mile" delivery service, thus thwarting its competitors' services and forcing these competitors to become its own customers.

49. As a result of the foregoing, ***Amazon has been able to double the delivery quotas imposed on its drivers***, increasing the volume of deliveries from 125-150 packages a day to 300 packages in the same time period, as documented by one well-informed commentator:



50. As bad as the conduct by Amazon alleged above was prior to 2020, it got worse when ecommerce activity increased during the COVID-19 pandemic, as Amazon saw an opportunity to monopolize the e-commerce delivery markets. Much as Amazon cloud services have become central to the Internet in such a way that natural competitors are compelled to turn to Amazon rather than develop rival technology, Amazon's aim is to develop its delivery system so

extensively that rivals will find it cheaper to turn to Amazon Logistics for their deliveries than to ensure such deliveries on their own.[8]

51.     With a built-out access control network, Amazon can also offer its delivery service to Fed Ex, UPS and others as an unavoidable "last mile" delivery service, thus cannibalizing its competitors' services while simultaneously forcing these competitors to become its own customers. Amazon's ubiquitous vans and trucks provide a vivid illustration of Amazon's dominant and growing power.

***Amazon's Patterns of Lies and Deception About its Key for Business***

52.     In its press release announcing the Key for Business,[9] Amazon claimed that its Key for Business "allows building owners and managers to give controlled access to delivery drivers to drop off Amazon packages to their residents[.]" This press release was materially false when made because Amazon intended from the outset to bypass the property owners and deceive superintendents and managers, tricking them into believing no owner or third-party consent was necessary.

---

[8] Media reports document that Amazon's efforts have come at the expense of the health and safety of these drivers. Lauren Kaori Gurley, *Amazon Delivery Drivers Are Overwhelmed and Overworked by Covid-19 Surge*, Motherboard (July 1, 2020) https://www.vice.com/en/article/m7j7mb/amazon-delivery-drivers-are-overwhelmed-and-overworked-by-covid-19-surge (documenting how Amazon's "punishing culture" and "skyrocketing quotas" "made conditions for Amazon's roughly 75,000 delivery drivers grueling and dangerous" including by forcing drivers to violate traffic and safety laws and forego lunch and bathroom breaks to meet Amazon's expectations). *See also* Patricia Callahan, *Amazon Pushes Fast Shipping but Avoids Responsibility for the Human Cost*, N.Y. Times (Sept. 5, 2019) https://www.nytimes.com/2019/09/05/us/amazon-delivery-drivers-accidents.html (documenting how Amazon's "relentless push for e-commerce dominance" pressures its drivers into unsafe situations, but when accidents result, Amazon goes to great lengths to "shields itself from liability").

[9] https://press.aboutamazon.com/news-releases/news-release-details/key-amazon-introduces-new-products-and-services-expand-its (last accessed April 15, 2021).

53.     Promotional materials further the sales pitch that "Amazon Key for Business is completely free and perfect for apartments, gated communities, and office buildings. . . Amazon Key for Business (KFB) connects with a smart fob to let building owners and managers safely & seamlessly grant access to Amazon's fully vetted and tracked delivery drivers."

54.     Amazon's website[10] claims that Key for Business "works seamlessly with" and "does not disrupt the existing building access system." Amazon repeats the same claims in direct communications with prospective customers.

55.     These claims are false.

56.     Amazon knows these claims are false.

57.     A recently posted video provides further insight into Amazon's sales tactics:



KFB Sales Pitch Example

---

[10] https://www.amazon.com/b?ie=UTF8&node=18530497011 (last visited April 11, 2021).

58.     In this video,[11] an individual identified as one of Amazon's "Regional Directors" explains how Amazon's sales representatives promoting KfB to building owners can leverage Amazon's prominence to gain the trust of business owners ("Amazon is a very respected business" with "such a big name").

 



59.     In the video, ***Amazon sales reps are explicitly encouraged to keep their pitch as "simple" as possible so that potential targets – low level managers and superintendents – do not "get nervous" and can be tricked into signing a contract with Amazon without "feel[ing] the need" to contact "a higher up".***

60.     Amazon also uses deceptive language to promote its Key for Business.

61.     In written and verbal communications with prospective customers, Amazon is

---

[11] https://www.youtube.com/watch?v=jpD20m4d_mE (last visited April 14, 2021).

careful to characterize Key for Business as an "update" or a "necessary upgrade to [Amazon's] delivery system."

