UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                          :
GATEGUARD, INC.,                                          :
                                                          :
                          Plaintiff,                      :
                                                          :        Case No. 21 Civ. 9321 (JGK)
        -against-                                         :
                                                          :        ORAL ARGUMENT REQUESTED
AMAZON.COM, INC.,                                         :
AMAZON.COM SERVICES, INC.,                                :
AMAZON.COM SERVICES, LLC,                                 :
AMAZON LOGISTICS, INC.,                                   :
                                                          :
                          Defendants.                     :
--------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
AND TO STRIKE PLAINTIFF'S CLASS ALLEGATIONS**

GIBSON, DUNN & CRUTCHER LLP
Anne Champion
Christopher D. Belelieu
Eric J. Stock
David P. Salant

200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000

*Attorneys for Defendants Amazon.com,
Inc., Amazon.com Services LLC, and
Amazon Logistics Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.    The Parties and Their Products ................................................................ 4

    B.    GateGuard's Allegations and Theories ..................................................... 5

        1.    Alleged Physical Damage to GateGuard Devices ..................................... 5

        2.    Alleged Unauthorized Installations ........................................................... 7

        3.    Alleged Theft of Intellectual Property ...................................................... 8

        4.    Alleged Anticompetitive Conduct ............................................................ 8

LEGAL STANDARD ................................................................................................. 9

ARGUMENT .......................................................................................................... 10

I.    GATEGUARD FAILS TO STATE A CLAIM UNDER THE COMPUTER
    FRAUD AND ABUSE ACT (COUNT I). ........................................................ 10

    A.    GateGuard Fails to Allege Cognizable CFAA Injury. .......................... 10

    B.    GateGuard's CFAA Claim Fails Because It Does Not Allege That
        Amazon "Intentionally Accessed" GateGuard's Computer System. .................. 13

    C.    GateGuard's CFAA Claim Fails Because It Does Not Plead That Amazon
        Acted "Without Authorization." .......................................................... 15

II.    GATEGUARD FAILS TO STATE A TRADE SECRETS CLAIM (COUNT VI). ....... 16

III.    GATEGUARD FAILS TO STATE A TARNISHMENT OR LANHAM ACT
    CLAIM (COUNTS VIII & IX). ................................................................. 17

IV.    GATEGUARD'S STATE-LAW TORT CLAIMS SHOULD BE DISMISSED
    (COUNTS II-V, X). ................................................................................. 19

V.    GATEGUARD'S ATTEMPTED MONOPOLIZATION CLAIM (COUNT XI)
    SHOULD BE DISMISSED, AND ITS CLASS ALLEGATIONS STRICKEN. ............ 25

    A.    GateGuard Fails to Define a Plausible Relevant Market. ..................... 26

**TABLE OF CONTENTS**
(continued)

Page

B.    GateGuard Lacks Antitrust Standing Because It Has Not Suffered
       Antitrust Injury and Is Not an Efficient Enforcer of Antitrust Laws. .................. 27

       1.    GateGuard Does Not Participate in the E-Commerce Delivery
              Market and Has Not Been Harmed by Any Reduction in
              Competition.............................................................................. 28

       2.    GateGuard Is Not an Efficient Enforcer of the Antitrust Laws
              Because Its Alleged Injury Is Not Directly Related to Any
              Anticompetitive Conduct. ......................................................... 29

C.    GateGuard Fails to Plead Anticompetitive Conduct or a Dangerous
       Probability of Monopolization. ............................................................ 31

       1.    GateGuard Fails to Plead Anticompetitive Conduct................................ 31

       2.    GateGuard Has Not Plausibly Pleaded that the Challenged Conduct
              Poses a Dangerous Probability of Monopolizing the Relevant
              Market. ..................................................................................... 32

D.    Alternatively, the Court Should Strike GateGuard's Class Allegations. ............. 33

CONCLUSION.............................................................................................. 34

ATTORNEY CERTIFICATION PURSUANT TO INDIVIDUAL RULE II(D)...................... 36

# TABLE OF AUTHORITIES

Page

CASES

*Affinity LLC v. GfK Mediamark Research & Intell., LLC,*
    547 F. App'x 54 (2d Cir. 2013) ...............................................................32

*In re Aluminum Warehousing Antitrust Litig.,*
    336 F.R.D. 5 (S.D.N.Y. 2020) ...............................................................34

*In re Aluminum Warehousing Antitrust Litig.,*
    833 F.3d 151 (2d Cir. 2016)...................................................................28

*Am. Council of Certified Podiatric Physicians & Surgeons v.*
    *Am. Bd. of Podiatric Surgery, Inc.,*
    323 F.3d 366 (6th Cir. 2003) .................................................................31

*In re Am. Express Anti-Steering Rules Antitrust Litig.,*
    19 F.4th 127 (2d Cir. 2021) ....................................................28, 29, 30

*Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs., Inc.,*
    108 F.3d 1147 (9th Cir. 1997) ...............................................................31

*Apple Mortgage Co. v. Barenblatt,*
    162 F. Supp. 3d 270 (S.D.N.Y. 2016) (Koeltl, J.) .................................14

*Arista Records, LLC v. Doe 3,*
    604 F.3d 110 (2d Cir. 2010)...................................................................14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................9

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983)...............................................................................30

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)...............................................................................32

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................9, 20

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)...................................................................31

*Borgese v. Baby Brezza Enterprises LLC,*
    2021 WL 634722 (S.D.N.Y. Feb. 18, 2021)....................................33, 34

# TABLE OF AUTHORITIES
(continued)

Page

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)........................................................................................................31

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)........................................................................................................26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)....................................................................................................28, 29

*Carvel Corp. v. Noonan*,
   350 F.3d 6, 17 (2d Cir. 2003), *certified question answered*, 3 N.Y.3d 182 (2004)................21

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..........................................................................................5, 11

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008)............................................................................................26

*Clarke-Smith v. Bus. Partners in Healthcare, LLC*,
   2016 WL 279094 (N.D. Tex. Jan. 22, 2016) ..........................................................................14

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
   817 F.3d 46 (2d Cir. 2016)..............................................................................................26

*Connolly v. Wood-Smith*,
   2014 WL 1257909 (S.D.N.Y. Mar. 27, 2014) ...............................................................21, 22

*DeAngelis v. Corzine*,
   17 F. Supp. 3d 270 (S.D.N.Y. 2014)..................................................................................24

*DeSoto v. Board of Parks and Recreation*,
   64 F. Supp. 3d 1070 (M.D. Tenn. 2014)..........................................................................13, 14

*In re DoubleClick Inc. Privacy Litigation*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001).................................................................................12

*ExpertConnect, L.L.C. v. Fowler*,
   2019 WL 3004161 (S.D.N.Y. July 10, 2019) .......................................................................16

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009).............................................................................................16

*Fischkoff v. Iovance Biotherapeutics, Inc.*,
   339 F. Supp. 3d 408 (S.D.N.Y. 2018).................................................................................24

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...................................................................33

*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*,
  2012 WL 1446922 (S.D.N.Y. Apr. 26, 2012) (Koeltl, J.) ......................18

*Gatt Comm'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013)...................................................................30

*Gen. Tel. Co. v. Falcon*,
  457 U.S. 147 (1982)............................................................................33

*Georgia Malone & Co. v. Rieder*,
  19 N.Y.3d 511 (2012) .........................................................................25

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985)..........23

*Harry v. Total Gas & Power N. Am., Inc.*,
  244 F. Supp. 3d 402 (S.D.N.Y. 2017) (Koeltl, J.), *aff'd as modified*,
  889 F.3d 104 (2d Cir. 2018)..................................................................27

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
  73 F.3d 497 (2d Cir. 1996)...................................................................18

*Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*,
  812 F.2d 786 (2d Cir. 1987)............................................................32, 33

*Intrepid Fin. Partners, LLC v. Fernandez*,
  2020 WL 7774478 (S.D.N.Y. Dec. 30, 2020) .......................................16

*In re Jetblue Airways Corp. Priv. Litig.*,
  379 F. Supp. 2d 299 (E.D.N.Y. 2005) ..................................................25

*Keebler v. Rath*,
  2009 WL 10703423 (S.D.N.Y. Sep. 22, 2009)...................................11, 15

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974)..........................................................................16, 17

*Kirch v. Liberty Media Corp.*,
  449 F.3d 388 (2d Cir. 2006)..............................................................19, 21

*Kirkpatrick v. Ironwood Commc'ns, Inc.*,
  2006 WL 2381797 (W.D. Wash. Aug. 16, 2006) ..................................33

**TABLE OF AUTHORITIES**
(continued)

Page

*Lee v. Bros.*,
2021 WL 4652336 (S.D.N.Y. Oct. 6, 2021) ..................................................................20, 21

*Lehman v. Dow Jones & Co.*,
783 F.2d 285 (2d Cir. 1986)........................................................................................16

*Letscher v. Swiss Bank Corp.*,
1997 WL 304895 (S.D.N.Y. June 5, 1997) ...................................................................15

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018).........................................................................34

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
83 F. Supp. 3d 501 (S.D.N.Y. 2015)...........................................................................10

*Lopez v. BigCommerce, Inc.*,
2017 WL 3278932 (S.D.N.Y. Aug. 1, 2017) ...............................................................24

