**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GATEGUARD, INC.

      *Plaintiff*,

    v.

AMAZON.COM, INC.,
AMAZON.COM SERVICES, INC.,
AMAZON.COM SERVICES, LLC,
AMAZON LOGISTICS, INC.

      *Defendants*.

---

Civil Action No. 21-cv-9321 (JGK)

**FIRST AMENDED INDIVIDUAL**
**AND CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## GATEGUARD'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND TO STRIKE PLAINTIFF'S CLASS ALLEGATIONS

QUAINTON LAW, PLLC
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, NY 10016
212-419-0575
equainton@gmail.com
*Attorneys for Plaintiff GateGuard, Inc.*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

LEGAL STANDARD..........................................................................................2

STATEMENT  OF FACTS ...................................................................................2

LEGAL ARGUMENT.........................................................................................7

    I.       GATEGUARD HAS STATED A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT..................................................................................7

    A.    GateGuard Has Suffered a Cognizable Injury. .................................................7

    B.    The Amended Complaint Contains Sufficient Factual Allegations From Which the Court Can Infer Amazon Intentionally Accessed the GateGuard "Computer." ....9

    C.    GateGuard has Adequately Pled That Amazon Acted "Without Authorization."............................................................................................10

    II.       GATEGUARD HAS STATED A TRADE SECRETS CLAIM....................11

    III.      GATEGUARD HAS ADEQUATELY ALLEGED A TARNISHMENT AND LANHAM ACT CLAIM..................................................................................13

    IV.      PLAINTIFF'S STATE LAW TORT CLAIMS ARE VALIDLY STATED. .15

    A.    Tortious Interference with Contract.............................................................15

    B.    Tortious Interference with Prospective Economic Advantage .......................17

    C.    Conversion .................................................................................................19

    D.    Trespass to Chattels ...................................................................................21

    E.    Unjust Enrichment ....................................................................................21

    V.       GATEGUARD HAS VALIDLY STATED AN ATTEMPTED MONOPOLIZATION CLAIM. ........................................................................22

    A.    GateGuard Has Adequately Alleged that Amazon Engaged in Anti-Competitve Conduct With A Specific Intent to Monopolize and a Dangerous Probability of Success.................................................................................22

    B.    The E-Commerce Delivery Market Is a Plausible Relevant Market. ..............25

    C.    GateGuard Has Standing to Bring its Antitrust Claims Against Amazon.......27

    D.    GateGuard is An Efficient Enforcer of the Antitrust Laws. ...........................29

    E.    Amazon's Wrongful Conduct Comes Squarely Within the Scope of the Anti-Competitive Conduct the Antitrust Laws Seek to Prevent. .......................29

    VI.      GATEGUARD'S CLASS CLAIMS SHOULD BE MAINTAINED. ...........30

    A.    Amazon's Motion is Pre-Mature and There is No Reason to Strike GateGuard's Class Claims at This Juncture...............................................30

CONCLUSION....................................................................................................32

# TABLE OF AUTHORITIES

## CASES

*Alivecor, Inc. v. Apple Inc.*,
  No. 21-CV-03958-JSW, 2022 WL 833628 (N.D. Cal. Mar. 21, 2022)....................29, 30

*Amaranth LLC v. J.P. Morgan Chase & Co.*,
  71 A.D.3d 40  (1st Dep't 2009). ...................................................................... 18

*Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*,
  59 A.D.3d 473 (2nd Dept. 2009). .................................................................... 15

*Apple Mortg. Corp. v. Barenblatt*,
  162 F. Supp. 3d 270 (S.D.N.Y. 2016).......................................................7, 8, 9

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................... 2

*Avaya, Inc. v. Telecom Labs, Inc.*, No. CIV. 06-2490 (GEB), 2009 WL 2928927 (D.N.J.
  Sept. 9, 2009)................................................................................................ 23

*Baron Assocs., P.C. v. RSKCO*,
  16 A.D.3d 362 (2nd Dep't 2005). .................................................................... 17

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................... 2

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
  651 F.2d 122 (2d Cir. 1981)............................................................................. 24

*Carvel Corp. v. Noonan*,
  3 N.Y.3d 182 (2004) ....................................................................................... 18

*Daniel v. Am. Bd. of Emergency Med.*,
  988 F. Supp. 112 (W.D.N.Y. 1997) .................................................................. 23

*Deere & Co. v. MTD Prod., Inc.*,
  41 F.3d 39 (2d Cir. 1994)................................................................................ 15

*DeSoto v. Bd. of Parks & Recreation*,
  64 F. Supp. 3d 1070 (M.D. Tenn. 2014)............................................................. 9

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016)................................................................. 25

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
  105 N.E. 3d 301 (N.Y. 2018)........................................................................... 11

*Fireman's Ass'n of State of New York v. French Am. Sch. of New York*,
  41 A.D.3d 925 (2007) ................................................................................................... 14

*Georgia Malone & Co. v. Rieder*,
  19 N.Y.3d 511 (2012) ................................................................................................... 21

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
  50 N.Y.2d 183 (1980) ................................................................................................... 17

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
  879 F.2d 1005 (2d Cir.1989); ...................................................................................... 24

*Halvatzis v. Perrone*,
  199 A.D.3d 785 (2nd Dep't 2021). ............................................................................... 19

*Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402 (S.D.N.Y. 2017) *aff'd as
  modified*, 889 F.3d 104 (2d Cir. 2018) ........................................................................ 27

*Henneberry v. Sumitomo Corp. of Am.*,
  532 F. Supp. 2d 523 (S.D.N.Y. 2007)........................................................................... 18

*Holmes v. Grubman*,
  568 F.3d 329 (2d Cir. 2009)........................................................................................... 2

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016)......................................................................................... 28

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021). ........................................................................................ 29

*In re EVIC Class Action Litig.*,
  No. 00-CIV-3811 (RMB), 2002 WL 1766554 (S.D.N.Y. July 31, 2002) ..................... 25

*International Distrib. Ctrs., Inc. v. Walsh Trucking*,
  812 F.2d 786 (2d Cir.1987)........................................................................................... 24

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
  893 F. Supp. 1207 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir. 1995) .......................... 25

*JBCHoldings NY, LLC v. Pakter*,
  931 F. Supp. 2d 514 (S.D.N.Y. 2013)............................................................................. 7

*L&W/Lindco Prod., Inc. v. Pure Asphalt Co.*,
  979 F. Supp. 632 (N.D. Ill. 1997). ............................................................................... 30

*Lowenbraun v. Garvey*,
  60 A.D.3d 916 (2nd Dep't 2009) .................................................................................. 17

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
   711 F.3d 106 (2d Cir. 2013)................................................................................. 2

*Mandarin Trading Ltd. v. Wildenstein*,
   16 NY3d 173 (2011) ................................................................................... 21, 22

*Marnell v. United Parcel Serv. of Am., Inc.*,
   260 F. Supp. 391 (N.D. Cal. 1966) .................................................................. 25

*McGahee v. Northern Propane Gas Co.*,
   858 F.2d 1487 (11th Cir.1988) ........................................................................ 24

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
   651 F.2d 76 (2d Cir. 1981)............................................................................... 23

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020)............................................................... 27

*Oncology Tech, LLC v. Elekta, Inc.*,
   No. SA-12-CA-314, 2013 WL 12171814 (W.D. Tex. Apr. 26, 2013) ............ 16

*Parker v. Time Warner Ent. Co., L.P.*,
   331 F.3d 13 (2d Cir. 2003)............................................................................... 31

*People v. Mahoney*,
   6 A.D.3d 1104 (4th Dep't 2004)...................................................................... 21

*Philips Med. Sys. Puerto Rico Inc. v. GIS Partners Corp.*,
   203 F. Supp. 3d 221 (D.P.R. 2016)..................................................................... 9

*Ray v. Stockton*,
   162 A.D. 3d 1677 (4th Dep't 2018)................................................................. 18

*Rebotix Repair LLC v. Intuitive Surgical, Inc.*,
   No. 8:20-CV-2274-VMC-TGW, 2021 WL 1227593 (M.D. Fla. Mar. 8, 2021) ............ 23

*Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,
   926 F.2d 134 (2d Cir. 1991)............................................................................. 15

*Schroeder v. Pinterest Inc.*,
   133 A.D.3d 12 (1st Dep't 2015) ...................................................................... 11

