UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


GATEGUARD, INC.,                      : Docket #21-cv-9321

                   Plaintiff,    :

     -against-                        :

AMAZON.COM, INC., et al.,        : New York, New York
                                   May 23, 2023
                   Defendants.

-------------------------------:

PROCEEDINGS BEFORE
THE HONORABLE VALERIE FIGUEREDO
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                      SOUTHERN DISTRICT OF NEW YORK
                      BY:  ATTORNEY'S NAME
                      1 St. Andrew's Plaza
                      New York, New York 10007

For Defendant:        NAME OF LAW FIRM
                      BY:  ATTORNEY'S NAME
                      ADDRESS
                      CITY, STATE   ZIP



Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
 1                THE DEPUTY CLERK:  Good afternoon.  This is
 2      the matter of GateGuard Inc. vs. Amazon.com, et al.
 3      Case number 21-CV-9321, the Honorable Valerie
 4      Figueredo presiding.
 5                Counsel, can you please give your
 6      appearances for the record starting with plaintiff's
 7      counsel?
 8                MR. QUAINTON:  Yes.  Eden Quainton, Counsel
 9      for Plaintiff GateGuard, Inc.
10                THE DEPUTY CLERK:  Defense?
11                MR. SALANT:  Good afternoon, Your Honor.
12      David Salant from Gibson, Dunn and Crutcher for the
13      Amazon Defendants.  And I'm joined on the line by
14      Anne Champion, also of Gibson, Dunn.
15                THE COURT:  Hi, everyone.  This is Judge
16      Figueredo.  I have the various letters beginning
17      with ECF41, 45, 46, and then I have the supplemental
18      objections and responses from plaintiff at ECF43-1.
19      Since this was occasioned by Amazon's request, I'm
20      happy to have Amazon go first.
21                MR. SALANT:  Yes, thank you, Your Honor.
22      This is David Salant for Amazon.
23                We seek the Court's help in ruling on two
24      discovery disputes we've encountered.  The first
25      having to do with Amazon's March 14 and 15
```

1    interrogatories and GateGuard's responses and

2    supplemental responses for the reason stated in our

3    letters at the ECF docket numbers you noted.  We

4    think that GateGuard has failed to allege the

5    existence of any injury in fact caused by Amazon

6    because it's unable to state in a verified

7    interrogatory response where this injury occurred.

8         So if Your Honor would allow me just to tee

9    up this issue, GateGuard alleged a specific

10   existence of injury in fact caused by Amazon that

11   the installation of Amazon's Key for Business device

12   at locations where GateGuard's intercom device was

13   installed caused damages to GateGuard either by

14   interfering with the device or by some alleged theft

15   of intellectual property in the location where both

16   devices were installed.

17        Amazon's interrogatories asked simple

18   questions that we've been asking for years:  Where

19   did this happen?  Where was the damage that you

20   allege was caused by Amazon?  What are the lost

21   contracts that you alleged specifically in your

22   complaint were caused by Amazon?  Where did it all

23   happen?  What remediation costs did you incur?  The

24   type of facts that must underlie GateGuard's

25   complaint allegations if they were brought with some

1    factual basis?

2          And now GateGuard appears to be admitting

3    that it does not know of any specific such

4    locations, contracts or costs.  And this

5    demonstrates to us either that GateGuard is holding

6    back this information which it specifically promised

7    in its first amended complaint, or it's unable to

8    allege this information in a verified court filing

9    which means that its allegations are baseless.  And

10   so we've come to the Court on this issue to ask the

11   Court to compel GateGuard to respond to our

12   interrogatories with the full current scope of its

13   knowledge and thus to acknowledge what is and is not

14   in its current knowledge.

15          So that's the first issue that we sought to

16   bring to the Court and has been going back and forth

17   in the letters issued that were submitted to Your

18   Honor.

19          THE COURT:  Mr. Salant, can I just ask a

20   question?  I was looking through plaintiff's

21   supplemental objections and responses.  I'm

22   wondering -- or maybe this isn't a question for you,

23   but would GateGuard be able to, for instance,

24   identify where there was a lost contract or a damage

25   of some other form, remediation or the like, once

1    there's an identification of the relevant building?

2    So, for instance, I think the letters indicate

3    there's three categories of building, in the 351

4    locations where GateGuard was installed and

5    Amazon -- I guess let me take a step back.

6            Do we know that at the 351 locations or 228

7    unique locations where GateGuard was installed that

8    Amazon also installed the Key for Business?

9            MR. SALANT:  Yes, Your Honor.  So that

10    number is now down to 217 unique locations in light

11    of duplicates on GateGuard's list.  So there are 217

12    locations that GateGuard, alleges in the history of

13    its business, were ever installed.

14            THE COURT:  Okay.  So then at those 217

15    unique locations with GateGuard, is there also

16    confirmation that those had Key for Business

17    installed?

18            MR. SALANT:  Some did and some did not.

19    Tonight, in connection with our interrogatory

20    responses, as Your Honor ordered at our last

21    conference, we will be serving on GateGuard a list

22    of those locations with a yes or no whether a Key

23    for Business device was installed there.  Our

24    assessment to date is that approximately 70 of those

25    217 locations have or had a Key for Business device

1    installed there.

2              THE COURT:  Okay.  And is this something

3    that once plaintiffs get the list of the 70

4    buildings, they can then identify their alleged

5    damage?  And -- go ahead.  I'm sorry.

6              MR. SALANT:  Forgive me, Your Honor.

7              Of course they could, Your Honor, but this

8    is the very definition of a fishing expedition.

9    GateGuard brought this case years ago and have been

10   complaining to us about locations for years.  And so

11   they should be able to give us this information

12   without us telling them which locations it's okay to

13   allege damages at.  They've claimed in their first

14   amended complaint that this is a case about Amazon

15   interfering with their devices, documented with

16   photographic video evidence resulting from Amazon's

17   illegal pattern of tampering with intercom and

18   access control devices in multifamily residential

19   buildings in New York.  It's the first sentence of

20   their first amended complaint.  And it's what

21   they've promised this court they could deliver.  And

22   so while -- we can, of course, go through this list

23   exchanging, and we will.  GateGuard should be able

24   to, under the Federal Rules, disclose the full scope

25   of its knowledge today.  Its knowledge of its own

1    injury, in fact, cannot be contingent upon discovery
2    obtained in litigation.  They need to have some
3    knowledge today if their complaint was to be brought
4    in good faith, particularly because they make
5    numerical allegations about the number of locations
6    and contracts at issue.  And so, of course, we could
7    proceed in this way where they get to play Go Fish,
8    but it's in violation of the federal rules for them
9    to hold back responsive knowledge they have in
10   response to a timely served interrogatory.
11           THE COURT:  And Mr. Salant, I'm not
12   disagreeing at all.  I was just trying to figure out
13   if perhaps they gave you some information, but are
14   reserving their right to supplement based on once
15   they identify more buildings where there was this
16   overlap.  But I don't disagree with you that as an
17   initial matter, they have to give you whatever they
18   had at the time they thought they had a claim.
19           And so on that point, I guess I'm happy to
20   hear from plaintiff, from Mr. Quainton.
21           MR. QUAINTON:  Yes.  Can you hear me okay.
22   You're very faint on your end.  Is my voice faint or
23   can you hear me okay?
24           THE COURT:  No.  If you can't hear me, just
25   let me know and I'm happy to talk louder.

1          MR. QUAINTON:  Okay.  Just -- no, I'm not

2     complaining.  I just want to make sure that my voice

3     is coming through clearly.

4          THE COURT:  Yes.  No, I can hear you.

5          MR. QUAINTON:  Okay, great.  Yes.  So, as

6     I've explained to Mr. Salant, we do have a list.

7     We've given him sort of the outline of where those

8     damaged devices occurred.  We've given the names of

9     the installers with knowledge.  We've given him the

10    names of the property owners where there are damaged

11    devices.  I am working on within that a specific

12    list of properties where there were damaged devices.

13    The issue is a little bit more complicated than

14    perhaps Mr. Salant knows.  One of our installers,

15    who observed many instances of GateGuard tampering

16    and damaged devices is deceased.  It's a man named

17    David Dubie.

18          And I was just talking with my client and

19    we have the actual damaged devices which he removed

20    from those locations, and we have the serial numbers

21    for the devices, so we can cross check those devices

22    with locations.  We have some locations that that

23    installer did identify before his death.  So we know

24    some of them, we don't know all of them.

25          There's another installer who is a third

1    party, works for a company called Atlantic Intercom.
2    That's on our initial disclosures.  And that
3    individual gave us firsthand eyewitness testimony
4    that our devices had been damaged by GateGuard --
5    sorry, by Amazon.  That person has proved to be
6    quite difficult to get a hold of.  Unfortunately, we
7    don't know his last name.  He was just on a first
8    name basis to my client.  So that's something
9    discovery will show.
10           There's yet another installer who's with a
11    third party called ADR Security.  He's on the list
12    as Alan Rudnick.  And he has firsthand knowledge of
13    Amazon damaging other devices in a pattern similar
14    to what happened to GateGuard, not specifically to
15    GateGuard.  And then we have our own current
16    installer who is working on finalizing the list of
17    properties that he knows about.
18           In addition, on the list, one of the most
19    significant areas that we've had issues has been
20    with a developer named Charles Kushner.  Your Honor
21    probably knows that name.  We had almost 40
22    devices -- 40 buildings with Mr. Kushner, and I
23    think he is a big client of Amazon's.  Eleven of the
24    devices had problems.  And our understanding is that
25    Amazon was on all of those devices because we think

1    Amazon is on all of his devices.  So I will provide
2    a list that drills down into more detail than what I
3    provided in the supplemental responses to the
4    interrogatories, which was intended to provide
5    additional information.  We're not -- certainly not
6    playing Go Fish.  We want to give all the
7    information that we have and we want to get all the
8    information that Amazon has because we -- and you
9    know, as I said in my response to Mr. Salant, we use
10   the word may and believe because we think that it's
11   the tip of the iceberg.  That what we know about is
12   not the entire universe of the damage that Amazon
13   has caused.  So I think the list that Amazon
14   provides will be helpful, but we're not trying to
15   hide the ball in terms of what we know.  I was a bit
16   concerned about something Mr. Salant said, is what
17   he said that the list appears to include 70.  I
18   would have thought that a company like Amazon should
19   know exactly how many devices or buildings are
20   involved, because I thought they would track it very
21   carefully.  I mean, GateGuard is a very small
22   company, so we do have recordkeeping issues that
23   small companies have.  But I would have thought
24   Amazon would know kind of exactly what the number
25   is.  But perhaps we can deal with that offline.

