```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK


GATEGUARD, INC.,                    : Docket #21-cv-9321

                    Plaintiff,      :

     -against-                      :

AMAZON.COM, INC., et al.,           : New York, New York
                                      July 19, 2023
                    Defendants.

--------------------------------:

                    PROCEEDINGS BEFORE
              THE HONORABLE VALERIE FIGUEREDO
               UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:        QUAINTON LAW, PLLC
                      BY:  EDEN P. QUAINTON, ESQ.
                      2 Park Avenue, Suite 20th Floor
                      New York, New York 10016


For Defendant:        GIBSON, DUNN & CRUTCHER, LLP
                      BY:  DAVID PHILIP SALANT, ESQ.
                      200 Park Avenue
                      New York, New York 10166




Transcription Service: Marissa Mignano Transcription
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

THE DEPUTY CLERK:  This is the matter of GateGuard, Inc, versus Amazon.com, Inc., et al, case number 21-cv-9321.  The Honorable Valerie Figueredo presiding.

Counsels, can you please give your appearances for the record, starting with plaintiff's counsel.

MR. QUAINTON:  Yes.  Good morning, Your Honor.  Eden Quainton for Plaintiff GateGuard, Inc.

THE DEPUTY CLERK:  Defense.

MR. SALANT:  Good morning, Your Honor. David Salant from Gibson Dunn for the Amazon defendants.  I'm joined by Annie Champion, also of Gibson Dunn, and some of our summer associates.

THE COURT:  Good morning, everyone.  This is Judge Figueredo.  Thank you for making the time. I have the two letters that came in before the conference at ECF 55 and 56, the July 14th and July 16th letters.

Mr. Quainton, I just wanted to start off by asking a question:  For the document collection, how have you gone about collecting the documents?

MR. QUAINTON:  So, so far, what we've done is I've asked Mr. Teman to collect information

relating to the orders, the clients, and the issues
raised by Gibson in an opposition from his emails,
texts, and also from the GateGuard archives, because
all of the -- starting after the company got up and
running, the contracts were archived.  And then I
have reviewed those for privilege and relevance, and
I have then pretty much submitted everything that's
just not privileged.  I haven't really kept anything
in reserve.

          And so that's the way we've done it so far.
I understand that Gibson Dunn wants us to do ESI
with a professional vendor, and as I said in my
letter, I'm not opposed to that.  I think it's just
a question of cost.

          THE COURT:  Well, let me just take a step
back, because I think I just wanted to be a little
bit more specific as to exactly so when you say
Mr. Tetom -- was that it?

          MR. QUAINTON:  Teman.

          THE COURT:  So when you say he -- I thought
you said at one point he was looking for documents
relevant to.

          Has he just been given an instruction --
so, for instance, was he told -- let's assume these
documents are all electronic communications.

Was he given, like, a date range and told to just pull all his emails?

MR. QUAINTON:  Yes.

THE COURT:  So there wasn't any type of sorting by him based on relevance?

MR. QUAINTON:  No, not that I'm -- no, the review was by me.  He was the one producing documents to me based on what we were looking for: Communications with the various clients and with the various parties that have information relevant to the damaging of the devices or the unauthorized installation of the key or the contract and the orders that were placed for the devices on the properties.  That's the nature of this case.

I'm not quite sure I understand what -- at this point, when we don't have a professional, that's the way, typically, that it's done.

THE COURT:  Just to get a little bit more detail, since it sounded like the parties hadn't reached any agreement on custodians or search terms.  When Mr. Teman was pulling these documents, was it just exclusively based on he was pulling every email communication, let's say -- I don't know, besides himself, if there were other individuals at GateGuard.

But was he just pulling everything for a specific date?

MR. QUAINTON:  Was he pulling everything for a specific date?  No, he was pulling -- we don't even have an agreed set of search terms.  It's the exact same issue for Amazon.  They've produced, in response to our requests, about 300 pages of documents.  I don't know what criteria they used because we don't have an agreement on the search terms.

And, again, I'm happy for us to agree on search terms.  I'm happy for us to agree on custodians, but they have to be reasonable.  But what we've done -- and I imagine Amazon has done this as well on their end -- in the absence of agreed custodians and in the absence of search terms, what Amazon has basically produced are their agreements with suppliers to locations that are at issue, plus their installation guide in multiple languages.  That's all they did.

So what we did is much more comprehensive than that.  We produced the analog to what they produced in their contracts with their suppliers, which is all of our contracts that we have with our clients that are relevant to this litigation.  And

that's probably the bulk of the production,
actually, just like their contracts are the bulk of
their production or a large part of their
production.

          And then what we've looked for and produced
are emails relevant to during the time period here,
which is 2017, to the time we filed the complaint,
so interactions with clients that bear on whether or
not there was tampering with the devices.  So I'm
not sure why any issue here is more GateGuard than
Amazon.  Frankly, I think we've done way more than
Amazon has.

          THE COURT:  So I might not be asking this
clearly enough.  I'm not trying to suggest anything
at the moment.  I'm merely just trying to understand
how these documents were collected.  Just because I
hear your argument that you might not necessarily be
required to hire a third-party vendor at this time,
but I think there has to be some showing that you've
conducted adequate searches and collection.  So
that's just what I'm trying to get a sense of.

          MR. QUAINTON:  Hello?

          THE COURT:  Yeah, sorry.  I'm just trying
to figure out a different way to ask this.

          When Mr. Teman was pulling the documents

and collecting the information, was there any lawyer
helping him, supervising, making sure that the
searches were conducted adequately?

          MR. QUAINTON:  No.  What I did is I
reviewed what he produced to me.  I didn't sit at
his side while he got the documents.

          THE COURT:  I'm just trying to figure out
how we would have known that he collected everything
that was potentially within the scope of what should
have been collected if no one was providing any
guidance or watching what he was doing.

          MR. QUAINTON:  Well, what is the
alternative?  For me to review every single email
that he has?  I mean --

          THE COURT:  I'm not at the review portion
yet.  I'm just at the collection.  And I'm trying to
make sure that the methods used for actually just,
at the initial instance, collecting everything were
adequate.  And that's what I'm still struggling to
understand in terms of what procedure was instituted
to ensure that Mr. Teman himself wasn't overlooking
some bucket or category of documents that
potentially should have been collected.

          MR. QUAINTON:  Well, I think that's a fair
point, and I guess that's something that we can

explore.  I mean, it's certainly a possibility that he overlooked something.  I don't know if there's a suggestion on something that we can do.  As I say, we've produced 3,500 pages of documents, which is seven times what Amazon has produced.