62.     For example, the above-referenced video documents how Amazon describes KfB to building owners as a "necessary upgrade[] to [Amazon's] delivery system:"



63.     This is of course a complete lie as Amazon is not updating or upgrading any of its own delivery devices, but is interfering with, and attempting to override, the existing access devices already installed at the gate.

64.     Amazon uses this deceptive language knowing few consumers will question or forgo an "update" or "upgrade" Amazon says is "necessary."

65.     In the promotional materials attached to this email Amazon insists that Key For Business is simply an update and "procedural fix," even though it does not actually update any Amazon products.

66.     Amazon also lies in its promotional materials that its product will not interfere with existing commercial access methods, deliberately pretending it will seek business owner consent for installing its devices and conflating residents' access with the access control of third-parties controlling commercial including GateGuard, other intercom providers or the property managers

or business owners themselves:

> Amazon Key for Business is a new ==security update== and ==procedural fix== for delivering packages to multi-family buildings. Amazon will now use AWS cloud technology to track our packages and track our delivery drivers. Building owners and managers who participate in the ==update==, will use this same cloud technology to control access of Amazon delivery drivers and create specific package delivery instructions for your building.

> **Q: Will Key for Business change the existing access experience for my residents?**

> A: Your residents can continue to use their existing access methods. ==Key for Business does not disrupt the existing building access system.==

67.     In reality, as described above, Amazon sales reps are specifically instructed to make the sale with lower-level individuals, such as a superintendent, without seeking the consent of "higher ups," *i.e.*, the landlord or property manager.

***Amazon Falsely Claims Key for Business "Does Not Disrupt" Intercoms***

68.     In promotional materials and other documents used to promote Key for Business to consumers, Amazon falsely claims its device can be added to any existing "control system" in a "secure" manner, deliberately concealing the fact that its device interferes with and is used to disable third-party control systems.

## Can the device be physically hacked and allow intruders into my apartment building?



==Installing Key for Business to any control system you have is completely secure.== The device is designed to prevent physical hacking

**Building Access Controller FAQs – Security and Control**



- How secure is installing another access control device in my building? Can it be physically hacked and allow intruders into my apartment building?
  - ==Installing "Building Access Controller" to any control system you have is completely secure.== The device is designed to prevent physical hacking.

69.    On its website,[12] Amazon claims that Key for Business "works seamlessly with" and "does not disrupt the existing building access system."

**5. Will Key for Business change the existing access experience for my residents?**

Your residents can continue to use their existing access methods. Key for Business does not disrupt the existing building access system.

70.    These claims are false.

71.    Far from "completely secure," Amazon's Key for Business *itself* is a serious security risk for buildings. In many instances, Amazon's Key for Business installations interfere with or destroy a building's primary intercom, electric door locks, and other components.

72.    Contrary to Amazon's representations, by disabling or destroying the building's primary access system, Key for Business plainly *does* "allow intruders into. . . apartment building[s]" since the device is designed to perform one function and one function only: ensure that Amazon drivers can make deliveries into buildings without resident, superintendent, property manager or third-party control or approval.

***Amazon's Relentless Hounding of Potential Customers***

73.    In addition to its deceptive sales tactics, Amazon is relentless in pushing the installation of Key for Business. Customers report that Amazon's representatives hound them incessantly (by phone, email, and in person)[13]:

---

[12] https://www.amazon.com/b?ie=UTF8&node=18530497011 (last visited April 11, 2021).

[13] *See, e.g.,* https://www.multifamilyinsiders.com/apartment-ideas/the-front-lines/17596-all-i-want-for-christmas-is-to-be-off-of-the-amazon-key-call-list (last accessed April 15, 2021), including reports such as:
- "They're relentless!!"
- "I'm about to get a restraining order."
- "Omg. They are THE WORST. I can't be more clear at this point and they continue to call. It is so annoying and disruptive."

*See also* https://www.multifamilyinsiders.com/apartment-ideas/the-front-lines/18024-any-communities-out-there-using-amazon-key-for-business-pros-cons (last accessed April 15, 2021):





**Zukos Mother**
@ZukosMother

The amazon key for business people are relentless like
LEAVE ME ALONEEEE

*Amazon Ignores Management's Instructions and Installs Key for Business Without Consent*

74.     Unsurprisingly, Amazon's hard-ball sales tactics have been successful. Occasionally property managers begrudgingly relent and allow Amazon to install Key for Business, taken in by Amazon's lies that the device will not interfere with its existing access control system.