*Medidata Sols., Inc., v. Veeva Sys. Inc.*,
2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ............................................................16

*Medtech Prods. Inc. v. Ranir, LLC*,
596 F. Supp. 2d 778 (S.D.N.Y. 2008).........................................................................16

*Meese v. Miller*,
436 N.Y.S.2d 496 (1st Dep't 1981) ............................................................................23

*Micks-Harm v. Nichols*,
2019 WL 4781342 (E.D. Mich. Sept. 30, 2019), *aff'd*,
2021 WL 4699064 (6th Cir. May 24, 2021) ...............................................................12

*Miss Universe, L.P., v. Villegas*,
672 F. Supp. 2d 575 (S.D.N.Y. 2009).........................................................................18

*Nat'l Ass'n of Pharma. Mfrs. v. Ayerst Labs.*,
850 F.2d 905 (2d Cir. 1988).......................................................................................32

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
105 F.3d 841 (2d. Cir. 1997).......................................................................................19

*Nat'l City Bank, N.A. v. Republic Mortg. Home Loans, LLC*,
2010 WL 959925 (W.D. Wash. Mar. 12, 2010) .........................................................11

*Nexans Wires S.A. v. Sark-USA, Inc.*,
166 F. App'x 559 (2d Cir. 2006) ................................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page

*NSI Int'l, Inc. v. Horizon Grp. USA, Inc.*,
    2021 WL 3038497 (S.D.N.Y. Jul. 16, 2021) (Koeltl, J.)........................................25

*NY Medscan, LLC v. JC-Duggan Inc.*,
    837 N.Y.S.2d 80 (1st Dep't 2007) ....................................................................23

*Oracle. v. Serv. Key, LLC*,
    2012 WL 6019580 (N.D. Cal. Dec. 3, 2012) ......................................................15

*Paycom Billing Services v. MasterCard International, Inc.*,
    467 F.3d 283 (2d Cir. 2006).............................................................................29

*Payment All. Int'l, Inc. v. Ferreira*,
    530 F. Supp. 2d 477 (S.D.N.Y. 2007)...............................................................16

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002).......................................................................31, 32

*Planetarium Travel, Inc. v. Altour Int'l, Inc.*,
    97 F. Supp. 3d 424 (S.D.N.Y. 2015)................................................................27

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007).............................................................................29

*RCC Ventures, LLC v. Am. DG Energy, Inc.*,
    2018 WL 1415219 (S.D.N.Y. Mar. 19, 2018) ....................................................17

*Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,
    926 F.2d 134 (2d Cir. 1991).............................................................................19

*Roboserve, Ltd. v. Tom's Foods Inc.*,
    940 F.2d 1441 (11th Cir. 1991) .......................................................................16

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010)................20, 22

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988)................................................................................5

*Shapiro v. Goldman*,
    696 F. App'x 532 (2d. Cir. 2017) .......................................................................5

*Shmueli v. City of New York*,
    424 F.3d 231 (2d Cir. 2005)..............................................................................12

# TABLE OF AUTHORITIES
(continued)

Page

*Sperry v. Crompton Corp.*,
    8 N.Y.3d 204 (2007) ........................................................................................25

*Taboola, Inc. v. Ezoic Inc.*,
    2021 WL 2041639 (S.D.N.Y. May 21, 2021) ..................................................20, 21

*Tan v. Doe*,
    2014 WL 1779048 (S.D.N.Y. May 5, 2014) ....................................................10, 14

*Tate v. Pac. Gas & Elec. Co.*,
    230 F. Supp. 2d 1072 (N.D. Cal. 2002) ...............................................................32

*TechnoMarine SA v. Giftports, Inc.*,
    758 F.3d 493 (2d Cir. 2014).................................................................................9

*Thyroff v. Nationwide Mut. Ins. Co.*,
    460 F.3d 400 (2d Cir. 2006)................................................................................23

*United States v. Teman*,
    465 F. Supp. 3d 277 (S.D.N.Y. 2020)....................................................3, 11, 21, 22

*United States v. Teman*,
    No. 19-CR-696 (PAE) (S.D.N.Y.) .................................................................3, 21

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015).................................................................................15

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021).............................................................................10, 13, 15

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y. 1978) ..........................................................................34

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016)..................................................................28

STATUTES

15 U.S.C. § 2.............................................................................................................26, 28

15 U.S.C. § 1125.........................................................................................................19

18 U.S.C. § 1030.................................................................................10, 11, 12, 13, 14

18 U.S.C. § 1836.........................................................................................................16

# TABLE OF AUTHORITIES
(continued)

Page

N.Y. Gen. Bus. L. § 360-l ................................................................................................18

N.Y. Gen. Bus. L. § 360-m ...............................................................................................18

**OTHER AUTHORITIES**

UCC § 2-106(1) ................................................................................................................11

UCC § 2A-103(j) ..............................................................................................................11

**RULES**

Fed. R. Civ. P. 8(a)(2) ........................................................................................................5

Fed. R. Civ. P. 9(b) ..........................................................................................................15

Fed. R. Civ. P. 12(b)(6) ............................................................................................1, 9, 11

Fed. R. Civ. P. 12(f) ....................................................................................................1, 33

Fed. R. Civ. P. 23(a)(4) ....................................................................................................33

Fed. R. Civ. P. 23(b)(3) ....................................................................................................34

Fed. R. Civ. P. 23(d)(1)(D) .........................................................................................1, 33

Fed. R. Evid. 201 ..............................................................................................................12

**TREATISES**

3 PHILIP AREEDA & DONALD TURNER, ANTITRUST LAW ¶ 737b (1978) .......................................31

Defendants Amazon.com, Inc., Amazon.com Services LLC,[1] and Amazon Logistics, Inc. (collectively, "Amazon" or "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint ("FAC") of Plaintiff GateGuard, Inc. ("GateGuard" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6), and to strike GateGuard's class allegations pursuant to Rules 12(f) and 23(d)(1)(D).

## PRELIMINARY STATEMENT

Untethered to reality, GateGuard has brought a sprawling, ill-defined, and outlandish complaint against Amazon not because GateGuard has any legitimate claims, but because GateGuard is seeking to use the justice system to salvage its business—a business that has been on the verge of collapse for years due to the criminal and fraudulent conduct of its founder, whom Judge Engelmayer recently sentenced to incarceration in federal prison.  This Court should not countenance GateGuard's improper and abusive pleading, and the FAC should be fully dismissed.

GateGuard produces, sells, and installs internet-enabled intercom systems that permit remote door-unlocking and audiovisual communication in apartment buildings.  Amazon is a multinational technology company involved in the e-commerce business, including the delivery of packages.  In 2019, Amazon began an initiative called "Key for Business" ("KFB"), by which it would install, for free, a small device connected to a building's existing door entry mechanism that permits delivery drivers to unlock the door and deliver Amazon packages to a secure location.  GateGuard alleges that KFB installations in buildings with GateGuard intercom systems require the GateGuard device's "case" to be opened and an "extender" wire to be connected from the KFB device to the mechanism inside the GateGuard device that unlocks the

---

[1]  Defendant Amazon.com Services, Inc. no longer exists and is now known as Amazon.com Services LLC.

door.  Without identifying any particular device, location, building, contract or customer affected, GateGuard claims that some KFB installations have caused GateGuard intercoms to malfunction.  Based on these simple allegations, GateGuard trumps up fantastical claims of computer hacking, trade secret misappropriation, and complex schemes to deceive landlords and monopolize the "e-commerce delivery market."

GateGuard's jumbled, conspiratorial allegations are legally deficient, wildly implausible, and inadequate to survive a motion to dismiss.

*First*, GateGuard's Computer Fraud and Abuse Act ("CFAA") claim fails to plead any act of "unauthorized access" of its "protected computer," not only because GateGuard does not own the devices after it sells them, but also because the alleged *physical* tampering does not constitute computer "access" under the CFAA.  Nor can GateGuard show that it meets the CFAA's $5,000 loss-per-violation threshold: repair costs are contractually borne by GateGuard's clients, and the entire device, including installation, costs less than $5,000.

*Second*, GateGuard fails to allege any viable trade secret claim because it sells and installs its unpatented devices in the public domain—precluding, as a matter of law, a finding that the device contains trade secrets.  Moreover, the FAC makes only a conclusory allegation, unsupported by required specifics, that Amazon obtained GateGuard's intellectual property.

*Third*, GateGuard cannot maintain claims for "tarnishment" or unfair competition under the Lanham Act because Amazon's KFB is undisputedly a distinctive product with its own marking, nullifying the risk of actual consumer confusion (which GateGuard fails to plead).

*Fourth*, GateGuard's various state-law tort claims fail as a matter of law, principally because they seek damages for alleged, but unspecified, injury to GateGuard's customers and not GateGuard itself.  There can be no tortious interference where GateGuard does not specify which

of *its* contracts were breached or which of *its* business opportunities were lost, let alone how

Amazon knowingly procured these results.  No conversion could have occurred because

GateGuard does not own the devices after it sells them and was never deprived access to them.

Nor was there unjust enrichment because no "sufficiently close relationship" is alleged between

the parties, who have never transacted business or had *any* interaction beyond this dispute.