*Specialty Mins., Inc. v. Pleuss-Stauffer AG*,
   No. 98 CIV. 7775(VM)(MHD, 2004 WL 42280 (S.D.N.Y. Jan. 7, 2004)..................... 23

*Sporn v. MCA Recs., Inc.*,
   58 N.Y.2d 482 (1983) ...................................................................................... 21

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998) .................................................................... 24

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ............................................................................ 9

*Western Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
  190 F.3d 974 (9th Cir. 1999) ................................................................ 25

*Xerox Corp. v. Media Scis., Inc.*,
  660 F. Supp. 2d 535 (S.D.N.Y. 2009) .................................................. 22

## STATUTES

18 U.S.C. §§ 1030 *et seq* (Consumer Fraud and Abuse Act). ............... 2, 7,  9, 10,

18 U.S.C.A. § 1832, *et seq*  (Defend Trade Secrets Act). ................................ 11, 12

18 U.S.C. § 1839(3). ......................................................................... 12

15 U.S.C. § 1125 (Lanham Act) ....................................................... 15

15 U.S.C. § 1, *et seq* (Sherman Act). ............................................... Ry23

## RULES

F.R.C.P Rule 12(b)(6) .......................................................................... 2

F.R.C.P Rule 8 ..................................................................................... 8

F.R.C.P. Rule 23(b)(3) ....................................................................... 31

## OTHER AUTHORITIES

William Lynch Schalle, *On Equipoise, Knowledge, and Speculation: A Unified Theory of Pleading Under the Defend Trade Secrets Act-Jurisdiction, Identification, Misappropriation, and Inevitable Disclosure*, 27 J. Intell. Prop. L. 137, 183 (2020) ........ 13

https://venturebeat.com/2020/09/24/amazon-debuts-new-ring-products-including-a-mini-home-surviellance-drone/ ....................................................................... 13

## TREATISES

Restatement of the Law of Torts (Second), October 2021 update, § 266, *Conversion by Destruction or Alteration* ................................................................. 20

**PENDING MATTERS**

*USA v. Teman*, 19-cr-696 ........................................................................................................ 8
*USA. v. Teman*, 21-1920 ....................................................................................................... 8

**<u>PRELIMINARY STATEMENT</u>**

For all its overheated rhetoric, Defendants' Motion to Dismiss Plaintiff's Amended

Complaint and to Strike Plaintiff's Class Allegations, Dkt. 19 ("Defs' Mot. to Dismiss") fails to

make a plausible case that GateGuard's claims are legally deficient. On the contrary, Amazon's

motion highlights the disputed facts that render dismissal as a matter of law inappropriate. Over

and over, Amazon returns to its core theme—that GateGuard does not "own" the advanced,

artificial-intelligence-enabled intercoms it installs at residential apartments. Defs' Mot. to

Dismiss at 2, 3, 11, 15, 22, 23, 24, 25. But this question is particularly ill-suited to resolution on

a motion to dismiss, not least because of the specific language in the GateGuard Service

Agreement Amazon itself has brought forward. *See* Declaration of David Salant, Ex. A, Dkt.

19-1 (the "Service Agreement"). The Service Agreement makes clear GateGuard does, in fact,

own its devices. *See, e.g.,* Service Agreement, Section 8(D)(i), Section 16. *See also* FAC ¶¶ 7,

91, 161.

Amazon's forced attempt to make the Service Agreement state the opposite of its plain

language is emblematic of Defs' Mot. to Dismiss that repeatedly misstates and distorts both the

facts and the law and then tilts at straw men or confuses the issues with red herrings.

In reality, GateGuard's First Amended Complaint (the "FAC") plausibly alleges (1)

ownership of its intercom panels, (2) Amazon's wrongful conduct in accessing these panels

without authorization, (3) Amazon's simultaneous damaging of, and attempting to benefit from,

GateGuard's devices and brand, (4) the existence of direct competition between Amazon and

GateGuard with respect to apartment building access control for package deliveries, a crucial

component of the complex e-commerce delivery market, and (5) Amazon's market power,

specific intent, and dangerous probability of monopolizing the e-commerce delivery market.

These facts serve as a sufficient pleading basis for GateGuard's Computer Fraud and Abuse Act, trade secrets, tarnishment, tort and attempted monopolization claims. For all the misdirection in Defs' Mot. to Dismiss, the motion must be denied.

## **LEGAL STANDARD**

In considering a motion to dismiss brought pursuant to F.R.C.P Rule 12(b)(6), the court must construe a complaint liberally, "accepting all factual allegations ... as true, and drawing all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal,* 556, U.S. at 678 (quoting *Twombly*, 550 U.S. at 556)). Stating a claim requires a complaint "with enough factual matter (taken as true) . . . to raise a reasonable expectation that discovery will reveal evidence" of unlawful conduct. *Twombly*, 550 U.S. at 556.

## **STATEMENT OF FACTS**

Plaintiff GateGuard, Inc. ("Plaintiff" or "GateGuard") is a startup company that develops, manufactures and sells security technology for multi-tenant apartment buildings. First Amended Complaint (the "FAC"), Dkt. 14, ¶ 2. One of GateGuard's primary offerings is its "AI Doorman" intercom device that enables building managers to autonomously track everyone who enters the building, buzzes, or uses a guest code. FAC ¶¶ 3-4. The AI Doorman is an Android OS-powered intercom built around proprietary technology that includes the configuration of its motherboard, the placement and type of electronic circuitry and other

components used, the insulation resistance between circuits, the voltages at which the device operates, the mechanisms of internet connectivity and the antennae used. FAC ¶ 86. Only authorized GateGuard agents are legally permitted access to the devices for repairs and troubleshooting. *Id*.

Use of the Company's website is governed by GateGuard's Service Agreement and Terms and Conditions that reinforce the Company's proprietary rights in its devices, intellectual property, and website. FAC ¶ 7, 85. GateGuard offers its devices and associated software on a subscription model based on a Service Agreement, pursuant to which GateGuard offers to install its intercom at a low upfront cost with recurring fees based on usage over a multiple-year period. FAC ¶ 7. To place an order, a customer is required to confirm that it has read and agrees to the Service Agreement and the related Terms and Conditions, which make clear, *inter alia*, that GateGuard is the owner of its devices. *Id.* The Service Agreement also makes clear the GateGuard customer is a "subscriber," not the owner of GateGuard installations. FAC ¶ 91. Customers are required to provide a Maintenance Security Deposit for the installation of a GateGuard device. *Id.* The manufacturer's suggested retail purchase price for a GateGuard device is $8649. Rather than selling the device, however, the Company leases its devices to the customer for a heavily discounted product fee of $3699 plus the Maintenance Security Deposit. *Id.* Early in the Company's history, in 2017 and 2018, a handful of customers claimed, in bad faith, that they were unaware of the Company's Terms and Conditions and had somehow purchased devices directly from the Company without using the Company's website. FAC ¶ 90 and Note 21.[1]

---

[1] These are the customers involved in the criminal case against GateGuard's founder, Ari Teman ("Teman"), currently pending on appeal. The self-serving claims of these customers should not be credited and are not typical of GateGuard's other customers. *See* Declaration of AriTeman, dated May 9, 2022 (the "Teman Decl.") at ¶¶ 2-3.

As a reflection of GateGuard's ownership rights, the Service Agreement states that GateGuard makes "an intense effort to protect *our devices*, networks, connections, and data" (emphasis added). FAC ¶ 94. The Service Agreement also provides that upon termination, GateGuard can recover its devices, Section 8(D)(i), and that GateGuard is allowed to install security cameras and take other measures to ensure that its personnel are the only ones with access to its devices. Section 16. In addition, under Section 6(C)(i), GateGuard expressly prohibits the landlord from allowing any third party to access its devices.