```
 1                 I hope that answers Your Honor's question.
 2                 THE COURT:  Mr. Quainton, is there a time
 3       by which you intend to provide the various drill
 4       down lists that you discussed?
 5                 MR. QUAINTON:  Well, I think that Mr.
 6       Salant was asking for an order for a week.  I mean,
 7       I have no intention to drag this out; the fact that
 8       we have the Memorial Day weekend coming up, and my
 9       wife was beating me up.  I'm sure other people have
10       had spouses beating them up, but those are issues we
11       all have to deal with.  So if you could give us
12       until the end of next week, that would be
13       appreciated.
14                 THE COURT:  Okay.  So that would be June 2.
15                 MR. QUAINTON:  That would be great.  Just
16       depressive business.  If it's absolutely imperative
17       to do it earlier, I can probably get it done.  But I
18       know that it's a difficult time for everybody.  So
19       that would be -- and I do want to be as thorough as
20       I possibly can be.  And as I say, we want to give
21       the information we have.  We want to get more
22       information.  Obviously, we want to prove up all our
23       damages.  So I have no desire to drag this out.
24                 THE COURT:  And the information you'll
25       provide will also include specific customers that
```

1    have breached contracts as a result of the alleged

2    interference by the Key for Business.

3              MR. QUAINTON:  So the breach is a slightly

4    different issue.  They're not supposed to put any

5    third party device on our devices.  That's part of

6    the contract.  So all of those damaged devices,

7    those would all be breaches of the contract.  I

8    mean, all 70 locations that Amazon is admitting to,

9    those would all be breaches of the contract.  We

10   didn't know that there were 70.  And maybe it's more

11   than 70.  That's what I said to Mr. Salant.  We

12   don't know exactly the extent of the damages.  But

13   wherever they put in a device, that's a breach of a

14   contract.

15             When they -- if Amazon -- so let's take

16   Kushner for example, because we have sort of a live

17   issue.  Kushner has lots and lots of buildings in

18   New York, and he was a big client for us.  But I

19   think we had 40 buildings altogether with him.  And

20   to the extent that Amazon knew about our terms and

21   conditions, and we alleged that they did know about

22   our terms and conditions, they knew that by inducing

23   Mr. Kushner to place the Amazon Key on properties

24   that were under contract with GateGuard, they knew

25   they were inducing a breach of that contract.  So

1    that would be all of those contracts plus additional

2    portfolio properties within the Kushner real estate

3    world.  So I guess the damage to the devices goes

4    together with the breach of contract.

5         When there's an installation of the key,

6    what I call the ticking time bomb scenario, we don't

7    necessarily know that anything has happened, so

8    there's a breach there.  At least we would argue

9    there's a breach, but we don't necessarily know that

10   it's happened because we don't know there's a

11   problem yet.  So I can certainly add the contractual

12   breaches, but I think those will largely dovetail

13   with the illegal installation of the key.

14        THE COURT:  Okay.  So you're not alleging

15   some damages based on, like -- it sounded like you

16   may have been, but I could have misread it.

17   Plaintiff is not alleging some damages based on

18   interference with the future economic relationship

19   with these building code?

20        MR. QUAINTON:  No.  Yes, we are.

21   Absolutely.  So with the building where -- so there

22   are two issues.  There's a building where there's a

23   problem.  Let's say a device malfunctions, client is

24   unhappy, they take down that one device.  We allege

25   that there is a lifetime expectancy of profits for

1    that one building because the devices are installed

2    at a very cheap price, far below market, in the

3    expectation of getting future benefits, including

4    various add ons that we're hoping to market through

5    the devices.  So that expectancy -- those are just

6    straight up lost profits.

7          But there is also -- the other expectancy

8    is to put the GateGuard device on other properties

9    within the portfolio.  And the strategy was very

10    consciously to go after property owners with large

11    portfolios.  Again, it's kind of this lost leader

12    approach where you install them at a cheap price,

13    hoping that you can then install them on a much

14    broader basis.  And that's why we asked for and got

15    the exclusivity provision with the property owner.

16          So if we have one device that malfunctions

17    on one bill -- let's say it's a trial building.

18    This happened in a couple of instances.  They say,

19    well, we'll take one or two, see how it goes, and

20    then if it works out, you could have the entire

21    portfolio.  And so they try one or two, and then

22    there's a problem.  If that problem turns out to

23    have been caused by Amazon illegally putting its key

24    inside of our device, we would allege that we lost.

25    And then the client is unhappy with us and says, we

 1    don't want to do business with you at all on all of
 2    our properties.  We would allege that Amazon's
 3    conduct has cost us that entire portfolio.
 4         There's another scenario where Amazon knows
 5    that we have a portfolio under exclusivity.  Let's
 6    say, for example, an installer or a marketer asks
 7    the question of the client, do you have any other
 8    companies that are installing intercoms on your
 9    properties.  And let's say, hypothetically, the
10    manager or the super, whoever they're talking to,
11    says, oh, yes, we've got this GateGuard.  And then
12    Amazon says, it's not a problem.  We can easily wire
13    our product into them.  Don't worry about it.  And
14    so they go ahead and wire up the whole portfolio.
15    We would allege they've damaged the entire
16    portfolio.  And that was our expectancy, we would
17    get that.  Which is how we get to the large numbers.
18    They complain about 15,000, but you multiply one
19    device by a portfolio of 80 and you see how the
20    multiplier works because we were specifically going
21    after large portfolios of properties.
22         THE COURT:  Okay.  I mean, I understand
23    that's the claim.  I guess for purposes of these
24    responses, I'm happy to give you to June 2, but I
25    would expect that at that point, there would be

```
 1    actual identifying of actual building addresses that
 2    have encountered these issues or terminated
 3    contracts or required some replacement or repair
 4    work based off of, presumably, the installation of
 5    Key for Business.
 6                 MR. QUAINTON:  Correct.  Yes, Your Honor.
 7                 THE COURT:  Okay, and then what about
 8    interrogatory number 5 and the directors, officers
 9    and employees?
10                 MR. QUAINTON:  I mean, I just don't
11    understand the relevance of why are they asking for
12    officers and directors before anytime that's
13    relevant in the case.  I mean, the damage starts --
14    I mean, GateGuard isn't even installed until 2017,
15    so there can't be any interference or theft of trade
16    secrets.  I guess they could have somehow got a demo
17    or something, but that's not our allegation.  Our
18    allegation is that they stole trade secrets once we
19    already had them installed.  So I just don't see the
20    relevance to 2016 at all.  I mean, it's not a huge
21    deal, but I guess it's more the principle is why are
22    we answering irrelevant questions.
23                 THE COURT:  But are you willing to provide
24    it from November 2017?
25                 MR. QUAINTON:  Yes.
```