I'm happy to -- I'm open to suggestions as to what, if anything, I can do to make sure that there's, as you say, no bucket that's overlooked.  Certainly, that's obviously not the intention.  If the -- yeah, I guess I'm not quite sure what the suggestion is.

To try to answer your question, I gave Mr. Teman instructions to review the GateGuard archives for all of the contracts that could be at issue here.  Amazon says that we didn't produce those.  I don't know how they come to that conclusion.  But he did go through the archives.  We did produce that.  I think that's pretty clear in terms of the instructions that I gave him.

In terms of emails and texts, the instructions were to find communications with those representatives of buildings that are at issue in the case.  And I didn't give him a specific list of names because he knows those names.  If there's a suggestion of something I can do to add to that or

if we just want --

I mean, look, I think the other alternative is -- look, the reality here is GateGuard is a small company, and it doesn't have the resources that Amazon has. As I've said from the very beginning, I was open, and I'm still open. I don't think this process is like a one-shot deal. It's a process that's ongoing. I'm certainly open to having an ESI vendor. I do know that, given GateGuard's finances right now, it's -- you know, it's an issue. So I'm not sure what else I can add, Your Honor. I'm really trying my best to answer your questions.

THE COURT: Sure. So maybe there's -- I think we don't have to necessarily jump to hiring this third-party vendor if there's an adequate basis to conclude that the collection and then the subsequent review was not flawed in some way. There is this issue of the metadata of some of these electronic documents, and it sounded like that was not at all produced.

Is that correct?

MR. QUAINTON: I think that's probably correct that we don't have all the metadata for those. I mean, that's something that we'll have to produce separately. But, again, I'm not sure why

this is -- just to put this in perspective,
Your Honor, the vendors cost about $15,000 to do a
collection.

This is not Amazon.  I hope we get to the
insufficiencies of what Amazon has done.  I'm not
sure why we're just focusing on GateGuard here.  But
$15,000, that's actually an issue for my client.
That's a rounding error to a rounding error to a
rounding error for a company like Amazon.  If they
want us to do the electronic, I'm happy to do that.
I've said that all along.  I think there are
countless emails back and forth where I said I'm
happy to do that, and I've been pushing my client to
do that.  And that's been on the table.

So I really think that the solution here is
just to say let's do a professional collection.
Happy to do it.  That way there won't be any
questions.  It'll all be perfectly supervised.  It's
simply a question of $15,000, which is an issue for
my client, and it's nothing for Amazon.

THE COURT:  Mr. Quainton, the presumption
is that the party responding to the discovery
request bears the expense, unless there's some
reason to cost shift.  And just because this is
Amazon and has deep pockets, that alone is not a

reason to flip the presumption and have them bear
the cost.  I'm trying to get --

        MR. QUAINTON:  Well --

        THE COURT:  Go ahead.

        MR. QUAINTON:  That is one of the --
Your Honor, those are among the factors that are
looked at.  The parties' relative ability to pay and
the burden on the parties, those are two of the most
important factors.  And another factor that is often
looked at in whether fee shifting is appropriate or
cost shifting is appropriate is the nature of the
demands.  I mean, Amazon's -- if you read what
they're saying, it's extremely generic.  Their
complaints are basically, oh, Mr. Teman's a felon,
and this is inadequate.

        And the courts say that when a party is
extremely generic like that in their requests for
additional information, that bears on whether there
should be cost shifting.  I mean, I think if you
look at the factors, they really do support cost
shifting here.  And the most important factor is the
relative burden to the parties because 15,000 is
literally like -- it's not even a penny to you and
me to Amazon.  It's not even money.  Whereas it's an
issue for my client.  And we can just resolve this

issue.  Otherwise --

  THE COURT:  Mr. --

  MR. QUAINTON:  Okay.  I guess Your Honor doesn't want to go there.  So I get that.  You're trying to see -- so I'm asking what else can I do?  So I actually think ESI is the best way to go.  My client just doesn't have the resources right now to pay for that.  So short of that, I think if we can agree on custodians and search terms, I guess what I could propose, if we don't go the ESI route, is I can sit at my client's side and literally go through emails and texts with him them, which I will do.  And I can certify that I've done that, that I have participated in the collection process.

  I haven't done that yet.  What I've done is I've asked him to produce, I've reviewed them, and I've produced them to the other side because I was hoping that we could get this ESI issue resolved with a professional vendor, which is always preferable, in my experience.

  But if we can't go there, once we get the custodians and the search terms, I will be happy to sit down, as I said, at my client's side and go through text and -- basically it's text and laptop.  That's the way he communicates.  And I'll make sure

there are no other devices that need to be -- from
which information needs to be collected and certify
that that's been done.  I would be willing to do
that.

THE COURT:  Mr. Salant, I'm happy to hear
you.

MR. SALANT:  Thank you, Your Honor.  It's
apparent from GateGuard's recitation of the
methodology they used that it's wholly inadequate.
It seems as if Mr. Teman has been assigned to make
responsiveness determinations and to decide what to
collect and produce.  The way to handle this is
simple and straightforward and is done in nearly
every case.  You identify the devices, you image
them by taking a forensic image, and you run search
terms over the extracted text.  That's how you run a
neutral and unbiased document collection.

And we think that should happen here,
especially where GateGuard is making claims of
hundreds of millions of dollars of damage.  You
know, they are making serious claims.  They have
promised proof, and that proof is not forthcoming of
any of their claims.  And Amazon is entitled to test
that.

So you already cited the law regarding cost

shifting.  It's wildly inappropriate to consider
cost shifting here.  And so Amazon, of course, is
not open to that.  GateGuard should do a neutral
review in production.  So counsel has suggested he
may sit at his client's side and read every one of
his emails and texts.  I suppose that could be a
methodology, a neutral methodology, that counsel
literally reads everything.  But it just raises more
questions.  We have lodged requests for custodians
other than Mr. Teman.

How will their documents be reviewed and
collected in a neutral way?  We have lodged search
terms that GateGuard has not responded to.

How would search terms be applied in this
sort of methodology?  So we think some neutral
methodology needs to be imposed for collection.
Responsiveness decisions need to be made by someone
who's neutral and trained on the RFPs and not just
told general subject matters, like counsel just
listed out.  So we need to make sure that the
parties are playing by the normal rules of document
review and collection.  And it's clear that
GateGuard is not doing so here.