75.     Often, however, a firm "*no*" does not stop Amazon. When their aggressive tactics fail, Amazon sales reps proceed to the location and install Key for Business anyway – ***without*** *the property owner's consent.*[14] To avoid the consent of management entirely, Amazon reps are instructed to seek out and pressure lower-level employees to close a deal quickly so the nervous

---

- "They pressured us to get installed quickly, but none of the drivers even know what it is…. I think it's all a scam[.]"
- "Not only did nothing change but everyday we get solicited by Amazon and asked if we want this service that we already have…. [O]ur deliveries with them have gotten worse if that is possible."

[14] https://www.multifamilyinsiders.com/apartment-ideas/the-front-lines/18024-any-communities-out-there-using-amazon-key-for-business-pros-cons (last visited April 11, 2021).

employees will not contact "higher-ups."

**Any communities out there using Amazon Key For Business? Pros? Cons?**   2 weeks 1 day ago

Tweet   Amazon has been to my property numerous times attempting to sell me on Amazon Key and ==I kept telling them no== as we have
always opened our gate for delivery drivers as soon as we see them pull in. ==One day, our gate malfunctioned.== When our
control access vendor came out to look, ==they noticed an Amazon box was installed (Amazon Key)== in our control panel. ==When
they installed it, they ripped out a main wire which was pricey to replace.== After numerous calls to Amazon, I'm still trying to get
reimbursed.
The fact they did this has rubbed me the wrong way entirely as ==this was done without consent.==

76.     Based on the number of social media posts discussing this phenomenon, it is
reasonable to infer that Amazon is systematically installing its Key for Business devices without
consent.

### *GateGuard's Falls Prey to Amazon's Ruthless Tactics*

77.     On information and belief, Amazon has installed its Key for Business devices at
over 40 buildings where GateGuard was already installed, either without the property owner's
consent or by misrepresenting the effect the Amazon device would have on the GateGuard
intercoms and resulting in the malfunctioning of GateGuard equipment, customer complaints, loss
of revenue and loss of goodwill.

78.     The consequences of Amazon's conduct have been devasting to GateGuard. ***The
company has lost contracts covering a total of 310 buildings as a result of Amazon's tactics***.
When a device malfunctions at one building as a result of Amazon's actions, GateGuard loses the
entire portfolio of buildings operated by a single manager.   Thus, Amazon's conduct has a
devastating multiplier effect on GateGuard's business, resulting in millions of dollars in lost
revenues.   Most importantly, at none of these buildings did GateGuard authorize the installation
of Amazon's Key for Business into its own devices and, on information and belief, none of the
installations were authorized or authorized with full disclosure.

79.     Property managers have retaliated against GateGuard, rather than Amazon, not

knowing the full story and not considering the possibility that Amazon would operate in the ruthless and anti-competitive manner discussed herein. This has damaged GateGuard directly in its earnings as well as falsely damaged GateGuard technology's reputation in the industry.

80.     As noted, Amazon achieves these unauthorized installations by arriving at a building and (falsely) representing to unwitting residents or building personnel that the building's management has authorized Amazon to install Key for Business. This strategy has been documented over and over, as indicated below:

### Amazon Key 4 Business

Last Monday, a couple guys buzzed my apartment saying they were from "Amazon Key." I came downstairs to the front of my building. One guy showed me a lanyard with the Amazon logo and said that they're hear because we've had reports of stolen packages (which is actually true) and they'd like to install an Amazon Key device in my buzzer to allow Amazon drivers access to our building. I asked if they'd spoken to my landlord, and they claimed that they had, he was okay with this (they had his name written down on their iPad) and they just needed someone on site to authorize this. It felt fishy, but I guess because of a momentary lack of judgement or pressure, I went ahead and scheduled the appointment for the next Monday.

After the appointment I texted some friends and Googled this, and came across this article, which sounded similar to my experience. My friends also said it sounded sketchy.

https://www.10news.com/news/local-news/new-scam-targets-local-amazon-customers-worried-about-package-thefts

I called the phone number on my confirmation email (which was from "noreply@amazonkey4business.com", another flag) and a not-so-professional-sounding Rep answered the phone. I asked to cancel and for a confirmation email. The rep agreed, but I never received a confirmation email. I then emailed my landlord and my landlord said that someone had contacted him, but he never authorized anything and didn't want this set up.

81.     When representatives of one of the world's largest and best-known companies represent that they have secured authorization to install equipment, it is little surprise that building personnel and tenants often trust these representations and allow Amazon to install Key for

Business.