    *Fifth*, GateGuard's monopolization claim should be dismissed and its class allegations

stricken.  GateGuard's amorphous market definition encompassing the likes of GateGuard,

FedEx, and building landlords, is hopelessly overbroad: Amazon, an e-commerce leader, and

GateGuard, a maker of intercom systems, operate in completely different markets, and their

products are not substitutes.  And regardless of how GateGuard defines its proposed

"e-commerce delivery market," it has no standing to assert antitrust claims within that market

because it does not even claim to compete there.  Nor does GateGuard give any reason why

Amazon's KFB innovation has injured it or others via *anticompetitive conduct*, rather than

protected, pro-competitive conduct that will improve efficiency and lower costs and prices.

Lastly, GateGuard's nomination of itself to lead the purported class is particularly inappropriate

in light of the criminal misconduct of its founder and owner, Ari Teman.

    Indeed, the true reason for GateGuard's recent business difficulties is apparent from the

face of judicially noticeable court records and has nothing to do with Amazon.  During the time

period at issue, Mr. Teman perpetrated a fraud against GateGuard's customers for which he was

indicted, convicted, and sentenced.  *See United States v. Teman*, No. 19-CR-696 (PAE)

(S.D.N.Y.).  The fraud followed complaints by GateGuard customers in 2018—*one year before

KFB's release*—that GateGuard's devices "had numerous problems" that Mr. "Teman had failed

to fix," and "that they were going to cease using GateGuard's devices."  *United States v. Teman*,

465 F. Supp. 3d 277, 286 (S.D.N.Y. 2020). GateGuard's business failures have nothing to do with Amazon and everything to do with GateGuard's own wrongdoing and poor product design.

Because the FAC fails to plead anything more than conclusory and implausible allegations, or to articulate a cognizable basis for Amazon's liability, it should be dismissed with prejudice, and its class allegations should be stricken.

## BACKGROUND[2]

### A.     The Parties and Their Products

*GateGuard*. GateGuard sells intercom devices to residential buildings in New York City. FAC ¶ 2. Its intercom device is allegedly "built around propriety technology" that GateGuard keeps secret, including "the configuration of its motherboard," the "placement and type" of "electronic circuitry," and "voltages," as well as its "inner casing," "system of wall-mounting hinges," "waterproofing design," and "custom-designed cables." *Id.* ¶ 86. GateGuard's devices are "integrated with a website" that permits landlords and tenants to "remote[ly] unlock" the door using smartphones and laptops; to use a "video intercom" to observe and communicate with visitors; and to apply "face recognition" technology to review an "online log of each entrance into the building" in order to "monitor non-primary uses, illegal sublets and the entrance of large groups." *Id.* ¶¶ 85, 88.

---

[2]  Except where otherwise noted, allegations in the FAC are presumed true for purposes of this Motion only. Amazon reserves the right to subsequently challenge the veracity of GateGuard's allegations.

The use of GateGuard's devices is subject to a service agreement.  FAC ¶¶ 7, 90; *see* Decl. of David P. Salant in Supp. of Defs.' Mot. to Dismiss, Ex. A ("Service Agreement").[3]  The Service Agreement lists a highest price of $3,699 to order a GateGuard device; a New York City "installation fee" of $849; and a highest "subscription fee" of $199.99 per month.  Service Agreement §§ 2(C), 3(C), 4(C).

*Amazon*.  Amazon is a multinational technology company involved in, among other things, the e-commerce business—the business of selling products and services over the internet. GateGuard alleges that, in 2016, Amazon began the physical delivery of packages to customers. FAC ¶ 30.  In 2019, Amazon announced its "Key for Business" initiative, which GateGuard claims involves the use of "Amazon Key," "a small device that can be inserted into existing access devices" and can be "remotely controlled," such that "Amazon deliverers can use it to obtain building access" and drop off packages in a secure location.  *Id.* ¶¶ 45-46.

**B.    GateGuard's Allegations and Theories[4]**

**1.    Alleged Physical Damage to GateGuard Devices**

GateGuard claims Amazon's KFB installations have caused physical damage to GateGuard's intercoms, resulting in necessary repairs and lost business.  GateGuard alleges KFB

---

[3]  This document is cited and quoted throughout the FAC and therefore may be considered in full on a motion to dismiss.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

[4]  GateGuard's lengthy and jumbled FAC may be independently dismissed for failure to advance a "short and plain statement" of its claims.  Fed. R. Civ. P. 8(a)(2).  *See Shapiro v. Goldman*, 696 F. App'x 532, 533 (2d. Cir. 2017) (summary order); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("When a complaint does not comply with the requirement that it be short and plain, the court

installations involve the placement of an "extender" "within or on top of existing intercom/access control devices of third parties," connecting the KFB device to the mechanism unlocking the door.  FAC ¶¶ 50, 52.  GateGuard alleges that KFB is connected to the inside of the GateGuard device, although the exact nature of this connection is not specified.  *Id.* ¶¶ 106; 109-111.  GateGuard contends that the installation of KFB "often short[s] the [GateGuard] devices and/or their lock mechanisms due to polarity or voltage mismatches."  *Id.* ¶ 50.

GateGuard alleges "[o]n information and belief" that "Amazon has installed its Key for Business devices at over 40 buildings where GateGuard was already installed … resulting in the malfunctioning of the GateGuard equipment, customer complaints, loss of revenue and loss of good will."  FAC ¶ 96.  Elsewhere, GateGuard claims that on "approximately 20 different occasions, building management have called GateGuard to repair or replace disabled intercom devices," which "cost GateGuard time and money in support and repair," and that "[e]ach time … GateGuard has discovered that Amazon tampered with its intercoms[.]"  *Id.* ¶¶ 118, 120. GateGuard alleges that, "[o]n information and belief," Amazon is performing similarly damaging installations on non-GateGuard building intercom systems, citing various complaints posted to social media unrelated to GateGuard.  *Id.* ¶¶ 121-123.

GateGuard does not identify any particular building, address, customer name, location, or date at which a KFB installation allegedly caused a GateGuard device to malfunction.  Nor does GateGuard specify any particular property manager who has complained to or retaliated against GateGuard, any particular cancelled contract, the nature of any complained-of malfunction, its duration, or its reparability.  GateGuard acknowledges that certain KFB installations have not

---

has the power, on its own initiative or in response to a motion by the defendant,… to dismiss the complaint.").

caused any malfunctioning, FAC ¶¶ 96, 113, as well as cases where Amazon allegedly "reinstall[ed] its devices" to resolve the purported technical issues, *id.* ¶¶ 125, 128.  GateGuard does not allege that any GateGuard device is presently not working.

### 2.    Alleged Unauthorized Installations

GateGuard claims Amazon "installed its own devices without permission of building management" in "at least forty buildings that utilize GateGuard's intercoms[.]"  FAC ¶¶ 10, 101.  GateGuard proffers unattributed text messages and a redacted email purportedly showing that Amazon had installed KFB in an unidentified building without authorization from management, *id.* ¶¶ 102-103, as well as screenshots of a video purportedly reflecting Amazon technicians installing a KFB device at an unidentified location, which installation GateGuard asserts was without the property owner's consent, *id.* ¶ 116-17.  GateGuard acknowledges that certain KFB installations were permitted by building management.  *Id.* ¶ 82.  However, GateGuard claims Amazon used deceptive sales practices to procure permission to install KFB in these buildings.  *Id.* ¶¶ 11, 66-81, 99.

Separately, GateGuard alleges that it holds a consent right over the installation of KFB in any building using a GateGuard device and claims it did not give that consent.  GateGuard claims that, under its Service Agreement, GateGuard's customers are "subscribers," and not owners of the GateGuard device they purchased, and that the upfront cost paid for a device is a "lease[]," rather than a sale.[5]  FAC ¶ 91.  Therefore, GateGuard claims to maintain "exclusive control over package management and access control devices on each building where it is installed."  *Id.* ¶ 104 (emphasis removed).

---

[5]  For reasons stated below, Amazon disputes this characterization as a matter of law.

GateGuard does not identify any particular location or date where an allegedly unauthorized installation of KFB occurred.

### 3. Alleged Theft of Intellectual Property

GateGuard claims its devices contain "a valuable repository of client data of great interest to a business such as Amazon"; that, "[b]y breaking into the GateGuard 'box,' a competitor such as Amazon is able to steal or damage [GateGuard's] proprietary technology"; and that "[o]n information and belief, Amazon is using GateGuard's proprietary technology to develop certain Key [for Business] functionalities and to develop a smart intercom of its own that will enable it to enter the smart building access control market[.]" FAC ¶¶ 5, 86. GateGuard also asserts that, even when successful installations of KFB have not affected GateGuard's functionality, "Amazon has been able to profit illicitly from GateGuard's brand and devices." FAC ¶ 97.

GateGuard does not identify any particular instance in which Amazon took or used GateGuard's intellectual property, or any particular material taken.