In buildings where its products are installed, GateGuard exerts total control over package delivery and management, thereby easing the burden on property managers and superintendents. FAC ¶ 48. Under its agreement with property managers, GateGuard has "control over all aspects of package delivery." *Id.* In direct competition and conflict with GateGuard, Amazon markets a product called the Amazon Key for Business (the "Amazon Key"). FAC ¶ 45. The Amazon Key is a small device that is inserted into existing access devices or systems through an "extender" or that is directly wired into the circuit board of an existing system. FAC ¶ 86. Through the Amazon Key, Amazon deliverers are able to bypass a building's existing access system and deliver packages directly into a building without the consent of the access system operator. FAC ¶ 46. GateGuard has not consented to the use of its devices by Amazon. FAC ¶ 97. GateGuard is aware of at least one specific instance in which the Amazon Key was installed without the consent of the property manager at a GateGuard building. FAC ¶¶ 102 -104. GateGuard has also caught Amazon Key technicians red-handed installing the Key into the GateGuard intercom panel without GateGuard's consent. FAC ¶¶ 107 – 115. GateGuard has compiled additional video evidence of Amazon Key technicians tampering with GateGuard devices. FAC ¶ 116. GateGuard has amassed substantial evidence that Amazon routinely installs its Key without property manager approval by targeting

subordinate employees without the authority to approve the installation of a new access device. FAC ¶¶ 66-67. Amazon Key sales reps are explicitly encouraged to keep their pitch as "simple" as possible so that potential targets – low level managers and superintendents without contractual authority to permit competing devices to be wired into existing access systems – do not "get nervous" and can be tricked into signing a contract with Amazon without "feel[ing] the need" to contact "a higher up." FAC ¶ 67.

Once the Amazon Key has been inserted into an existing access system, Amazon either unfairly benefits from the wiring and placement of the existing system or causes the existing system to short or malfunction. FAC ¶¶ 50, 96 ("piggy-backing" and "free-riding"), 50, 106 (shorting or irreparably damaging the GateGuard devices). This situation results in a "win-win" for Amazon, which is either unjustly enriched by its free use of a third party's installation or wiring system, or can leverage the property manager's dissatisfaction with GateGuard into a new relationship with Amazon. FAC ¶ 122 (Key marketed as an "upgrade" to the system the Key itself has damaged).

Amazon's conduct has been devastating for GateGuard. GateGuard's equipment has malfunctioned on at least 20 occasions and each time GateGuard was able to confirm that Amazon had inserted its Key into the GateGuard intercom panel, resulting in an electric short or other damage to the GateGuard panel. FAC ¶¶ 118 -120. GateGuard has provided the details of the maintenance call logs at the buildings affected by Amazon's conduct. FAC ¶ 118-119. Based on the number of intrusions GateGuard has been able to document, GateGuard has lost over 110 contracts on buildings throughout New York city. FAC ¶ 97. Each contract has an expected lifetime value of approximately $90,000 resulting in damages of at least $10 million just from lost contracts alone, without taking into consideration the lost opportunities and damage to goodwill caused by Amazon's tactics. *See* Service Agreement, Section 4(C).

Amazon's goal, evidenced by the ubiquitous Amazon delivery vans and trucks, is to monopolize the e-commerce delivery market. FAC ¶ 1, 43, 47, 59. The e-commerce delivery market is the market for the delivery of goods purchased on-line. Through its dominant position in e-commerce and sales and fulfillment, Amazon already has market power in this market. FAC ¶¶ 38-40. In urban centers, the vast majority of the population lives in multi-family apartment complexes. FAC ¶ 41, 42. Control of the e-commerce delivery market depends thus on two central, and intertwined, elements: control of transportation logistics (vans, trucks, cars, scooters, bicycles, etc) and control of apartment **access** for package delivery. These two elements merge in last mile delivery logistics, which accounts for 50% of delivery costs. FAC ¶ 33. In congested urban centers, transportation vehicles need places to park, stand or hover, and without access control, vehicles may be required to circle a destination several times or even abandon deliveries altogether, adding to delivery costs and damaging the deliverer's brand. FAC ¶ 47. If Amazon can control residential access for package delivery, it will have an insurmountable advantage over other transportation rivals, such as UPS, Fed Ex or independent fulfillment centers. FAC ¶ 44. However, to achieve this advantage, Amazon must compete with and displace other providers of access control for package delivery such as GateGuard. *Id*. Thus, Amazon and GateGuard are direct competitors in the crucial, indeed, decisive component of the urban e-commerce delivery market: residential access control for package delivery. FAC ¶¶ 49.

Amazon does not seek to outcompete GateGuard on the basis of technological superiority. Rather, Amazon uses deception, threats, unauthorized access, product tampering and free riding to achieve its ends. FAC ¶¶ 60-74, 80-84, 96-116, 134. Indeed, destroying independent package delivery access control providers such as GateGuard is central to Amazon's strategy. FAC ¶ 48.

The anti-competitive effect of Amazon's tactics is felt throughout the e-commerce delivery market, where shippers, fulfillment centers and e-commerce platforms that have not attempted to strong-arm their way into a privileged residential access position are put at a competitive disadvantage to Amazon. Because GateGuard is on the front line of the competitive battle in the most strategically important component of the market, it is the ideal representative for all the market actors who are harmed by Amazon's underhanded and illegal attempt to control apartment access and end-point package delivery.

## **LEGAL ARGUMENT**

I.    **GATEGUARD HAS STATED A CLAIM UNDER THE COMPUTER FRAUD AND ABUSE ACT.**

   A.  **GateGuard Has Suffered a Cognizable Injury.**

Amazon makes a hodgepodge of unconvincing arguments in support of its position that GateGuad has not suffered a cognizable injury under the Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 *et seq.,*  (the "CFAA"). Amazon begins with the irrelevant assertion that the CFAA is "primarily" a criminal statute. Defs' Mot. to Dismiss at 10. However, the CFAA expressly contemplates civil remedies. "The CFAA is primarily a criminal statute, but it also creates a private cause of action allowing compensatory and equitable relief for any person who suffers one of several classes of damages, including losses exceeding $5,000." *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 520 (S.D.N.Y. 2013); *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 287(S.D.N.Y. 2016) (Koeltl, J.)(CFAA contains private right of action);

Second, Amazon claims it does not have "fair notice" of the CFAA claim because the pleadings do not identify any particular device, location, or date of "access." This is unpersuasive. GateGuard has identified, and captured on video, specific instances of Amazon's

illegal tampering with GateGuard devices. FAC ¶ 97. The audio-visual evidence is time and date-stamped and clearly identifies Amazon workers in the act of operating on a specific externally affixed intercom panel identified by GateGuard as one of its own. *Id.* [2] Amazon knows whether its workers obtained GateGuard's consent and operated on GateGuard's devices to install the Amazon Key. GateGuard's video evidence gives Amazon clear notice that Amazon is alleged to have sent its workers on a specific date and occasion to disassemble and interfere with a specific intercom the pleading identifies as a GateGuard device. *Id.* At the pleading stage, F.R.C.P Rule 8 requires no more.

These two preliminary points serve to set the stage for Amazon's principal point, that GateGuard's claims are barred because, according to Amazon, it does not "own" the devices with which Amazon has tampered. Defs' Mot. to Dismiss at 11. *See supra* at 1, 3-4 and Note 1. In support of its position, Amazon asks the Court to take judicial notice of the entire criminal docket in *USA v. Teman*, 19-cr-696. Def's Mot. to Dismiss at 11 and Note 7. GateGuard has no objection in principle (although the Court should also take note of the appellate docket, *USA v. Teman*, 21-1920), but the Court need not scour through thousands of pages of a sprawling docket, since the issue with respect to ownership is simply whether, as a matter of law, the Court can conclude the landlords unambiguously own the GateGuard intercoms, which it plainly cannot. *See supra* at 1, 3-4. At most, there could be a fact question as to whether GateGuard's online terms are ambiguous. But this fact question simply underscores the need for discovery as this Court has held in the past when faced with contractual ambiguity. *See Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 281 (S.D.N.Y. 2016)(Koeltl, J.).

---

[2] The date-stamping makes clear that GateGuard's claims are not time-barred as Amazon suggests. Defs' Mot. to Dismiss, at 11 and Note 6.

**B. The Amended Complaint Contains Sufficient Factual Allegations From Which the Court Can Infer Amazon Intentionally Accessed the GateGuard "Computer."**

Amazon next argues that GateGuard fails to plead that Amazon intentionally accessed the GateGuard intercom's "computer" itself.  Defs' Mot. to Dismiss at 14.[3] In support, Amazon cites unpersuasively to this Court's opinion in *Apple Mortg. Corp.*, in which the Court found that there was a triable issue of fact as to access because the defendants had "accessed, deleted, or forwarded . . . emails." *Apple Mortg. Corp.*, 162 F. Supp. 3d at 287. It does not follow that because access to emails constitutes unauthorized access, non-email access is outside the scope of the CFAA. This is simply a non-sequitur. Here, Amazon has gone far deeper into the "guts" of the GateGuard computer, accessing its motherboard and fundamental circuitry.