```
 1                    THE COURT:  Okay.  And that'll come with
 2     the June 2 supplemental responses?
 3                    MR. QUAINTON:  Oh, sure, yes.  Absolutely.
 4                    THE COURT:  Okay.
 5                    MR. QUAINTON:  It was just the 2016 I was
 6     objecting to.
 7                    THE COURT:  Mr. Salant, I'm happy to -- so
 8     they're indicating they can provide supplemental
 9     responses by June 2.  We can certainly re-raise this
10     issue if those June 2 responses are insufficient.
11                    MR. SALANT:  Yes, Your Honor.  Understood.
12     And so that is acceptable to us.  We just want to
13     make sure that the order, the agreement that
14     GateGuard is agreeing to, is to set out the full
15     scope of its current responsive knowledge,
16     understanding that there are some things it knows
17     and doesn't know, but the full scope of what it
18     knows today or at the date of the service of its
19     second supplemental interrogatory responses; in
20     particular, specific addresses, contracts, costs at
21     issue.  That's the key thing for us is to finally
22     get these answers from GateGuard.
23                    THE COURT:  Okay.  It sounds like, Mr.
24     Quainton, I just want to make sure we have an
25     understanding as to that, that you're going to be
```

1    providing your current whatever knowledge you have

2    currently, obviously you can supplement it, but that

3    there isn't going to be some objection based off of

4    we're currently in discovery and this is not

5    something you currently have.  You should be able to

6    identify whatever the basis was for commencing the

7    action.  Does that make sense?

8           MR. QUAINTON:  It does make sense.  And I

9    think what I'll do is, for example, if we're still

10   trying to get some of these match serial numbers

11   with buildings, I'll just note that.  But I have

12   specific addresses and I'm working on a list, so

13   that shouldn't be a problem.  Anything I don't know,

14   I'll say at this point I don't know it yet, but I

15   hope to know it soon.  Whatever we do know, we'll

16   put in.

17          THE COURT:  Okay.  I guess that leaves only

18   the issue of the building; is that correct?

19          MR. SALANT:  Yes, Your Honor.  So if it's

20   all right with you moving to the second issue that

21   we've raised to the Court which pertains to the

22   location lists.  So some of this has been alluded to

23   already, and I think it's time we all address it

24   squarely, to set the stage, GateGuard's complaint

25   alleges a mechanism of injury.  The notion that

1    installation of Amazon's Key for Business device at

2    the same location as a GateGuard device caused an

3    interference or injury and facilitated some alleged

4    misappropriation of GateGuard's intellectual

5    property.  Obviously we disagree with these claims,

6    but we take those as the theory that's asserted in

7    GateGuard's first amended complaint.

8            At the initial pretrial conference, this

9    Court ordered a process to circumscribe the scope of

10   discovery where GateGuard sends a list of the

11   locations where its device is or was installed, and

12   Amazon responds with a list of those devices at

13   which Key for Business is or was installed.  And so

14   GateGuard did disclose its location list, and that's

15   the one we just mentioned, that in the history of

16   its business, it installed 217 GateGuard devices at

17   217 unique locations.  And Amazon will be serving

18   its counterless, with its interrogatory responses

19   that are due tonight.  Which to preview,

20   approximately 70 locations of overlap where there

21   were ever one and the other device at the same

22   location.  That is the scope of discovery in this

23   case.  But now GateGuard wishes to expand the

24   locations at issue in this case by 15,000 locations,

25   including numerous locations.  All of these are

1    locations at which a GateGuard device admittedly was

2    never ordered or installed.  And so we've given a

3    number of reasons why the scope of discovery should

4    be limited and not extended to these 15,000

5    nonexistent GateGuard locations.  I'll give a

6    summary of those reasons now, and then, of course,

7    we can discuss them.

8          So the first is that GateGuard's legal

9    theory is frivolous.  It's a claim that GateGuard

10   customers signed on to some onerous clause that was

11   in Gateguard's terms of service that give GateGuard

12   so called exclusive control over all buildings

13   everywhere in that company's portfolio.  No Court

14   would uphold that kind of clause.  The sort of

15   plenary authority to control every building's

16   entrance.  It's an unenforceable contract of

17   adhesion.  But in all events, Key for Business and

18   GateGuard don't compete in the same way that this

19   exclusive right should prevent a building from

20   putting a GateGuard device there.

21         So we just think that the whole notion that

22   there were 15,000 contracts out there that Amazon

23   should have known it could not approach or install a

24   device at when there's no GateGuard device that ever

25   did or that didn't exist and never did exist there

```
 1    is totally frivolous.  It's an out of control type
 2    of allegation.  But even putting that aside, the
 3    issue seems to be that GateGuard thinks its own
 4    customers breached that term, which is a problem
 5    GateGuard ought to have with its customers and not
 6    with Amazon.  And so that's just our first main
 7    objection, which is this whole legal theory does not
 8    make sense.  But perhaps more importantly, it's not
 9    the legal theory that GateGuard alleged in its
10    complaint.  And it's not what Judge Koeltl said was
11    plausibly alleged.  The quotations that GateGuard
12    draws from in its letters to the Court are Judge
13    Koeltl's holdings, that the tortious interference
14    claim was plausibly alleged because GateGuard
15    plausibly alleged that Amazon knew an existing
16    GateGuard device had a contract behind it that
17    Amazon allegedly knew about and caused the building
18    to violate.  It's a completely new theory that every
19    portfolio, 15,000 locations, it's 70 times the size
20    of every device GateGuard has ever installed in its
21    history could be within the reasonable scope of
22    liability for a tortious interference claim.  There
23    is simply no way for Amazon to have known that these
24    locations were an issue or should have known it.
25            So with this context in mind, the
```

1    GateGuard's attempt to make Amazon investigate
2    15,000 locations where its device was never
3    installed and never existed, it's totally
4    disproportionate and ironic.  I mean, in light of
5    what GateGuard has said thus far, inability to
6    respond with any particular locations.  They told us
7    before this case started it was nine locations.
8    They alleged there are 40 such locations in the
9    first amended complaint.  There are now 217
10   locations in the history of its company.  And now it
11   wants us to go check 15,000 locations, which is just
12   an attempt to explode discovery beyond what makes
13   sense for the theory that GateGuard alleged in this
14   complaint.  So what we're asking for, Your Honor,
15   are guardrails on discovery that GateGuard is not
16   entitled to this freewheeling investigation of
17   Amazon, and a ruling that only devices where
18   GateGuard -- excuse me, only locations where
19   GateGuard devices is, was installed are within the
20   scope of discovery in this case.
21             THE COURT:  Mr. Quainton?
22             MR. QUAINTON:  Yes, Your Honor.  So a
23   couple of responses.
24             I think the first, just going back to the
25   decision of Judge Koeltl in this case.  So the first

1    thing is that Judge Koeltl clearly understood that

2    the entire portfolio of buildings would be affected

3    by potential misconduct by Amazon.  So as I said in

4    one example, if one device has a problem in one

5    building, that can poison a relationship and cause a

6    loss of the entire portfolio.  The other thing that

7    Judge Koeltl clearly saw, I don't think he saw the

8    scope of the problem, but he clearly says that the

9    fact permits an inference, and this is what I cited

10   in my letter, that Amazon had actual knowledge of

11   the relevant contracts and intentionally procured

12   their breach.

13          Now, what are the relevant contracts here?

14   The relevant contracts here are online terms and

15   conditions.  Those online terms and conditions do

16   provide for an exclusivity across a portfolio.

17   There's actually nothing unusual about that.  And

18   whether that may or may not be enforceable is not

19   for Amazon to unilaterally decide as a matter of

20   discovery.  It's discoverable to know did Amazon

21   know that these portfolios were subject to an

22   exclusivity?  Did they tell the client, don't worry

23   about it?  I think my hypothetical is extremely

24   possible that one of the Amazon representatives

25   actually asked a building operator, building