So that's why we ask for an order that
GateGuard either hire a vendor or do something to

forensically collect the at-issue devices which counsel, it seems, has identified.  And we think the Court would have good cause to order GateGuard to do that.  And Amazon, for its part, is using similarly neutral methods for the collection, review, and production of documents.

THE COURT:  Mr. Salant, I know Mr. Quainton had talked about cost shifting and suggesting that the burden analysis there turns solely on the respective, I guess, financial -- how financially viable this is for the individual parties.  And I'm wondering if there's any case you want to point me to that would suggest otherwise.

MR. SALANT:  Yes, of course.  I mean the most obvious case is the one that GateGuard cited in its letter.  This is the *Rowe Entertainment against William Morris Agency* case.  So the GateGuard citation to this case undermines the very argument it's making here, that the relative position of the parties ought to decide who pays for discovery.

I mean, as an initial matter, before even getting into the case law, GateGuard is the plaintiff here.  They have brought claims and promised proof.  They have asserted that they've been injured in amounts in the hundreds of millions

or billions of dollars.  Clearly, that's not panning
out and is not where this case is going.  But if
GateGuard were serious about this, then it would
mount a reasonable effort to collect and review its
own documents.

But anyway, turning to the case law, the
*Rowe* case, it's clear from that case that the factor
of resources only, quote, "may be relevant."  In
that case, the Court actually shifted costs to the
plaintiffs despite the fact that the defendants were
the more powerful party, and the Court explained
that the presumption is that the responding party
must bear the expense of complying with discovery
requests.  That, I think, is something Your Honor
mentioned at the top of this hearing.

Cost shifting is not appropriate where the
request to discovery is from a party that is
relevant to any issue on which the party bears the
burden of proof.  And moreover, when, quote, "the
total cost of the requested discovery is not
substantial," end quote, cost shifting is not
appropriate.

So, you know, that's just taking, for
example, the case GateGuard has cited to Your Honor.
We think it's clear that, in this context, where

we're asking for an everyday, ordinary course, neutral collection and review, that cost shifting is totally inappropriate here.

MR. QUAINTON:  If I could respond to that, Your Honor?

THE COURT:  Go ahead.

MR. QUAINTON:  I think looking at the *Rowe* case, I think that we agree that's probably the best case to look at.  So starting at -- where is it?  This is about 428.  So this is 205 F.R.D. 421, and it starts at 428.  And when the Court analyzes the issue of cost shifting in detail, look at all of the factors in detail.  The Court says, as Mr. Salant said, that the presumption is the responding party must bear the expense of complying with discovery requests.

But then it goes on, "Nevertheless, a Court may protect the responding party from undue burden or expense by shifting some or all of the costs to the requesting party."  And then it says here, "The expense of locating, extracting responsive emails is substantial."  And this is substantial for GateGuard.  I don't know the actual numbers because we haven't retained anybody yet, but it's substantial.

The Court goes on to say the less specific the requesting party's discovery demands, the more appropriate it is to shift the cost of production to that party.  That's at 429.  And here, the demands are extremely vague.  I'm not sure -- they're saying, well, GateGuard did a bad job.  I think that's extremely vague.

Then there's the likelihood of a successful search, the marginal utility in determining whether to shift costs.  I think all parties agree that the benefit, leaving cost aside, just getting this done, as Mr. Salant says -- and I don't disagree with Mr. Salant's view of the universe -- that the best way to do this is with a neutral third party that would have significant marginal utility.

And the Court goes on to look at all the parties -- the benefits to the parties.  The total costs are important and the ability to control costs.  So when you look at the factors, the big picture is kind of what's the marginal utility of the cost shifting, how expensive is it, and how are the parties best able to bear the burden of that -- or which party is best able to bear the burden.

I agree that's not dispositive on its own, but I guess I would invite the Court to review the

*Rowe* case and the factors, and I believe they would support cost shifting.  If the Court is not inclined to do that, then I think if we have a couple of weeks or ten days or something, I can see if I can get my client to retain the vendor.

It is an issue, because, look, I do agree. I've done this many, many, many times, as has Mr. Salant and have Gibson Dunn.  They've probably done it way more than I have.  But I think we're in agreement on the best methodology, and it's really a question of cost shifting.  So I think *Rowe* does support our position, and I would invite the Court to look at that before making a final decision.

And if the Court is not inclined to do that, then just maybe give us ten days to see if we can retain somebody on our own.  Because I am willing to do what I suggested, which is to sit at my client's side and make sure that everything gets done properly.  But that's not a good use of my time.  So I would prefer to get the neutral vendor involved.

THE COURT:  Okay.  So why don't we do this: I will take a look at *Rowe*.  I'll issue a written decision.  I'm going to focus on the cost shifting, since that seems to be the route the parties want to

take for purposes of hiring a third-party
E-discovery vendor to do this.  We still have the
custodian issue.

MR. SALANT:  Your Honor, just to make
Amazon's position clear, we do not agree to a cost
shifting.

THE COURT:  No, no, no, I wasn't suggesting
that.  I think I started off by trying to go down
the route of figuring out if there was a way to do
this without a neutral vendor.  It sounded like from
everyone's arguments that both sides would prefer
using a neutral vendor, but plaintiff wants the cost
shifted.  And so I think both sides have pointed me
to *Rowe*.  I can certainly give you a decision on
whether cost shifting is appropriate.  That won't
take long.  I can issue it in a written order, but
that's what I'm going to focus on.

But I completely understand, Mr. Salant,
that Amazon opposes the cost shifting.

MR. SALANT:  Yes, Your Honor.  And if cost
shifting were being considered, there would need to
be an evidentiary record to support GateGuard's
claims that it just made on the phone that it's a
struggling company, that it can't afford this, that
its claims are not worth it.  So none of those

factors are present here.  And that would be a
factual predicate needed for any sort of cost
shifting consideration as well.

          MR. QUAINTON:  I would just correct the
record.  There's no evidence that we say our claims
aren't worth it.  So let's try to stay on point.

          THE COURT:  So I just want to move on to
the custodian issue.

          Has there been any -- I thought from
Mr. Quainton's letter that there had been a proposal
on July 10th, but that may just be as to the search
terms.

          I'm just curious, has there been any
further discussion on the custodians?

          MR. SALANT:  There has not, Your Honor.
With respect to GateGuard's custodians, Amazon has
made a proposal, and we still have not heard back
from GateGuard.  With respect to Amazon's
custodians, we've exchanged proposals, but our
latest was the July 10th where we proposed the six
people we thought were most well placed to be
custodians.  GateGuard obviously has rejected that.
So it does seem we're at an impasse on the identity
of Amazon's custodians for custodial discovery as
well.