82.     Amazon has followed this same "playbook" to install Key for Business at no fewer than a dozen buildings that utilize GateGuard's intercoms, without authorization and in a manner that intentionally or recklessly damages GateGuard's devices. The damage to GateGuard's business has a multiplier effect, as landlords who have been deceived into believing GateGuard malfunctions at one building cancel contracts covering dozens of additional buildings throughout Manhattan.

83.     This is not conjecture. GateGuard has specific proof that Amazon lies to building superintendents to install Key for Business inside the GateGuard intercom, as evidenced in the following dialogue between a GateGuard representative and a building superintendent:



84. GateGuard contacted building management who confirmed they had *not* authorized Amazon's installation:



From: ██████ ███████████████████████ >
Date: Wed, Oct 21, 2020 at 12:54 PM
Subject: Re: ████████ █ ██████ & ██ West ████ Street
To: ██████████ █████████ >
Cc: ████████████████ < ████████████████ >, ████████ ████████████ >

==I didn't authorize anything from Amazon.==  No one ever contacted me for anything from them.

85.     Not only was the installation of Key for Business unauthorized by building management, it was _**never**_ discussed with _**GateGuard,**_ which, under its contract, has _**exclusive**_ control over package management and access control devices on each building where it is installed. Amazon knows GateGuard has an agreement with the property manager for operation of its intercom and, as a sophisticated market participant, knows that no intercom provider would agree to allow another company to install their equipment on top of its own without consent and thus knows that it is intentionally interfering with GateGuards contractual relations with the property owners.

86.     Generally, GateGuard only learned of the installation after the client complained that the intercom – which had had no problems prior to the surreptitious insertion of the Key for Business into Gateguard's device – was now malfunctioning, leaving it with no effective remedy other than to demand damages from Amazon, which Amazon refuses to pay.

87.     The reason that Amazon's Key for Business is so damaging to GateGuard's intercom is that the Amazon device is installed directly onto the GateGuard circuit board or wiring that is connected directly to the circuit board, often "shorting" the devices and rendering them inoperable.

88.     Even though Amazon operates in great secrecy, GateGuard has been able to catch Amazon "red-handed" tampering with its intercom device.

89.     The image immediately below shows Amazon's extender, a subway-ticket size device that needs to be inserted in or connected to an existing intercom or access control system:



90.     At one building in Manhattan, GateGuard discovered this "extender" device inserted and connected inside GateGuard's intercom. The picture shown below is the back of a portion GateGuard's intercom. The extender device has been wedged onto Gateguard's blue circuit board; the green strip connecting the extender wires to a separate Amazon device can be seen on the bottom right and the grey "bubbles" that can be seen on the upper left-hand portion of the extender in paragraph 89 can be seen on the upper right-hand side of GateGuard's case below:



91.     By connecting its device into the GateGuard intercom, Amazon can illegally "free-ride" off of GateGuard's product while being placed on or near GateGuard's circuitry resulting in malfunctioning that is blamed on GateGuard.

92.     The dangerous placement of Amazon's unauthorized device can be clearly seen in paragraph 90. Circuit boards are incredible delicate electronics which are protected by cases and should not have even the tiniest unauthorized objects – let alone an entire alien circuit board – pressed against them. The insertion of the smallest objects on top of a circuit board cause an electric short, a broken part, or other permanent injury to the board. In this case, by wedging its "extender" into GateGuard's case, Amazon damaged GateGuard electronic components, irreparably destroying the intercom screen.

93.     The flip side of this circuit board clearly identifies it as an "extender," which is a device that "extends" the functionality of another device, in this case, GateGuard's intercom.



94.     The "extension" benefits Amazon and harms GateGuard, by shorting its device, damaging the intercom screen, and disabling other electronic components.

95.     The "extender" is clearly connected to the Amazon Key for Business device, as shown by the sticker on the reverse of the device identifying the model name, number and FCC ID, as well as the amazon.com website specifying ownership of the product.

96.     The FCC ID clearly identifies Amazon.com Services Inc. as the "applicant/grantee", as shown below:

28



97.     In addition, GateGuard has captured video of Amazon technicians tampering with multiple GateGuard devices.[15] Set forth below are images from the video showing Amazon technicians after they illegally opened the GateGuard® device without authorization and destroyed it:

---

[15] https://drive.google.com/file/d/1sFlE7808kHtjKajLsomDTwzTI3w1zlic/view
https://drive.google.com/file/d/1Xtry9xVKCv1-VRr2NyqpNvvDV03XjT4L/view





97.    In the videos, Amazon employees wearing the jacket with the familiar Amazon prime half-moon ascending arrow logo can be seen installing a device into the existing intercom at a building served exclusively by GateGuard.  Amazon did not obtain the consent of either GateGuard or the property owner for the installation of its Key.