### 4. Alleged Anticompetitive Conduct

GateGuard claims Amazon's KFB initiative is part of a "broader scheme that attempts to monopolize the e-commerce delivery market" and to achieve a "dominant position in package delivery generally." FAC ¶¶ 1, 39. GateGuard asserts that, having obtained substantial market power in the e-commerce delivery market, Amazon now seeks "domination of nation-wide package delivery[.]" *Id.* ¶¶ 25-40. According to GateGuard, "Amazon's strategy is not to displace all competitors in the access control market"—the market in which GateGuard participates—but rather to "position itself strategically in the access control space so as to monopolize the lucrative delivery market." *Id.* ¶ 43 (emphasis removed). GateGuard identifies Amazon's competitors in this regard to include all of: "[t]hird party-logistic ('3PL') providers such as Ship Bob and other fulfillment centers"; "[o]ther package delivery companies," such as

"UPS, FedEx, USPS, [and] DHL"; "[o]ther e-commerce retailers"; "[b]uilding access providers with package delivery management functions such as GateGuard"; and "certain landlords who seek to internalize package delivery services[.]" *Id.* ¶ 44.

GateGuard asserts that KFB "provides Amazon with a direct competitive edge over other package delivery services," whose deliverers must ring the bell and wait to be let in, causing the added costs of "failed deliveries" and "circling time," as well as companies who can no longer credibly charge for "off-site storage" to hold undelivered packages. FAC ¶¶ 47, 54. "[B]y ensuring more rapid, reliable deliveries through [KFB,] Amazon can market a faster, more efficient package delivery service," giving Amazon "a decisive cost advantage over competitors in the package delivery industry," a result that GateGuard asserts is anticompetitive. *Id.* ¶¶ 53, 55.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "[a] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts may not accept as true "'a formulaic recitation of the elements of a cause of action,'" "'naked assertion[s]' devoid of 'further factual enhancement,'" or "'a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (brackets in *Iqbal*). Where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible," dismissal is appropriate. *Twombly*, 550 U.S. at 570; *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

## ARGUMENT

## I.    GATEGUARD FAILS TO STATE A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT (COUNT I).

### A.    GateGuard Fails to Allege Cognizable CFAA Injury.

GateGuard fails to state a CFAA claim for multiple reasons.  *First*, GateGuard's CFAA claim fails because the allegations in the FAC that Amazon physically interfered with GateGuard's intercom devices are not the types of allegations the CFAA was meant to address. The CFAA "is principally a criminal statute," *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015), "'aimed at preventing the typical consequences of hacking,'" *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021) (citation omitted).  Amazon undisputedly did not hack GateGuard's devices.  For that reason alone, this claim should be dismissed.

*Second*, GateGuard does not identify any particular "protected computer" that was allegedly accessed illegally.  18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(B)–(C); *See Tan v. Doe*, 2014 WL 1779048, at *1 (S.D.N.Y. May 5, 2014) (dismissing CFAA claim making conclusory allegations of a "protected computer system").  The FAC makes unspecified allegations referencing GateGuard installations at multiple buildings but never identifies any particular device, location, or date of "access."  18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(B)–(C).  GateGuard's indiscernible photographs and video screenshots, FAC ¶¶ 108, 109, 111, 116, similarly do not specify the address, device, or landlord at issue, or any particular malfunction.  Without "linking [Amazon] to a computer" in particular, GateGuard has not provided "fair notice of the nature of

plaintiff's CFAA claim," and the claim should be dismissed.  *Nat'l City Bank, N.A. v. Republic Mortg. Home Loans, LLC*, 2010 WL 959925, at *1 (W.D. Wash. Mar. 12, 2010).[6]

    *Third*, GateGuard has not itself "suffer[ed] damage or loss," 18 U.S.C. § 1030(g), because a CFAA plaintiff must own and control the computer at issue to have standing.  *Keebler v. Rath*, 2009 WL 10703423, at *2 (S.D.N.Y. Sep. 22, 2009).  GateGuard does not own devices installed in its clients' buildings, its clients do, as demonstrated by GateGuard's own allegations and documents.  GateGuard "sells" its devices, FAC ¶ 2, and GateGuard's Service Agreement charges building owners an upfront sum to acquire the "Product" without reference to any fixed term, Service Agreement §§ 2(B)-(G).  *See Chambers*, 282 F.3d at 153 & n.4 (affirming district court's reliance on contracts discussed in complaint to dispose of Rule 12(b)(6) motion).  Moreover, the Service Agreement states that GateGuard "devices which are installed cannot be used elsewhere"—even after the client terminates the agreement—indicating that the device's value passes fully and irrevocably.  Service Agreement § 5(B)(ii).  These are terms typical of a "sale," not a "lease."  *See* UCC §§ 2-106(1), 2A-103(j).  In contrast, GateGuard's *software* "is licensed, not sold" for a "Term" of years, in exchange for recurring fees.  Service Agreement §§ 2(G), 5(A).  And GateGuard's customers testified under oath at Teman's criminal fraud trial to their understanding that "they"—not GateGuard—"owned the devices" GateGuard installed at their buildings.  *Teman*, 465 F. Supp. 3d at 287.[7]  Since GateGuard does not own, but merely

---

[6]  Additionally, GateGuard pleads no fact indicating that this action falls within the two-year statutory period for private CFAA claims, an independent ground for dismissal.  18 U.S.C. § 1030(g).

[7]  Amazon respectfully requests that the Court take judicial notice of the public court records in the *Teman* criminal action, including Judge Engelmayer's reported opinion summarizing the evidence of

services, the alleged protected computers, it lacks CFAA standing.  *See Micks-Harm v. Nichols*, 2019 WL 4781342, at *10 (E.D. Mich. Sept. 30, 2019), *aff'd*, 2021 WL 4699064 (6th Cir. May 24, 2021) ("Plaintiffs cannot bring any challenges as to those who accessed [another's] computers.").

GateGuard's alleged costs incurred to repair malfunctioning devices is not cognizable CFAA injury because GateGuard's Service Agreement indemnifies GateGuard for such activities, such that its customers—not GateGuard—are the only parties theoretically injured. Service Agreement §§ 1(H), 8(C), Sched. A § 10(B).  Similarly, GateGuard's purported losses of goodwill or brand reputation, FAC ¶¶ 96, 146, are not actionable damages under the CFAA.  *See In re DoubleClick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 525 n.34 (S.D.N.Y. 2001).

*Fourth*, GateGuard fails to plead a loss in excess of $5,000 caused by any *single* act.  *See DoubleClick*, 154 F. Supp. 2d at 523 (losses "may only be aggregated across victims and over time for a single act"); 18 U.S.C. § 1030(c)(4)(A)(i)(I) (only "the United States" may aggregate losses "resulting from a related course of conduct").  GateGuard does not allege *any* particular costs incurred to investigate or repair any device, which, in any event, would be payable by customers pursuant to its Service Agreement.  Moreover, under the Service Agreement, the total cost of a GateGuard device, plus installation, plus two months' subscription, is less than $5,000. Therefore, even assuming remediation involved a full replacement and reinstallation of the

---

conviction.  *See* Fed. R. Evid. 201 (judicial notice may be taken of facts "readily determined from sources whose accuracy cannot reasonably be questioned"); *Shmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005) (The criminal "prosecution of [plaintiff] is a matter of public record, of which we take judicial notice.").

12

device over a two-month period, GateGuard would still fail to meet the CFAA's $5,000 loss threshold.[8]

**B.    GateGuard's CFAA Claim Fails Because It Does Not Allege That Amazon "Intentionally Accessed" GateGuard's Computer System.**

GateGuard also has not plausibly alleged that Amazon "intentionally accesse[d]" any GateGuard computer or "obtain[ed]" any "information" within the meaning of the CFAA.  18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(B)–(C).  The Supreme Court recently defined CFAA "access" as "the act of *entering a computer system itself or a particular part of a computer system, such as files, folders, or databases*."  *Van Buren*, 141 S. Ct. at 1657 (emphasis added); *id.* at 1657 n.6 (example of "access" is "gain[ing] entry to memory in order to read or write data").[9]

---

[8]    Nor may GateGuard claim "loss" from lost contracts: consequential damages only qualify towards the $5,000 loss threshold if they directly arise from an "interruption of service" rendering the protected computer system or its data unavailable.  *See* 18 U.S.C. § 1030(e)(11); *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559, 562 (2d Cir. 2006) (summary order).  Plaintiff fails to specify any computers affected, the start and end time of any interruption, or any resulting lost profits.  Similarly, GateGuard's alternative theory of CFAA jurisdiction—that Amazon's package delivery quotas purportedly pose "a direct threat to public health and safety," FAC ¶ 145; 18 U.S.C. § 1030(c)(4)(A)(i)(IV)—is conclusory and untethered from the question of unauthorized computer access.