Amazon also unpersuasively relies on *DeSoto v. Bd. of Parks & Recreation*, 64 F. Supp. 3d 1070, 1103 (M.D. Tenn. 2014) in which the Court held that, in the case of smartphone access, the unauthorized use had to consist of more than unsuccessfully attempting to log in to the device. The appropriate smartphone analogy would be disassembling the phone and accessing the phone motherboard, which would clearly violate the CFAA. The Supreme Court has stated that "in the computing context, "access" references the act of entering a computer "system itself." *Van Buren v. United States,* 141 S. Ct. 1648, 1657 (2021). Here, Amazon is alleged to have accessed the GateGuard computer's circuit board itself, the "guts" of the GateGuard computer, the heart of the "system itself," without authorization. FAC ¶106. Further, Amazon is also alleged to have "obtained and used valuable information from those devices, including customer locations, accounts, and id's, in violation of 18 U.S.C. § 1030(a)(2)(C)."

---

[3] Amazon does not dispute that GateGuard's intercom is clearly a "computer" within the scope of the CFAA. *See, e.g.*, *Philips Med. Sys. Puerto Rico Inc. v. GIS Partners Corp.*, 203 F. Supp. 3d 221, 230 (D.P.R. 2016).

FAC ¶ 122. GateGuard raises a plausible inference that if a competitor surreptitiously breaks into its device and accesses the inner workings of the computer system itself, while lying to building personnel about its authority, it has accessed and used proprietary data improperly.

As to Amazon's suggestion that it gained access only "by mistake" or "inadvertently," Def's Mot. to Dismiss at 15, this is patently frivolous. Amazon's technicians deliberately gained access to the inner circuitry of the GateGuard intercom panel, without GateGuard's authorization and, as indicated by specific text messages, without the property owner's approval—pursuant to a specific policy of deliberately attempting to circumvent the internal apartment approval process. FAC 58-59, 83-84, 122-23. There was nothing accidental or mistaken about this. The specific visual evidence GateGuard has provided together with its concrete allegations are plainly sufficient to state a claim for unauthorized access to the GateGuard computer.

Amazon's claim that the value of the GateGuard intercom panel is less than $5,000 is also frivolous. The Service Agreement states that, if a device were to be sold outright, the manufacturer's suggested retail price would be $8,649. Service Agreement, Sec. 2(B). On its own this is superior to the $5,000 threshold in the CFAA. But the true value of the intercom panel is upwards of $90,000, which is the revenue that can be derived from the device over its useful life. Service Agreement, Sec. 4(C)(i). The Court should not credit Amazon's forced, counter-factual argument.

### C. GateGuard has Adequately Pled That Amazon Acted "Without Authorization."

Amazon's assertion that GateGuard has failed to allege Amazon acted without authorization in accessing the inner workings of the GateGuard intercom computer is baseless. The FAC states over and over again that GateGuard did not, at any time, authorize Amazon's intrusions into its intercom system. FAC ¶ 80, 85, 92, 115, 126, 134, 138, 150. GateGuard has

also brought forward specific evidence that property managers also did not authorize Amazon's intrusions into GateGuard's system. FAC ¶¶ 84-85. Indeed, GateGuard has captured audio of Amazon supervisors encouraging the Key sales reps to bypass the regular approval channels for installing devices at apartment buildings and pressuring low-level employees without authorization to permit the installation of the Key. FAC ¶¶ 57-59. Amazon's authorization argument is utterly without merit.

## II.    <u>GATEGUARD HAS STATED A TRADE SECRETS CLAIM.</u>

GateGuard has brought trade secrets claims under both New York law and the Defend Trade Secrets Act, 18 U.S.C.A. § 1832, et seq. (the "DTSA"). FAC, Counts VI and VII. For both causes of action, GateGuard must plausibly allege that it possessed trade secrets and that Amazon misappropriated these trade secrets. *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 27 (1st Dep't 2015). "Misappropriation" means the use of plaintiff's trade secrets in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. *Id.*

As to the first point, the FAC plausibly alleges that GateGuard owns valuable trade secrets embodied in its devices. These trade secrets include, "the configuration of its motherboard, the placement and type of electronic circuitry and other components used, the insulation resistance between circuits, the voltages at which the device operates, the mechanisms of internet connectivity, the antennae used, the inner casing of the intercom, its system of wall-mounting and hinges, its waterproofing design, and its custom-designed cables." FAC ¶ 165. By their nature, these technical aspects of the GateGuard Intercom are clearly capable of intellectual property protection, under both New York law and the DTSA. Under New York law, a trade secret is "any formula, pattern, device or compilation of information" that the owner uses in its business and that affords it an advantage over competitors who do not know or use it. *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E. 3d 301, 310 (N.Y. 2018).

The DTSA defines trade secrets as "all forms and types" of information that the owner takes "reasonable measures to keep ... secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person." 18 U.S.C. § 1839(3).

GateGuard goes to great length to protect the secrecy of the intellectual property contained inside its intercom panels. The FAC alleges that "GateGuard's proprietary technology is kept secret from competitors and customers, with only authorized GateGuard agents permitted access to the devices for repairs and troubleshooting." FAC ¶ 166; *see also supra* at 4. The Service Agreement, Section 16, authorizes GateGuard to set up security cameras, employ technicians with recording devices and body cameras, and charge customers for any vandalizing of the GateGuard devices, in order to ensure the security of its equipment and incentivize landlords to cooperate in the protection of GateGuard's intercoms. Amazon asserts, in conclusory fashion, that GateGuard's intellectual property was sold and installed in a "public forum" and is thus not capable of intellectual property protection. Defs' Mot. to Dismiss at 16. Amazon cites no authority for this proposition which fails the most basic test of logic. Under Amazon's theory, an electric car charging station in a mall parking lot cannot contain protectible intellectual property "under the hood" because the charging station is in a public forum. The same would be true of intellectual property contained in "smart" parking meters, ATM machines, cell phone charging stations and dozens of other types of technology located in a "public forum." Bad actors would be free to break into such devices, copy any design, configuration, cabling, waterproofing, circuitry or other elements because the devices are installed in a public forum—an absurd result.

As to misappropriation, GateGuard has unquestionably alleged that Amazon has misappropriated, or wrongly used, its trade secrets.  FAC ¶ 50 ("The Amazon Key . . . is wired

directly into or onto the GateGuard circuitry, or the circuitry of other access control providers, often shorting the devices and/or their lock mechanisms due to polarity or voltage mismatches."). GateGuard alleges that the use of the GateGuard computer circuity was unauthorized and hence wrongful. *See, e.g.*, FAC ¶ 99; *see also supra* at 12. Amazon itself nowhere denies that it used GateGuard's intellectual property. Rather, it relies solely on its nonsensical "public forum" argument. *See supra* at 12. The Court should not credit this argument, which, if taken seriously would usher in "open season" on countless devices located in "public fora," including Amazon's own "Ring" security device, which GateGuard would be free to break into and install its own GateGuard extender to gain access to Amazon's customers. [4]

## III.   GATEGUARD HAS ADEQUATELY ALLEGED A TARNISHMENT AND LANHAM ACT CLAIM.

As in the other areas of its brief, in seeking dismissal of GateGuard's tarnishment claims, Amazon inhabits an Alice-in-Wonderland universe in which the video evidence of its technicians disassembling the GateGuard intercom and using the GateGuard circuit board without GateGuard's approval does not show any "unfair" competition or damage to GateGuard. Defs' Mot. to Dismiss at 18. This upside-down vision of the world reflects nothing

---

[4] In addition, the FAC alleges that Amazon is seeking to develop its own smart building access device to compete with GateGuard and Google's "Nest." FAC ¶ 86.  Amazon is also aggressively moving into the smart home security space with its suite of "Ring products." *See* https://venturebeat.com/2020/09/24/amazon-debuts-new-ring-products-including-a-mini-home-surveillance-drone/. A plausible inference arises that Amazon has used its unlawful access to GateGuard's technology to develop or refine its own products, where Amazon has the motive, the opportunity, and the ability to misappropriate GateGuard's technology for its own product development. Amazon should not be permitted to play a game of "cat and mouse" to avoid discovery. William Lynch Schaller, *On Equipoise, Knowledge, and Speculation: A Unified Theory of Pleading Under the Defend Trade Secrets Act-Jurisdiction, Identification, Misappropriation, and Inevitable Disclosure*, 27 J. Intell. Prop. L. 137, 183 (2020).

so much as Amazon's apparent belief that normal rules of commercial behavior do not apply to it.