```
 1    superintendent, or a manager, do you have anybody
 2    else who's installed intercoms?  And the person
 3    says, oh, yes, we've got GateGuard.  And Amazon
 4    says, oh, don't worry about that, we can easily wire
 5    our devices into them.  Or alternative conversation,
 6    the superintendent or the -- and I say
 7    superintendent deliberately because sometimes what
 8    Amazon did is they would deceive the superintendent
 9    who didn't actually have the authority
10    contractually, but that's a slightly separate issue.
11    But they would have a conversation.  And maybe in
12    that conversation, the superintendent or the manager
13    says, well, you know, we've got GateGuard already
14    installed on a couple of our buildings, is that
15    going to be an issue for you?  And they say, well,
16    don't worry about it, don't worry about it.  We can
17    work that out.  And they say that knowing that they
18    can't do that under the contract.  They don't say,
19    you've got a contract that we know about, that this
20    is cause a breach, but we think it's a stupid
21    contract, so go ahead and breach it.  That's not the
22    conversation that you have in the real world.  The
23    real world is, oh, don't worry about it.  And that
24    induces the breach of the contract.
25               So we can get into, and maybe we will at
```

 1    summary judgment or at some other stage, the
 2    enforceability of these contracts.  But that's not
 3    an appropriate objection in discovery.  In
 4    discovery, we are entitled to all of the information
 5    that's reasonably related to lead to discoverable
 6    information related to our claim.  And when the
 7    judge who's ruled on the issue says that the fact
 8    permits an inference that the defendants had actual
 9    knowledge of the relevant contracts and
10    intentionally procured their breach and when we know
11    that GateGuard and Amazon have been in discussions
12    for, as Amazon insists, years, it's highly possible
13    that Amazon knew about these provisions and for
14    whatever reason, induced their breach.  It's not
15    valid to say, we just think this is a stupid
16    contract, go ahead and breach it.  Or they can say
17    that, but it's still inducing the breach of the
18    contract.
19            So I don't think there's anything frivolous
20    at all about our claim.  And as I say, the fact that
21    we go from a relatively small number of contracts to
22    very large damages and very large number of
23    buildings has to do with this multiplier effect.
24    Our strategy was find large property owners, many of
25    these were in the Jewish community in New York.

1    Find large property owners that we can have good

2    relationships with, put our device on one or two

3    buildings, and then go for a much bigger contract.

4    So interfering with that relationship affects a much

5    larger universe than just the one or two contracts

6    at issue, and I think that -- we fundamentally

7    object to that.

8            The numbers that are thrown out, just so

9    Your Honor understands, I think they said 40

10   contracts -- 40 devices we think we have reason to

11   believe and we actually think it's higher now

12   because it's 70, but we believe that it was at least

13   40 where there was an overlap between Amazon and the

14   key.  217 is the total number of devices installed.

15   That's actually quite a lot of devices, when you

16   think about the markets that we were trying to

17   capture.  15,000 is just the multiplier effect, and

18   it's not at all unusual for an owner to have 80

19   buildings or 70 buildings.  So if you interfere with

20   the relationship at 205 West 15th -- 14th Street or

21   whatever, that can affect other properties

22   throughout Manhattan.  And I think at this stage, it

23   would be highly inappropriate to restrict discovery.

24   All Amazon needs to do is -- and they keep good

25   records -- just tell us where did you install the

1    key.  If it's not installed in our portfolio
2    properties, they don't have an issue.  But if they
3    are installing the key in Amazon portfolio
4    properties, and if discovery shows that the supers
5    and the Amazon marketers or the Amazon installers
6    knew about these contracts and deliberately overrode
7    them, that's an intentional or tortious interference
8    with our contractual rights.  And maybe at summary
9    judgment, they can say, well, these conversations
10   never existed.  We knew about these contracts, but
11   we never tried to induce the breach.  Or they can
12   come up with a theory.  We knew about these
13   contracts, but we thought they were stupid, so we
14   didn't bother to respect them.  I don't know what --
15   that to me, sounds utterly frivolous.  But it's not
16   a discovery point, it's a summary judgment type
17   argument.
18        So we strongly object to any limitation on
19   discovery with respect to the number of buildings at
20   this stage in the proceedings.
21        MR. SALANT:  Your Honor, if I may, I'd like
22   to just respond to a couple of points, if it's all
23   right with you.
24        THE COURT:  Sure.  Actually I just had a
25   few because I'm admittedly struggling to see how

1    we're getting from the locations where GateGuard was

2    installed to the 15,000 other portfolio buildings.

3    I get the argument.  It just seems to me quite

4    speculative to think that they would have installed

5    it in one building and then potentially you had the

6    entire property owner's portfolio at your disposal.

7    I'm wondering though -- so, Mr. Quainton, you had

8    talked about the portfolio companies.  There was an

9    interference with contractual rights if, for

10   instance, Amazon was trying to install Key for

11   Business and they had asked, do you have anyone else

12   installed, and the person says, don't worry about

13   it, if they were to say we have GateGuard.  I

14   understand if you point to those facts why that

15   would get you discovery on that building.  But right

16   now, we just have the speculation that because you

17   installed it in one building, they would have had

18   the business everywhere else.  And there's nothing

19   you're pointing to concretely that would indicate

20   that other than this assumption that you were going

21   to get the entire portfolio.  And so that does seem

22   like quite a disproportionate amount of discovery

23   given the number of buildings it was actually

24   installed in.

25            MR. QUAINTON:  Well, if I could give Your

1    Honor a couple of concrete examples.

2         I think in both the initial disclosures of

3    Amazon, if I'm not mistaken, and certainly in our

4    initial disclosures, we include a major real estate

5    owner called named Joseph Soleimani.  So Soleimani

6    actually is somebody with whom there has been quite

7    a lot of history, unfortunately not all of it happy.

8    There's been litigation.  He was involved in a

9    criminal case as well.  So the way that relationship

10   worked is that my client is a charismatic young

11   entrepreneur.  He was in his thirties at the time

12   and he's kind of a visionary and he made close

13   friends with Soleimani's son, and he got the

14   GateGuard device on a couple of properties.  And

15   very much the idea was that GateGuard was going to

16   go after the entire portfolio.  There are economies

17   of scale, like when you have one intercom that

18   works, why would you have 50% GateGuard, 50% Key?

19   That doesn't make any sense.  Or 50% GateGuard and

20   50% somebody else?

21        So you're very consciously going after a

22   portfolio business.  And as I say, there's specific

23   litigation where this came up and there were

24   specific problems with some of those devices.  If

25   any of those devices had problems as a result of the

1    Key, and it'd be interesting to look at the 70 that

2    Amazon has disclosed because I say we don't know the

3    full scope that would suggest that the entire

4    relationship was poised because of an Amazon

5    problem.  We don't know that for a fact.  I'm not

6    suggesting I know that for a fact.  That's certainly

7    possible, but it's not at all speculative,

8    respectfully, Your Honor, that the portfolio would

9    have been in play.

10           There was a reason that GateGuard put that

11   exclusivity in its terms and conditions.  As I say,

12   all of the clients will tell you that one of the

13   reasons that they were attracted to GateGuard was

14   the low initial price.  That's not because this is a

15   cheap device.  It's actually a very sophisticated

16   device.  And you'll get testimony from Soleimani and

17   others that this is actually top of the line,

18   cutting edge technology.  So why would you market

19   cutting edge, innovative AI technology at

20   substantially below market?  Obviously, you're

21   trying to go for a bigger market.  You're trying to

22   get a relationship, and if that works, get your

23   devices on all of the buildings.  That's the only

24   way, economically this makes any sense.

25           So that's why you put it in your contract.

1    That's what you hope to actually have enforced.  And

2    we think -- I mean, I know for a fact that Amazon

3    have these terms and conditions.  They looked at

4    them and they made the decision that we think that

5    these don't apply.  And I just don't think that's

6    the basis right now to say we can't get discovery

7    into the portfolios.

8            When Judge Koeltl says yes, Amazon knew

9    about the contracts -- sorry, there's an inference

10   that's reasonable that Amazon knew about the

11   contracts.  These are contracts that have this

12   exclusivity provision and intentionally procure

13   their breach.  Those aren't my words.  Those are the

14   Judge's words.

15           So I don't see how we can say, on the one

16   hand, Amazon knew about the contracts and may have

17   intentionally procured their breach, and we're

18   entitled to discovery into that potential breach,

19   but then say, well, it kind of goes too far because

20   the contracts go too far.  That doesn't make sense

21   to me.  That's not an issue to cut off discovery.

22           THE COURT:  I guess I'm a little confused

23   as to why Judge Koeltl's statements in that motion

24   to dismiss decision wouldn't be applicable to the

25   351 or now 217, I think was the number, unique

1    locations.  Like for those buildings where they were
2    installing Key for Business, they would have known
3    about the -- or you know, reasonable inference that
4    they knew about the contract and procured its breach
5    by installing the Key for Business where GateGuard
6    was located.  But you seem to be reading the
7    statement to include, like, every building in New
8    York City.

9              MR. QUAINTON:  No, no, no, no, no.  Not at
10   all.  No.  Those are all GateGuard portfolio
11   properties.  So the 217, right now, we know there
12   are 70 that overlap with Amazon.  Within that
13   universe, there are some GateGuard devices that
14   malfunctioned.  And some of those malfunctions, we
15   have evidence were related to the Key.  Some of
16   them, we believe, are related to the Key.  Discovery
17   will show what the truth is.  But within those 217
18   unique locations, just take a Soleimani example, you
19   have three installed, but you're going after a
20   portfolio of 60 or 70.  The 60 or 70 are in play.
21   Or take one where we install one device, and Amazon
22   then goes ahead and has this conversation, this
23   hypothetical conversation that I'm talking about,
24   say it's not a problem.  Then they wire up the rest
25   of the portfolio devices with the Key, and then when

1    my client tries to expand the GateGuard business,

2    they said, we don't really need that, we've already

3    got the Key.  Well, they said they don't really

4    compete.  But these devices do compete for packaged

5    delivery services.  And one of the big selling

6    points for the intercom, which sets it apart from

7    other run of the mill intercoms, is that it has

8    package delivery functionality, that there's a suite

9    of tools, online tracking, web services that enable

10   you to track packages.

11           So if we have one device in one property,

12   and our aim is to expand it to 80, and then Amazon

13   comes along and says, don't worry about that,

14   rinky-dink little GateGuard put Key on everywhere,

15   we're the best.  They put the Key on, and then my

16   client tries to expand the business selling this

17   idea of package deliverance, and we don't really

18   need that, we've got the Key everywhere.  They've

19   looked at our contract, they've looked at its terms

20   and they've said, well, contracts don't matter to us

21   because we decide these are frivolous contracts, you

22   don't have to enforce them, you don't have to

23   respect them.  I don't think that's how business is

24   meant to work.  If you think something's not

25   enforceable, you go to court.

1              THE COURT:  In your hypothetical, you at

2     least have perhaps for one of those portfolio

3     companies, you have some indication that someone

4     from Amazon or the like said, don't worry about it,

5     we can still install this regardless of what's in

6     the contract.  But it sounds like here what you want

7     is the 14,000 buildings without any indication

8     whatsoever, concrete points or something concretely