MR. QUAINTON:  So just to give Your Honor some additional information first on the proposed GateGuard custodians, so one of the people that they propose is dead.  The others are no longer with the company, with the exception of -- I think it's Tom Olrosh, who was an installer for the company.  So they're asking the impossible.  Obviously, people who are no longer with the company can't be custodians.  The reality here is Mr. Teman is the custodian for the information and maybe Tom Olrosh.

As to Amazon, I think Mr. Salant is correct that we're at an impasse.  We haven't really had a chance to meet and confer specifically on the custodians.  We made a proposal, they made a counterproposal, and then the back and forth of the letters ensued.  So I'm not sure we can resolve that on the call.  I think the more appropriate thing to do would be for us to meet and confer.

You know, you saw my letter.  You saw the reasons that I don't think their proposed custodians are appropriate.  I won't belabor that here.  But, you know, I think we do need to get an agreed group of custodians at Amazon, and I think that's going to be much more difficult than GateGuard because, you know, GateGuard is really -- the custodian is

Mr. Teman.  So I think honestly we need to meet and
confer before going any further.

THE COURT:  Mr. Quainton, you had mentioned
one of the custodians is dead and a few may have
left the company.

But does the company not retain these
individuals' emails or electronic documents in some
fashion, in an archive or somewhere else?

MR. QUAINTON:  Oh, well, certainly, but
they wouldn't be custodians.  I mean, I think --
that's a fair point.  That's a fair point.  I think
all the email communications involving those
individuals within the GateGuard servers, I think
that's certainly something we would -- I think is
appropriate.  I thought that the suggestion was to
make them actual custodians, which is impossible.

But to make sure that we collect whatever
GateGuard has relating to those individuals, I would
think that that's not only sensible, but necessary.

THE COURT:  Okay.  You know, Mr. Salant,
you can feel free to step in.  I could be mistaken,
but I would have thought the purpose of naming
someone as a custodian would be to get their
documents, and then to the extent Mr. Teman might
not be copied on an email or might not have been

CC'd or something, that the documents for that
person would still be caught up in the search.

      MR. SALANT:  Yes, that's correct,
Your Honor.  The people we used as custodians were
the people GateGuard listed on its initial
disclosures or in its interrogatory responses as
people with relevant information.  Yes, if they have
a custodial file somewhere, an email archive, a
ShareDrive folder, that's what would be collected
and searched for production in the ordinary course,
and that's what we mean by custodian.

      THE COURT:  Okay.  And it sounds like,
Mr. Quainton, you're not opposed to doing that, even
if the individuals identified have left or died?

      MR. QUAINTON:  No, I'm not opposed to that.
I mean, I think they may need -- Amazon may need to
issue Rule 45 subpoenas or something to get
information from them.  But, no, I have no objection
to trying to find -- I mean, obviously, the
information would have to be responsive.  If they're
talking about getting pizza or something, that's
not, you know -- but, in principle, yes, that makes
sense.  Those individuals could have relevant
information.  In fact, we listed that they could
have relevant information.

THE COURT:  Okay.  I guess I just wanted to make sure, when you say the Rule 45 subpoena, they're talking about the email archives or ShareDrive hard-copy documents that would still be in plaintiff's possession.  So I think to the extent the company has --

MR. QUAINTON:  Yes.

THE COURT:  Okay.  So this can all get done through a collection by GateGuard?

MR. QUAINTON:  Yes.  Okay.  That's fair enough.

MR. SALANT:  And, Your Honor, the only thing I would add to that is that sometimes companies have a contractual right to ask former employees for their documents and to show that they've done so.  There's SDNY case law on this.  And so we would ask that GateGuard collect what's in its possession, custody, and control, which means what it can get if it asks.

MR. QUAINTON:  And that would go for Amazon as well.  There are people like Mr. Max Simon who have relevant -- that we believe have relevant information who have left the company.  And the diagram of the key group that Amazon provided, the org chart does not include many, many individuals

that we think have relevant information.

And to the extent they have left the company, then Amazon should also direct its attention to try to get relevant information from them.

THE COURT: Okay. So I think that's fair. We just need to figure out who these individuals are. It sounds like maybe, for GateGuard, we might be at somewhat of a resolution. I'm not sure that -- the only people I've focused on so far were the ones who left the company and died.

Is there anyone else that we need to discuss on the proposed custodians for GateGuard?

MR. QUAINTON: No, I think that would be the list. Also, it's just one person who died. It's a Mr. Denby. But to the extent there are files relating to him in the GateGuard archives, those would be searched.

THE COURT: Okay. So, Mr. Salant, is that resolution as to GateGuard's custodians, is that okay for Amazon?

MR. SALANT: Yes, Your Honor. Those six individuals are the custodians we proposed, and so the plan we've been discussing sounds fair to us.

THE COURT: Okay. Perfect.

So then now we have Amazon's custodians.
And, Mr. Quainton, I'm looking at your list.

Is it page three of your letter?  It was
the exhibit?

MR. QUAINTON:  Yes.  Hold on.  Let me just
make sure I pull that up.  Bear with me one second.

Okay.  Yeah, I'm with you.  Apologize for
that.

THE COURT:  No worries.  But this one's
just easy.

But Jeff Bezos, why do we think he might
have relevant documents?

MR. QUAINTON:  So my client was in contact
with Amazon and emailed Mr. Bezos on several
occasions, and I would not expect there's a
voluminous amount of correspondence.  But what I
heard in the meet and confer was that the Gibson
Dunn knew already what Mr. Bezos had with respect to
GateGuard and Teman, because, I guess, there may be
some communications that were privileged.

But without a search of Mr. Bezos' emails
or some kind of a declaration that the only person
he communicated with was counsel, there may well be
relevant information.  It may not be a lot, but he
may have sent emails to colleagues that are either

themselves relevant and admissible or that could lead to the discovery of admissible evidence.

I don't know how when Amazon -- when we know that there were communications to him and Amazon admits that there are some communications from him that are privileged, how he can say, well, we're not even going to look to see if there's anything else.  And these senior people in their emails, there could be something relevant to what Mr. Bezos thinks about the key.  There could be a comment that's helpful.

I mean, I get why Amazon would fight this, but he may have said something to a colleague towards somebody else that would be relevant and admissible or that could lead to the discovery of admissible evidence.  I don't want to speculate too much on what that is or could be, but I don't see how you can just exclude potential evidence.

THE COURT:  Mr. Salant?

MR. SALANT:  Thank you, Your Honor.