***Amazon's Key for Business Installations Routinely Damage Intercoms, Door Locks, and Wiring***

99.    On approximately 20 different occasions, building management have called GateGuard to repair or replace disabled intercom devices. These calls cost GateGuard time and money in support and repair, and it is likely that there are many more incidents that are not reported, causing even greater disruption to customers and loss of business.

100.    GateGuard logs have caught Amazon-branded technicians tampering with GateGuard on multiple occasions.





101.    Each time GateGuard has been called by building management, GateGuard has discovered that Amazon tampered with its intercoms, including by inserting and connecting Amazon's extenders, a crucial component of the Key for Business "upgrade responsible for the damage described above.

102.    On information and belief, Amazon's actions are not isolated instances, but are systematic business practices designed to destroy competition. The numerous on-line complaints and the confirmation that Amazon representatives lie about their authority to install equipment as discussed above provide a reasonable inference that Amazon's practices are widespread.

103.    As shown in the Twitter dialogue reproduced below, when installing Key for Business – with or without authorization from building management – Amazon routinely disables or destroys existing intercom devices, door locks, and wiring:



104.    After Amazon began aggressively seeking to control the building access market,

GateGuard has received dozens of complaints and has been able to prove that these are directly

related to Amazon's conduct.

105.    As discussed below, GateGuard has confronted Amazon with evidence of its misconduct and, rather than compensating GateGuard for the damage caused, on information and belief, Amazon has profited from the information provided by GateGuard to surreptitiously reinstall its devices to cover up its initial illegal tampering. On information and belief, all of the customer complaints relating to GateGuard devices failing after an Amazon Key installation are a direct result of Amazon's conduct. In addition, many instances of illegal installation remain undiscovered, continuing to put GateGuard's equipment at risk (because some devices short repeatedly and only fail over time) and continuing to provide Amazon with unearned benefits from its illegal free-riding conduct.

106.    As a result of Amazon's conduct, GateGuard customers, residents and others have come to believe falsely that GateGuard's intercom systems are defective or that they are otherwise less desirable or valuable to building owners than the Amazon systems that have been illegally inserted into GateGuard intercoms.

***Amazon Attempts to Avoid Detection***

107.    To prevent detection, particularly after it learns that a savvy access control provider such as GateGuard has become aware of its tactics, Amazon removes its "extenders" from GateGuard's devices after they have been sufficiently damaged.

108.    GateGuard has been told by building managers that Amazon misleads them, claims the extenders had nothing to do with any malfunctioning of GateGuard's devices and then returns to the building to install a new device that it now presents as an "update" that will avoid the problems with the previous access control system. Since the property managers were in many, if not most situations, unaware of the initial installation, they can easily be duped by Amazon. Even in rare situations where the property managers authorized the installation, they were not informed

35

of the manner in which Amazon would install its Key directly into GateGuard's intercom or onto its wiring, leading the property managers to believe Amazon's lies that their product had nothing to do with GateGuard's malfunctioning.

109.    As a result of Amazon's conduct, GateGuard has suffered reputational harm, diminished customer loyalty, and loss of revenue and other valuable commercial relationships, both existing and prospective.

***Amazon Reveals its Intentions***

110.    In October of 2020, GateGuard approached Amazon and provided considerable evidence of its destructive and unlawful conduct (including the evidence incorporated above).

111.    In addition to denying any responsibility for its conduct, Amazon "gaslit" GateGuard, suggesting that the failure of GateGuard devices identified as having been the result of tampering by Amazon was not because of anything done by Amazon but, rather, was GateGuard's fault.

112.    Amazon's arguments to this effect, however, were unsubstantiated, unsupportable and false.

113.    Although Amazon evinced interest in further discussions to explore a potential resolution, when the parties met, Amazon refused to cease installing Key for Business in a manner that damaged GateGuard and merely offered to enlist GateGuard as a Key for Business installer, for which GateGuard would be paid a nominal fee.