[9]    Prior to *Van Buren*, lower courts distinguished between physical "tamper[ing]" with a computer— which is not actionable under the CFAA—and "gaining admission to its contents" by "proceeding past a login screen"—which may be.  *DeSoto v. Board of Parks and Recreation*, 64 F. Supp. 3d 1070, 1078, 1103 (M.D. Tenn. 2014) (dismissing CFAA claim when defendants allegedly confiscated smartphone and "attempted to access" it by entering passcode attempts, and device wiped its data

GateGuard's allegations of a physical intrusion into the GateGuard device do not adequately allege that Amazon ever "enter[ed]" GateGuard's "computer system itself," such as by gaining entry to computer memory or files.  GateGuard makes no allegation that a successful installation of KFB is even *capable* of reading data on GateGuard devices or connecting to GateGuard's software or website, such that Amazon could access GateGuard's "face detection and recognition," "cloud interaction and storage," or "video chat" functionalities.  FAC ¶ 85.  Instead, GateGuard alleges that Amazon "wedged" its device into GateGuard's case and connected physical wiring to the door-opening mechanism, with the goal to "obtain building access," ***not computer access***.  FAC ¶¶ 46, 109.  That is legally insufficient to support a CFAA claim.  *See DeSoto*, 64 F. Supp. 3d at 1103; *Tan*, 2014 WL 1779048, at *1; *cf. Apple Mortgage Co. v. Barenblatt*, 162 F. Supp. 3d 270, 287 (S.D.N.Y. 2016) (Koeltl, J.) (finding "access" when plaintiff alleged particular files on its computer system were "accessed and deleted").[10]

---

after ten unsuccessful attempts); *see Clarke-Smith v. Bus. Partners in Healthcare, LLC*, 2016 WL 279094, at *10 (N.D. Tex. Jan. 22, 2016) (granting summary judgment against CFAA claim when laptop was physically taken, but no files had been opened).

[10]    GateGuard also does not identify any of its data Amazon actually "obtained," as it must under 18 U.S.C. § 1030(a)(2)(C).  GateGuard claims "[u]pon information and belief" that Amazon "obtained" information from a GateGuard computer, FAC ¶ 142, but its only allegation of data retrieved pertains to an unrelated episode in India, *id.* ¶ 137.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (allegations pleaded on information and belief only sufficient "where the facts are peculiarly within the possession and control of the defendant … or where the belief is based on factual information that makes the inference … plausible") (citations omitted).

Additionally, GateGuard does not plausibly allege that any such "access," to the extent it occurred, was intentional and anything more than a nonactionable, inadvertent connection. *See United States v. Valle*, 807 F.3d 508, 525 (2d Cir. 2015); *Letscher v. Swiss Bank Corp.*, 1997 WL 304895, at *5 (S.D.N.Y. June 5, 1997) (dismissing CFAA claim where access was "mistaken, inadvertent, or careless").

### C. GateGuard's CFAA Claim Fails Because It Does Not Plead That Amazon Acted "Without Authorization."

GateGuard has not sufficiently alleged that Amazon acted "without authorization," that is, "'without any permission at all.'" *Van Buren*, 141 S. Ct. at 1658 (citation omitted). GateGuard's allegations of access to GateGuard devices obtained by deceit sound in fraud and are subject to Rule 9(b)'s heightened specificity standard. *See Oracle. v. Serv. Key, LLC*, 2012 WL 6019580, at *6 (N.D. Cal. Dec. 3, 2012) (applying Rule 9(b) to CFAA claim "grounded in fraud"). Yet GateGuard never states the time, place, or allegedly fraudulent statements made to GateGuard or its customers. And to the extent GateGuard says its customers were deceived, it is for those customers, not GateGuard, to say so.

Nor can GateGuard rescue its CFAA claim with the conclusory allegation that GateGuard must pre-authorize any new connections to its deployed intercom systems. GateGuard's product was purchased and owned by GateGuard's clients, who maintain full control over the functioning of their own doors. *See supra* Part I.A. That GateGuard reserved the right to be the exclusive party to troubleshoot its devices is beside the point: "Without proof of ownership of [the devices], Plaintiff … cannot prove that Defendant[s'] access was unauthorized[.]" *Keebler*, 2009 WL 10703423, at *2.

## II.     GATEGUARD FAILS TO STATE A TRADE SECRETS CLAIM (COUNT VI).

GateGuard has not adequately pleaded the existence of a trade secret or any act of misappropriation by Amazon.  To state a claim for the "misappropriation of trade secrets under New York law, a party must [allege]: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009).  A trade secret complaint must "allege facts sufficient to identify the information for which protection is claimed and sufficient information about its nature, value, and measures taken to safeguard it to support an inference that the information qualifies as a trade secret."  *Intrepid Fin. Partners, LLC v. Fernandez*, 2020 WL 7774478, at *4 (S.D.N.Y. Dec. 30, 2020) (citation omitted).  Trade secret misappropriation under 18 U.S.C. § 1836 involves similar elements, and the two claims are regularly addressed together.  *See ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *4 n.1 (S.D.N.Y. July 10, 2019).

The unpatented physical components of GateGuard's devices cannot be trade secrets because they were sold and installed in the public forum.  "'The most important consideration [in determining whether an item is a trade secret] remains whether the information was secret.'"  *Payment All. Int'l, Inc. v. Ferreira*, 530 F. Supp. 2d 477, 481 (S.D.N.Y. 2007) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)).  Only information kept inaccessible to competitors or the general public is considered secret.  *See, e.g.*, *Medidata Sols., Inc., v. Veeva Sys. Inc.*, 2018 WL 6173349, at *3-4 (S.D.N.Y. Nov. 26, 2018) (internal company documents); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 789-90 (S.D.N.Y. 2008) (internal strategic information).  Once a product is sold and placed into public circulation, any information discerned from it cannot be a trade secret.  *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 484 (1974) ("By definition a trade secret has not been placed in the public domain.");  *Roboserve,*

*Ltd. v. Tom's Foods Inc.*, 940 F.2d 1441, 1455 (11th Cir. 1991) (no trade secret protection in vending machine when thousands had been distributed: "the federal patent laws preemptively prohibit a trade secret claim under these facts").  GateGuard's devices are for sale, unpatented, and allegedly installed in buildings citywide.  FAC ¶¶ 91-93, 96.  The design aspects GateGuard claims are trade secrets, *id.* ¶ 165, are readily accessible to any customer, tenant, delivery person, or repairman living or working in buildings with GateGuard devices.

GateGuard also fails to allege that Amazon "misappropriated" any purported trade secret.  GateGuard does not contend that Amazon stole or copied any particular information of GateGuard's for use in its own business.  Nor does GateGuard allege any facts to support its assertion that Amazon used GateGuard's proprietary information to "develop a device with the same or similar functionality."  FAC ¶ 166.  *See RCC Ventures, LLC v. Am. DG Energy, Inc.*, 2018 WL 1415219, at *3 (S.D.N.Y. Mar. 19, 2018) (rejecting similar "conclusory statements" on a motion to dismiss).  To the contrary, Amazon is alleged to have attached its own device to existing intercom systems made by GateGuard and others, in order to permit Amazon delivery people to open doors.

Finally, GateGuard does not identify any contractual relationship or duty owed by Amazon to GateGuard, or that Amazon discovered the trade secret through "improper means."  Even assuming Amazon divined information regarding GateGuard's product from GateGuard's publicly placed intercoms, such "reverse engineering" is not actionable under trade secret law.  *Kewanee Oil*, 416 U.S. at 476.

## III.  GATEGUARD FAILS TO STATE A TARNISHMENT OR LANHAM ACT CLAIM (COUNTS VIII & IX).

GateGuard's claims of "tarnishment" under New York law and unfair competition under the Lanham Act fail because they do not allege any consumer confusion between GateGuard's

intercom product and Amazon's admittedly distinct KFB device.  To state a claim for tarnishment under General Business Law Section 360-l, a plaintiff must plead possession of a "truly distinctive" trademark and a likelihood of "tarnishment": that, as a result of defendant's substantially similar mark, the plaintiff's trademark has been "linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods."  *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996).

GateGuard makes no claim that its mark is substantially similar to Amazon's; rather GateGuard says KFB is a distinctly marked device with different functionalities.  FAC ¶¶ 46, 49-52.  Nor does GateGuard allege that KFB is a product of "shoddy quality," which quality consumers might confusedly impute onto GateGuard's product.  *See Miss Universe, L.P., v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) ("Marks must at least be similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same.").

GateGuard also fails to credibly allege Amazon's *willful* effort to infringe on GateGuard's mark and unfairly compete, as required to obtain any money damages.  *See* N.Y. Gen. Bus. L. § 360-m; *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 2012 WL 1446922, at *4 (S.D.N.Y. Apr. 26, 2012) (Koeltl, J.).[11]  GateGuard claims Amazon's overall motive is "not to

---

[11]  Plaintiff's assertion that it has a "registered trademark," FAC ¶ 177, does not sufficiently plead that the mark is *registered with the New York Secretary of State*, another requirement to access monetary remedies under Section 360-m.  *See Gameologist*, 2012 WL 1446922, at *4.

displace all competitors in the access control market," but rather to make gains in the *package delivery market*.  FAC ¶ 43.

Nor can GateGuard state a claim for unfair competition under the Lanham Act.  15 U.S.C. § 1125.  To do so, a plaintiff must allege that a defendant has made "a false designation of origin, or any false description or representation" with respect to goods or services in commerce.  *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991).  GateGuard fails to plausibly allege any "false designation of origin," such as Amazon holding out GateGuard's product as its own, or any specific instance of false advertising *regarding GateGuard or its qualities*.  GateGuard's own allegation is that KFB is a separately marked device.  FAC ¶¶ 46, 49-52.  Many GateGuard customers allegedly are not even aware of KFB's existence in their building.  *Id.* ¶¶ 83, 128.  Moreover, GateGuard fails to allege that any of Defendants' statements actually confused consumers or were likely to influence consumers' purchasing decisions adversely to GateGuard.  *See Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d. Cir. 1997).  The cited social medial complaints directed towards Amazon, FAC ¶¶ 81, 83, 99, 123, only underscore consumers' lack of confusion in this regard.