Leaving aside Amazon's through-the-looking-glass view of the propriety of its conduct, GateGuard has stated a claim for tarnishment and unfair competition. Under New York law, GateGuard first needs to show it possesses a "strong mark," one "which has a distinctive quality or has acquired a secondary meaning" *Allied Maintenance Corp. v. Allied Mech. Trades,* 42 N.Y.2d 538, 545 (1977). The FAC alleges that "GateGuard possesses a strong and distinctive registered trademark in the name "GateGuard" applied to a smart intercom or access control devices." As described in the FAC, the GateGuard intercom panel contains "unique features and capabilities," FAC ¶ 4, "built around proprietary technology" FAC ¶ 86, with "seamless" integration into a website that permits landlords and property owners to track activity and usage and contains glowing reviews for GateGuard's intercom. FAC ¶¶ 85, 90. Whether GateGuard's mark is ultimately strong enough to sustain a tarnishment claim is a fact question that should not be decided on a motion to dismiss. *Fireman's Ass'n of State of New York v. French Am. Sch. of New York,* 41 A.D.3d 925, 928, (2007).[5]

Beyond the distinctiveness of the GateGuard mark, the FAC alleges that the Key is installed into the GateGuard circuit board, without the authorization of either GateGuard or the property owners. This installation can cause the GateGuard device to short, at which point Amazon then presents the Key as a more reliable system for package delivery management. FAC ¶ 122. Consumers are thus deceived into believing the GateGuard device is shoddy or inferior to the Key, which is presented as an "upgrade" to property owners unaware of the

---

[5] Amazon makes much of the absence of a state registration for the GateGuard mark. Defs' Mot. to Dismiss at 18. However, GateGuard's has a validly filed federal mark, *see* Teman Decl. at ¶ 5, and its state registration is in progress. *Id.* at ¶ 6. It would be inefficient to dismiss GateGuard's claim on state registration grounds, because GateGuard would simply refile once the registration has been granted.

Key's role in causing the malfunctioning of GateGuard's device. This causes the "tarnishment" of the GateGuard mark. *Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 43 (2d Cir. 1994) (tarnishment generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product). Here Amazon is acting to create the impression that GateGuard's products are inferior (hence the need for the Key "upgrade") and of poor quality. GateGuard's mark is severely diminished in value to the benefit of a competing device.

GateGuard's federal unfair competition claim is validly stated for similar reasons. After damaging GateGuard's devices, Amazon presents the Key as a necessary intercom "upgrade," falsely representing that GateGuard is a device of inferior quality and unreliable for package management, bringing Amazon's conduct within the scope of the prohibits of the Lanham Act, 15 U.S.C. § 1125. See *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991)(Lanham Act claim can be stated by "false description *or representation*")(emphasis added).

## IV.    PLAINTIFF'S STATE LAW TORT CLAIMS ARE VALIDLY STATED.

### A.    Tortious Interference with Contract.

"The elements of tortious interference with contractual relations are (1) the existence of a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and (4) damages to the plaintiff." *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 59 A.D.3d 473, 476, (2nd Dept. 2009). Here, there is no question there is a valid agreement between GateGuard and its customers, as even Amazon acknowledges. *See* Salant Decl., Ex. A. The Service Agreement requires GateGuard's customers to provide broad surveillance rights to GateGuard so that GateGuard can prevent

unauthorized access to its equipment. Service Agreement, Section 16. Amazon intentionally induced the breach of this agreement by lying to building superintendents that management had approved the installation of the Key device when management specifically denied granting any such approval. FAC ¶ 102. GateGuard has alleged with great specificity how Amazon's unauthorized access to and interference with the inner workings of its Intercom panel has caused devices to short circuit and resulted in harm to GateGuard's business and brand. *See supra* at 5; FAC ¶¶ 50, 105-06. Finally, the FAC alleges that Amazon's knowledge of the restrictions in the GateGuard Service Agreement, easily accessible on-line, as Amazon admits, Salant Decl. ¶ 2, can plausibly be inferred from Amazon's need to lie to access GateGuard's devices. FAC ¶¶ 102, 149. This inference is all the more plausible because individuals in supervisory positions encouraged their subordinates to mislead superintendents about Amazon's authority to access the third-party devices. FAC ¶¶ 66-68. The most plausible explanation for Amazon's lies and misrepresentations is that Amazon knew the Service Agreement prohibited installation of the Key without GateGuard's approval. Courts frequently permit circumstantial evidence to prove the existence of knowledge, which like fraud, rarely results in an inculpatory "memo to files." *See Oncology Tech, LLC v. Elekta, Inc.*, No. SA-12-CA-314, 2013 WL 12171814, at *2 (W.D. Tex. Apr. 26, 2013)(sufficient evidence from which to infer that party knew, or was reckless in not knowing, of agreement). Here, in addition, Amazon was on notice of GateGuard's contractual rights and nonetheless accessed GateGuard's devices without authorization. FAC ¶¶ 130-132.[6] At a minimum, GateGuard is entitled to discovery based on the plausible inferences that can be drawn from the facts alleged in the FAC.

---

[6] The FAC alleges that GateGuard made Amazon aware of the wrongfulness of its conduct in October, 2020. FAC ¶ 130. The date-stamps on GateGuard's audio-visual evidence show that Amazon was caught disassembling a GateGuard intercom on May 1, 2021, *after* Amazon was unquestionably on notice of GateGuard's rights.

However, Amazon maintains that the procurement of a breach of the Services Agreement cannot constitute tortious interference with contract under New York law because the Services Agreement is "at will." Defs' Mot. to Dismiss, at 20. This is a misrepresentation of New York law. The correct statement of the law is that: "In order to sustain a cause of action based on tortious interference with a contract terminable at will, there must be a showing of wrongful conduct, which includes, *inter alia*, fraudulent representations, threats, or a violation of a duty of fidelity owed to the plaintiff by reason of a confidential relationship between the parties." *Lowenbraun v. Garvey*, 60 A.D.3d 916, 917 (2nd Dep't 2009). *See also Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 194 (1980); *Baron Assocs., P.C. v. RSKCO*, 16 A.D.3d 362, 362 (2nd Dep't 2005). In other words, it is *false* to claim, as Amazon does, that contracts terminable at will cannot be the subject of tortious interference with contract claims.

Here, GateGuard has brought forward specific evidence of misrepresentations made by Amazon to GateGuard's customers to obtain unlawful access to GateGuard's devices, thus causing a breach of GateGuard's customer's undertaking only to permit GateGuard to access its devices for repairs, maintenance or otherwise. This allegation brings GateGuard's cause of action squarely within the rule set for in *Lowenbraun* and *Guard-Life Corp.*[7]

**B.  Tortious Interference with Prospective Economic Advantage**

"To state a cause of action for tortious interference with prospective economic advantage, a plaintiff must plead that defendant directly interfered with a third party and that the defendant either employed wrongful means or acted for the sole purpose of inflicting intentional

---

[7] *See* Service Agreement, Section 6(C): "Subscriber shall not (as applicable) use, copy, modify, create derivative works of, distribute, sell, pledge, sublicense, lease, loan, rent, timeshare or provide access to the Products or Services *nor permit any third party to do any of the foregoing*."

harm on plaintiff." *Ray v. Stockton*, 162 A.D. 3d 1677, 1679 (4th Dep't 2018). "Wrongful means" is conduct amounting "to a crime or an independent tort." *Carvel Corp. v. Noonan*, 3 N.Y.3d 189, 190 (2004)). Here, Amazon directly interfered with Amazon's relationship with its customers and the future business it would otherwise have been able to develop by means of its unauthorized and unlawful accessing of and damage to GateGuard's intercom panel. FAC ¶¶ 153-155. The FAC minces no words in describing the severity of Amazon's wrongful conduct. *See* FAC ¶ 9 (New York **criminal** liability for anyone "who shall willfully destroy, damage, or jam or otherwise interfere with the proper operation of" intercoms).