9     where Amazon said, well, first they never ordered

10    GateGuard, so we're assuming they would have ordered

11    GateGuard.  And then on top of that, you're assuming

12    that Amazon would have come in and said, don't worry

13    about some exclusivity you have in a different

14    building.  You can still install this here.  Go

15    ahead.  Go ahead.

16              MR. QUAINTON:  Sorry, Your Honor.  Just

17    respectfully, I must not be being clear.

18              All of the portfolio properties relate to

19    an existing installed GateGuard device or ordered

20    GateGuard device.  There's not a single property

21    that we just had our eyes on.  That would be another

22    theory.  But that's not these 15,000 locations.

23    These are all locations -- no, these are all

24    locations related to our portfolio.  What we

25    consider to be our portfolios, where the device was

1    already either installed or ordered but not

2    installed yet.

3         THE COURT:  So I'm looking at ECF41 where

4    there's three building categories that were broken

5    down.  There's the category one and two, which we're

6    not talking about right now.  And then category

7    three is described as 14,086 portfolio locations

8    where GateGuard was neither ordered nor installed.

9    You're saying that at these 14,086 locations,

10   GateGuard had been ordered but not installed?

11        MR. QUAINTON:  No.  Divide 14,000 by 70,

12   you get 200.  70 would be the average size of the

13   portfolio.  So you would have within that portfolio

14   at least one GateGuard device installed or ordered.

15   And what we're saying is GateGuard -- Amazon sorry,

16   interfered with that portfolio.  And from a

17   discovery perspective, the conversations that I'm

18   imagining, I think they're real, I don't think this

19   is a fishing expedition.  I think this really

20   happened in the real world.  We need to have

21   discovery into the people at those buildings.  Did

22   these conversations occur?  Was it at a different

23   building?  We need to know within our portfolio, so

24   we have Amazon -- so, by the way, I don't think it's

25   going to be -- it may not be 15,000, but it'll be a

1    multiple of the relevant universe of the buildings

2    where we had a device that was already installed and

3    that was within a portfolio of properties with one

4    owner.  And we were aiming to get that entire

5    portfolio and Amazon interfered with our contractual

6    rights to get that portfolio.  That's our claim.

7    That's one of our claims.

8            And I think you just have to do the math on

9    it.  These are large portfolios.  As I said, the

10   strategy was to target not the smaller owners, but

11   target the owners with the large portfolios and get

12   a foothold in those properties.  And if it works,

13   expand.  Take a really cutting edge device that has

14   all kinds of functionality, install it at a low

15   price with the expectation that if it works, you're

16   going to get the whole property.  Amazon comes in

17   for whatever reason, says maybe it's not as

18   nefarious.  It's like, oh, don't worry about it.

19   We, can work with them, but we can figure it out.

20   We can install our device on them.  And maybe the

21   installers don't even think about it.  Maybe they

22   don't even know that it's, like, a bad idea to put

23   the Key inside of an intercom.  Maybe they think --

24   who knows what they think?  They're just trying to

25   do their jobs.  But the fact is it winds up

1    interfering with our contractual rights and we're

2    entitled to know where that happened.

3            THE COURT:  Mr. Salant, did you want to

4    chime in?

5            MR. SALANT:  Yes, Your Honor.  Thank you.

6    So, just putting aside the notion that the harm

7    that's alleged here, in locations where GateGuard

8    never existed, are totally speculative, and putting

9    aside the notion that this hypothetical that counsel

10   has raised, that Amazon said, don't worry about the

11   contract is not tortious, that may have been a

12   breach of contract, but it's not a tortious

13   interference.  GateGuard is taking Judge Koeltl's

14   rulings out of context.  I think if you read the

15   full paragraphs of what Judge Koeltl is saying when

16   he allowed the tortious interference claims to

17   proceed, that they're grounded in allegations of

18   interference with real GateGuard devices in real

19   places.

20           I'm looking at Judge Koeltl's opinion,

21   which is ECF30 at page 26, which is the quote that

22   counsel has read over and over.  The full paragraph

23   on page 26 makes it very clear what Judge Koeltl was

24   saying, that GateGuard's allegations are that the

25   service agreement, these terms and conditions that

1    these clauses were inserted into forbids customers

2    from allowing others to access or alter those

3    devices without GateGuard's consent.  That's the

4    contract and the device that Judge Koeltl found

5    GateGuard plausibly alleged was interfered with.  So

6    he was not endorsing the portfolio theory or at all

7    suggesting that it was not unduly speculative, or

8    that these 15,000 locations, which by the way, were

9    well beyond what GateGuard told Judge Koeltl in the

10   first amended complaint, they said it was about 40

11   locations.  So he was working off totally different

12   information and saying something totally different.

13   And so it just doesn't make sense that looking at a

14   location with no GateGuard device that Amazon or

15   anyone could have known that there was something --

16   that this was to ground it in the doctrine was

17   within the scope of liability of a tort, because the

18   scope of liability is bounded by reason; what's

19   reasonable, what's foreseeable.

20          A similar issue occurs with GateGuard's

21   citation of Judge Koeltl's other phrase, which is at

22   ECF30 on page 28.  The full paragraph there, which

23   talks about canceled agreements, rely on the notion

24   that, and I'm quoting here, "The FAC plausibly

25   alleges that Amazon was aware of GateGuard's

1   relationships with customers who contracted for the

2   installation of a GateGuard device.  That Amazon

3   deliberately gained access to and tampered with

4   those devices, even though it lacked authority to do

5   so.  And that the resulting damage to many devices

6   caused landlords to cancel contracts not only for

7   damaged intercom systems, but other additional

8   buildings."

9          So it's not that Amazon knew or could have

10  known the unknowable, which is that some population

11  of locations 70 times GateGuard's entire size of

12  devices installed in its history, these ought to be

13  part of investigation and discovery.  We think it's

14  the very definition of a fishing expedition.

15         And I'll just note one last thing, which is

16  that counsel suggested that his principal, the

17  principal of GateGuard, Ari Teman, is a visionary.

18  That is not accurate.  He has been tried and

19  convicted and sentenced to incarceration for doing

20  something that bears some resemblance to this

21  approach, which is adding terms and conditions to a

22  contract and claiming benefits, exclusive benefits

23  based upon them.  It's not exactly the same, but an

24  analogous wire fraud theory that the Government

25  brought and proved.  And so we're very concerned

1    that this just goes beyond what proportional

2    discovery ought to be and that it's a use of

3    discovery tools to extend boundlessly and trump up a

4    case that was not alleged and is not within the

5    appropriate scope of liability for a business tort.

6    So that's our response on the matter.  And thank

7    Your Honor for letting me reply.

8          THE COURT:  Okay.  So I guess this is the

9    approach I'd like to take, and I'm happy to work

10   with the parties if folks want a different approach.

11   But it sounds to me like there's no dispute that as

12   to the 217 unique locations, plaintiffs are entitled

13   to discovery.  I think on that we're all on the same

14   page.

15         I also think, like at the outer bound,

16   these 14,086 portfolio locations for all the reasons

17   I might have indicated already, including the fact

18   that I just don't think this is proportional to the

19   claims alleged and what was foreseeable.  And I did

20   pull up, Mr. Salant, while you were talking, the two

21   relevant paragraphs from Judge Koeltl's decision.

22   And I agree that the scope there, or at least his

23   discussion there, doesn't seem to suggest this broad

24   scope of these portfolio locations.

25         At the moment, I don't think plaintiffs

1   have shown that this discovery is relevant and

2   proportional.

3           I don't mean to suggest that, Mr. Quainton,

4   if in discovery you find information to suggest that

5   the portfolio of a particular landowner was at play

6   and was interfered with at that point, if you want

7   to come up with something more concrete and attempt

8   to seek discovery for those buildings, I'm not going

9   to foreclose that.  But at the moment, I just

10  haven't heard anything to make me think that the

11  discovery you seek here, again, is proportional,

12  given the allegations.

13          MR. QUAINTON:  Respectfully, Your Honor, I

14  mean, I appreciate that way of looking at it.

15          I do think that it's not quite fair to

16  Judge Koeltl's opinion.  I take the point that Judge

17  Koeltl was focusing on damage to devices.  My point

18  was to look at the logic of what he's saying and to

19  try to see how that logic works for my clients

20  harms.  So he clearly did see that there was a

21  portfolio impact.  He saw the portfolio impact.  I

22  think directly, if you have one device that

23  malfunctions, you could lose the portfolio.  I think

24  that seems to be clear.  And he also saw that, and

25  he says this directly, it's true he's talking about

1    the damage context.  But what he says is that the

2    fact alleges that they had knowledge of the contract

3    and they intentionally procured their breach.  So

4    even though it's true that he's focusing on the

5    damage piece of the contract and the access to the

6    device piece of the contract, I don't see how we can

7    say that gives Amazon a pass on ignoring the

8    contract as to other things.  It seems to me what

9    he's saying is Amazon knew about these contracts and

10    intentionally procured their breach.  Not Amazon

11    knew about these contracts and didn't like some of

12    them and picked and shows.

13           So I guess I'm a little bit uncomfortable

14    with that.  And I don't know if the wind is blowing

15    against me on this, so be it, but maybe then I need

16    to file an amended -- seek leave to file an amended

17    complaint to make clear that we are seeking to

18    enforce the contract.

19           I don't think it's relevant to bring up the

20    criminal case.  I know that case very well.  And

21    representing Mr. Teman on appeal in the Second

22    Circuit.  I think we're going to win.  I hope we're

23    going to win.  But the question of whether he's a

24    visionary, went to the pricing of the devices and

25    the exclusivity terms.  Whether there was a use of a

1    remotely controlled check, which was the issue in

2    the criminal case, whether that device was

3    authorized or not authorized, it's very separate

4    from the overall strategy of taking a cutting edge

5    device, installing it at below cost on the

6    expectation that you would get a portfolio

7    exclusivity.  That's not crazy at all or

8    unreasonable at all.  The clients could accept it or

9    reject it, but those were the terms.

10          So I guess, obviously I disagree

11    respectfully with Your Honor, I don't know if this

12    appropriate step.  I mean, I'm glad you leave the

13    opportunity for us to come back if we find something

14    more concrete.  But perhaps I need to address the

15    issue more clearly and simply seek leave to amend

16    the complaint, because the issue has been joined on

17    this point and we have a fundamental disagreement.

18          THE COURT:  So, Mr. Quainton, let me just

19    maybe tackle it a different way.  You have the 217

20    unique locations that you know for sure had

21    GateGuard installed and you know for sure had Key

22    for Business.  I guess the other reason I wasn't

23    seeing a relevancy hook is because to the extent

24    some of those buildings have a portfolio of other

25    buildings, you can certainly make the same argument.

1   And then without having to, essentially it sounds

2   like, fish through all these other 14,000 other

3   buildings.  And I guess I would understand your

4   argument at least if you were making it as to the

5   1,007 locations where Gate Guard was ordered but not

6   installed, but you're talking about buildings where

7   there was no order of GateGuard and no installation.

8   So it's even more removed.

9          MR. QUAINTON:  So can I ask you, Your

10  Honor, a question, just to understand

11  hypothetically, how you would deal with the

12  situation?  If, in discovery, we uncover either a

13  deposition or in an email something to the tenor of

14  what I've described as a hypothetical, where there's

15  an actual conversation between Amazon and I guess if