We can assure the Court that we have looked into GateGuard's allegations and have communicated with our client about who was involved in following up on these allegations.  And those are the people we've proposed and, in meet and confers, have been

discussing with GateGuard.

Mr. Bezos is not one of those people.  He is what I would call an apex custodian.  He is the former CEO and chairman of our company.  He was not troubleshooting GateGuard devices.  The fact that Mr. Teman sent him a few harassing emails, which I don't believe he ever responded to, does not mean he's reasonably likely to possess unique information in this case or in any way relevant.

The standard for who a custodian ought to be in a case is that there's some reasonable likelihood they will possess unique knowledge about the case or unique documents about the case.  And these high-level executives are not such people.  And so, you know, we think GateGuard has not demonstrated good cause to use any of these people as custodians, including these very high-level Amazon executives who, in our understanding, just were not involved in these issues that GateGuard raised.

MR. QUAINTON:  So just if I could respond to that.  I think, just to be absolutely clear, there's -- Mr. Bezos is, I think, maybe one issue.  But when Mr. Salant says that these individuals that we have identified were just not mean, I mean,

that's just flatly wrong.

Many of these individuals actually got on a
video call with Mr. Teman and discussed with
Mr. Teman both Mr. Teman's complaints and some of
Mr. Teman's proposed solutions.  I think -- I
understand at one point he may have been interested
in some kind of a business deal with Amazon.  But
the individuals that we've identified here, many of
them were actually on a video call with Mr. Teman
where he expressed his concerns.

It's inconceivable to me that those
individuals at a company like Amazon did not follow
up with other people to make sure they'd closed the
loop on Mr. Teman's allegations or his concerns or
his complaints.  It's just inconceivable to me they
would have had a video call and then just dropped
the ball, left no trace of that whatsoever.  That
doesn't have the ring of truth to me.

As far as Mr. Bezos goes, again,
Mr. Teman's emails raised important issues about
Amazon's practices.  And I think the CEO of the
company who's put on notice of a pattern of behavior
that involves breaking into other parties' devices
and stalling an Amazon product without the consent
of the owner of the device, those are some pretty

serious allegations that must have been followed up
on.

And it's paradoxical that Gibson Dunn says
we can't trust Mr. Teman, but they say, "Trust us;
we've done everything." I'm not even sure I know
what that means. Have they reviewed all of
Mr. Bezos' emails? Did they just call Mr. Bezos and
ask him? If my client just calls, would that be
sufficient, as far as my collection goes for my
client? Can I just call him and say, "Did you talk
to so and so?" He says, No, no, no, that's
ridiculous. Then I can get my client's off the
hook?

It really seems like we're going towards a
double-headed system here, one set of rules for
Mr. Teman and another set of rules for Amazon.

THE COURT: Just to focus in on the list of
custodians, I think there is a difference between
saying that Mr. Bezos, who runs or ran or he's the
chairman of Amazon, could potentially have
reasonably likely -- would be reasonably likely to
have information that could potentially be relevant
here, than Mr. Teman, which by -- Mr. Quainton, by
your statements earlier, this is, like, a smaller
company. He's much more involved. I don't think

you've pointed me to anything that would indicate
that Mr. Bezos would have information relevant to
the claims here.

But I just want to focus, because we've
been talking generically about the individuals on
the list.  The next person on your list is Andy
Jassy.

And what's his role at Amazon?

MR. QUAINTON:  He's another senior person
at Amazon who also received communications from
Mr. Teman.

THE COURT:  Is there any indication that
these individuals responded to these communications?

MR. QUAINTON:  I don't believe Mr. Jassy or
Mr. Bezos responded to the emails.  But I would note
that one of the things that Mr. Teman provided to
both Mr. Bezos and to Mr. Jassy and, also, I guess
some other people were copied as well, was a
photograph of the GateGuard device showing how the
device appears to have been entered into improperly
by Amazon.

So somebody looking at this can't just
discard this.  They can't just say -- I mean, there
may be an element of hyperbole in the way Mr. Teman
communicates, but when you look at the essence of

this, he's showing them a photo and saying, "Look
what's going on; you guys need to stop this and look
into it." So it's not just kind of a random
harassing email, the way it's being presented. It's
a very focused series of emails that have actual
photographs of the devices and what's happened to
them. So it is --

THE COURT: Sure. Even if you accept all
that, there's no reason to think that Mr. Bezos
himself would have investigated this. He likely
would have delegated this to whoever was in charge
of whatever division this was of his company. And
so if that person is a custodian, you're going to
get the information that's relevant to your claim.

But it sounds like -- we were talking about
burden for a while, but I think the idea that you
would search all of Mr. Bezos' emails with just what
I would think would be just a very low chance that
you're finding anything that would be -- information
that would be relevant and unique that you couldn't
find from another custodian. It seems like that
burden would be incredibly high on Amazon, given
what we've discussed here with Mr. Bezos' incredibly
limited role in this.

Just because I'm trying to move this

discussion along, and we still have the issue of the
properties, Mr. Salant, who is Andy Jassy?

       MR. SALANT:  He's the current CEO of
Amazon, Your Honor.  And he was copied on
Mr. Teman's harassing emails.

       THE COURT:  Okay.  And who's Josh Bartos?

       MR. SALANT:  He is a -- I have him as a
channel director for Amazon Key.  He's an executive
involved with Amazon Key.  But I'm not sure his
exact role offhand.

       THE COURT:  But he's at least involved in
whatever aspect of the business deals with Amazon
Key?

       MR. SALANT:  That's right, yes.

       THE COURT:  And John-Michael Coles?

       MR. SALANT:  He is a senior product manager
for Key for Business, or I think was.  And I know
that GateGuard claims he was on one of the calls.
There was a video call that was held, and GateGuard
claims he was present on that call.

       THE COURT:  But at least we're getting into
the realm of individuals who were working in the Key
for Business area.

       Is Alexander Carroll another such
individual?

MR. SALANT:  I'm not sure if he's an
employee of Amazon.  I think he might be an employee
of ClearHome, which is another company that Amazon
engaged to install Key for Business devices.

MR. QUAINTON:  Yeah, Carroll, I agree it's
a bit unclear, but he identifies himself as -- this
is on his LinkedIn profile.  He identifies himself
as being a representative of or agent for Amazon Key
for Business.  So that's a relationship, the
ClearHome and Amazon, that we are exploring, and
there's a deposition scheduled, a 30(b)(6)
deposition scheduled to probe that a little bit.

But I think if somebody is identifying
himself as Director of Field Services for
ClearHome/Amazon Key for Business, that merits
further investigation.