114.    Amazon characterized the Hobson's choice it presented to GateGuard (which was recorded on video by GateGuard) along the lines of, "***either [Amazon] can cost you money or make you money***." This is exactly the strategy Amazon aims to deploy with other potential rivals, turning itself into the essential gatekeeper, relegating third parties, at best, to an "adjunct" role and

36

making it prohibitively expensive for others to provide rival and truly competitive access solutions. In the long run, this strategy aims not only to control the access market, but, ultimately, to control the ecommerce and package delivery markets generally.

***Summary of Amazon's Anti-Competitive Conduct***

115.    Amazon is not achieving dominance of the building access and e-commerce delivery markets by technological innovation, but by deception, harassment, ruthlessness, and blatantly illegal conduct, such as the unauthorized accessing of and tampering with GateGuard and other parties' devices, and the pattern of lies and misrepresentations through which it deceives lower-level apartment personnel to permit installation of the Key without the need to contact and consult the "higher-ups."

116.    The House Antitrust Report documents Amazon's brazenly anti-competitive behavior, highlighting Amazon's bullying, appropriation of third-party seller data, imposing fees on captive users of its platforms, "self-preferencing" and abusing its "gatekeeper power."  Much of the House Antitrust Report evokes patterns strikingly similar to the conduct that has so damaged GateGuard, and underscores the anti-competitive purpose underlying Amazon's deceptive, illegal and cut-throat practices: "Once Amazon succeeds in trapping enough customers in its "flywheel" to secure dominant position across varied markets, it can then raise prices or remove incentives or allowances for third party sellers/competitors." Damning as it is, however, the House Antitrust Report is not the only source of information for Amazon's history of anti-competitive practices.

117.    Reuters recently reported that it had reviewed thousands of pages of internal Amazon documents – including emails, strategy papers and business plans – that show the company ran a systematic campaign of creating knockoffs and manipulating search results to

boost its own product lines in India, one of the company's largest growth markets. The documents reveal how Amazon's private-brands team in India secretly exploited internal data from Amazon.in to copy products sold by other companies, and then offered them on its platform.[16] On information and belief, Amazon has stolen GateGuard's proprietary data in a similar manner.

118.     The conduct of which GateGuard and others have been victim in fact represents the anti-competitive DNA at the core of the Amazon business model.

## CAUSES OF ACTION

## COUNT I.

### COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 *et seq*.)
### (AS TO ALL DEFENDANTS)

119.     GateGuard realleges and incorporates by reference each and every allegation set above.

120.     GateGuard's devices are "high speed data processing device performing logical, arithmetic, or storage functions" and thus come within the definition of "computer" under the Computer Fraud and Abuse Act,  18 U.S.C. § 1030(e)(1).

121.     GateGuard's intercom devices are involved in interstate and foreign commerce because they control packages and other deliveries to residential dwellings that originate from locations both inside and outside of the State of New York. As a result, GateGuard's intercoms are "protected computers" under 18 U.S.C. § 1030(e)(2).

122.     Upon information and belief, each of the Amazon Defendants knowingly and intentionally accessed GateGuard's intercom devices without authorization or in excess of

---

[16] https://www.reuters.com/investigates/special-report/amazon-india-rigging/

authorization, and thereby obtained and used valuable information from those devices, including customer locations, accounts, and id's, in violation of 18 U.S.C. § 1030(a)(2)(C).

123.    Upon information and belief, each of the Amazon Defendants intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage in violation of 18 U.S.C. § 1030(a)(5)(B).

124.    Each of the Amazon Defendants caused loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also caused damage affecting ten or more protected computers during a one-year period under 18 U.S.C. § 1030(c)(4)(A)(i)(I).

125.    Amazon's imposition of ever increasing delivery quotas as part of its illegal scheme described herein poses a direct threat to public health and safety, harming both the drivers and installers and also leading to reckless driving conduct, in violation of 18 U.S.C. § 1030(c)(4)(A)(i)(4).

126.    GateGuard has suffered damage and loss as a consequence of Defendants' actions, including but not limited to the cost of investigating and responding to unauthorized access and abuse of its intercom devices, conducting damage assessments, restoring and replacing intercom devices, wiring, systems, or information, termination of contracts,  the loss of existing and future business, and the harm to GateGuard's operations, reputation and goodwill as described above, all in an amount to be determined at trial, together with attorneys' fees and  other equitable relief under 18 U.S.C. § 1030(g).

## COUNT II.

**TORTIOUS INTERFERENCE WITH CONTRACT UNDER NEW YORK LAW
(AS TO ALL DEFENDANTS)**

127.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

128.    GateGuard has entered into valid contracts with the owners or authorized agents of the residential dwellings at which Plaintiff's intercom devices were installed.