## IV.    GATEGUARD'S STATE-LAW TORT CLAIMS SHOULD BE DISMISSED (COUNTS II-V, X).

*Tortious interference with contract* (**Count II**).  GateGuard's claim fails because GateGuard has not alleged the existence of a valid contract with any specific third party, let alone one that was breached as a result of Amazon's conduct.  GateGuard must show (i) "the existence of a valid contract between the plaintiff and a third party"; (ii) the "defendant's knowledge of the contract"; (iii) the "defendant's intentional procurement of the third-party's breach of the contract without justification"; (iv) "actual breach of the contract"; and (v) "damages resulting therefrom."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir.

2006).  "The law requires some factual specificity in pleading tortious interference."  *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) (alterations omitted).

GateGuard claims it "entered into valid contracts with [building] owners or [their] authorized agents," and that Amazon "intentionally procured the breach" of those contracts, FAC ¶¶ 148, 150, yet GateGuard fails to identify who those building owners or agents are, the effective dates of their purported contracts, which term(s) of the contracts were allegedly breached, or how such breach was intentionally procured by Amazon.  GateGuard's "formulaic recitation of the elements" of its claim, without even the scantest factual support, cannot survive a motion to dismiss.  *Twombly*, 550 U.S. at 555.

The Service Agreement offers GateGuard no support.  By its terms, the Service Agreement is an at-will agreement that permits customers to "terminate … this Agreement … *for convenience at any time* upon ninety (90) days['] prior written notice[.]"  Service Agreement § 5.B (emphasis added).  "New York courts have held that a contract that is terminable at will," like GateGuard's contract, "cannot be the basis for a tortious interference claim" because such contracts fail to satisfy the element of "actual breach[.]"  *Lee v. Bros.*, 2021 WL 4652336, at *4 (S.D.N.Y. Oct. 6, 2021).

Even if GateGuard could plead a breach, it cannot show Amazon knew about any contract or intentionally procured a third party's breach.  GateGuard never pleads "specific allegations" that Amazon had "actual knowledge" not just of a contractual relationship in general, but of the "terms of the contract and of the contractual obligation that was allegedly breached."  *Taboola, Inc. v. Ezoic Inc.*, 2021 WL 2041639, at *9 (S.D.N.Y. May 21, 2021).  GateGuard's "conclusory assertions of knowledge," and "[c]laims that [Amazon] 'should have

known' about a contract" are "insufficient" to survive a motion to dismiss. *Id.* (alterations omitted).

Finally, GateGuard cannot plead that Amazon "procured" a third party's breach of contract where it has failed to allege a breach. The plausible explanation for GateGuard's loss of customer contracts is GateGuard's malfunctions predating KFB and the public revelation of its founder's fraudulent and threatening conduct targeting GateGuard customers. *See Teman*, 465 F. Supp. 3d at 286; *Teman*, No. 19-CR-696 (PAE) (S.D.N.Y.), ECF No. 276 at 71-79 (Sentencing Tr. Jul. 28, 2021).

**Tortious Interference With Prospective Economic Advantage** (**Count III**). GateGuard's claim fails because it does not identify any "particular, existing business relationship" with which Amazon intentionally interfered. *Connolly v. Wood-Smith*, 2014 WL 1257909, at *5 (S.D.N.Y. Mar. 27, 2014). This claim "is a difficult one to sustain with requirements more demanding than those for interference with … an existing contract." *Lee*, 2021 WL 4652336, at *5 (quotations and alterations omitted). To state a claim, "the plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" *Kirch*, 449 F.3d at 400 (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003), *certified question answered*, 3 N.Y.3d 182 (2004)). GateGuard must show that Amazon "target[ed] some activities toward the third party and convince[d] the third party not to enter into a business relationship with" GateGuard. *Connolly*, 2014 WL 1257909, at *4 (quotations omitted). Moreover, GateGuard must show that Amazon's alleged interference was the "but-for" cause of the damaged business relationship. *Id.* at *4-5.

GateGuard does none of this. GateGuard's vague references to lost business from "existing" and "future customers," FAC ¶ 146, do not identify any specific customer, let alone support the allegation that Amazon had knowledge of GateGuard's relationship with that customer. Without identifying a "particular, existing business relationship through which [GateGuard] would have done business but for the" alleged interference, GateGuard's claim cannot succeed. *Connolly*, 2014 WL 1257909, at *5.

Moreover, GateGuard has not alleged that Amazon "intentionally" targeted landlords "by wrongful means" to "convince [them] not to enter into a business relationship with" GateGuard. *Id.* at *4. GateGuard's claims that Amazon made misleading statements to building superintendents about KFB, even if true, do not constitute the kind of "criminal or independently tortious" conduct required. *RSM Prod. Corp.*, 643 F. Supp. 2d at 412. Nor does GateGuard plausibly allege how Amazon stood to gain from interfering with GateGuard's relationships with landlords; Amazon's "true motivation" was purportedly to "increase[e] the volume and speed of its deliveries," FAC ¶ 51, not to harm GateGuard.

Finally, GateGuard has not pleaded facts showing that Amazon was the "but-for" cause of any lost business. GateGuard's customers testified under oath that they stopped using GateGuard's services after they experienced "numerous problems with the devices" in 2018 or earlier—prior to the 2019 launch of KFB—that the company "failed to fix," *Teman*, 465 F. Supp. 3d at 286. These problems, and Teman's abusive and criminal responses to his customers' dissatisfaction, are the obvious causes of GateGuard's business downturn.

***Conversion*** (**Count V**). GateGuard's claim fails because GateGuard does not identify a single device that it owns or possesses, and, even if it did, GateGuard was never completely excluded from those devices. Under New York law, "conversion is the unauthorized assumption

and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co*., 460 F.3d 400, 403-04 (2d Cir. 2006) (citations and alterations omitted). "Conversion requires not merely temporary interference with property rights, but the … complete exclusion of the rightful possessor." *Harper & Row Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).

GateGuard fails to identify any "specific identifiable" intercom that was allegedly seized by Amazon, either by reference to its location, serial number, date of damage, or any other identifying information. Moreover, as noted above, GateGuard's assertion of "legal owner[ship]" over the "devices installed at residential dwellings under contract with it," FAC ¶ 161, is contradicted by its own allegations. *Supra* Part I.A. There can be no conversion claim where a plaintiff has not first "demonstrate[d] legal ownership or an immediate superior right of possession to a specific identifiable thing." *Meese v. Miller*, 436 N.Y.S.2d 496, 500 (1st Dep't 1981). GateGuard's purported "exclusive control over package management" at "each building where it is installed," FAC ¶ 104, even if true, does not actually allege right of possession. In fact, GateGuard cites its legal *inability* to repossess the devices as justification for its imposition of an "opportunity cost" fee on customers who cancel their contracts prematurely. Service Agreement §§ 2(B)-(D), 5(B)(i)-(ii). Because "[P]laintiff [does] not legally own the … equipment, nor [does] it have an immediate and superior right to its possession over the legal owner," it cannot state a claim for conversion. *NY Medscan, LLC v. JC-Duggan Inc.*, 837 N.Y.S.2d 80, 82 (1st Dep't 2007).

Finally, GateGuard was never "completely excluded" from accessing the devices. GateGuard does not allege that the devices were ever removed from building sites, and

repeatedly acknowledges having full, continuing access to the devices.  *See* FAC ¶¶ 108-109

(describing GateGuard's access to, and inspection of, allegedly tampered-with devices).  Because

GateGuard "maintain[ed] access to the allegedly converted" intercoms, it "fails to state a claim

for conversion."  *Lopez v. BigCommerce, Inc.*, 2017 WL 3278932, at *5 (S.D.N.Y. Aug. 1,

2017).

     ***Trespass to Chattels* (Count IV)**.  GateGuard fails to state a claim because: (i)

GateGuard does not own the devices; (ii) Amazon did not intentionally damage the devices; and

(iii) GateGuard has not suffered actual damages.  The elements of trespass to chattels "are

substantially similar to the elements of … conversion."  *DeAngelis v. Corzine*, 17 F. Supp. 3d

270, 283 (S.D.N.Y. 2014).  A "trespass to chattel occurs when a party intentionally damages or

interferes with the use of property belonging to another."  *Fischkoff v. Iovance Biotherapeutics,

Inc.*, 339 F. Supp. 3d 408, 416 (S.D.N.Y. 2018) (quotations omitted).  Where, as here, the claim

is premised on "interference by unauthorized use"—as opposed to complete dispossession—a

plaintiff must show "actual damages."  *Id.*

     Like its conversion claim, GateGuard's trespass to chattels claim fails because GateGuard

does not own the intercom devices.  *See supra* Part I.A.  Additionally, GateGuard's allegation

that Amazon "intentionally impaired" the devices, FAC ¶ 158, is conclusory and implausible.  In

GateGuard's telling, malfunctioning intercoms harm Amazon by "compromis[ing] the safety of

… Amazon's own customers" and their packages.  FAC ¶ 13.  GateGuard provides no reason

why Amazon would intentionally damage apartment intercoms and harm its own interests.