Amazon claims GateGuard must show Amazon "convinced a third party **not to enter into** a business relationship" with GateGuard (emphasis added). Defs' Mot. to Dismiss at 21. This is not quite right, despite the federal courts that occasionally employ this language. GateGuard must allege that Amazon directed its tortious conduct at third parties with whom GateGuard had **an existing** or potential economic relationship. *Carvel Corp.*, 3 N.Y.3d at 192. Indeed, "the relationship must be in existence at the time of the interference." *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 548 (S.D.N.Y. 2007). As a result, it is not true that a plaintiff must always establish that the defendant prevented the third party from **entering into** a commercial relationship, since the tort can apply to conduct targeted at both future and existing customers. Deliberately preventing an existing client from continuing or expanding a relationship, as Amazon is alleged to do by damaging the GateGuard device and then disparaging it by presenting the Key as an "upgrade" and implicitly representing that GateGuard has deceived its customers by marketing an inferior product, clearly comes within the terms of the tort. *See Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 48 (1st Dep't 2009)(sustaining intentional interference with prospective economic advantage based on statements that disparaged plaintiff and put in question its business "integrity").

18

The FAC alleges that Amazon's conduct prevented GateGuard both from extending its contracts with existing customers and marketing new products and services to future customers. FAC ¶¶ 153, 154. Specifically, under the Service Agreement, landlords agree GateGuard may use its intercom panels to market "additional services directly to [their] tenants. These may include, but are not limited to, such things as insurance, rent payment services, internet connectivity, delivery services, cleaning services, online platforms, etc." Service Agreement, Section 14(A). Amazon's conduct was the "but for" cause of the destruction of this future revenue stream, as tenants who could only be reached through the functioning intercom panel could not be reached at all once the intercom was disabled. As with tortious interference with contract, here, too, Amazon was on notice of GateGuard's contractual rights as of at least October, 2020 and yet nonetheless tortiously interfered with GateGuard's prospective deals with tenants by damaging and sometimes destroying the platform through which such transactions were to be made.

## C.  Conversion

The two key elements of conversion under New York Law are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Halvatzis v. Perrone*, 199 A.D.3d 785, 787 (2nd Dep't 2021). GateGuard has adequately alleged ownership of the GateGuard devices as well as Amazon's total or near total interference with GateGuard's ownership rights by the extent of the damage caused to GateGuard's devices. Accordingly, GateGuard's cause of action for conversion should proceed.

Amazon makes three weak arguments in support of its motion to dismiss GateGuard's conversion claims. *First*, Amazon asserts that GateGuard has not sufficiently alleged legal

ownership of its intercom devices to sustain a claim for conversion.  Defs' Mot. to Dismiss at

23. This assertion has been amply discussed above and need not be belabored further.

    *Second*, Amazon claims GateGuard does not allege any damage to any specific device.

Defs' Mot. to Dismiss at 23. This is wrong. GateGuard has captured Amazon technicians on a

specific occasion accessing a specific device FAC ¶¶ 116-117. GateGuard further alleges that

it has identified approximately 20 additional instances in which Amazon's unauthorized

installation of the Key damaged specific intercoms installed at its customers' properties. FAC ¶

118. Contrary to Amazon's conclusory statements, there is no requirement under New York

law or federal pleading standards that GateGuard provide the specific serial number of the

damaged devices.

    *Third*, Amazon claims Plaintiff fails to allege it was "completely excluded" from access

to its devices. Defs' Mot. to Dismiss at 23-24. This is not the law. When an item of property is

rendered useless by defendants' wrongful conduct, a plaintiff's ability to "access" the destroyed

property has no bearing on her right to recover in conversion. *See* Restatement of the Law of

Torts (Second), October 2021 update, § 266, *Conversion by Destruction or Alteration*. There

may even be conversion by alteration of the physical condition of the chattel falling short

of complete destruction that will permit a claim for conversion. *Id.* § 266(d).  Here, Amazon is

alleged to have unlawfully accessed the inner workings of the GateGuard Intercom and installed

an unauthorized device that caused the "shorting," malfunctioning and functional destruction of

GateGuard's devices. FAC ¶¶ 9, 79, 96-97, 105-06 (***devices rendered "inoperable"***) (emphasis

added), 123, 126-27, 128, 184. This suffices to state a claim for conversion under New York

law.

**D.  Trespass to Chattels**

Amazon's arguments with respect to trespass to chattels fail for the same reasons its conversion claim fails. First, at worst for GateGuard, there is a fact question as to ownership. Second, Amazon is clearly alleged to have intentionally damaged the GateGuard devices by illegally accessing the devices and disabling their inner workings. Trespass involves interference with property rights, rather than total or substantial destruction. *Sporn v. MCA Recs., Inc.*, 58 N.Y.2d 482, 488 (1983). This is clearly established here. Moreover, Amazon did not "accidentally" disassemble GateGuard's device or insert a foreign object on the GateGuard circuit board by mistake. These were deliberate, pre-meditated actions demonstrating objective intent. *See People v. Mahoney*, 6 A.D.3d 1104, 1104 (4th Dep't 2004). GateGuard's devices shorted and  malfunctioned as a result of Amazon's intentional, unauthorized acts, thus establishing damages and a sufficient factual predicate for the cause of action.

**E.  Unjust Enrichment**

Under New York law, to state a claim for unjust enrichment, it is well settled that a plaintiff must allege, "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered" *Mandarin Trading Ltd. v. Wildenstein,* 16 NY3d 173, 182 (2011). "An unjust enrichment claim is rooted in the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

Amazon does not deny that it was enriched by its practice of "free-riding" on existing intercom systems or by presenting its products as an "upgrade" to a system it had caused to malfunction. Nor does it deny its enrichment was at GateGuard's expense. On the contrary, Amazon openly embraced its enrichment at GateGuard's expense, stating in no uncertain terms,

"either Amazon can make you money or it can cost you money." FAC ¶ 134. Both parties knew this meant that either GateGuard would have to permit Amazon to undermine its business model by granting Amazon access to its devices or face hostile action by Amazon to damage GateGuard's business further.

Amazon seizes on language in *Mandarin Trading* to argue that the relationship between GateGuard and Amazon was too "attenuated" to warrant recovery on an unjust enrichment claim, because Amazon and GateGuard do not have a "commercial relationship." Defs' Mot. to Dismiss at 25. But Amazon again misstates the law and fails to cite the relevant passage from *Mandarin Trading* in its entirety, which makes clear that the unjustly enriched party's *awareness* of the injured party can suffice, under appropriate circumstances, to satisfy the equitable requirements of the tort. *Mandarin Trading Ltd.,* N.Y.3d at 182. If the defendant is *aware* of the plaintiff, and intentionally acts to appropriate for itself the benefits of plaintiff's labor, a cause of action for unjust enrichment on equitable grounds may lie, notwithstanding the absence of a "commercial relationship." *Id*. Here, Amazon was not only aware of GateGuard and the benefit it could obtain by "free-riding" on its devices, but also sought to benefit when its own actions damaged GateGuard devices. FAC ¶ 122, 134. As a matter of basic equity, Amazon should not be permitted to profit at GateGuard's expense in this manner.

## V.     GATEGUARD HAS VALIDLY STATED AN ATTEMPTED MONOPOLIZATION CLAIM.

### A.   GateGuard Has Adequately Alleged that Amazon Engaged in Anti-Competitve Conduct With A Specific Intent to Monopolize and a Dangerous Probability of Success.

"To demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Xerox Corp. v. Media Scis., Inc.,*

660 F. Supp. 2d 535, 543 (S.D.N.Y. 2009). Here, there can be no serious argument that Amazon's unauthorized disassembling and interfering with GateGuard's and others devices, FAC ¶¶ 83-84, 107-111, its practice of misrepresenting its authority to building superintendents, FAC ¶¶ 102-105, its deliberate policy of targeting lower level employees who can be pressured into allowing Key access without obtaining management approval, FAC ¶¶ 66-67, and its extortionate threats to coerce GateGuard into granting access for the Key, FAC ¶ 134, do not constitute predatory or anti-competitive conduct. *See Specialty Mins., Inc. v. Pleuss-Stauffer AG*, No. 98 CIV. 7775(VM)(MHD, 2004 WL 42280, at *3 (S.D.N.Y. Jan. 7, 2004)(threats and misrepresentations among factors considered in determining plaintiff had asserted a claim for attempted monopolization); *Avaya, Inc. v. Telecom Labs, Inc.*, No. CIV. 06-2490 (GEB), 2009 WL 2928927, at *2 (D.N.J. Sept. 9, 2009)(counterclaimant given leave to add Sherman Act claims based, *inter alia*, on plaintiff's false statements and threats); *Rebotix Repair LLC v. Intuitive Surgical, Inc.,* No. 8:20-CV-2274-VMC-TGW, 2021 WL 1227593, at *10 (M.D. Fla. Mar. 8, 2021)(threats of retaliation). Specific intent to monopolize can be inferred from evidence of predatory or anti-competitive conduct. *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981) (proof of unlawful conduct may be used to infer specific intent to monopolize); *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 112, 127 (W.D.N.Y. 1997)("proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, may be used to infer the second element, specific intent to monopolize").