16  we're limited to the 217 buildings at this case, so

17  be it.  But within that universe, the conversations

18  that we discovered that were going on between the

19  Amazon installers and the Amazon -- and the property

20  owners or managers or supers were effectively, hey,

21  we noticed that -- let's say the property manager

22  says, we've got this thing in our contract that says

23  we're under exclusivity with GateGuard, and Amazon

24  says, don't worry about that.  That's a stupid

25  provision.  Hypothetically, if we have facts like

1    that, I mean, then wouldn't the portfolio be in

2    play?  I mean, surely Your Honor wouldn't suggest

3    that if we actually have evidence, which I think

4    there will be, that corroborates my theory here,

5    that would somehow circumscribe damages, which is

6    really what we're talking about.

7         THE COURT:  Right.  I mean, I think the

8    scenario you just raised is very different than what

9    I think has been concretely put forth here.

10         I think you've got a different argument if

11    you have someone from Amazon at a building where

12    GateGuard was not installed, where GateGuard says,

13    we still have this exclusivity contract, and you

14    have statements that say you can disregard it.  I

15    think that's a different scenario.

16         But right now I'm just going off of what I

17    think is speculative, this argument that because you

18    had GateGuard installed at an entirely different

19    building, Amazon somehow interfered with your

20    ability to extend that relationship into buildings,

21    that GateGuard had not been ordered or installed.

22         As I said, I'm not closing the door.  I'm

23    just saying at the moment you haven't come forth

24    with anything to make me think that it's

25    proportional to the needs of the case to give you

1    discovery into the 14,000 buildings.  Should that

2    change, I'm happy to hear you out again.

3    Alternatively, if you feel strongly, you can always

4    take an objection to Judge Koeltl.

5            MR. QUAINTON:  Understood, Your Honor.

6            THE COURT:  Mr. Salant, does that settle

7    the question of the buildings?

8            MR. SALANT:  Yes, Your Honor.  I suppose it

9    leaves in play the last category, the locations

10   where a GateGuard device was allegedly ordered but

11   never installed.  Our reasons for why these should

12   be outside of the scope of discovery are

13   substantially the same, that looking at 1,000

14   buildings when there's no GateGuard device there to

15   have been interfered with would be disproportional.

16   But I'm not sure if you ruled or reached that issue,

17   but please tell me if I'm mistaken.

18           THE COURT:  No.  I was trying to go

19   category by category, so I hadn't touched that one.

20   Is this 1,007 locations where GateGuard was ordered

21   and not installed, but Key for Business was

22   installed?

23           MR. SALANT:  Well, Your Honor, we don't

24   know whether Key for Business was installed in any

25   of these locations yet.  We haven't checked.  We've

1    just checked the locations where GateGuard was

2    installed.  So we haven't gotten to that yet in

3    discovery whether Key for Business devices were

4    installed in these 1,007 locations.

5              THE COURT:  Okay.  So on this, it's sort of

6    consistent with what I was saying.  I think Mr.

7    Quainton has certainly made the argument that

8    presumably he's going to show that someone at Amazon

9    had these conversations where they said, either

10   don't worry about it or it's not an issue.  So I do

11   here see the potential for allowing discovery where

12   you have buildings where Key for Business was

13   installed because then you now have the GateGuard

14   was ordered but not installed, but you did have Key

15   for Business installed.  So I think that's like a

16   different analysis than the last category of

17   buildings we were talking about.  And Amazon

18   wouldn't know which buildings it had the Key for

19   Business installed in; is that correct?

20             MR. SALANT:  Well, we would find out, of

21   course.  If Your Honor told us to, we would

22   certainly find out.  But our objection is there's

23   just no way for the harm to have occurred as

24   GateGuard alleged it because it requires a GateGuard

25   device present for Amazon to have interfered with,

1    ruined, misappropriated, anything physically.

2            THE COURT:  But wouldn't the fact that they

3    ordered it, couldn't they potentially, depending on

4    what facts come out in discovery, attempt to show

5    that you interfered with that relationship because

6    at least the building owner had ordered it so there

7    was presumably some intent to install it, and then

8    for whatever reason, that didn't happen.  And I

9    guess their theory would be because Key for Business

10   came in.

11           MR. SALANT:  I suppose that's a possible

12   allegation.  It doesn't seem to be the allegation

13   GateGuard made in its complaint.  It's a different

14   allegation that would comprise an amendment.  I

15   guess it would require the specific situation that

16   an order was frustrated because of the installation

17   of Key for Business.  But that could happen.

18   There's no specific allegation or indication that

19   that ever happened.  It seems as if what GateGuard

20   is attempting to do is exactly the same.  This

21   notion that the reason that location was due to it

22   is because of this exclusivity rather than the

23   cancellation of a particular contract.  But in all

24   events, it would seem to require linking that

25   location to an existing GateGuard location.

1    Something must have gone wrong, causing the building

2    to cancel a contract that swept somewhat broader.

3    So to put it plainly, us going to 1,007 locations

4    and looking at them would be of no use because the

5    allegation is like a lost hypothetical business, not

6    anything that happened on the ground.

7         THE COURT:  Unless one of those -- unless

8    you had of those 1,007 buildings, they were part of

9    the portfolio, where maybe like a sister building

10   had GateGuard installed.  So it would be a building

11   on your 217 unique locations then if there was

12   overlap there, then now that would be the linking

13   that you want to see?

14        MR. SALANT:  Yeah, I suppose that that's

15   right.  So there's the list of 217, which is

16   GateGuard's installations.  There's the forthcoming

17   list of 70, which is the overlap locations.  And I

18   suppose if there were orders among those 70 that

19   GateGuard alleges were canceled because of us, I

20   guess that does fall within the scope of the alleged

21   tort, but that's not something that's been alleged

22   or that we have any evidence to go off of.  And a

23   sort of top down investigation of 1,000 locations

24   seems like a bit much when the case is about 70

25   devices.

1          MR. QUAINTON:  May I respond, Your Honor?

2          THE COURT:  Yes, go ahead.

3          MR. QUAINTON:  Yeah, I don't think the case

4    is about 70 devices.  And this is actually not the

5    portfolio scenario.  This is a scenario where those

6    1,000 buildings are taken on their own terms.  So

7    within those 1,000, GateGuard has an order for a

8    device.  Customer says, yes, I'd like to sign up.

9    GateGuard contacts its supplier in China, gets the

10   devices ready, gets them ready to install.  In the

11   meantime, Amazon has showed up and has installed the

12   Key.  And as part of that conversation, they found

13   out about the super or the property owner said, we

14   have this order with GateGuard.  And they say, don't

15   worry about that, or whatever they say to override

16   that order.  We lose that business because the Key

17   is installed.

18          This is not the portfolio theory.  This is

19   direct damage to an existing order.  So I realize

20   that Amazon wants to limit this case as much as

21   possible, but there has to be proportionate fairness

22   here if we have existing orders that are frustrated

23   because of Amazon's conduct, that must be within any

24   fair reading of tortious interference with contract.

25          THE COURT:  Okay.  Mr. Quainton -- oh,

1    sorry, Mr. Salant, I don't want to cut you off.

2          MR. SALANT:  Forgive me, Your Honor.

3          The only point I wanted to make was that

4    discovery needs to be limited to the allegation

5    where cancellations of GateGuard installations

6    occurred because of Key for Business, because of

7    Amazon.  Only GateGuard can tell us where those

8    cancellations happened.  We should not need to do a

9    top down investigation of 1,000 places when there's

10   just no hint of a Key for Business installation or

11   Amazon's conduct being involved in this.  It's the

12   type of thing that GateGuard must know and must tell

13   us, which is why we've served those interrogatories

14   asking about canceled contracts.

15          MR. QUAINTON:  That's actually not true.

16   We would not necessarily know why that Key had

17   showed up, that Amazon had showed up.  That's

18   exactly the point.  You have much easier access to

19   that information.  You can press a button on a

20   screen, and of those 1,000 locations, you can say

21   there are 50 where it overlaps, or 60 or 70 or

22   whatever it is.  For us to find that out is a

23   process -- just for one single customer, we have to

24   go back.  If it wasn't at the time, we just lost the

25   business.  The client says, Sorry, we don't want it

1    anymore, and sometimes those discussions get

2    acrimonious and the record is unclear.  But we lost

3    the business.  We don't know why we lost the

4    business.  If you're saying it's fair the plaintiffs

5    has to go when we have a tortious interference claim

6    that's been sustained, we have to go and interview

7    in discovery every single person who had an order

8    and who turned it down and find out if it was

9    because of the Key, when you can just tell us there

10   are only 60 places where it is at all an issue.  And

11   then we can find out that you're actually right.  If

12   the cancellation had nothing to do with the Key,

13   even though the Key was installed, we don't have a

14   case.  It might have been that they had second

15   thoughts about the business, or it might have been

16   they didn't like Ari Teman.

17          But in terms of proportionality, it's just

18   vastly easier for Amazon to make the first cut than

19   for us to go back and reconstruct the relationship

20   with every single customer, when it's not at all

21   obvious that anyone would necessarily even have had

22   the idea to think that it was the Key that was

23   causing that lost business.  Even if it was causing

24   the lost business, just not necessarily what you

25   would have been thinking of at the time.

1          MR. SALANT:  Well, Your Honor, GateGuard

2    brought this case and must know what business it

3    lost.  Counsel has just suggested there were times

4    where people canceled contracts and that he seeks to

5    investigate the causation of those because he

6    doesn't know what caused them.  Putting aside that

7    that lacks causation, which every tort needs in

8    order to be fully alleged.  It means that GateGuard

9    is in possession of information of which contracts

10   were canceled and lost for orders that were

11   frustrated, and then we can talk about them.  But

12   reversing the burden and saying Amazon needs to

13   investigate why people canceled GateGuard contracts

14   makes no sense and seems disproportionate.

15         THE COURT:  Here's what I think we should

16   do on the 1,007 locations.  I don't know that this

17   requires Amazon to investigate as to why the

18   contract was canceled, but it does seem like in

19   terms of talking about what's less burdensome that

20   at least for the 1,007 building, it should be, I

21   would think, less burdensome for Amazon to just

22   identify the buildings that had Key for Business

23   installed.

24         For that category of buildings where you

25   have an order that was frustrated, so they ordered

1  GateGuard, it was never installed and Key for

2  Business was installed, I think Mr. Quainton, for

3  all the reasons he's argued, has demonstrated that

4  at least those buildings might have potentially

5  relevant information for his claims.

6        Mr. Salant, I would think it would be not

7  unduly burdensome for Amazon to be able to identify

8  in just those 1,007 buildings where it has Key for

9  Business installed.

10       MR. SALANT:  Yes, Your Honor.  If the Court

11  orders it, of course we will do it.  But we stand in

12  our objection that investigating what happened at

13  all these places and why a customer canceled a

14  GateGuard contract is just not something we would

15  know and --

16       THE COURT:  Yes.  And I don't want to leave

17  this in an ambiguous fashion in any way, and I'm not

18  at all requiring Amazon to investigate why the

19  contract was canceled.  All I think Amazon has to do

20  is identify which of those 1007 buildings had Key

21  for Business installed.

22       MR. SALANT:  Yes, Your Honor.  I mean, the

23  effect of this that we're concerned about is that we

24  send a list of where Key for Business was installed

25  and then GateGuard responds by alleging at every