MR. SALANT:  Your Honor, perhaps I could
cut this off by saying we are open to exchanging the
custodians we thought were involved for custodians
that GateGuard thinks were involved if they're
Amazon employees and they can demonstrate they were
involved in the GateGuard episode.  So we're open to
making that exchange, if GateGuard wants.

We don't suggest GateGuard does it because
we think we found the people who touched the issue.

But we're happy to, if those conditions are met, meaning they're Amazon employees and it's demonstrated they had some involvement in the GateGuard episode, like attending a call with Mr. Teman or the like.  And we thought six total custodians would be fair.  And we are open to letting GateGuard pick and choose a little bit, if it wants to.

THE COURT:  Mr. Quainton, does that sound reasonable?

MR. QUAINTON:  Well, it sounds reasonable. I guess the devil's in the details.  I think what I'm hearing -- and if what I'm hearing is correct, then I think we're on the right path.  What I'm hearing is that Amazon is essentially open to working this out and coming to an agreement with us on appropriate custodians.  I'm hearing that they kind of concede that some of the proposed custodians wouldn't be appropriate.

I mean, a warehouse manager in Illinois, for the life of me, I can't understand what that person could possibly have to do with anything.  Or some kind of a recruiting manager who worked for Amazon for nine months and is now no longer there, I can't for the life of me imagine why that person

would have any information.

So Amazon's list has some problems, but to the extent we can have a discussion as to which individuals would be appropriate, yeah, of course, I think that would be the right way to go.

MR. SALANT:  Okay.  We could meet and confer on this, Your Honor, if the guidelines are along the lines we've been talking about, you know, employees of Amazon that GateGuard picks that have some demonstrated nexus to the GateGuard episode.

MR. QUAINTON:  Well, so a "demonstrated nexus to the GateGuard episode," I'm not sure I understand what that necessarily means.  I'm not sure we can know ex ante who those individuals are. I mean that really puts the cart before the horse. The purpose of discovery, from our perspective, is to find out who had the nexus.  It's not for Amazon to say, you know, here's the universe of people that had a nexus, and be quiet as to the rest.

For example, if one of the individuals that we identify, if Amazon says, Well, we don't think he had anything to do with it, but he's the channel director for the Key, our position is -- again, going back to these emails from Mr. Teman, he is providing very detailed photographs showing the

Amazon device that has been installed in the
GateGuard intercom.

And so the channel director, I don't know
if he knew what was going on, but I don't think the
parameters can possibly be that we agree ex ante on
who was involved.  That doesn't make sense.  It has
to be people who are reasonably likely -- and I
think I would agree with that -- reasonably likely
to have information connected to the claims, and on
that basis I think we should meet and confer.  But
we can't say, you know, we have to know that they
had involvement with the GateGuard claims.

THE COURT:  So I think what I understood
was some of these individuals -- so, for instance,
you know, maybe John-Michael Coles or Alexander
Carroll, maybe Mr. Salant's or Amazon's position
previously was that they were, you know, too senior,
didn't potentially have -- weren't reasonably likely
to have information.  But it sounds like now Amazon
would be open to making them custodians because of
their -- and I'm going to quote -- demonstrated
nexus was the fact that they were on the video call.

Some of these other individuals seem -- you
know, again, by their title, would seem to be
reasonably likely to have unique knowledge.  So I'm

just looking at the Prasant Mohan Joga as the head
of Key engineering.  You know, there might be a
reason that Amazon is objecting to this person.  But
it sounds like that's something that could be ironed
out in a meet and confer, because, certainly, from
the title, it sounds like she might have -- or he or
the person might have reasonably -- might have
unique knowledge.  But, again, that might be
something that is not borne down by the actual facts
or responsibilities or the person's day-to-day.

         And, Mr. Salant, you can correct me if I'm
wrong, but it sounds like, at least on this,
potentially some discussion by the parties could
lead to some compromise on the list of custodians.

         MR. SALANT:  Yes, Your Honor.  We're open
to meeting and conferring about this.  I think if we
talked, we could probably make some good progress.

         THE COURT:  Does this only need, then, the
discovery related to the building?

         MR. SALANT:  I'm sorry, Your Honor.  I
didn't hear you.

         MR. QUAINTON:  Yeah, I didn't hear that,
Your Honor.

         THE COURT:  Are there any other issues left
to raise?

MR. SALANT:  Yes, Your Honor.  The one last issue is the issue of the 33 at-issue locations, which is the third point that we listed in our letter at ECF 55.  So in the light of this discussion that we've been having now for an hour, it seems clear that GateGuard's document productions are woefully deficient to prove any of their claims.

We've been here twice before now where we've asked Your Honor to compel GateGuard to state what information it has about the at-issue devices, injuries, remediation costs.  And upon Your Honor's order, on June 2nd, GateGuard served supplemental interrogatory responses where they listed 33 at-issue devices.  That's in Exhibit B of our letter, so it's ECF 55-2.

So those 33 locations were submitted to us as locations where GateGuard had an installed device that was damaged, allegedly, by Amazon.  That list of addresses was served on us under cover of a verified interrogatory response.  We have been looking at GateGuard's document productions, which GateGuard has represented it has produced all its contracts and similar such documents.  We have been visiting the buildings, and we're finding that GateGuard devices are not always there.

Within GateGuard's document production, we've only found the invoices, like the contract or correspondence to order the device at eight of the 33 locations.  We've not found documents regarding trouble with the device, malfunctions, at any of the stated locations.  We've not found documents regarding remediation costs or replacement costs at any of the 33 locations.

So we have this proof problem where GateGuard apparently has conducted a thorough review and production of noncustodial documents of its contracts, for example, and the proof is just not coming in.  And we are troubled by this because GateGuard has promised this proof in their complaint and in their written discovery.

And we think this may be a basis to seek a summary judgment, because if GateGuard cannot allege or has no proof in the record of the three key ingredients that it promised -- the existence of a GateGuard device; problems with a GateGuard device; and remediation costs, like injury, damages -- then it can't maintain any of its causes of action.

And so that's where we are.  And so we've phrased it as we'd like the Court to compel GateGuard, maybe give it one last chance, to produce

any and all documents demonstrating that it
installed these devices, that these devices went
bad, and that it had injury or damage.  And if it
doesn't do that, then we think the right next move
is a summary judgment briefing to demonstrate the
absence of these critical ingredients before we
waste time with further discovery, expert discovery,
and all the other directions this case could go in
if GateGuard continues what is amounting to, like, a
wide-ranging investigation in a vacuum without
putting up proof of its claims.