129.    Defendants were aware of these contracts as evidenced by their misrepresentation of their authority to access and tamper with Gateguard's devices.

130.    Defendants intentionally procured the breach of GateGuard's contracts with landlords and property managers by causing the intercom devices to malfunction and the causing the termination of contracts with GateGuard under false pretexts. In fact, GateGuard's contracts do not permit termination when the devices have been damaged by a third party due to no fault of GateGuard's.

131.    Plaintiff has suffered damages as a result of Defendant's intentional interference with their contractual relations with landlords and their agents in an amount to be determined at trial.

## COUNT III.

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
UNDER NEW YORK LAW
(AS TO ALL DEFENDANTS)**

132.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

133.    Defendants intentionally and wrongfully interfered with future economic advantage to be received from existing customers through the extension of their contracts with Plaintiff and from future customers who will be deceived into thinking Plaintiff's rival product to the Key for Business is responsible for the equipment malfunctioning.

134.    Plaintiff has lost existing customers, future business from such customers and prospective customers as a result of Defendants' wrongful conduct, including their unauthorized access to Plaintiff's intercom devices and their tampering with and manipulating said devices to cause them to malfunction.

135.    Plaintiff has also been delayed in fulfilling new, revenue-generating devices as its installers were forced to rush to repair extensive damage caused by Amazon's illegal installations, losing that revenue-generating time forever.

136.    As a result of Defendants' tortious interference with prospective economic advantage, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT IV.

### TRESPASS TO CHATTELS UNDER NEW YORK LAW
### (AS TO ALL DEFENDANTS)

137.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

138.    Defendants intentionally impaired the condition, quality and value of Plaintiff's intercom devices by means of their unauthorized access to such devices and their manipulation and tampering with the devices in such a manner as to impair their proper functioning and deprive Plaintiff of the economic benefit therefrom.

139.    As a result of Defendants' intentional impairment of the condition, quality and value of Plaintiff's intercom devices, Defendants have committed trespass to chattels and are liable to Plaintiff for damages in an amount to be determined at trial.

## COUNT V.

### WRONGFUL MISAPPROPRIATION UNDER NEW YORK LAW
### (AS TO ALL DEFENDANTS)

140.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

141.    Defendants wrongfully and dishonestly, by means of subterfuge and deceit, applied Plaintiff's intercom devices to their own use, installing their extenders without authorization to benefit from Plaintiff's devices without paying compensation or obtaining consent.

142.    As a result of Defendants' wrongful misappropriation, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT VI.

### CONVERSION
### (AS TO ALL DEFENDANTS)

143.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

144.    GateGuard is the legal owner of the intercom devices installed at residential dwellings under contract with it.

145.    By accessing GateGuard's intercoms without authorization and using and misusing the devices so as to install the Key for Business, Defendants wrongfully exercised dominion over Plaintiff's intercom devices.

146.    As a result of the ensuing conversion of Plaintiff's property, Plaintiff has suffered damages in an amount to be determined at trial.

## COUNT VII.

### UNJUST ENRICHMENT
### (AS TO ALL DEFENDANTS)

147.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

148.    Defendants were enriched by their practice of installing the Key for Business inside Plaintiff's intercom devices without consent by illegally "free-riding" on the work that Plaintiff had performed to connect and wire its devices to the electrical circuits in the residential buildings under contract to it.

149.    Defendants' actions occurred at the expense of Plaintiff in that Defendants' free riding also involved tampering with and manipulating the intercom devices in such a manner as to cause the devices to malfunction while maintaining the functionality of Defendants' Key for Business.

150.    It would be against equity and good conscience to permit Defendants to profit from their unauthorized, wrongful and damaging conduct.

151.    As a result of the foregoing, Defendants have been unjustly enriched in an amount to be determined at trial.

## COUNT VIII – CLASS CLAIM.

**ATTEMPTED MONOPOLIZATION
UNDER THE SHERMAN ANTITRUST ACT OF 1890,
15 U.S.C. § 1 et seq.
CLAYTON ACT OF 1914 § 4
(AS TO ALL DEFENDANTS)**

152.    GateGuard realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs above.

153.    Amazon unquestionably exerts market power in the e-commerce delivery market. Based on statistics showing dramatically increasing market share, at the end of 2020, Amazon already controlled more than 60% of the e-commerce delivery market, an already staggeringly high percentage for a single company, and easily substantial enough for a determination that Amazon has market power in the relevant market. Moreover, the continued explosive growth of e-commerce and e-commerce deliveries as the economy entered its second year of the Covid pandemic indicate this percentage is likely now 5-10 points higher.