     Finally, GateGuard claims it was "deprive[d]" of "economic benefit" as a result of

Amazon's alleged "tampering" with unspecified intercoms, FAC ¶ 158, but GateGuard fails to

identify a single lost contract or business relationship to support actual damages.  The costs of

repairing or replacing GateGuard devices cannot be actual damages because GateGuard does not own the devices and is contractually entitled to full compensation from customers for repair services rendered as a "result of [the customer's] or someone else's actions[,]" Service Agreement, Sched. A § 10.  GateGuard's vague reference to lost "economic benefit," without more, is insufficient to withstand a motion to dismiss.  *See In re Jetblue Airways Corp. Priv. Litig.*, 379 F. Supp. 2d 299, 328 (E.D.N.Y. 2005).

 ***Unjust Enrichment* (Count X)**.  GateGuard cannot state a claim for unjust enrichment: its relationship to Amazon "is too attenuated because they simply had no dealings with each other."  *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 517-18 (2012).  Unjust enrichment is a "quasi-contract" claim that requires a plaintiff to plead, among other things, a "sufficiently close relationship" with the defendant.  *Id.* at 516; *see also Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215-16 (2007).  Here, there is no relationship at all between Amazon and GateGuard.  They are undisputedly not each other's customers or in privity with one another.[12]  GateGuard's allegation of unsuccessful settlement discussions prior to litigation, FAC ¶¶ 130-134, is similarly insufficient to establish any "close relationship."  *See NSI*, 2021 WL 3038497, at *8.

## V. GATEGUARD'S ATTEMPTED MONOPOLIZATION CLAIM (COUNT XI) SHOULD BE DISMISSED, AND ITS CLASS ALLEGATIONS STRICKEN.

 "To survive a motion to dismiss, a Sherman Act claim must (1) define the relevant … market, (2) allege an antitrust injury, and (3) allege conduct in violation of antitrust laws."

---

[12] They are also not competitors, *see infra* Part V.B.1, which in any event "is an insufficient relationship" to support a claim for unjust enrichment.  *NSI Int'l, Inc. v. Horizon Grp. USA, Inc.*, 2021 WL 3038497, at *8 (S.D.N.Y. Jul. 16, 2021) (Koeltl, J.).

*Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (quotations omitted);

*see* 15 U.S.C. § 2.  Because GateGuard fails at each step, its antitrust claim should be dismissed.

### A.   GateGuard Fails to Define a Plausible Relevant Market.

GateGuard's proposed "e-commerce delivery market" (FAC ¶¶ 36-50, 192) is deficient

because it is based on an illogical theory that a hodgepodge of distinct and non-substitutable

services are in the same relevant market.  In deciding a motion to dismiss on market definition

grounds, courts must "assess whether the … complaint asserts sufficient facts to allege plausibly

the existence of both a product and geographic market."  *Concord*, 817 F.3d at 53.  "The outer

boundaries of a product market are determined by the reasonable interchangeability of use or the

cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v.*

*United States,* 370 U.S. 294, 325 (1962).  "[W]here the plaintiff fails to define its proposed

relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of

demand … the relevant market is legally insufficient and a motion to dismiss may be granted."

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (citation omitted).

GateGuard's proposed market definition is fundamentally flawed because it includes

GateGuard's intercom and building management services together with other products that,

under the facts pled, are not "reasonably interchangeable" with those services, such as shipping

carrier services from FedEx and UPS that physically transport products from online retailers

across the country to their customers.  *See* FAC ¶ 44.  GateGuard's conclusory allegation that

"[b]uilding access providers" are in the same market as "logistics" and "package delivery

companies," *id.*, is utterly implausible:  No online retailer would switch to a GateGuard intercom

to deliver products to customers in response to a hypothetical price increase by a shipping

carrier, and no consumer purchasing from an online retailer would consider GateGuard's

intercom services an alternative to shipping functions performed by UPS, FedEx, or Amazon.

26

*See* FAC ¶ 88.[13]  Indeed, GateGuard concedes that it offers its services to landlords and property

owners, not to online retailers or consumers.[14]  FAC ¶ 85.  These basic flaws doom GateGuard's

market definition.  *See Planetarium Travel, Inc. v. Altour Int'l, Inc.*, 97 F. Supp. 3d 424, 429

(S.D.N.Y. 2015) (dismissing complaint and explaining that products are not substitutes unless

consumers would switch among such products following price increase).

**B.    GateGuard Lacks Antitrust Standing Because It Has Not Suffered Antitrust Injury and Is Not an Efficient Enforcer of Antitrust Laws.**

GateGuard's absurd market definition is an attempt to manufacture antitrust standing by

shoehorning its products into a market that includes the services allegedly disadvantaged by

KFB—shipping services to online retailers.  But no artful pleading can cure GateGuard's

fundamental standing problem: that its alleged injury arises ***not from any purported reduction in***

***competition***, but rather from purely incidental effects of the installation of KFB.

 "Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its

terms fails to establish this requirement it must be dismissed as a matter of law."  *Harry v. Total*

*Gas & Power N. Am., Inc*., 244 F. Supp. 3d 402, 419 (S.D.N.Y. 2017) (Koeltl, J.), *aff'd as*

*modified*, 889 F.3d 104 (2d Cir. 2018) (quotation omitted).  To establish antitrust standing, a

plaintiff must show *both* that it has "suffered a special kind of antitrust injury" *and* is an

---

[13]  The same is true of the "landlords" and others GateGuard includes in its market definition.  FAC ¶ 44.

[14]  Nor is KFB a substitute for GateGuard's intercom services, which are allegedly sold to New York landlords seeking to comply with state laws requiring apartments to be equipped with intercom systems.  *See* FAC ¶ 9.  No landlord would install KFB as a substitute for a GateGuard intercom, because KFB is not an intercom with certain functions (*e.g.*, voice communication) contemplated by those laws.

"efficient enforcer of the antitrust laws." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (citation omitted) ("*Amex*").  GateGuard shows neither.

### 1.    GateGuard Does Not Participate in the E-Commerce Delivery Market and Has Not Been Harmed by Any Reduction in Competition.

To establish antitrust injury, a plaintiff must allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Generally, only "[c]ompetitors and consumers in the market where trade is allegedly restrained," can allege antitrust injury.  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) ("*Aluminum Warehousing*") (citation omitted).  And such parties must plead "more than injury causally linked to an illegal presence in the market"; they must plead an injury "that flows from that which makes defendants' acts unlawful," *i.e.*, from the reduction in competition caused by the antitrust violation. *Brunswick*, 429 U.S. at 489.[15]

---

[15]  The "narrow exception to the market participant requirement" for plaintiffs whose injuries are "inextricably intertwined" with the injury inflicted on the relevant market, *Aluminum Warehousing*, 833 F.3d at 158, plainly cannot apply here because injury to GateGuard is not the means by which the claimed anticompetitive effect—a competitive advantage for Amazon over rival delivery providers—occurs.  Rather, installation of the KFB would have the same effect on competition between Amazon, FedEx, UPS and others regardless of any purported incidental impact on GateGuard.  Indeed, the hypothesized strategy by Amazon to gain a competitive advantage over shipping rivals would work *better* if GateGuard's intercoms were *not* damaged.  Moreover, this narrow exception applies only to conspiracy claims under Section 1 of the Sherman Act, whereas GateGuard brings its claim under Section 2.  *See* FAC ¶ 21; *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 363-64 (S.D.N.Y. 2016).

First, GateGuard cannot have suffered antitrust injury here because it does not participate in any cognizable relevant market.  Even assuming GateGuard has adequately defined an "e-commerce delivery market," GateGuard's theory of anticompetitive harm is that Amazon will obtain an advantage over *shipping carriers*, and GateGuard does not plead facts plausibly suggesting that it competes with UPS, FedEx, Amazon, or any other shipping carrier.  Rather, GateGuard is one of "hundreds" of competitors in the New York "intercom" or "access control market," FAC ¶¶ 42-43, where it offers a product to *landlords* in New York that opens and closes doors, and a service that manages "who can deliver into the [building]," *id.* ¶ 48.

Second, even if GateGuard competed in a relevant market, GateGuard would still lack antitrust standing because its claimed injury—damaged intercoms and business relationships—does not derive from any ***reduction in competition*** among shipping carriers for e-commerce deliveries.  Instead, it arises solely from the alleged occasional technical incompatibility between its intercoms and KFB.  That injury does not "reflect the anticompetitive effect" of the alleged antitrust violation.  *Brunswick*, 429 U.S. at 489; *see Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007); *Paycom Billing Services v. MasterCard International, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (no antitrust standing where injury was "indirect").  GateGuard's alleged injury would be identical if KFB were provided to building owners by a small technology company resulting in similar technological incompatibilities with GateGuard's products.

### 2. GateGuard Is Not an Efficient Enforcer of the Antitrust Laws Because Its Alleged Injury Is Not Directly Related to Any Anticompetitive Conduct.