As to Amazon's market power, the Complaint sufficiently alleges that Amazon not only has market power in the e-commerce market, FAC ¶ 26, but also in the e-commerce delivery market. FAC ¶ 38. As the FAC explains, "Likewise, Amazon has market power over fulfillment logistics for third-party sellers who sell through the Amazon marketplace, as reflected in the 73% fulfillment rate for third party sales on the Amazon platform. If Amazon controls 70% of

the online marketplace (with its own sales aggregated with third party sales) and its own sales amount to 50% of all online sales, this means that it must control in excess of 60% of all e-commerce deliveries." These statistics have likely been accentuated in the recent Covid-dominated period, as the trend lines of Amazon's e- fulfillment and logistics growth indicate. FAC ¶¶ 30-31. It is highly likely that, as of this writing, Amazon's share of e-commerce deliveries is well over 70%, which is strong evidence of market power. *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.,* 651 F.2d 122, 129 (2d Cir. 1981). Obviously, Amazon's specific, current, market share is a matter for discovery and whether this market share, combined with the evidence of anticompetitive conduct alleged in the FAC, constitutes a "dangerous probability of success" is a question for the jury. *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 100–01 (2d Cir. 1998)(holding a market share of 72 percent combined with other anticompetitive actions is sufficient to create a genuine factual issue as to whether there was a dangerous probability that defendant would achieve monopoly power); *see also see also H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1017 (2d Cir.1989); *International Distrib. Ctrs., Inc. v. Walsh Trucking,* 812 F.2d 786, 791 (2d Cir.1987); *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1506 (11th Cir.1988) (60 or 65 percent market share is sufficiently large to create a genuine issue of material fact as to dangerous probability of success). For all these reasons, GateGuard has stated a *prima facie* case of attempted monopolization that warrants discovery.

Amazon ignores the foregoing analysis and instead focuses on three unpersuasive arguments: (a) e-commerce delivery is not a plausible relevant market, (b) GateGuard lacks antitrust standing, and (c) GateGuard fails to plead anti-competitive conduct. In the alternative, Amazon's requests that GateGuard's class claims be stricken. These arguments are addressed in order below.

24

**B.**   <u>**The E-Commerce Delivery Market Is a Plausible Relevant Market.**</u>

First, as a threshold matter, market definition is a highly factual question best left to the trier of fact. *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 34 (S.D.N.Y. 2016)*; Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 893 F. Supp. 1207, 1214 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir. 1995). With this understanding, GateGuard proposes the "e-commerce delivery market" as the relevant market for its attempted monopolization claim. Courts have frequently upheld the pleading of similar relevant markets*. In re EVIC Class Action Litig.*, No. 00-CIV-3811 (RMB), 2002 WL 1766554, at *11 (S.D.N.Y. July 31, 2002)("the transportation and delivery of packages in the United States ... by ground transportation primarily through interstate trucking"); *Western Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 190 F.3d 974, 976 (9th Cir. 1999)(package delivery market); *Marnell v. United Parcel Serv. of Am., Inc.*, 260 F. Supp. 391, 396 (N.D. Cal. 1966) (retail parcel delivery market). The e-commerce delivery market is an analog, and in some sense a successor, to the "bricks and mortar" retail delivery market that courts throughout the country have entertained for decades.

In opposition, Amazon argues that GateGuard has included too many different market participants and that, therefore, the entire market definition should be thrown out. Defs' Motion to Dismiss, at 26. This does not follow. If there are participants who do not belong in the market, they should be excluded, but the market itself remains coherent.

The key point about the e-commerce delivery market for purposes of the dispute between GateGuard and Amazon is that *within* the e-commerce delivery market there are different sub-sectors, including fulfillment, transportation and residential package delivery. Of these three, residential access control for package delivery is the critical, essential lever for the attempted monopolization of the market as a whole. FAC ¶¶ 42-43, 52, 55. Combined with its market power in the e-commerce delivery market, Amazon's installation of the Key by means

of the wrongful conduct identified in the FAC is the specific means by which Amazon aims to exclude competing providers of access control for package delivery and then monopolize the e-commerce delivery market.

Amazon fails to grasp this fundamental point and, as a result, attacks a straw man. According to Amazon, "No online retailer would switch to a GateGuard intercom to deliver products to customers in response to a hypothetical price increase by a shipping carrier, and no consumer purchasing from an online retailer would consider GateGuard's intercom services an alternative to shipping functions performed by UPS, FedEx, or Amazon." Defs' Mot. to Dismiss. This is both non-sensical and irrelevant. GateGuard nowhere argues that it competes with Amazon in the *transportation* or shipping of package for residential delivery. Rather, GateGuard argues that it competes with Amazon in the building access for package delivery segment of the market. FAC ¶ 42, 43, 51. Nor is Amazon more persuasive in stating "No landlord would install KFB as a substitute for a GateGuard intercom, because KFB is not an intercom." Defs' Mot. to Dismiss at 27 and Note 14. The Key does not compete with intercoms generically. FAC ¶ 43. Rather, it competes with a specific functionality – package delivery control – that is critical to the e-commerce delivery market. Here, a landlord *would* switch away from GateGuard to Amazon for package delivery management, a key element of GateGuard's Service Agreement, by "upgrading" to the Key for package delivery following a Key-induced product malfunction. FAC ¶¶ 48, 120, 122. Amazon does not achieve this result by honest competition, but by unlawfully breaking into GateGuard's devices, leveraging off of GateGuard's circuit board and existing wiring, and lying to lower-level apartment personal about Amazon's authority to install its Key. This cut-throat behavior is itself strong evidence of the intense competition between the Key and GateGuard along one axis of product functionality—access for package delivery.

Amazon also claims that the proposed e-commerce delivery market is an illogical "hodgepodge." Defs' Mot. to Dismiss at 26. This too misses the mark. E-commerce delivery is a market with multiple components ranging from online fulfillment to transportation and building access. This does not render the market an illogical "hodgepodge;" it simply means the market is complex and multi-faceted. Markets vary enormously in complexity, from the market for milk to the market in wireless telecommunications. *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 239–40 (S.D.N.Y. 2020) (retail mobile wireless telecommunications services illustrate a prototypical complex market, with wireless services tied to the electronic hardware devices and operational material created by providers of software content). Because it wants to transform a complex market with multiple interconnected facets into a simple "milk-style" market, Amazon's critique of GateGuard's proposed market definition is unconvincing and rings hollow.

### C.  <u>GateGuard Has Standing to Bring its Antitrust Claims Against Amazon.</u>

Amazon correctly quotes this Court for the proposition that "Antitrust standing is a threshold, pleading-stage inquiry."*Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 419 (S.D.N.Y. 2017) (Koeltl, J.), *aff'd as modified*, 889 F.3d 104 (2d Cir. 2018). Defs' Mot. To Dismiss at 27. However, Amazon thoroughly misapplies the concept of antitrust standing, because of its failure (or unwillingness) to grasp the essential nature of competition in the e-commerce delivery market. First, Amazon absurdly claims that GateGuard does not "participate" in the e-commerce delivery market. On the contrary, GateGuard participates in a critical, indeed arguably *the* critical, aspect of the ecommerce delivery market: building access for package delivery. FAC ¶¶ 47, 53-56. GateGuard markets itself as, in significant part, a package delivery management service. FAC ¶ 48. This service runs headlong into the Key's attempt to secure control of the same aspect of the market so that it will have a decisive

competitive advantage over rivals in the transportation and fulfillment segments of the market. Saying GateGuard does not "participate" in the e-commerce delivery market is like saying mobile handset software providers do not "participate" in the wireless telecommunication market, a non-sensical claim.