```
 1    single one of these locations, a contract, an order
 2    was frustrated.  And then we're in the position of
 3    somehow having to prove our innocence, which seems
 4    to be reversal, a reversal of the normal way of
 5    discovery.
 6              THE COURT:  Well, I don't understand why
 7    they still wouldn't have to come forth with evidence
 8    that there was actually some frustrating or
 9    something done by -- I mean, I would think it would
10    still be their burden to prove that Amazon somehow
11    interfered.
12              MR. SALANT:  Yes, I agree with that, Your
13    Honor.  That GateGuard would need to allege and
14    prove that.
15              THE COURT:  So I guess, since you're still
16    early on in discovery, once you identify the
17    buildings, it at least gives them an opportunity to
18    presumably narrow down that 1,007 buildings so they
19    could then go and speak to these clients and try to
20    obtain evidence and discovery that shows that there
21    was something nefarious that happened with the
22    order, as opposed to just they ordered it and
23    changed their minds of their own free will.
24              MR. SALANT:  Of course, Your Honor.  If
25    it's what Your Honor orders, it's what we'll do.
```

1    We'll provide that list and sort of hold off on

2    investigating what happened at these places until

3    GateGuard advances some evidence.  We just think

4    they should know now.  They should know now where

5    contracts were lost and where issues occurred.

6            MR. QUAINTON:  I would just add one thing,

7    Your Honor, if I might, in terms of I think there

8    are other limiting principles in the federal rules.

9            For example, I'm not arguing for any

10   particular limit here, but the number of

11   depositions, including third party depositions that

12   are permitted.  Presumably there's going to be some

13   limit at some point that's discussed as to that.  So

14   while of course causation is our burden, I think

15   that it is proportional to have Amazon in the first

16   instance do what's easy for it.  Simply identify the

17   relevant buildings, and then we can use the tools

18   and Amazon can object and we can attempt to get to

19   the bottom of where there was, in fact, lost

20   business because of the Key, if anywhere.  I mean,

21   that's what we have to prove.

22           THE COURT:  So I just wanted to address one

23   point that Mr. Salant made at the end.  And in the

24   normal course, plaintiff would have brought these

25   claims and should have had some evidence of a lost

1    business in this type of instance where GateGuard
2    was ordered but was never installed.  And that's
3    supposedly what Mr. Quainton is going to produce in
4    these supplemental interrogatory responses by
5    June 2.  But what I understand him to be seeking
6    here is something more than what he initially had
7    when he brought the complaint, which he's entitled
8    to obtain in discovery in a limited fashion, which
9    is why I thought the request for the 14,086
10   portfolio locations perhaps was too far into the
11   speculative fishing expedition realm.  But these
12   1,000 locations where GateGuard was ordered, so long
13   as there's a Key for Business, I think you're closer
14   to the realm of establishing a link, at least to the
15   claims you've alleged.  I'm happy to tackle anything
16   else the parties want to raise.  I think those were
17   all the issues in the letters.
18            MR. QUAINTON:  Sorry, Your Honor.  There
19   was one other issue on our end.  It was at the end
20   of my letter, and there's -- so much focus had been
21   on our interrogatories.  I know Your Honor probably
22   has other matters, but the interrogatory response --
23   sorry, the initial disclosures that were provided by
24   Amazon we feel are inadequate because they don't
25   identify anybody at Amazon with knowledge, which I

1    think they should.  I think we may have to do

2    multiple 30(b)(6) depositions.  I think in terms of

3    knowing who custodians are, so we can talk about

4    that.  It would be good to know who at Amazon has

5    interacted with GateGuard.  We know some of that

6    because my client already did interact with some

7    people at GateGuard, but there may be others.  And

8    then there's this issue of third parties.  And I was

9    sort of very troubled by the absence of any

10   disclosure of third party information that Amazon

11   would have about its own contractors or

12   subcontractors.  And I referred to a deposition of a

13   company called Clear Home that has been -- it was

14   scheduled for the 22nd, and we're deferring that so

15   that all the parties can review the relevant

16   discovery.  But it does appear, based on the

17   response from Clear Home, that they have in their

18   possession information responsive to our Amazon

19   focused questions, which indicates that I don't know

20   what that information is, obviously, but it suggests

21   to me that Amazon has information relating to

22   Clear Home.  And so I think Amazon should be ordered

23   to produce or to identify those third parties who

24   may have been involved in installing devices.

25   Because some of these conversations, the

1   hypothetical that we've been talking about may not

2   have come through Amazon people.  They may have come

3   through people who were working with Amazon.  And I

4   think we're entitled to that discovery.  Whether

5   Amazon can break the chain of responsibility, I

6   don't know.  But if they hire Clear Home to do an

7   installation and Clear Home is the one who says,

8   don't worry about GateGuard's contract or Clear Home

9   is the one that does the faulty installation, I

10  think that would be within the scope of our

11  complaint.  My point is --

12          MS. CHAMPION:  Mr. Quainton, this is Anne

13  Champion.

14          MR. QUAINTON:  Hold on.  Let me just

15  finish.  Let me just finish my sentence.

16          MS. CHAMPION:  But this is totally

17  premature.  How could we identify a third party

18  installer before we have a location from you?  So if

19  you want to serve a rob (phonetic) on that for the

20  overlapping locations, then serve one.  But there's

21  no way we could have done that before we have those

22  locations.

23          MR. QUAINTON:  That's not true because we

24  know that you have been discussing issues about

25  GateGuard, as you, yourself, has said many times

1  with GateGuard.  And it's entirely possible that you

2  had internal conversations with your suppliers about

3  GateGuard before you had any list of buildings from

4  us.  You may have asked them, do you guys know

5  anything about this GateGuard?  What's up with this

6  GateGuard that's complaining about everything?  And

7  they come back and they say, oh, it's troublemaker

8  Ari Teman.  Or they say, yeah, we had some

9  installation problems, but it's all fixed.  That's

10  entirely possible before you get the list.  So no, I

11  totally disagree that it would not be within the

12  scope of what Amazon should be identifying in its

13  initial disclosure.  So that we can then -- that's

14  the point of the initial disclosures.  So we can

15  then go and do further discovery with respect to

16  those individuals.

17      MS. CHAMPION:  Again, this is premature on

18  this call.  If you need information from us about

19  installers at the relevant locations, then let's

20  talk about that another time.  But it's not

21  appropriate with the Court.

22      MR. QUAINTON:  Well, it's been raised

23  several times with Amazon and I've been very patient

24  with you, Anne, and David, in responding to your

25  concerns and you've just completely blown off my