        So that's why we made the third point in
our letter.  And what we're asking for is an order
to compel GateGuard to produce what it has and to
acknowledge that that's it, that's all it has, and
it can't supplement the record after.

        THE COURT:  Mr. Quainton?

        MR. QUAINTON:  So may I respond to that?

        THE COURT:  Yes, go ahead.

        MR. QUAINTON:  So, first of all, we have --
I'm not sure where Mr. Salant gets the eight
properties.  There are far more than that.  I think
if he looks at the actual invoices, many invoices
have multiple properties.  Sometimes an invoice
would have seven or eight different properties, and

I don't have -- you know, it's hundreds of pages.
But there are many, many, many invoices for the
properties at issue.

        And there's specific correspondence and
specific evidence, both in terms of photographs and
in terms of videos showing the damage.  There are
emails showing that Amazon did install the devices
without consent.  So we have the unlawful access.
We have the damage.

        In terms of the -- this seems to be
Amazon's theory of the case, that the harm would be
the repair cost to the device.  And if we have to
brief this on summary judgment, I think Amazon is
actually shooting blanks here, because what happened
is, when these devices were damaged -- this is the
reason that they're not finding them at the
properties now -- is they were taken off, and the
client went to somebody else.  So we lost the
client.  There's nothing to repair because the
client was ticked off that there was a problem with
the device and simply went to a substitute.

        THE COURT:  Have you produced those
communications between Mr. Teman or GateGuard and
the client showing that they were leaving because of
damage to the device?

MR. QUAINTON:  We've produced -- I mean, for example, I'm just looking at one.  The tenant says the intercom is not working.

Then Teman says, you know, Amazon shouldn't put a device on.

And then the client says, "No, Amazon did reach out to us, but we did not agree to it."  And then they did -- and then Amazon -- sorry, the client is put on notice.  No, they did it anyway.

And the client says, "Really?  Well, that's not good.  Thanks for letting us know."  And it goes on in that vein that something happens, and the client's not happy.  And in some cases, they didn't know.  In some cases, they didn't agree to have the device installed, and it was installed anyway.  That's one of our complaints.

But we do need discovery here.  It's not discovery in a vacuum.  It's discovery to find the facts.  There are facts here showing that there was serious misconduct by Amazon in installing devices on our devices and causing them damage.

In terms of showing that all those clients went to somebody else, there's quite a bit of third-party discovery that we need to do in finding out more details about what these clients did.  You

can't say that because a device -- you know, we
didn't have an invoice for repairing a device that
was damaged and taken off the wall and replaced with
another device, that we have no case.  That just
misunderstands our entire theory of the case, which
is that when the devices were replaced because of an
Amazon injury, we lost that client and all of the
future revenue from that client.

        We've explained this multiple times.  Now
what Amazon -- the latest on what Amazon has done is
they've sent us an interrogatory, and they said,
okay, here's our interrogatory, and why don't you
fill it out.  You know, organize the evidence for
us.  That's sort of Amazon's job.  But I take the
interrogatory which was served, I think, about a
week ago.  So it's nowhere near due.  And they're
asking for each of the locations, you know, show the
damage or the communications and what's the evidence
that you have.

        We'll have some evidence, and some evidence
we need through discovery, including by third-party
discovery.  So I'm not quite sure how we get to an
order for anything at this point.  If there were to
be a discovery order, I think the rules are pretty
clear that Amazon has to file a preconference

motion, and then after they file that motion, then they can file a motion to compel.  They can't just sort of pull an order out of their hat.

So I think on this one, it seems to me the best approach is for us to respond in the ordinary course to Amazon's latest interrogatory.  And if they're unhappy with our responses to their interrogatory, they can avail themselves with the remedies that they have.  And at any point, if they feel that they can -- I'm not sure what they're trying to convince you of.  If they think at any point they can prove summary judgment, I mean, that's their right.

THE COURT:  So why don't we do this on this point:  Since it sounds like you have this outstanding interrogatory that you're going to respond to, along with the interrogatories, I heard you to say that you've already provided much of this to Amazon for all of the 33 buildings and not just the eight that they've identified.

If you've already provided it to them, would you not be able to just provide them with the Bates stamps for the pages where you think, for instance, there's email communication showing that a property owner or property manager was displeased

and had gone to -- had stopped using GateGuard, had
not renewed the contract, whatever it may be, but
for the instances, for example, where they talk
about -- you said you've provided already all the
invoices, so that should be easy to point them to
the Bates range of those documents.

          And then to the extent you're saying you've
already provided them with evidence of the problems
with the GateGuard device and the repair and
remediation costs, you should similarly be able to
point them to the documents in the production?

          MR. QUAINTON:  Yeah, I think, Your Honor,
that's what they're asking for in the latest
interrogatory.  That's exactly what -- they're
basically asking us to organize the information in a
more user-friendly way for the defense, which I'm
not really sure that's appropriate, but fair enough.

          I think it's a useful exercise for us, in
any event.  So what you're suggesting, Your Honor,
just to be clear, and Mr. Salant can correct me, I
think that's essentially what they're asking in the
interrogatory.  So I think the best approach is we
respond to that interrogatory, and then we discuss
the responses.

          And as I say, obviously, we'll do our best

to respond to that and put in the information with
the Bates stamps -- I think that's what you're
asking for -- with pointing to the evidence in the
record or where we think evidence may be.  If it's a
third party that we still need to, you know, depose
or whatever, we'll put all that in the
interrogatory, and then I think we'll have a clearer
picture of where we are, and Amazon can take it from
there if they're dissatisfied.

THE COURT:  So, Mr. Salant, I think, given
that Mr. Quainton has indicated that for at least a
lot of these topic areas, he's provided the
documents for you, I think if we don't already have
a conference scheduled for August, I can certainly
schedule one.  But once you've gotten that response
and he's indicated where that information is, if you
still think it's sufficient, then we can have
another conversation.

But it sounds like since we're going to
potentially -- might need another conference, that
waiting until he's identified where he says the
evidence is wouldn't necessarily be -- it's not
going to slow anyone down and still keep the case
moving.

MR. SALANT:  Yes, Your Honor.  We're happy

to proceed that way.  As GateGuard has implied,
we're asking these questions in every which way we
could think of, of what their evidence is for these
33 addresses.  So if they -- I hope they'll respond
to our interrogatory, which asks them to fill in the
blanks where in your production is evidence that you
installed a device here, that the device went wrong,
and that you had remediation costs or other injury.

We've poured over their production, and
most of this is just not there.  So if it's
GateGuard's position that it is there, we're happy
to proceed this way and then reraise the issue of
summary judgment.