154.    Amazon has a specific intent to monopolize the e-commerce delivery market, as can be easily inferred from the anti-competitive conduct Amazon has displayed in its dealings with GateGuard, third-party access device providers and property owner, and its specific comments to GateGuard.  Proof of anticompetitive or exclusionary conduct may be used to infer specific intent to monopolize. *Volvo N. Am. Corp. v. Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).

155.    The anti-competitive conduct detailed in this Complaint, consistent with the business practices identified by the House Antitrust Report and independent news agencies such as Reuters, combined with Amazon's unquestionable market power, give Amazon a dangerous probability of succeeding in monopolizing the e-commerce delivery market.

156.    GateGuard and the other members of the proposed class have suffered anti-trust injury for which Clayton Act treble damages and attorneys' fees are available.

157.    As a result of the foregoing, GateGuard and the other members of the class are entitled to treble damages and attorneys' fees, in a total amount to be determined at trial.

## CLASS REPRESENTATION ALLEGATIONS

158.    The Class Members are so numerous that their individual joinder herein is impracticable. On information and belief, the Class Members number in the thousands. Members of the class include not only rival access control device providers who have suffered similar injury to GateGuard's, but also other package delivery services, e-commerce retailers, and property owners. The precise number of Class Members and their identities are unknown at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the records of Defendants.

159.    Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to, the extent of Amazon's market power in the relevant market, whether Amazon Key for Business was installed at multi-family residential buildings without consent, whether Amazon lied to building representatives about its authorization to install its access "key," whether Amazon tampered with intercom or other access devices, whether Amazon sought to turn rivals into unwilling customers, whether Amazon has a specific intent to monopolize the e-commerce delivery market and whether Amazon has a dangerous probability of succeeding in monopolizing the market.

160.     The claims of GateGuard are typical of the claims of the Class Members in that all class members must prove Amazon's market power in the relevant market, anti-competitive conduct on the part of Amazon, such as the pattern of deceit and illegally tampering of which GateGuard was a victim, all class members must prove Amazon's specific intent to monopolize as directly expressed to GateGuard by an Amazon representative and all Class Members must establish that Amazon has a dangerous probability success.

161.     GateGuard is an adequate representative of the Class because its interests do not conflict with the interests of the Class Members it seeks to represent, it has retained competent counsel experienced in prosecuting class actions, and it intends to prosecute this action vigorously.

162.     The interests of Class Members will be fairly and adequately protected by Plaintiff and its counsel.

163.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

**WHEREFORE**, Plaintiff demands judgment:

(1)      Under Count I, for damages resulting from Defendants' violation of the Computer Fraud and Abuse Act in an amount to be determined at trial, together with attorneys' fees and costs;

(2)      Under Count II, for damages resulting from Defendants' tortious interference with contract in an amount to be determined at trial, together with attorneys' fees and costs;

(3)      Under Count III, for damages resulting from Defendants' tortious interference with prospective economic advantage in an amount to be determined at trial resulting from Defendants' interference with together with attorneys' fees and costs;

(4)      Under Count IV, for damages resulting from Defendants' trespass to chattels in an amount to be determined at trial;

(5)      Under Count V, for damages resulting from Defendants' wrongful misappropriation in an amount to be determined at trial;

(6)      Under Count VI, for damages resulting from Defendants' conversion of Plaintiff's property in an amount to be determined at trial, together with attorneys' fees and costs;

(7)      Under Count IV, for damages resulting from Defendants' unjust enrichment in an amount to be determined at trial;

(8)      Certifying Count VIII as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure Rule and appointing Ari Teman as class representative;

(9)      Under Count VIII, for an award of treble damages and attorneys' fees under § 4 of the Clayton Act in an amount to be determined at trial;

(10)     Awarding Ari Teman a reasonable fee as class representative;

(11)     Issuing an injunction permanently enjoining Defendants from accessing Plaintiff's intercom devices without authorization and modifying, altering or tampering with such devices in any manner without Plaintiff's express authorization

(12)     Such other relief as this Court deems just and proper.

Dated: New York, New York
          November 10, 2021

**QUAINTON LAW, PLLC**
2 Park Ave., 2nd Floor
New York, New York 10016
(212) 419-0575
*Attorneys for Plaintiff*
*GateGuard, Inc.*

By: */s/ Eden P. Quainton*
          EDEN P. QUAINTON