GateGuard also lacks standing because it is not an "efficient enforcer of the antitrust laws." *Amex*, 19 F.4th at 138.

First, GateGuard fails to allege a "direct relation between the injury asserted" and the anticompetitive conduct alleged. *Id.* at 140. As noted, GateGuard's alleged injury derives not from any reduction in competition, but from an ancillary effect of the challenged conduct—that Amazon's installation of KFB sometimes "interfere[s] with the proper operation GateGuard's intercoms." FAC ¶ 10. This injury is "incidental[]" to the alleged monopolistic conduct, weighing against GateGuard being an efficient enforcer. *Gatt Comm'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 78 (2d Cir. 2013).

Second, even if the conduct were "anticompetitive"—which it is not—there are "more direct victims." *Amex*, 19 F.4th at 40. GateGuard even identifies companies like FedEx and UPS as more direct victims that will purportedly suffer "pricing and reliability disadvantage" associated with "failed deliveries" and "circling time." FAC ¶¶ 29, 47. These companies would "normally [be] motivate[d] … to vindicate the public interest in antitrust enforcement." *Amex*, 19 F.4th at 141.[16]

---

[16]  While GateGuard's failure to satisfy the first two factors of the efficient enforcer test—lack of directness, and the availability of more direct parties to sue—is enough, *see Amex*, 19 F.4th at 141, GateGuard also fails to meet the third and fourth factors. GateGuard's injury is "highly speculative" because it relies on hypothetical future harm to unspecified intercoms and contracts. And GateGuard's claim also poses a risk of either "duplicate recoveries" by landlords and Plaintiff, who both claim ownership over the intercoms, or "complex apportionment of damages" between entities like FedEx that have allegedly been "directly victimized" and those who, like GateGuard, were at best only "indirectly affected." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983).

C.    **GateGuard Fails to Plead Anticompetitive Conduct or a Dangerous Probability of Monopolization.**

1.    **GateGuard Fails to Plead Anticompetitive Conduct.**

GateGuard also fails to plausibly allege any "predatory or anticompetitive" conduct as required to claim attempted monopolization.  *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (citation omitted).  "[F]ederal antitrust laws … do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce," *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) (citation omitted), and "[i]solated business torts … do not typically rise to the level of a section 2 violation unless there is a harm to competition itself," *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 323 F.3d 366, 372 (6th Cir. 2003).  Therefore, when an antitrust claim relies on allegations sounding in business tort or unfair competition, courts "insist on a 'preliminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer)' before these practices can rise to the level of exclusionary conduct."  *Am. Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Pubs., Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (quoting 3 PHILIP AREEDA & DONALD TURNER, ANTITRUST LAW ¶ 737b (1978)).

Here, GateGuard's claim of "anticompetitive" conduct is that KFB allows Amazon to reduce costs and offer more attractive products and services to its customers.  But there is nothing anticompetitive about that.  Indeed, GateGuard concedes that KFB is good for consumers: it "ensure[s] more rapid, reliable deliveries," and allows Amazon to offer "faster, more efficient package delivery service not only for its own products, but also for third-party deliveries."  FAC ¶ 55.  Such procompetitive conduct "of invention and innovation is clearly tolerated by the antitrust laws."  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281

(2d Cir. 1979); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (although "procompetitive or efficiency-enhancing" practices "may cause serious harm … this kind of harm is the essence of competition").  Further, there is no reason other shipping carriers cannot deploy technological solutions similar to KFB to compete with Amazon.

GateGuard's reliance on allegedly misleading statements in promotional materials or to building personnel is misplaced because GateGuard's inchoate allegations fail to "overcome a presumption that the effect on competition of such [misleading advertising] was *de minimis.*" *Nat'l Ass'n of Pharma. Mfrs. v. Ayerst Labs.*, 850 F.2d 905, 916 (2d Cir. 1988); *see also Affinity LLC v. GfK Mediamark Research & Intell., LLC*, 547 F. App'x 54, 57 (2d Cir. 2013) (affirming dismissal).  Among other things, the FAC lacks allegations suggesting that any misleading statement was "not readily susceptible of neutralization or offset by rivals."  *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002).

### 2. GateGuard Has Not Plausibly Pleaded that the Challenged Conduct Poses a Dangerous Probability of Monopolizing the Relevant Market.

Finally, GateGuard has not plausibly alleged that Amazon's alleged conduct poses a "dangerous probability of achieving monopoly power."  *PepsiCo*, 315 F.3d at 105.  For this factor, courts must consider not only the defendant's market share, but also the "strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand."  *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987).

Nowhere does GateGuard explain how Amazon's supposed damage to GateGuard's intercoms, or alleged misleading statements in marketing KFB in apartment buildings in high-traffic areas of New York City, poses a danger that it will monopolize the e-commerce business *of the entire nation*.  GateGuard concedes that the New York Metro area's share of the national

e-commerce delivery market does not exceed 7%. FAC ¶ 36. Conduct that impacts such a small

proportion of market share cannot pose a "dangerous probability" of monopolization. Worse,

GateGuard limits its FAC to forty unidentified buildings where Amazon allegedly interfered with

GateGuard's intercom business, FAC ¶ 96—a tiny slice that could not possibly support a claim

of nationwide monopolization because "competitors from outside the market could easily …

surmount[] any barriers to entry" by deploying similar technology or explaining to the forty

buildings' owners why they should uninstall KFB. *Walsh Trucking*, 812 F.2d at 792.

### D.    Alternatively, the Court Should Strike GateGuard's Class Allegations.

Should GateGuard's antitrust claim survive, the Court should strike its class allegations

pursuant to Rule 12(f) and its power to "eliminate allegations about representation of absent

persons" under Rule 23(d)(1)(D). Courts strike class allegations when the class certification

"issues are 'plain enough from the pleadings,'" and "may be resolved without further discovery."

*Borgese v. Baby Brezza Enterprises LLC*, 2021 WL 634722, at *2 (S.D.N.Y. Feb. 18, 2021)

(quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)). Here, GateGuard cannot satisfy

either the adequacy or predominance requirements.

*First*, GateGuard cannot "fairly and adequately protect the interests of the class," Fed. R.

Civ. P. 23(a)(4), because GateGuard's founder and owner was recently criminally convicted for

defrauding GateGuard's customers—the very "property owners" GateGuard seeks to represent in

the purported class, FAC ¶ 197. An entity controlled by a felon is not an "adequate[]" class

representative, Fed. R. Civ. P. 23(a)(4), and that is particularly so where there is a fundamental

"conflict[] of interest between [the proposed class representative] and the class [it] seek[s] to

represent," *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *see*

*Kirkpatrick v. Ironwood Commc'ns, Inc.*, 2006 WL 2381797, at *6 (W.D. Wash. Aug. 16, 2006)

(plaintiff convicted of crime of dishonesty was inadequate class representative); *Weisman v. Darneille*, 78 F.R.D. 669, 670-71 (S.D.N.Y. 1978) (same).

*Second*, GateGuard would not be an adequate class representative for other putative class members whose financial interests conflict with GateGuard's. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 539 (S.D.N.Y. 2018) (finding adequacy lacking where some class members benefited from the alleged benchmark manipulation at others' expense. The putative class includes, among others: (1) "package delivery management service providers," such as GateGuard, (2) "other package delivery services," (3) "fulfillment centers," (4) "e-commerce retailers," and (5) "property owners." FAC ¶ 197. The claims and theories of injury among these different groups are likely to conflict based on their differing roles in the economy. Similarly, common issues will not predominate as Rule 23(b)(3) requires because each category of class members will have to prove injury with evidence that is not common to class members in the other groups. *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 45 (S.D.N.Y. 2020).

Because it is "'plain enough from the pleadings'" that the alleged class cannot be certified, GateGuard's class allegations should be stricken. *Borgese*, 2021 WL 634722, at *2 (citation omitted).

## CONCLUSION

The Court should dismiss the FAC with prejudice and strike GateGuard's class allegations.

Dated:  New York, New York
       March 10, 2022

                Respectfully submitted,

                GIBSON, DUNN & CRUTCHER LLP

                By:  _/s/  Anne Champion_

                      Anne Champion
                      Christopher D. Belelieu
                      Eric J. Stock
                      David P. Salant

                      200 Park Avenue
                      New York, NY 10166-0193
                      Telephone: (212) 351-4000
                      Email: achampion@gibsondunn.com
                              cbelelieu@gibsondunn.com
                              estock@gibsondunn.com
                              dsalant@gibsondunn.com

                      _Attorneys for Defendants Amazon.com, Inc.,_
                      _Amazon.com Services LLC, and Amazon_
                      _Logistics Inc._

**ATTORNEY CERTIFICATION PURSUANT TO INDIVIDUAL RULE II(D)**

Pursuant to the Court's Individual Rule II(D), I, Anne Champion, an attorney duly admitted to practice law before this Court, hereby certify that the foregoing memorandum of law contains 9,996 words, in compliance with the Court's order of January 8, 2022 enlarging Defendants' word limit to 10,000 words (ECF No. 12), and that this memorandum complies with the Court's applicable formatting rules.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum.


Dated: March 10, 2022                                    _____/s/ Anne Champion_____
          New York, New York                                      Anne Champion