It is true that "generally, only "[c]ompetitors and consumers in the market where trade is allegedly restrained," can allege antitrust injury. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016). But Amazon and GateGuard **do** compete in the market, not in transportation or fulfillment, but in residential access for package delivery. And GateGuard suffers direct injury from Amazon's anti-competitive actions in this segment of the market, ranging from lost-customers and lost goodwill, to damaged devices and greater maintenance costs. Amazon again absurdly argues that injury to GateGuard is not the means by which Amazon gains a competitive advantage over transportation rivals. Defs' Mot. to Dismiss at 28 and Note 15. On the contrary, injury to GateGuard is the **necessary** means by which Amazon gains its advantage. Either Amazon surreptitiously disassembles GateGuard's intercom and accesses its circuit board, with the range of harms detailed throughout this memorandum, or Amazon seeks to coerce GateGuard into accepting the installation of the Key on Amazon's terms ("we can either make you money or cost you money"). Either way, GateGuard suffers. There is simply no neutral, harmless manner in which Amazon competes with GateGuard. [8]

---

[8] Amazon again tilts at windmills in arguing that Amazon's anti-competitive conduct *vis à vis* GateGuard does not result in a decrease in competition among shippers. Defs' Mot. to Dismiss at 29. This is wrong for two separate reasons. First, the primary decrease in competition is among independent providers of package delivery access control such as GateGuard. Second, however, GateGuard's contention is that Amazon's conduct will – in fact is designed to – decrease competition among other market participants by giving Amazon a decisive advantage in the crucial final step of e-commerce delivery, enabling it to undercut and drive out of business its transportation and fulfillment rivals, and ultimately raise prices for delivery to the detriment of consumers.

**D.  GateGuard is An Efficient Enforcer of the Antitrust Laws.**

For the reasons indicated above, GateGuard is not only an efficient enforcer of the

antitrust laws, it is the *ideal* enforcer of the laws in the circumstances described in the FAC.

Amazon's rivals in the transportation segment of the market do not face Amazon's cut-throat

tactics in the access control segment of the market and do not have the same knowledge of and

experience with Amazon's tactics as does GateGuard. These rivals share GateGuard's interest

in transparent, lawful competition, but they do not have the technicians, maintenance crews, and

marketing personnel to know how Amazon operates and the illicit means it uses to achieve its

ends. GateGuard is simply the best positioned, and most efficient party to "vindicate the public

interest in antitrust enforcement." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19

F.4th 127, 141 (2d Cir. 2021).

**E.  Amazon's Wrongful Conduct Comes Squarely Within the Scope of the Anti-
     Competitive Conduct the Antitrust Laws Seek to Prevent.**

In one of its more willful distortions of the FAC, Amazon asserts that "GateGuard's

claim of 'anticompetitive' conduct is that KFB allows Amazon to reduce costs and offer more

attractive products and services to its customers." Defs' Mot. to Dismiss, at 31. This is silly.

GateGuard's claim is that Amazaon illegally breaks into its devices, interferes with their

circuitry, lies to building officials, and threatens GateGuard to coerce adoption of its device. As

discussed, such conduct comes squarely within the scope of the antitrust laws. *See supra* at 23-

24. That the Key gives Amazon a competitive advantage does not mean it has not engaged in

predatory or anti-competitive conduct. In fact, most anti-competitive conduct attempts to

provide consumers an apparent benefit to reduce competition and ultimately raise prices. A

monopolist's product improvements, for example, run afoul of the antitrust laws if the

monopolist abuses its power when introducing the product, even if the product constitutes an

objective "improvement" from the consumer's perspective. *Alivecor, Inc. v. Apple Inc.*, No. 21-

CV-03958-JSW, 2022 WL 833628, at *9 (N.D. Cal. Mar. 21, 2022). Similarly, predatory

pricing may feel good to the consumer in the short-term but is no less anathema to a free

market. *L&W/Lindco Prod., Inc. v. Pure Asphalt Co.*, 979 F. Supp. 632, 638 (N.D. Ill. 1997).

Moreover, GateGuard is not simply complaining of ordinary business torts to itself, but

to a market-wide practice – of which it is a victim – of seeking to impose the Key through

underhanded and deceitful tactics that reduces competition for package delivery access control

in the e-commerce delivery market as a whole. Amazon's alleged anti-competitive conduct is

precisely of the type the anti-trust laws seek to prohibit.

**VI.    GATEGUARD'S CLASS CLAIMS SHOULD BE MAINTAINED.**

   **A.  Amazon's Motion is Pre-Mature and There is No Reason to Strike
        GateGuard's Class Claims at This Juncture.**

Amazon makes much of Ari Teman's criminal conviction for the use of remotely

created checks. Def's Mot. to Dismiss at 33. According to Amazon, Teman's conviction *ipso*

*facto* renders *GateGuard* an inadequate class representative. *Id.* Amazon's argument should be

rejected for several independent reasons. First, Teman's conviction is on appeal and he

maintains his innocence of the charges against him. Teman Decl. at ¶ 3. Second, it would be

premature to act now when no motion for class certification is before the Court. Third,

prematurely barring GateGuard from representing the class when Teman's appeal is pending

would violate Teman's due process rights, since he would be deprived of a property interest

before a complete opportunity to be heard.  Fourth,if Teman's appeal is unsuccessful, he will

delegate decision-making authority for pursuing class claims, which would alleviate any

possible concerns. Teman Decl. at ¶ 4.

Separately, Amazon argues that there is a "fundamental" conflict of interest between

GateGuard and property owners generally. Defs' Mot. to Dismiss at 33. This is wrong.

GateGuard's proposed class does not include *all* New York property managers and certainly not those managers who may have authorized the installation of the Key. Teman's proposed class would include only those property managers who have not authorized installation of the Key or have been subjected to high-pressure sales tactics to install a device they do not want or that interferes with their other contractual obligations. All proposed class members would be given notice and an opportunity to opt-out, as GateGuard has made clear in seeking certification under F.R.C.P. Rule 23(b)(3). More importantly, before moving for class certification, GateGuard intends to move for class discovery, which makes any decision on class composition premature at this stage. *Parker v. Time Warner Ent. Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003)(reversible error to rule on class certification when "there has been no class certification motion filed nor any actual evidence presented"). Without the benefit of class certification briefing or any class discovery, Amazon would have the Court strike the class allegations because it is "plain enough" from the pleadings that a class cannot be certified. Defs' Mot. to Dismiss at 34. Nothing could be less "plain" than Amazon's distortion of GateGuard's claims.

The unauthorized installation of the Key harms the interests of broad groups of commercial actors: independent package delivery management services whose devices are harmed and/or the value of whose services is diluted or undermined; property owners who do not want and have not authorized the Key; shippers and third-party fulfillment centers who can be undercut because of the cost and speed advantage Amazon obtains from its unauthorized installation of the Key; and e-commerce retailers who are constrained to use Amazon services for delivery and fulfillment because they cannot match the advantage Amazon has obtained from its anti-competitive conduct. These groups all share a common interest in preventing, and obtaining compensation for, Amazon's anti-competitive roll-out of its Key.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Defendants' Motion to Dismiss

Plaintiff's Amended Complaint and Strike Plaintiff's Class Allegations.

Dated: New York, New York
      May 9, 2022

                         Respectfully submitted,

                         QUAINTON LAW, PLLC

                         By: _Den Quainton_

                              Eden P. Quainton
                              2 Park Ave., 20th Floor
                              New York, New York 10016
                              Telephone: 212-419-00575
                              Email: equainton@gmail.com

                              *Attorneys for Plaintiff GateGuard, Inc.*

**ATTORNEY CERTIFICATION PURSUANT TO INDIVIDUAL RULE II(D)**

Pursuant to the Court's Individual Rule II(D), I, Eden P. Quainton, an attorney duly admitted to practice law before this Court, hereby certify that the foregoing memorandum of law contains 9,999 words, in compliance with the Court's order of January 8, 2022 enlarging Plaintiff's' word limit to 10,000 words (ECF No. 12), and that this memorandum complies with the Court's applicable formatting rules. In preparing this certification, I have relied on the word count of the word-processing system used to prepare this memorandum.

Dated: May 9, 2022                               */s/ Eden P. Quainton*_____
     New York, New York                          Eden P. Quainton

33