```
 1    concerns, which I don't appreciate.  And so I don't
 2    think it's premature.  We've been talking about it
 3    for over a month.
 4            THE COURT:  Why don't we do this?  Since we
 5    have set this June 7th date for plaintiff to provide
 6    the supplemental disclosures, is this something that
 7    the parties can perhaps meet and confer and reach a
 8    decision, some resolution by June 2, and should
 9    there be no resolution, we can tackle it at another
10    conference.
11            MS. CHAMPION:  That sounds great to me,
12    Your Honor.
13            MR. QUAINTON:  Yes.
14            THE COURT:  Okay.  So what I can do is I
15    can wait.  You have until June 2.  If you want to
16    send me a letter after that with the outcome of any
17    issues, I can then schedule another conference.
18    Alternatively, if you don't want to wait that long,
19    I can give you another conference date now.
20            MR. SALANT:  Your Honor, this is David.  I
21    believe we have our next conference -- we have a
22    standing conference monthly that's already on your
23    calendar.
24            THE COURT:  Okay, perfect.  So that works.
25    So, again, if there's an issue after the June 2
```

1    deadline, just feel free to send in a letter.

2              MR. SALANT:  Yes, your Honor.

3              And may I ask, will the Court issue an

4    order arising out of this conference or should we

5    just take kind of what was said here as the rulings?

6              THE COURT:  So what I'll do is I can issue

7    a written order just making clear that the scope of

8    discovery at the moment is limited.  It sounds like

9    there's been 217 unique locations with both Key for

10   Business and GateGuard.  Amazon is going to take the

11   1,007 list where GateGuard was ordered and identify

12   the buildings where it installed Key Guard and

13   discovery will then be permitted into those

14   buildings -- I'm sorry, let me take a step back.

15   There were only 70 buildings where Key for Business

16   and GateGuard was installed; is that correct?

17             MR. SALANT:  That's right, yes.

18             THE COURT:  Okay.  So I'm going to start

19   again.  So there were 70 buildings where there's Key

20   for Business and GateGuard.  And then we're going to

21   find the list of buildings where there's a GateGuard

22   device ordered and Key for Business installed.  And

23   on the 14,000 portfolio locations, there's not going

24   to be any discovery at the moment until there's some

25   information brought forth by Mr. Quainton that shows

1    that there was some basis to think that these

2    portfolio companies were going to install GateGuard

3    or use GateGuard or had ordered GateGuard or

4    something of the like.

5         MR. SALANT:  Yes, Your Honor.  And then you

6    set a June 2nd date for supplemental interrogatory

7    responses?

8         THE COURT:  Yes.  And then also for the

9    meet and confer on responding to plaintiff's

10   interrogatory responses.  I can put that all in

11   order.

12        MR. QUAINTON:  I think that was the issue

13   with the initial disclosures.  And so I guess we

14   would meet and confer on defendants' initial

15   disclosures, if I understand correct, prior to the

16   June 2 date?

17        THE COURT:  Yes.

18        Okay.  I'm just writing this down so it all

19   gets memorialized in an order.  If I miss anything,

20   feel free to let us know, but otherwise I'll wait to

21   hear back from you by June 2 -- or after June 2.

22   Thank you very much, everyone.

23        MR. SALANT:  Thank you, Your Honor.

24        MR. QUAINTON:  Thank you very much, Your

25   Honor.

1              C E R T I F I C A T E

2

3      I, Marissa Mignano, certify that the foregoing

4  transcript of proceedings in the case of

5  GATEGUARD, INC. v. AMAZON.COM, INC., et al., Docket

6  #21-cv-9321, was prepared using digital transcription

7  software and is a true and accurate record of

8  the proceedings.

9

10

11  Signature    ___*Marissa Mignano*_____

12                 Marissa Mignano

13

14  Date:      May 31, 2023

15

16

17

18

19

20

21

22

23

24

25