The only thing we want to try and cut off
is that GateGuard can't supplement later, that it's
had a full and fair chance to demonstrate these key
ingredients of the existence of a device,
malfunction of the device, and injury of all
documents in its possession, custody, and control.
And that that's it.  Because we've bothered
Your Honor twice now, two months in a row, and this
is the third time with this exact same question.

So we just want to tie it down that this is
all that GateGuard has.  Based on counsel's
statements during the conference today, it sounds

like the answer is yes.  But when we say that we're
asking you to compel them, that's what we're asking
for, this agreement that they're done producing what
they have, and that's what we'll use as the record
for their injury.  And if GateGuard thinks that
they've produced proof for the 33 devices, we look
forward to learning where it is in their
productions.

            THE COURT:  So the only thing I'll say on
that last point is that since it sounds like the
review might not have been as fulsome and
potentially they might still be collecting
documents, you still haven't necessarily ironed out
the custodians for GateGuard, I don't think we're at
a point where I'm going to get them to agree that
they're not able to supplement it later, because I
still think they're still collecting and reviewing
documents, or at least it sounds like that from the
conversation at the start of the conference.

            But that's certainly something we can
discuss next month once you've seen what they've
pointed you to and once they've had an opportunity
to collect from some of these custodians and conduct
a review using search terms.

            MR. SALANT:  Understood, Your Honor.  The

only thing I would add is that it's the distinction
between custodial and noncustodial discovery.  We do
want to pull the custodial information, but the
noncustodial information, like their contracts with
their customers, counsel did represent today that he
instructed Mr. Teman and Mr. Teman gathered all
contracts with their customers.

So if there aren't 33 contracts with 33
customers for 33 addresses, then they have a proof
problem that would, I think, vitiate all their
claims.

MR. QUAINTON:  Sorry, Mr. Salant -- sorry.
Just to cut in, I want to make sure the record is
clear on that.  This is in our interrogatory.  You
know this perfectly well.  What I said -- what
Mr. Teman has said is that, when the company was
just starting up, it did not have an archival system
for recording the contracts with customers.  That
was later.  So start-up -- the initial orders were
done by email and confirmation by email.

And what I represented to you is that we
were going to make every effort, obviously, to find
all of those email confirmations of orders.  But as
has just been stated, I think we're going down a
path, perhaps of having an ESI vendor, and that will

possibly -- there may be emails relating to those
that haven't been produced.

           And the other point I would make is I'm not
sure I understand if all 33 aren't established, then
we don't have a case.  That's just ridiculous.  We
have a case if there are ten.  We have a case if
there's one device.  Amazon has no right to damage
any of our devices.  You know, it's a question of
how big the damages are, but it doesn't vitiate the
case or provide a basis for summary judgment.

           And also, just the other point, and I think
it's very important for the Court to be mindful of
this, is that there are two buckets of contracts
that are at issue here.  It's not just these 33
locations.  There are also another -- and I put this
in the letter -- there are another at least 34
locations where we believe Amazon interfered with an
order, so the order was never placed, but Amazon did
then subsequently install the Key.

           So what happened there is not something
that we have custody and control of, but it's very
important to our case.  We know that somebody placed
an order, then things went awry.  Whatever, it
wasn't followed up.  The Key is installed.  We need
to depose those individuals and find out what

exactly happened.

So that doesn't even get into the whole issue of portfolio properties that we talked about during our first call.  But there are two buckets. One is the bucket of properties where there was a device that was damaged, and those are the ones we've been talking about.  Second are where there's potentially an issue because there's an overlap with an Amazon installation, on an Amazon actual installation -- on a GateGuard installation.

But there's this whole bucket of cases where there was an order, nothing came of it, and then a Key was installed.  I just want the Court to be mindful of that.  That's a big part of the case, and there's a lot of third-party discovery that's ongoing to get that information.

THE COURT:  Okay.  So I'm mindful that there's more than the 33 at-issue buildings or locations.  But I think for now, if we're just focused on -- I will give you an order on the issue of the cost shifting for the ESI vendor.  You all are going to meet and confer about the custodians, and the interrogatory response that's forthcoming from GateGuard could potentially address the location of where some of the evidence that

Mr. Salant has mentioned that Amazon is looking for is in the production that GateGuard has already provided.

I think we have a conference scheduled for August 15th at 11:00 a.m., so should these issues not be resolved, we can certainly discuss them again.  And if there's any other new issues, we could certainly include those in the letter.

Is there anything else anyone wants to raise now?

MR. QUAINTON:  Yes, Your Honor.  In terms of the time of the conference, I have a trial coming up on August 22nd, and so I think that week is going to be bad for me, and I don't know if it would be possible to have the conference after the 22nd. That would be ideal for me.  I want to have my full attention devoted to these issues on the call and not be distracted by preparing for the trial.

THE COURT:  Sure.  Yeah, I can move it, but because of just the schedule the way it is at the moment -- I'm happy to move it.  It's just the next availability would be the week of September 11th. Which is fine by me, I'm not suggesting otherwise, but I just want to flag that it'd be about a month later.  Maybe if the parties want to discuss about

whether that timing makes sense, you can always send
me a letter, and we can adjourn it or keep it
depending on whether you want to move forward or
not.

MR. QUAINTON:  That sounds fair.

MR. SALANT:  Thank you, Your Honor.  So if
I understood you correctly, we'll keep the
August 15th date on, and then the parties can confer
and potentially propose alternative dates to
Your Honor?

THE COURT:  Yeah.  I'll leave it on the
schedule as August 15th.  If you talk and you
realize I don't think we can hold out until
September, then don't send in anything, and we'll
just proceed with August 15th.

If you talk and you realize there's no way
we're going to get it -- you know, Mr. Quainton has
his trial, and he's too busy to do August 15th,
which is totally fine, all I'm saying is that if
you're going to propose alternate dates, it has to
be for the week of September 11th or later.

MR. SALANT:  Got it.  Thank you, Your
Honor.  Understood.

MR. QUAINTON:  Okay.

THE COURT:  Great.  Thank you so much,

everyone.

        MR. SALANT:  Thanks, Your Honor.

        MR. QUAINTON:  Thank you, Your Honor.

C E R T I F I C A T E

    I, Marissa Mignano, certify that the foregoing transcript of proceedings in the case of GATEGUARD, INC. v. AMAZON.COM, INC., et al., Docket #21-cv-9321, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  ___*Marissa Mignano*_____
           Marissa Mignano


Date:      August 4, 2023