UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GATEGUARD, INC.,                    : Docket #21-cv-9321

                    Plaintiff,     :

      -against-                     :

AMAZON.COM, INC., et al.,           : New York, New York
                                      February 28, 2024
                    Defendants.

--------------------------------:

PROCEEDINGS BEFORE
THE HONORABLE VALERIE FIGUEREDO
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:        QUAINTON LAW, PLLC
                      BY:  EDEN P. QUAINTON, ESQ.
                      2 Park Avenue, Suite 20th Floor
                      New York, New York 10016


For Defendant:        GIBSON, DUNN & CRUTCHER, LLP
                      BY:  DAVID PHILIP SALANT, ESQ.
                        ANNE MARIE CHAMPION, ESQ.
                        CHRISTOPHER BELELIEU, ESQ.
                      200 Park Avenue
                      New York, New York 10166




Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com



Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

INDEX

E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

1              THE DEPUTY CLERK:  Gateguard, Inc. vs.

2    Amazon.com, Inc., et al, case number 21-cv-9321.

3    The Honorable Valerie Figueredo presiding.

4              Counselors, can you please make your

5    appearances for the record, starting with

6    plaintiff's counsel.

7              MR. QUAINTON:  Good morning, Your Honor.

8    Eden Quainton for plaintiff, Gateguard, Inc.

9              THE DEPUTY CLERK:  Defense.

10             MR. SALANT:  Good morning, Your Honor.

11   David Salant from Gibson Dunn & Crutcher for the

12   Amazon defendants.  And I'm joined by Anne Champion

13   and Chris Belelieu.

14             THE COURT:  Good morning, everyone.  This

15   is Judge Figueredo.  So since we have a fair number

16   of issues to get through, I'm just going to jump

17   right in.

18             I'm going to start with ECF 91, which is

19   Gibson Dunn's letter concerning the attorney-client

20   privilege issue.  And I have, Mr. Quainton,

21   Gateguard's response at ECF 128.

22             And I'm just trying to understand, does

23   this really just boil down to twelve emails and

24   three attachments that you're trying to claw back?

25             MR. QUAINTON:  Yes, Your Honor, that's what

1    we've identified.

2              THE COURT:  And have you given them a

3    privilege log already?

4              MR. QUAINTON:  I have not yet given them

5    the privilege log.  I have somebody working on that.

6    I was hoping it would be ready by today.  It may be

7    later on today, but I don't have it yet.  He'll have

8    it just as soon as I do have it.

9              And it's quite extensive.  There are quite

10   a lot of privileged materials because we searched

11   Mr. Teaman's custodial files and he's been involved

12   in a number of litigations as well as a criminal

13   matter.  And the search terms that Amazon gave hit

14   on a lot of those items.

15             So there's a very extensive volume of

16   privileged material, but we will provide that

17   privilege log as soon as we're able.  I was hoping

18   it would be before today, but that obviously didn't

19   happen.  But I'm hoping it could be as soon as

20   possible.

21             THE COURT:  And the twelve emails and three

22   attachments, those have not been the subject of any

23   questioning at any deposition thus far?

24             MR. QUAINTON:  They have not.

25             THE COURT:  Okay.  So Mr. Salant, I read

1    your letter.  I understand there's been instances

2    where the case has been delayed, and I understand

3    the frustration.  But given that we're, at this

4    point, talking about twelve emails and they're going

5    to produce the privilege log, is this not something

6    that we can move past without a formal ruling on the

7    waiver?

8         MR. SALANT:  I believe we can.  There's

9    just one question, which is what would be on the

10   privilege log that's not on the claw back list.  We

11   are in receipt of GateGuard's claw back list.  We

12   have segregated those documents and we reserve the

13   right to raise those claw backs later.

14        But we need to know if what will be claimed

15   in this later privilege log includes documents used

16   at depositions, what the gap will be, and we think

17   that just promising it at some unspecified later

18   date isn't adequate.  So, yes, if there can be some

19   timely way to get a privilege log and check if any

20   of those documents have been used at deposition, we

21   can reserve and challenge it later.  But we're sort

22   of operating in this vacuum where GateGuard produced

23   the documents, told us some were privileged,

24   produced them again, wouldn't give a privilege log.

25   And so hopefully there's some way forward where

1    privilege log can be ordered and we can come back if

2    any of them are documents we're actually trying to

3    use in this case.

4         THE COURT:  Well, how about we do this.

5    Since it sounds like the privilege log is near

6    completion, Mr. Quainton, can you commit to

7    producing the privilege log by Friday, March 1?

8         MR. QUAINTON:  Yes, I can.

9         THE COURT:  Okay.  So then I think I

10   understand Amazon's concern, but it sounds like

11   potentially we might be able to get the privilege --

12   or GateGuard's represented that it's going to

13   produce the privilege log on Friday.  And then if

14   there's any documents that you want to specifically

15   challenge, you certainly have the right to come

16   back, and that would at least narrow the scope of

17   the challenge.

18        MR. SALANT:  That works for us, Your Honor.

19        THE COURT:  Okay.  So then, Mr. Quainton,

20   by close of business on March 1, if you can produce

21   the privilege log to Amazon, we can then revisit

22   this issue if there's a need to.

23        MR. QUAINTON:  Yes, Your Honor.

24        THE COURT:  The next one I have is ECF 92.

25   I'm going to just summarize it as the new locations

1    that GateGuard is pointing to, and the response from
2    GateGuard, excuse me, came in at ECF 125.
3          And what I guess I'm most curious about
4    after our prior conversation in May of 2023 on this
5    issue is, to the extent these new locations came up,
6    why did it take so long to identify them?
7          MR. QUAINTON:  Is that directed to me, Your
8    Honor?  Mr. Quainton?
9          THE COURT:  Yes.  Yes.  I'm sorry.  Yes.
10          MR. QUAINTON:  Yes, thank you.
11          So what initially happened is GateGuard,
12    and this was primarily with Mr. Teaman who was the
13    CEO at the time, went through all its records and
14    identified the locations where devices had been
15    installed, and to Mr. Teaman's awareness of the
16    records where a device had been installed.
17          But Mr. Teaman, he passed the reins of a
18    company to David Taxman, who really didn't have
19    much -- well, who didn't have any history with the
20    company.  And Mr. Teaman, as I believe the Court
21    knows, is currently at a BOP facility in Miami.
22          So his father, who is an IT specialist,
23    he's a senior person at Goldman and Morgan Stanley,
24    stepped in and has been helping the company with
25    various matters relating to information.  And I had

1  a doubt about devices that may have been removed or
2  devices that were no longer active where we lost a
3  customer.  And because the customer was lost at some
4  point in the past, it didn't -- Mr. Teaman didn't
5  record it.  The company doesn't have a list of
6  customers that were lost.  That's not a record the
7  company keeps.  That's something that I was really
8  focusing on, particularly after Amazon issued its
9  Interrogatory Number 7, and we identified locations
10  where there had been an issue and we'd lost a
11  customer.
12          So I was really, very focused on this.  And
13  I had a number of conversations with Mr. Teaman and
14  he said, GateGuard doesn't have that information.
15          And I said, well, is there any proxy for
16  that, because I just don't feel like we've
17  necessarily scoured everything to make sure that
18  we're not missing something.  Because obviously it's
19  a question of where we've been harmed or how we've
20  been harmed is a central issue.
21          So he did some more research.  He said,
22  well, what I can do, I have a record of device
23  availability -- by the way, this is a metric that
24  Amazon tracks as well with the key -- and I can tell
25  you how long a device was offline.  And I have that

1    for every single device that we've ever sold.  I can

2    tell you how long it was online, how long it was

3    offline.

4         And presumably if a device is offline for

5    an extended period of time, that's because the

6    customer is no longer using the device.  If it's

7    offline for a short period of time, that could just

8    be there's a problem or there could be an Internet

9    outage or some minor issue.  But if it's an extended

10   period of time, then it's a fair assumption that

11   that customer is no longer using the device, and

12   we've effectively lost the customer.

13        So he ran those numbers and he ran that

14   data, he came up with a big list of devices and

15   locations.  I actually mistakenly sent that big list

16   to Amazon.  I didn't intend to.  What I intended to

17   do was what I ultimately did, which is I compared

18   the list of device availability with the list of

19   devices that we'd already identified.  And there

20   were 32 additional devices that had not been

21   captured by the previous analysis of the data.

22   Because the way that Mr. Teaman, Sr. had looked at

23   the data was not something that was done in the

24   ordinary course.  The data existed, but it hadn't

25   been analyzed to satisfy what I was looking for.

1          And so when I got that information, I then
2     asked Amazon in a document request for installation
3     agreements relating to those devices, because we
4     need the installation agreements to figure out who
5     it was at the locations who -- first of all, was the
6     key for business installed at any of those
7     locations?  So it's very likely that the key for
8     business was not installed at all those locations.
9     It may only be a handful.  So we're not talking
10    about a huge burden.  There may be a handful of
11    devices.  Of the 32 where the key was installed.
12          For those devices where the key was
13    installed or those locations of the key was
14    installed, I wanted the installation agreements so
15    that I could see who Amazon or who Amazon's agents
16    had identified as the relevant person.  Because one
17    of the issues that's really complicated our fact
18    finding in this case is that GateGuard's contact, as
19    a location, is typically not the person who
20    authorized the installation of the key.  And that
21    person, our contact, will many times say no, the key
22    was never installed here.  So any problems you're
23    having has nothing to do with the key.
24          But when we dig further with the
25    installation agreement, we can't dig further because

1    we're not sure who it was who authorized the device.

2    Then we find out in some cases that the device was

3    installed but never authorized.  In some cases that

4    it was installed, but -- it was installed, but there

5    was an internal procedure and, in fact, a person had

6    just forgotten they'd authorized it.

7          In any event, all we're asking for is for

8    these 32 locations that were uncovered by a data

9    analysis that we hadn't previously run, that Amazon

10   just tell us, is the key installed at those

11   locations and, if so, provide the same discovery

12   that they provided for the other locations so we can

13   assess whether that device unavailability resulted

14   from the incompatibility with the key or damage

15   caused by the key.

16         THE COURT:  Can I just ask, Mr. Quainton,

17   this data analysis that you engaged in, when did

18   that process begin?

19         MR. QUAINTON:  Well, it would have been

20   after Mr. Teaman reported to the BOP.  So it would

21   have been in -- it would have been in October.

22   Probably would have been in, I think, mid to late

23   October.

24         THE COURT:  I guess this is what I'm trying

25   to figure out.  What was done between May of 2023,

 1    when you knew we were limiting it to 70 or so

 2    addresses, and October?

 3             MR. QUAINTON:  Well, what I was trying to

 4    do in this case -- I think Your Honor I've seen that

 5    the volume of materials.  We were trying to comply

 6    with our own obligations.  There was a difficulty

 7    getting a vendor.  We did a production of 3,000

 8    pages that Amazon thought was inadequate.  We

 9    retained a vendor and they found a quarter of a

10    million pages of documents to work through.  We met

11    and conferred on various issues.  You know, there's

12    just a lot --

13             THE COURT:  So, but you said -- I don't

14    mean to interrupt, but just because of the nature of

15    all the issues we're trying to get through today,

16    that all goes to document requests on other issues.

17             I'm trying to figure out what was done in

18    those summer months, early fall, to sort of realize

19    that maybe 70 addresses wasn't what captured the

20    full universe of potential injury or relevant

21    locations.  And it sounds like there was nothing

22    until October.  And that's when the new CEO came in.

23    And you just, you inquired as to potential locations

24    where there was a key for a GateGuard device

25    installed that was inactive.

1              MR. QUAINTON:  I'm continuing to work to

2       develop the facts and protect my clients' interests

3       as aggressively as I can.  I'm not a magician.  As I

4       think you know, there were a number of things that

5       were happening to me personally.  My father died.  I

6       had serious health issues.  I mean, I don't want to

7       get into all that again.  That's ancient history.

8              But there was an enormous amount of stuff

9       going on in this case.  It's a massive case.  Amazon

10      has eight lawyers assigned to this case:  Two

11      partners, six associates, an army of paralegals.

12      GateGuard is a tiny startup.  Its business has been

13      damaged by what's undisputed, which is the

14      unauthorized installation of the keeper business in

15      a manner that harms our business.

16             If I had done this in November, I don't

17      think that would be a reason to say, Oh, you know,

18      no, it's out of the scope of the case.  These are

19      locations where we're alleging Amazon has

20      potentially installed the key without authorization

21      and damaged our business.

22             Could I have done it earlier?  Possibly.

23      As I say, with everything that was going on, I did

24      it as quickly as I could in the face of the

25      challenges of this matter.

```
 1              I just think, stepping back a second, what
 2    we're asking for, again, this is not a huge matter.
 3    Amazon can tell us in literally 30 minutes whether
 4    any of those locations have the key installed.  They
 5    can tell us in another two hours whether there are
 6    installation agreements for those locations or not.
 7    This is not a huge volume of material that we're
 8    springing on them at the last minute.  It's a data
 9    search that in my diligence, attempting to leave no
10    stone unturned, even when I was told there's no data
11    that exists for tracking every single lost customer.
12    I pressed on that and we came up with this device
13    unavailability metric, which is, as I said, it's a
14    proxy for the lost customer.  I don't know for sure
15    what everything had happened to those devices, but,
16    you know --
17              THE COURT:  I guess the reason I just have
18    some hesitation here is I guess technically you have
19    a close of fact discovery deadline of February 29.
20    And I know there's a motion to amend the complaint
21    pending, but it sounds like you're trying to
22    basically reopen fact discovery for all of these new
23    potential buildings.
24              And I guess, let me just ask, how many
25    depositions have been taken thus far?
```

1          MR. QUAINTON:  So nine depositions have

2    been taken.  That's another issue that I don't know

3    if this is the right time to address that, but we

4    intend to seek permission to take additional

5    depositions.  We've gone back and forth with Amazon

6    and we don't see eye to eye.

7          What we would like to do is, there are

8    three properties and three Amazon witnesses whose

9    depositions we would like to take.

10          THE COURT:  So I guess before we veer off

11    into a new topic, just because otherwise I'm not

12    going to be able to keep it straight.

13          I'm trying to figure out what the scope of

14    the work would be if you were permitted to look into

15    these new addresses.  And so there's 32 new

16    addresses where the device was inactive.  You first

17    need confirmation that a key for business was

18    installed, and that itself might reduce the number

19    of addresses.  But once you get the new addresses

20    with confirmation a key for business was installed,

21    what other information would you be looking for?

22          MR. QUAINTON:  So I'd be looking for the

23    records of what's called the installation agreement.

24    Every time that a key for business device is

25    installed at a location, the Amazon procedure, that

1      there's meant to be a contract between Amazon and
2      the company that owns or manages the property in
3      question, those agreements are delegated -- or the
4      execution of those agreements on the Amazon side is
5      delegated to a third party.  But those are
6      agreements between Amazon and the location, and
7      those agreements identify the person who gave the
8      authorization.
9              So if I go to a property, 350 West 124th,
10     and I know the property manager and I ask the
11     property manager, Was the key for business ever
12     installed here.  He may well say, and many have
13     said, No, that was never installed here.
14             And then we find out that there was an
15     installation agreement between Amazon and that very
16     location signed by the superintendent.  And
17     sometimes it turns out that the superintendent
18     signed the agreement without the authorization of
19     the property manager.  Sometimes the superintendent
20     says, I never signed the agreement.  Sometimes
21     there's a person who's identified by Amazon by name
22     and the name is incorrect.  It takes time to figure
23     out what's actually going on.
24             So what I'd like to do -- just to try to
25     give the scope of this -- so we originally had, I

1    think, about 280 addresses and there were 70

2    overlaps.  So that's about one in four, right, where

3    there's -- where there's an overlap.  Assuming that

4    same percentage holds, we're talking about -- and

5    there are 32 here -- that would be eight additional

6    potential locations.

7          And what we would do is we would ask for

8    the installation agreements for those locations.  We

9    would look at the person who's identified on the

10    installation agreement, and we would try to

11    determine the timing of the installation of the key

12    to figure out whether -- and then we would try to

13    figure out whether any service issue was related to

14    the key or not.  Sometimes the timing will exclude

15    that possibility, if the key is installed, let's say

16    after the customer -- after the device was inactive.

17          But unless we know some basic facts about

18    when the key was installed, who authorized it, it's

19    sort of impossible for us to figure out the scope of

20    our damages.

21          THE COURT:  Mr. Salant, is there anything

22    you want to add?

23          MR. SALANT:  Sure.  Your Honor, I would

24    just need to respond to a couple of things that

25    GateGuard said.

1              As Your Honor noted, last year there was a

2     court ordered process for identifying these

3     addresses.  Even more so, this is a 2021 case.

4     GateGuard brought this case, claiming billions in

5     damages and addresses at issue in 2021, and should

6     have known what addresses were at issue then.

7              We asked repeatedly in written discovery,

8     including interrogatories, and indeed some of these

9     buildings on GateGuard's list are the so called

10    portfolio properties.  There are ten of them where

11    GateGuard affirmatively told us there was no key for

12    business -- excuse me, there was no GateGuard device

13    installed there.  It was a portfolio property,

14    meaning one where GateGuard was not installed, but

15    they believed they had some contractual right to the

16    building.  So they told us the opposite.

17             Now GateGuard is saying it discovered new

18    addresses.  Ari Teaman, Mr. Teaman, the founder and

19    CEO, was the best positioned person to know where

20    his devices were installed.  This came up in May of

21    2023, long before he reported for his prison term.

22    And there's also the fact that GateGuard could go to

23    these locations and figure out where its devices

24    were and were not, and whether a key for business

25    device was there or was not.  And so GateGuard has

1    at its disposal the way to figure out what addresses

2    are at issue.

3          I think the main thing that we've learned

4    from counsel's points today is that GateGuard does

5    not have an understanding of the relevance of these

6    addresses.  It wants to explore what they could or

7    might mean and whether damage might or might not

8    have happened there.  And it's quite late for

9    GateGuard to do so, especially when in deposition,

10   David Teaman, the father of Ari Teaman, told us he

11   obtained this data from someone at GateGuard and

12   whipped it up, and it was pretty easy to determine

13   what this list was.

14         So we're just not understanding how

15   GateGuard can change the game this late.  And we

16   would respectfully submit that the scope of

17   discovery should not be expanded beyond what the

18   Court ordered and what the parties said previously.

19         THE COURT:  Mr. Quainton, I just want to

20   make sure, because something Mr. Salant said, the 32

21   new addresses that you've identified, you have

22   confirmation that these are addresses where a

23   GateGuard device is installed.  We're not talking

24   about a portfolio building.

25         MR. QUAINTON:  Correct.  They may have been

1    on a previous portfolio list, but these are

2    locations at which there actually was a GateGuard

3    device installed that was inactive for a certain

4    period of time.

5            And if I could just say one thing that I --

6    might really help the Court understand the bind that

7    we're in.  One of the parties that we subpoenaed,

8    one of our own clients that we subpoenaed for

9    information about GateGuard -- information about the

10   70 GateGuard locations, there were five GateGuard

11   properties with that property manager.  Those

12   devices were removed because the property manager

13   was dissatisfied with GateGuard.  There was some

14   service issue.  And that property manager, when we

15   spoke to them, know this was all GateGuard.  The key

16   for business was never installed here.  And, in

17   fact, they told me point blank, We actually tried

18   out the key for business and we didn't like it and

19   we told Amazon we weren't interested.  So I'm sorry,

20   there's really no connection between the key for

21   business and your devices.

22           And I pushed back and I said, Look, I'm

23   looking at an installation agreement that I hadn't

24   seen, that the GateGuard would never have seen but

25   for this litigation, and it says that there's a

1   superintendent who signed up a lot of buildings and
2   I don't understand how that could have happened.
3       So we go back and forth. And then, I think
4   it was just yesterday or the day before, the person
5   comes back to me and said, Oh, you know what, what I
6   told you before was incorrect. The key for business
7   was installed at those locations. And yes, the
8   superintendent actually did authorize it and he told
9   one of his managers and that information just never
10  got to the people that I was talking to, which are
11  the same people that we were talking to.
12      I can't just go to those locations and
13  knock on the door and get into the basement. The
14  GateGuard device has been removed. I don't have any
15  authority to do that. So we're dependent on this
16  discovery process and piecing together what happened
17  by a very laborious and time consuming process.
18      So to determine the scope of our damages,
19  we just need to know, okay, let's say there are
20  eight of these locations where the key was
21  installed. Was it installed before those devices
22  became inactive? Did the property owners know that
23  the key for business was installed? Simple
24  questions. And again, I just don't think we're
25  talking about a massive new process, even if the

```
 1    Second Amended Complaint is not permitted by the
 2    Court.
 3             THE COURT:  Okay.  So I guess I'd just like
 4    to, before I give you a final decision on this,
 5    given that we do have the pending motion to amend
 6    the complaint, or the potential motion to amend the
 7    complaint.  Since it might, just Mr. Quainton had
 8    made the argument that it could be just one in four
 9    of these 32, Mr. Salant, is it possible for Amazon
10    to quickly look at the 32 list and identify which
11    had a key for business installed, so we know the
12    number of buildings that are actually at issue?
13             MR. SALANT:  We can do that, Your Honor.
14    Our position would be that if we provide this
15    information, that it would be information and maybe
16    some documents only, and that we do not reopen
17    depositions or open fact discovery for a longer
18    period to cover these.  We can provide some narrow
19    amount of information, if Your Honor orders it, of
20    course, but we just don't want to restart discovery
21    on these addresses or anything else, given the ten
22    months we've spent on this 2021 case.
23             THE COURT:  Yeah.  And I hear you on that,
24    and I guess I'd like to see what happens with the
25    motion to amend the complaint.  But because this
```

```
 1   might be something like eight buildings as opposed
 2   to closer to 30, I'd like to just get a sense of the
 3   number of buildings we're talking about.
 4            So, Mr. Salant, you'd really just be
 5   providing confirmation that there was a key for
 6   business installed at the 30.  So I think we did
 7   this in the prior process, but it would just be
 8   looking to confirm whether there was even a key for
 9   business installed.
10            MR. SALANT:  All right, Your Honor, we'll
11   agree to that.  We will tell GateGuard where key for
12   business was installed on its list of 32 new
13   addresses.  We'll try to do it by the end of the day
14   today -- maybe tomorrow.  By the end of the day
15   tomorrow, and we can take it from there.
16            THE COURT:  Yeah.  And just to be clear,
17   that's all I've required at this point.  I'm going
18   to just reserve giving you a final decision on this
19   request.
20            MR. SALANT:  Okay.  Understood, Your Honor.
21   Thank you.
22            MR. QUAINTON:  Thank you, Your Honor.
23            THE COURT:  The next issue, the next one I
24   have is ECF 93, which raises the issue of what I
25   guess just summarizes as trade secrets.  And the
```

1    response from GateGuard is at ECF 131.

2            MR. SALANT:  Your Honor, this is counsel

3    for Amazon.  We might be able to help on this one by

4    narrowing it.  We acknowledge that in the passage of

5    time over one month, because we did not obtain a

6    protective order, we did continue with discovery

7    regarding GateGuard's trade requests for trade

8    secret discovery.  We did not instruct any of our

9    witnesses not to answer questions or to limit the

10   scope of their testimony by trade secrets discovery.

11   We provided documents that were based on very broad

12   search terms.

13           So we think the passage of time kind of

14   partially moots this, where if fact discovery is to

15   close tomorrow, we don't need a protective order.

16   But if this trade secrets issue, the so called

17   copying theory, is reintroduced to the case or is

18   brought back, we may need to return to the issue.

19           THE COURT:  Okay.  Mr. Quainton, is that

20   your understanding as well?

21           MR. QUAINTON:  Mostly.  I think the wrinkle

22   is that, and again, I don't want this to get off

23   track, but we have discussed with Amazon and hope to

24   bring to the Court a motion for permission to take

25   additional depositions.

```
1              Just assuming hypothetically, that the
2    Court were to grant that motion but deny the motion
3    to amend.  So I think if the motion to amend is
4    granted, then this request for protective order is
5    entirely mooted because the motion to amend is
6    specifically seeking damages for an alleged copying
7    that benefited the Ring products, including the Ring
8    intercom.
9              But assuming that's denied, but the Court
10   does permit additional depositions, then the
11   protective order would not be entirely mooted
12   because there are still issues about what
13   individuals may have known about the Ring deployment
14   as it may relate to the piggybacking theory.
15             For example, when the GateGuard devices
16   were obtained through Clear Home by Amazon, the
17   stated purpose was for compatibility testing,
18   compatibility with -- but it was unclear
19   compatibility with what.  And it turns out that the
20   deposition testimony is clear that this so called
21   compatibility testing in March, April, May of 2021
22   was being done with respect to both the key for
23   business and the Ring intercom.
24             So I think it's fair that -- and we didn't
25   know that before, but I think it's fair when we're
```

1    trying to figure out how they're piggybacking, there

2    are questions about how they might be wanting to

3    piggyback with respect to the Ring intercom that

4    could bear on their intentions with respect to the

5    key for business device, since they're testing both

6    of them or they're acquiring devices in order to

7    test those devices with both the key and the Ring

8    intercom.

9           And also there's another area that might be

10    relevant, which is the manner in which Amazon seeks

11    authorization for the Ring.  The Ring intercom is

12    marketed in Europe.  The key for business is

13    primarily in North America.  But there could be

14    questions that may lead to admissible responses or

15    evidence about the manner in which authorization is

16    sought for the Ring intercom that could bear on,

17    well, why didn't you do the same thing for the key?

18    If you knew it was important with the Ring, why was

19    it not important with the key?

20           So I think there is a possible universe in

21    which the Court says the Second Amended Complaint is

22    out.  But I hear that you want these additional

23    depositions.  Two of them for Amazon, were noticed

24    in a timely manner.  We couldn't agree on the dates.

25    And also the ten deposition limit created a kind of

1  a chicken and egg problem; how to use schedule when

2  you don't know exactly what you can do.

3       But there's at least a plausible case where

4  this issue is not mooted, where you say, Yeah, you

5  can take those depositions, and there could be

6  questions related to the Ring that would be

7  relevant.  It might be better to reserve on this

8  until that deposition issue is squarely before the

9  Court.

10       THE COURT:  Okay.  So I'm, again, fine,

11  holding off if you think there's a universe in which

12  this becomes a moot issue.

13       And, Amazon, you can always come back

14  depending on the outcome of the motion to amend as

15  to whether you want to seek a protective order for

16  this.

17       MR. SALANT:  All right.  Your Honor, that

18  works for us.

19       THE COURT:  Can I just ask a question?

20  This is a bit out of order, and this just came to

21  mind, so I just would like to get the parties'

22  views.

23       So the deadline for the close of fact

24  discovery is February 29, and obviously there's a

25  potential motion to amend the complaint.  Are the

```
 1    parties -- I don't know if you've discussed whether
 2    you'd like, because a motion to amend the complaint
 3    will take a little bit of time to decide.  It's not
 4    something that I'm going to give you an oral ruling
 5    on the phone for.  And so I don't know if the
 6    parties have discussed whether they want to continue
 7    with discovery pending the resolution of that motion
 8    or whether they're looking to pause it pending the
 9    resolution.
10         MR. SALANT:  All right.  Your Honor, on
11    behalf of Amazon, we would not want to continue
12    discovery while the motion to amend is pending.
13         Our position is fact discovery will have
14    closed on February 29, that we've spent ten months
15    on it, that it's been extended numerous times.  The
16    only main exception being the deposition of
17    Ari Teaman, which we've attempted to schedule but we
18    haven't been able to hold yet.  And he's also
19    GateGuard's 30(b)(6) witness on all notice topics.
20         So other than Mr. Teaman's deposition, we
21    think fact discovery has closed or should close on
22    February 29.  GateGuard, of course, wants to amend
23    the complaint and presumably would seek more
24    discovery should it obtain leave to amend.  We would
25    disagree with that.  And so our view is that there
```

1    should not be discovery on these currently

2    undisputed claims.

3            THE COURT:  Mr. Quainton?

4            MR. QUAINTON:  Yes, we take a different

5    view, for a couple of reasons.

6            Beyond the deposition of Mr. Teaman, which

7    is an outstanding issue, and beyond the issues that

8    are before the Court today, there are still some

9    issues before the parties that are going to require

10   further -- at least further conferring and quite

11   likely further discovery.  And so let me give you

12   some indication of what that would be.

13           The first issue is that GateGuard has

14   issued a deficiency letter to Amazon with respect to

15   Amazon's most recent responses to GateGuard's

16   request for documents and interrogatories.  Part of

17   that is before the Court today.  That was the 32

18   addresses.  And that's where GateGuard is seeking a

19   protective order.  That arose in the context of our

20   fifth request for production of documents.

21           But there were also other requests.  For

22   example, with respect to the 70 locations, we don't

23   have all the installation agreements or all the data

24   relating to those properties.  Of the 70 -- in fact,

25   we only have less than 20; I believe there's a huge

1   gap.  And Amazon tells us, Well, we did what we
2   could.  But in depositions, it was clear that
3   there's additional information relating to the 70
4   properties that would help us understand what
5   happened at those properties.
6           We don't believe that there's been a full
7   and complete search.  For example, Mr. Nievera, who
8   was the most senior person that we deposed, said
9   that there's something called a call script.
10  There's a script that Amazon representatives and
11  Amazon itself are meant to follow when they're
12  trying to determine whether a property has been
13  appropriately authorized.  So we need to see those.
14  We've asked for those call scripts.
15          There's also something called an ingestion
16  form, which is a form -- I've never seen the
17  ingestion form because they weren't produced, which
18  shows how this property was essentially ingested,
19  absorbed, or cataloged within the Amazon system.
20  That is a category of documents that hasn't been
21  produced.
22          So that's an outstanding issue.  We have
23  not yet had a chance to meet and confer.  Our
24  deficiency letter was sent on the 22nd, and the 23rd
25  was pending.  And as Your Honor could see, there's a

1     lot of issues to address, but that's something the
2     parties are going to have to meet and confer on.
3     And hopefully we can resolve that without court
4     intervention, but we may not be able to.  And there
5     may be additional discovery that Amazon agrees to in
6     light of our meeting and conferring.
7              And there are other issues.  In addition,
8     Your Honor recalls that with respect to the so
9     called ordered properties, these are properties
10    where GateGuard was ordered but then never actually
11    installed.  Amazon has said that they believe that
12    Your Honor categorically refused -- or not
13    refused -- denied GateGuard the ability to get any
14    discovery with respect to those properties.  And my
15    reading of your order and rereading the transcript
16    of the conference we had on the topic was that Your
17    Honor said, I'm not convinced today that's
18    appropriate, but it might be appropriate if you can
19    come back with more evidence.
20             So I want to go over that with Amazon.  And
21    I think the depositions that we've had and the
22    information we've obtained about the way it's, sort
23    of, impossible to really know what went on at these
24    properties until you drill down and find out who
25    said what to whom.

```
 1              We think that -- we haven't had a chance to
 2    meet and confer with Amazon -- so there's nothing
 3    right for the Court.  But that's just an indication
 4    of another area where there's a dispute that may
 5    need additional discovery.
 6              Another major area where we need additional
 7    time, it's not new discovery, this is existing
 8    discovery with respect to subpoenas that were
 9    issued.  And securing compliance with the subpoenas
10    is extremely difficult.  Many parties simply don't
11    comply and we have to go back again and again and
12    eventually they do comply.
13              One of the best examples is Clear Home,
14    which is a major Amazon, what they call a channel
15    partner.  They were responsible for both getting new
16    clients and through one of their subsidiaries,
17    installing the key at those new clients.  And the
18    president of Clear Home testified that all of his
19    communications with Amazon were by telephone.  And
20    he said that he would provide us with the telephone
21    numbers of the Amazon people that he talked to so we
22    could determine whether they were communicating by
23    cell phone, because one of the issues in discovery
24    has been whether Amazon should be required to search
25    the cell phones of its custodians.  And Amazon has
```

1    said, No, that's not necessary because cell phones

2    were never used except in connection with Amazon

3    sort of software.  They have a software program

4    that's available on cell phones as well as desktops.

5    And I just don't know that I can believe that

6    without sort of touching the wound, as it were,

7    like, who was communicating, what were the

8    addresses, and what were the phone numbers.

9          That subpoena went without response, much

10   like the first subpoena, which we sent back in

11   April, and it never got full responses until

12   December.  And that was not for lack of trying.  So

13   that's one example.

14         Another example is another major client of

15   GateGuard's just initially ignored the subpoena.

16   And then counsel contacted me on Friday -- or

17   Thursday or Friday and requested an extension.  And

18   I said, Yeah, I'm happy to give you an extension,

19   but we have fact discovery closing.  So that's an

20   issue.

21         Just outstanding subpoenas where we either

22   haven't been able to secure compliance or a party

23   has requested an extension.  That's going to --

24   subject to, of course, Your Honor's ruling, for us

25   to be able to obtain the facts we need, that would

1    require some additional time.

2            The other issue that is a burning issue as

3    well is the schedule for expert discovery.  Right

4    now, the schedule was submitted on consent by both

5    parties, and I guess I didn't really focus on how

6    this was going to interact with all the other loose

7    ends that are outstanding.  But technically, we're

8    supposed to designate experts by Friday, by March 1.

9    That's going to be extremely difficult, among other

10   things, because of the remaining gaps.  I mean, the

11   issues that are being discussed today, as well as

12   the outstanding deficiency letter and subpoenas,

13   make it difficult for me to have a meaningful

14   conversation with an expert as to exactly what

15   they're going to be reviewing so they can give me a

16   cost estimate for how much their services are going

17   to be, et cetera, et cetera.  I am in the process of

18   doing that, and we'll meet the deadline if required.

19           But it seems with everything going on, and

20   I don't quite see what the need would be to

21   designate by Friday, and I would want to request

22   some additional time for that.

23           And then the last thing was, of course, the

24   Second Amended Complaint.  Don't need to say

25   anything more about that.  That may affect timing.

```
 1              THE COURT:  Okay.  On the expert discovery
 2    issue, I think given that you have the pending
 3    motion to amend the complaint, it might make sense
 4    to put a pause on the March 1 deadline.
 5              Mr. Salant, I'm happy to hear from you if
 6    you have a different view, but it sounds like
 7    there's a bit, depending on the ruling on the motion
 8    to amend the complaint, that could potentially
 9    change the landscape of what needs to get done
10    before you move to expert discovery.
11              MR. SALANT:  Your Honor, we're open to
12    that, I suppose.  I mean, it's two days away that
13    the parties are supposed to identify their experts.
14    We think that the parties should probably know who
15    their experts are by now and be able to identify
16    them.  But we're open to holding off on expert
17    discovery while the motion to amend is pending on
18    exactly your theory, Your Honor, that the motion to
19    amend result could change the scope of expert
20    discovery.  So, yes, we are open to that.
21              And may I just make a couple of quick
22    responses to the issues GateGuard has raised.
23    GateGuard is now putting before the Court numerous
24    factual discovery issues, some of which we've been
25    talking about, some of which we haven't.
```

1          But just to be clear, I mean, we made our
2     positions clear in written interrogatory and RFP
3     responses for months.  And GateGuard has not moved
4     on any of these issues, including its third-party
5     subpoenas.  You know, the night before, day of
6     extension it's not proportional discovery, it's not
7     proper discovery, and GateGuard should not be
8     permitted to do it.
9          We have conducted and given broad discovery
10    in this case.  We have given GateGuard eight Amazon
11    custodians.  We have run against their collected
12    ESI, 66 unrestricted search terms, including the
13    search term Teaman and the search term GateGuard and
14    other spellings of those terms, and reviewed for
15    production and produced the results.  So discovery
16    has been broad and has covered a lot.  GateGuard has
17    not been diligent by making these last minute
18    requests and so we think they should not be
19    permitted.
20         The only last thing I would note is on the
21    so called 26 ordered addresses, GateGuard is now
22    seeking discovery regarding the 26 addresses where
23    its device was allegedly ordered but never
24    installed.  Again, we've made our positions clear in
25    the written discovery.  It is impossible for the

1  piggybacking theory, the so called piggybacking

2  theory to have occurred at a location where both

3  devices don't exist.

4       As a side note, it's impossible for the

5  piggybacking theory to be true at all because

6  witnesses have testified that the key for business

7  device is a power connection to the intercom.

8  There's no data connection at all.

9       But putting that aside, GateGuard's request

10 to expand to the 26 devices is an economic argument.

11 It's saying it should apply its injury to other

12 places.  It's not a matter for fact discovery, and

13 so it just shouldn't be in this case.

14       So that's just to preview our positions on

15 these new issues GateGuard raised in its colloquy.

16       THE COURT:  Can I just add, I might have

17 missed something on the 26 buildings, but isn't that

18 also beyond the scope of what we said was the limit

19 of discovery in the May 2023 hearing?

20       MR. SALANT:  I agree with that, Your Honor.

21 Although I think in your May order there was a note

22 about ordered location.  So I can't remember exactly

23 what it said.  But I think there was a note on that.

24       But I would say the next sentence in Your

25 Honor's order said that GateGuard needed to respond

1    to our ROG asking, what addresses were you injured

2    at.  And they responded with a list of 33 addresses.

3         So they've told us 33 addresses where they

4    claim injury.  And so those responses were never

5    supplemented.  Nothing really has changed.  And so

6    that is another touchstone we've been using for the

7    scope of discovery, which is where does GateGuard

8    claim it was injured.  And it's told us in verified

9    ROG responses and it never changed the answer.  So

10   this investigation into other unknown areas is

11   improper and disproportional because there's no

12   allegation they were injured there.

13        THE COURT:  Okay, understood.  I guess just

14   to shift back of focus to the various issues raised

15   in the written letters, I'm going to shift to the

16   Rule 26 disclosures at ECF 96.  It was the letter

17   concerning the computation of claim damages and the

18   witnesses that GateGuard would use to support its

19   claims.  And the response is at ECF 134.

20        It sounds like the second part of the

21   request is moot because GateGuard has supplemented

22   the list of witnesses.  Is that still the case?

23        MR. SALANT:  Your Honor, to my knowledge,

24   GateGuard has not supplemented its initial

25   disclosures.  So we don't think it's done that.

1           I may be missing something, but I don't
2    think it has.
3           MR. QUAINTON:  Your Honor, if I may
4    respond.
5           THE COURT:  Yes.
6           MR. QUAINTON:  I tried to make this point
7    in my response -- my written response.  We fully
8    intend to supplement the witness disclosure, but
9    it's complicated by the issues that are outstanding,
10   some of the issues that are before the Court:  The
11   protective order on the 32, the issue on ordered
12   locations that we're going to meet and confer with
13   Amazon.  That's not right for the Court.  The door
14   was left open for that, but that's not right for
15   this now.
16          Any responses that we get from people that
17   we are currently in contact with -- I'll give you an
18   example of one of the problems that we face with
19   respect to one of the GateGuard locations where
20   there was an issue and where we want to put down a
21   witness.  Amazon's installation agreement for who
22   authorized the installation of the key identifies a
23   person by first name and last name.  I won't say
24   those names now.  It turns out the first name is
25   correct, but on investigation, the last name that

1    Amazon put down is fictitious and has nothing to do
2    with the person who actually signed, who has an
3    entirely different last name.  There was a person
4    who's with the same first name but with a different
5    last name.  So if I put down on my witness list a
6    person identified by Amazon, I know that is not
7    reliable.  And I know I have to go beyond that,
8    behind that.
9          In addition, when we're talking to a
10    property, and the first response -- and this has
11    happened multiple times -- is property manager says,
12    No, no key was ever there, no idea what you're
13    talking about.  And then it turns out that it's the
14    supers who actually signed the agreement.  In some
15    cases, Amazon, when it doesn't identify the person
16    by a fictitious last name, only uses a first name.
17          For example, one of the people who we
18    deposed was just identified as Ramon.  And you'll
19    see that there is a Ramon -- a deposition of Ramon
20    Rodriguez.  Ramon Rodriguez will be on our list, but
21    I couldn't possibly have identified that person just
22    by the name Ramon.
23          So we have every intention of updating the
24    list.  I don't think it would be fair to sort of
25    bind us by a list of names when we want to update

1  it, but we haven't been able to material it so that

2  there's a motion in limine that says, No, you can't

3  get the testimony of these people at trial because

4  you didn't include them on your initial disclosure.

5  And the reason we didn't is that the information

6  Amazon gave us was wrong, and we're trying to get to

7  the bottom of it.

8       So we fully intend to do that.  In terms of

9  the timing, I think it depends on the answers to all

10  of the issues that -- the written issues for the

11  Court and some of the others that I've raised, but

12  we have every intention of amending that.  I think

13  with respect to the damages, it's a little bit

14  different.

15       I mean, you saw our answers on that, so I

16  won't say anything right now.  I'll wait for Your

17  Honor to ask any questions that Your Honor may have.

18       THE COURT:  I guess just on the witness

19  disclosure, it sounds to me like we're operating

20  under a world where the February 29th deadline was

21  never intended to be met.

22       I understand you were seeking to amend the

23  initial disclosures, but theoretically, fact

24  discovery closes, I guess, tomorrow.  So I'm not

25  entirely sure when you were intending to amend it

1    before the close of fact discovery.

2              MR. QUAINTON:  Well, that's a good point.

3    I guess the answer is, Your Honor said we could

4    issue subpoenas -- I think the deadline for that was

5    January 5.

6              So we issued subpoenas, we got responses,

7    and then some of those responses indicated -- we

8    didn't get any responses.  In one case, counsel

9    called me on Friday in response to a subpoena that

10   was sent out in compliance with Your Honor's order

11   on the 5th and said, I need more time.  I know some

12   of the people at that location that I would put down

13   on the witness list.  I don't necessarily know the

14   right people to put on the witness list because of

15   the way in which we are kind of boxed in by

16   inadequate and, frankly, improper record keeping on

17   the Amazon side.

18             So I fully intend to comply with the

19   Court's orders.  To be candid, I do think that an

20   extension is necessary.  In fact, I raised this with

21   the other side, and they said they don't think it's

22   necessary.  They said, If we can agree jointly on an

23   extension, and I don't want to put words in opposing

24   counsel's mouth, but the gist of their response was,

25   if we are in agreement on something, we would

1    jointly agree.  For example, with respect to Ari

2    Teaman, there's no doubt we don't oppose any

3    extension of discovery so that deposition could go

4    forward.  But Amazon disagrees with anything,

5    obviously, that they disagree with.

6         So if we're not permitted to seek an

7    extension and the 29th is a hard and fast date, we

8    will comply.  The only point I'm trying to make is

9    that that will, I think, unfairly foreclose us from

10   including names that we couldn't have obtained

11   earlier because we had no way of knowing those names

12   until we had secured compliance with subpoenas, when

13   a non-subpoena approach was not getting us the

14   information that we needed to identify the actual

15   people who could tell a jury or a finder of fact

16   what actually happened.

17        THE COURT:  Okay.  So I think we need to

18   work off of the assumption that you have a deadline

19   of February 29, and the initial disclosures need to

20   be supplemented if you're going to supplement them

21   by that deadline.

22        Obviously, depending on what happens with

23   the motion to amend the complaint, that deadline may

24   be extended.  But it sounds like you've had

25   discovery since, I think Mr. Salant had said, ten

1    months, but it's been ongoing for a bit of time.

2         What I'm a little troubled by is that,

3    despite there being the February 29th deadline, it

4    sounds like there wasn't an effort to get these

5    things done before that deadline on the assumption

6    that there would be another extension.

7         And so I think depending on the outcome,

8    again, as I said a few times of the motion to amend

9    the complaint, you may get more time on discovery.

10   But I think we have to work towards closing,

11   completing fact discovery under the assumption that

12   February 29th is the deadline.

13        MR. QUAINTON:  Understood, Your Honor.

14        If I could just give Your Honor one

15   additional just background fact that has been

16   challenging, and that, as you know, Mr. Teaman is

17   currently incarcerated and he has been having severe

18   health issues.  In fact, some issues that we thought

19   were potentially life threatening, a number of these

20   issues.  And I'm advising him with respect to those

21   issues as well.

22        And if you look at -- it's *USA v. Teaman*,

23   19-cr-696, you'll see an emergency motion for the

24   release of Mr. Teaman to the custody of a hospital

25   so he could be evaluated was just granted by

1    Judge Engelmayer.

2         And my motion is very short.  But the

3    background to that, trying to work with the family

4    and Mr. Teaman and putting his life and his health,

5    frankly, above everything else, that has been an

6    additional challenge.  And he is the person who

7    knows the most about Amazon -- sorry about

8    GateGuard, where his father and the new CEO don't

9    know as much.

10        So I don't think it's the case that we were

11   just never intending to comply.  It's that it's a

12   challenging case.  There's a lot of documents we're

13   faced with issues in the production that Amazon gave

14   us that I mentioned, and there's just some

15   background facts that have made it extremely

16   difficult.

17        So GateGuard has been as diligent as

18   humanly possible.  We would like the opportunity,

19   and I'm not saying that we were assuming that we

20   would get this by any stretch of the imagination,

21   but we would like the opportunity to put in a

22   request for some additional time in light of

23   everything that we've been talking about and the

24   background fact that I just mentioned.

25             MR. SALANT:  Your Honor, may I just briefly

1     respond to a couple of the points on the table?

2               THE COURT:  Sure.

3               MR. SALANT:  Just to be clear, our position

4     on the February 29th fact discovery deadline, we

5     think Your Honor is putting your finger on it, that

6     GateGuard had no intention to abide by those court

7     ordered dates.  Amazon's position is that fact

8     discovery should close on February 29th, period.

9     The one thing that should be taken out of time is

10    the deposition of Mr. Teaman.  That should close

11    fact discovery on the existing claims.

12              To the extent a motion to amend is granted,

13    then of course we can return to the question of

14    whether new discovery should take place as to the

15    amended claims.  But the claims that are in the

16    case, discovery should close as scheduled and as

17    extended multiple times.

18              And so I just wanted to just be clear on

19    Amazon's position that we really do need an end of

20    fact discovery on the open claims.

21              MR. QUAINTON:  Your Honor, I think there's

22    one issue that just in terms of timing that I think

23    it's critical that Your Honor appreciate.  And that

24    is the last order on discovery said that the

25    deadline for written discovery was January 5 and the

1   deadline for third-party subpoenas was January 5.

2   And so we issued our discovery demands and subpoenas

3   in compliance with that order.  We got a response

4   from Amazon in a timely manner, I think, in whatever

5   that would be, February 5.  And in the meantime,

6   Amazon, as you know, filed six motions.  We sought

7   leave to amend.  There were many, many issues that

8   arose between February 5 and February 22, which is

9   not an extended period of time.

10          When I sent the deficiency letter with

11  respect to Amazon's responses to our January 5

12  production, and I actually raised this with Amazon

13  on Friday and said, I'd like to put it before the

14  Court.  And Amazon said, rightly, Well, we need to

15  meet and confer first, and we haven't had time, and

16  we'll set a date to meet and confer.  That hasn't

17  happened yet.  You've heard some of the arguments

18  back and forth about whether we are entitled to the

19  additional discovery that we want, but that hasn't

20  been discussed between the parties and we haven't

21  sought a middle ground and no motion has been made.

22          So to the extent that that process results

23  in either Amazon agreeing with us or Your Honor

24  agreeing with us, that necessarily will involve

25  additional information.  And that's not a question

 1    of not intending to comply.  We did everything that
 2    we could to comply.
 3         So I just don't think it's fair to say that
 4    the only thing outstanding is the deposition of
 5    Ari Teaman, when there's a deficiency letter on the
 6    table that the parties have not yet been conferred
 7    on that was issued in a timely fashion within the
 8    discovery deadline in response to responses that
 9    were received on February 5.
10         So I think we're going to need more time to
11    address that.  That can't be done, I don't think,
12    between now and tomorrow.
13         And I also think the subpoena point, there
14    were responses to subpoenas that we had to give
15    people time to respond.  And as I say, some people
16    have not yet responded and some are planning on --
17    have asked for an extension.
18         You've heard those arguments.  I'm not
19    going to repeat them, but I think there are issues
20    pending in addition, by the way, to the 32 addresses
21    that are independent of the Second Amended Complaint
22    that push us back beyond February 29th without
23    anyone saying, Oh, GateGuard just never intended to
24    comply.  GateGuard is doing the best that it can
25    against a very formidable adversary, and we would

1    like the opportunity to at least make the request

2    for additional time.

3         MR. SALANT:  Your Honor, we're willing to

4    work with GateGuard on already identified issues to

5    try to cooperatively resolve them.  We do think

6    GateGuard is out of time to file a motion, but we'll

7    be cooperative.  And as we've said, anything

8    GateGuard brings to us about already identified

9    issues, we will try to work with them.

10        Third-party discovery is GateGuard's issue.

11   GateGuard issued 33 third-party subpoenas.  It is

12   extremely disruptive and costly to undisputedly

13   innocent third parties.  And so GateGuard should

14   also be reined in for doing that.  But it's up to

15   GateGuard to pursue its own subpoenas.

16        THE COURT:  Okay.  So I think on any

17   already identified issues, Mr. Quainton, you had

18   mentioned discovery deficiencies that arose after

19   the January 5th or production or supplemental

20   request for production.  If there's an issue that

21   was already raised with Amazon and you haven't had

22   time to meet and confer, I think that's obviously --

23   we can remain open.

24        But what I'm concerned about, because this

25   has just happened before in this case, is this last

```
 1   minute on the eve of the close of fact discovery, a
 2   request for an extension, and I'm very reluctant to
 3   extend this deadline again.  I've extended it a few
 4   times and the requests have always been made, in my
 5   recollection -- if I'm mistaken, you should let me
 6   know.  But they always came at the last minute.
 7           And so if we're talking about an issue
 8   you've already raised with Amazon and that needs to
 9   have a meet and confer and then potentially come
10   back to me, you know, that can remain open.  The
11   deposition of Mr. Teaman remains an open issue.
12           But to the extent we're talking about
13   raising new discovery issues, I think the ship for
14   that has sort of sailed given the current deadline
15   of February 29.
16           MR. QUAINTON:  I don't think we're talking
17   about new issues.  I mean, in many other cases that
18   I've been working on, for example, after formal
19   discovery ends, there have been depositions that are
20   still outstanding.  In this case, we all agree about
21   Ari Teaman.  GateGuard still has at least one
22   deposition as of right -- or had one deposition as
23   of right.  We've put on the table with Amazon and
24   we've been discussing potential other depositions
25   without changing the deadline for discovery.
```

1             I know that other district court judges in
2     cases that I'm working on have granted the parties,
3     both plaintiffs and defendants, the opportunity to
4     take additional depositions that couldn't be
5     scheduled before the close of discovery, after the
6     close of discovery, without changing the overall
7     discovery deadline.  So I think the depositions,
8     that's another issue that's something that would be
9     appropriate to say we should be allowed at least to
10    take one of the one deposition we have left.  And if
11    Your Honor would agree, and again, I've had this
12    happen in other cases where the Court said, Okay,
13    you've been trying to get that and the deadline is
14    the deadline, but you've been trying to schedule
15    this deposition so it can be scheduled outside the
16    close of fact discovery.
17             MR. SALANT:  Your Honor, I'm sorry, but
18    that's just not accurate.  GateGuard has mentioned
19    the taking of other depositions, has noticed and
20    canceled the day before numerous depositions.  We
21    asked GateGuard which did it want to be its 10th
22    deposition.  It did not tell us.  So we strongly
23    object to the taking of more depositions after the
24    close of fact discovery tomorrow.  And we also
25    object to any extension of giving more than ten

```
 1    depositions which plainly does not have good cause
 2    in this modest case that should not be an open-ended
 3    investigation.
 4             THE COURT:  Okay.  So I think on this point
 5    we've sort of talked about it at length.  And I
 6    think I've been clear, again, if it was an
 7    outstanding discovery issue that was raised, we can
 8    discuss it after the close of fact discovery.  But
 9    otherwise, the current deadline is tomorrow.  And so
10    if we're talking about taking depositions that
11    weren't noticed and didn't have to be rescheduled, I
12    think you're out of time unless --
13             MR. QUAINTON:  Well, Your Honor, with
14    respect to the depositions, they were noticed and
15    there are depositions that were noticed and that
16    were rescheduled, but there's one that's been
17    rescheduled for tomorrow.
18             THE COURT:  That's fine because it was
19    noticed before.  But I thought I heard you say you
20    wanted more depositions beyond the ten.
21             MR. QUAINTON:  Well, part of the problem is
22    that there were three property managers whose
23    depositions that I wanted and one of those didn't
24    respond to the subpoena for the deposition until
25    last Friday and then requested an extension.  So the
```

1    deposition was duly noticed at 4:00 last Friday.
2    But I can't take a deposition when my adversary
3    says, We're not ready, can we find a different date.
4            I mean, in many, many cases, if you've
5    noticed it and you're contacted by your adversary
6    and they say, Can we pick a different date, that's
7    entirely reasonable.
8            So I think Amazon is talking about the
9    depositions of additional Amazon witnesses.  And we
10   did notice two additional Amazon witnesses, but
11   obviously without court of approval we couldn't take
12   those depositions.
13           You know, part of the problem was we talked
14   about this on Friday.  And on Friday Amazon said,
15   well -- I told them our position and then Amazon
16   said, Well, we'll get back to you on Sunday so that
17   you can at least bring this before the Court, three
18   days before the conference on the 28th.  We weren't
19   sure whether Sunday was too late anyway, but we
20   thought three days that could work.  But then I got
21   word on Monday that Amazon rejected our position.
22   So that put me in a bind where I couldn't put
23   anything in writing.  I couldn't actually make the
24   request.  So the request has never been made.
25           Had Amazon told me on Sunday that they

1   opposed the request, I would have made the request.

2   At least there would have been a written request for

3   the Court to rule on.  But now I'm kind of boxed in

4   again.  And this is another pattern, is that Amazon,

5   to avoid actually confronting what it's done here,

6   which is to install a product without authorization

7   on thousands of buildings around the country and

8   cause significant damage, we just get repeatedly

9   boxed in.  And I don't think that's fair.

10           So I couldn't even bring the motion, the

11  premotion conference letter, in a timely fashion

12  because I didn't get the answer from Amazon that was

13  promised on Sunday.

14           So I realized there's a deadline.  The

15  deadlines are real.  But I also think that when a

16  party is sort of foreclosed from even making a

17  motion, that it shouldn't be held against the party.

18           MR. SALANT:  Your Honor, forgive me, but

19  some of what GateGuard said is just not right.

20           First, GateGuard says its 10th deposition

21  is noticed for tomorrow.  That is news to me.  But

22  if GateGuard wants to take its 10th deposition

23  tomorrow, we are open to it and tell us where and

24  when and we will be there.

25           But GateGuard noticed numerous depositions

```
 1    above its ten deposition limit.  We sent them at
 2    9:36 in the morning on Monday our position that
 3    GateGuard should not be able to take more than ten
 4    depositions.  We've told him it numerous times.  He
 5    told us -- GateGuard told us they would tell us the
 6    10th deposition that they were intending to take.
 7    They never got back to us.
 8          So GateGuard has not been diligent over
 9    weeks and we would strongly object to extending
10    depositions to more than the ten that are the
11    default under the federal rules.
12          THE COURT:  This is where I'm having, Mr.
13    Quainton, trouble with your argument.  It's the idea
14    that you noticed more than ten, you didn't have
15    permission, and were a day before the deadline and
16    you didn't previously seek permission to go above
17    the ten.
18          MR. QUAINTON:  No, I understand.  What I
19    was trying to say is, that I intended to seek
20    permission and I think that consistent with the
21    rules, I could have done so on Sunday, but didn't
22    get the response until Monday.  And I don't think
23    that the rules permit raising an issue two days
24    before an already burdened court.
25          In terms of the scheduling of the
```

1    depositions, I think it was appropriate to notice

2    those depositions, but obviously not to proceed with

3    anything without court approval and be able to

4    proceed with noticed depositions was complicated by

5    the fact that parties either didn't respond to me or

6    responded to me with a request for an extension to a

7    duly noticed deposition.  Putting me in a kind of a

8    real bind as to what to go forward with because I

9    don't have all the information, and there still is

10   very significant information outstanding that's

11   critical to plaintiff's case.

12           THE COURT:  Well, when were the depositions

13   noticed?

14           MR. QUAINTON:  One was noticed for the

15   23rd.  I don't have the exact dates.  One was

16   noticed for the 23rd.  I think one was noticed for

17   the 26th.  And one was noticed earlier on.  One was

18   noticed on, I believe it was, that Monday, whatever

19   that would have been Monday of the week.  And I

20   actually went to New York, got a conference room.

21   You know, several calls to the witness.  I never

22   heard back.  They never -- just never showed up for

23   the deposition.  That was one of our most

24   significant customers.  It's for Livingston

25   Management that has a very, very large number of

1    properties.  There was an unrelated dispute with

2    GateGuard and so I don't know, maybe they're just

3    playing -- putting their head in the sand and don't

4    want to cooperate at all with us but I think it was

5    the 19th if that was the Monday of that week that

6    the deposition was noticed.

7            And as I said I showed up, everybody was on

8    notice.  I didn't receive any objection from anybody

9    except the witness just never showed.  That's just

10   an illustration of the difficulty.

11           It wasn't as though we just threw these

12   things out there and didn't do anything.  No, it was

13   noticed.  There were no objections.  I showed up,

14   the witness didn't show.  I still haven't been able

15   to reach the party, by the way.  And as I say, it's

16   a very significant witness and there are, I think,

17   potentially very significant issues with respect to

18   the key that we have not been able to identify

19   through any other channel other than actually

20   drilling down to find out who authorized the key;

21   were they aware of the key's installation; when --

22   there were some service issues with this client;

23   when those issues arose, were they aware that the

24   key had already been installed.

25           Because we have unimpeached testimony of

1    one of the superintendents that the device works

2    perfectly before the key is installed and then

3    after -- our device, that is, and then after the key

4    installed it just doesn't work at all anymore.

5            And this is not something that GateGuard is

6    just making up.  In fact, Amazon has conceded that

7    there are problems of compatibility between their

8    device and our device.  But our clients didn't know

9    that.  So we have to interview those clients.

10           And if I had to choose -- so the three that

11   are outstanding, that's one, that's Livingston

12   Management.  The other is a company called KNR.

13   That's also very significant.  They have five of our

14   properties.  And the third is a company called

15   Goldmont.  And they also have a very large number of

16   properties.  Goldmont -- there's also a dispute with

17   Goldmont, separate and apart from the Amazon

18   dispute, which may be part of why they were so

19   reluctant to comply with the subpoena.

20           But that dispute has nothing to do with the

21   underlying issue of whether any service issues that

22   that client had could have been related to the key.

23   That we don't know until we talk to them and know if

24   they even knew that the key for business was

25   installed in their properties.

1          So I'm trying to juggle which one of these

2     two to actually go through with and then see what to

3     find out -- what else I would want to ask the Court

4     for.  But parties don't show up.  Other parties

5     contact me, request an extension.

6          So those three property managers were all

7     duly noticed.  One of them has not shown up.  One of

8     them has agreed to the deposition.  And they did

9     agree they would be available tomorrow.  I'm not

10    sure that's the one that's the most important at

11    this rate.  And the third was noticed for today, but

12    the opposing counsel requested an extension on

13    making a witness available.

14         THE COURT:  So I guess not to belabor this

15    point, but did you notice more than ten depositions?

16         MR. QUAINTON:  Yes, I did, Your Honor.

17         THE COURT:  How many?

18         MR. QUAINTON:  Well, so there were a total

19    of -- I've taken nine, and I noticed three

20    additional property managers, and there may have

21    been one other that I discarded.  And then there

22    were two additional ones noticed for Amazon.

23         THE COURT:  So I guess this is where I'm

24    not following the logic.  If you notice 15

25    depositions sometime in January or earlier, why was

1    there not a request made at that time to get more

2    than the ten you're allotted?

3            MR. QUAINTON:  I guess I didn't know what

4    was -- we were still taking in January.  We still

5    had depositions that were ongoing with Amazon.

6            I think we took three Amazon depositions in

7    the course of January, if I'm not mistaken.  And

8    those were very important depositions.  So I wasn't

9    really sure what additional depositions might be

10   necessary, whether it would be appropriate to pursue

11   those additional Amazon witnesses in light of the

12   testimony that I was getting and whether maybe the

13   ten would be sufficient and I wouldn't need to

14   burden the Court with an additional request for

15   additional depositions.

16           So before taking anything that would exceed

17   the ten, obviously long enough in advance for the

18   Court to issue a ruling, the intention was to, and

19   is, to seek approval.  With respect to the Amazon

20   ones, as I say, it was sort of putting Amazon on

21   notice of who else I was interested in.  But

22   given -- I mean, we had the deposition of a very

23   senior Amazon representative, I think was on the

24   26th of January, we had another one on the 19th of

25   January.  And these were depositions that were

1    deferred from earlier because of the schedules of

2    the Amazon witnesses.

3         With respect to the three property

4    managers, it was unclear to me who would comply, how

5    they'd comply, whether perhaps a declaration would

6    be sufficient in lieu of a deposition.

7         So if I contact a party, and in lieu of the

8    deposition, they say, I'll give you a declaration,

9    there's no need to seek court approval for that

10   deposition.  And that may be the solution that I'm

11   sort of stuck with.

12        But I didn't want to request permission to

13   take a deposition if that wasn't going to be

14   necessary, because I take it off the table, because

15   the declaration would be sufficient.  And with

16   respect to the Amazon ones, I couldn't really make

17   the determination until relatively late in the game

18   because of scheduling of outstanding depositions.

19        THE COURT:  And how many have you taken so

20   far?

21        MR. QUAINTON:  Nine, Your Honor.

22        THE COURT:  Okay.  Just to keep the ball

23   rolling, we still have the issue of the supplement,

24   GateGuard's, the computation of claim damages.

25        And so I understand, Mr. Quainton, that

 1    some of this maybe, potentially, is something you'd

 2    want an expert to talk about.  But on some of these,

 3    I think there is some requirement that you have to

 4    provide some computation of damages.

 5           And so, for instance, the portfolio

 6    losses --

 7           MR. QUAINTON:  Sorry, which motion are we

 8    on?  If I could just --

 9           THE COURT:  Yeah.  Apologies.  This is

10    still ECF 96.  Your response is at ECF 134.

11           MR. QUAINTON:  Got it.  Right.  Okay.  Got

12    it.

13           THE COURT:  I guess, let me just ask, you

14    haven't supplemented your computation of damages?

15           MR. QUAINTON:  That is correct, yes.  We

16    have not done that yet.  And for the reasons that I

17    indicated.

18           THE COURT:  And for instance, for the

19    portfolio losses, what's your basis for not having

20    to provide a more concrete damages analysis?

21           MR. QUAINTON:  Because there are still

22    outstanding portfolio issues.  I mean, among other

23    things, there are the 32 addresses that we've talked

24    about.

25           THE COURT:  Well, what about the addresses

1    that were not -- so, putting aside the ones, the new

2    addresses identified.  What about the previously

3    identified addresses?

4          MR. QUAINTON:  So, as I say, discovery is

5    still ongoing.  Let me go back to KNR, which is one

6    that I've been focusing on recently.  So they have a

7    very large portfolio, and they were a significant

8    customer.  They had five of our devices, and there

9    were service issues.  They were dissatisfied.

10          I don't yet know for a fact, because I

11    haven't been able to drill down, based on the

12    evidence that I do have, whether -- what the

13    specific timing of the installation of the key and

14    the possible relationship of the key to the service

15    issue.  So right now, I'm still including as a

16    portfolio loss because that was a portfolio that

17    really was in play for GateGuard.  We really thought

18    that we would be able to get our device on the

19    entire portfolio.

20          And by the way, Amazon pursued the exact

21    same strategy with KNR.  They had one superintendent

22    who signed an installation agreement, and on the

23    basis of that they got the entire portfolio.

24          So it's a common approach to these large

25    properties where you really want to basically get in

1    the door, show your product works, and then on the

2    basis of that get the whole portfolio.

3         So right now our damages include the

4    portfolio losses.  I'm not ready to amend that or

5    change that.

6         And that's true also, for example, of the

7    two others, Goldmont and Livingston.  Very large

8    portfolios, and if we are completely stuck -- I

9    mean, I think that will still argue, we'll still

10   present through our expert and the timing and the

11   issues that we have.  Those portfolios were

12   compromised because of the installation of the key

13   in a way that damaged our device.

14        So if GateGuard wants us to -- we're not

15   willing to take the portfolio damages off the table.

16   I mean, I understand there was an issue of portfolio

17   discovery in terms of proportionality and burden.  I

18   get that.  But in terms of the damages, we should

19   have every right to present to the finder of fact

20   the damages that we claim from the lost portfolio.

21        As I say, Amazon does the exact same thing

22   where they get in the door with one installation

23   agreement.  KNR is a great example.  And they get

24   the entire -- I apologize, Your Honor.  And they get

25   the entire portfolio on the basis of that

1  installation.

2  Could we go in and prune and say we

3  definitely know that this portfolio was lost for

4  another reason?  I mean, I suppose, yeah.  I mean, I

5  suppose as I think it through, there are some

6  extensive damages that I -- you know, the theory of

7  portfolio damages, I'm not willing to take off the

8  table because I think it's relevant.

9  But if there are some portfolios that I can

10  conclusively say No, it really was not the key, I

11  think that's something I could amend.  But I don't

12  think it's going to be a significant variation

13  because of the value we attribute to individual

14  properties and the strategy that we and Amazon have

15  of pursuing entire portfolios through the

16  installation of individual devices.

17  MR. SALANT:  Your Honor, I just need to

18  object to GateGuard's lengthy and filibustering

19  colloquies.  Your Honor asked a simple question and

20  GateGuard gave a ten-minute answer that was wholly

21  nonresponsive.

22  This is of a kind of what meet and confers

23  and depositions have been like.  It's disrespectful

24  to the Court and GateGuard should answer Your

25  Honor's questions, and we should obtain rulings on

```
 1    the issue of whether GateGuard is precluded from
 2    bringing more after the close of fact discovery and
 3    whether it should get more depositions or not.
 4              MR. QUAINTON:  Respectfully, Your Honor,
 5    I'm just trying to answer your question as best I
 6    can.
 7              THE COURT:  Well, let me ask on the
 8    question of the claim damages, it sounds like, at
 9    least for the portfolio losses that GateGuard is
10    going to use this portfolio theory.
11              Ms. Salant, that seems like, given the
12    current deadline for closed discovery, at least you
13    have an understanding of what they plan to rely on.
14    And it sounds like it's something perhaps -- I don't
15    know, I guess perhaps if Amazon wants to have a
16    damages expert or something along those lines.  But
17    at least it sounds like we're at a point where you
18    have the information they've given you and we again
19    are at the close of fact discovery.
20              MR. SALANT:  Yes, Your Honor, I agree.  If
21    this is all GateGuard has and all it will give, we
22    do not need an order, we just need that GateGuard is
23    precluded from bringing anything new to the table
24    later.  We completely agree.
25              THE COURT:  Well, I think that's the
```

1    natural operation, right?  Like you can't bring

2    anything new after the close of fact discovery

3    unless we're talking about after the ruling on the

4    amended complaint.  If we're talking about new

5    discovery related to the claims in the amended

6    complaint.

7              MR. SALANT:  Yes, Your Honor, we agree.

8              THE COURT:  I'm now at ECF 97, which is the

9    missing documents, or at least I'm summarizing,

10    missing financial documents, truncated or

11    over-redacted documents, and the attorneys' eyes

12    only confidentiality designations.  The response

13    from GateGuard is at 135.

14              MR. SALANT:  Yes, Your Honor, and I think

15    Amazon could simplify this one as well.

16              It's the same issue.  If GateGuard has not

17    produced documents by the close of fact discovery,

18    it should be precluded from relying on anything new.

19    We've learned that GateGuard does not maintain

20    financial statements, does not hire an auditor, is

21    not sure if it pays its taxes or files tax returns,

22    and it has promised to us bank statements to try to

23    help us with financial valuation, which is to rebut

24    its claim of valuation-based damages.  So we think

25    it's the same issue, that GateGuard should produce

1    it to us, and if it doesn't, it should be precluded

2    from producing anything new later.

3         THE COURT:  Mr. Quainton, you don't have

4    these documents or they're not documents that you

5    have collected and are planning to produce before

6    tomorrow?

7         MR. QUAINTON:  Well, actually there are a

8    number of issues embedded in this request.  There

9    was a request for financial information, and we've

10   had lengthy discussion about that, and we have

11   agreed to produce redacted bank statements.  And so

12   am I going to be able to -- I have not personally

13   seen the statements or done the redactions.  If

14   Amazon is saying that if I don't produce the bank

15   statements or redact them, then there's no way our

16   expert can even look at those.  That's basically

17   saying we can't show our expert any financial

18   information.  That's not fair, when we agreed that

19   we would provide additional information.  Amazon is

20   saying that there's additional information that we

21   want from them.

22        I was under the impression that when I had

23   agreed to furnish this information, that was

24   sufficient.  They will get that information.  They

25   will also get, there were two data sets of

1    information that they wanted with respect to
2    GateGuard.  Frankly, the last few days, it's been
3    impossible to really get anything from Mr. Teaman
4    because he's worried about his son's physical health
5    and medical condition.  But we agreed to produce
6    that.  So I certainly was not operating under the
7    assumption that if the bank statements that we've
8    agreed to provide weren't provided by tomorrow, that
9    we'd be precluded from relying on them.  That seems
10    excessively harsh.  It's just producing documents
11    that we've agreed to produce but haven't been able
12    to assemble and collect with respect to the -- and
13    appropriately redact.  With respect to the other
14    issues that are embedded --

15         THE COURT:  I just want to interrupt a
16    minute because I'm pretty flexible with deadlines,
17    and I think I've been flexible here.  I've granted
18    numerous extensions.  So I don't understand.  These
19    were documents that were requested, it seems like a
20    while ago by Amazon, you agreed to produce them.  If
21    you knew the deadline was tomorrow, why were they
22    not produced?

23         And I understand these recent health
24    developments that may have arisen in February, but
25    what about January, December, and the prior times?

1    I don't want to fall into a situation where we're

2    right before the deadline and then we're raising

3    these arguments about the inability to meet the

4    deadline when these were things that probably should

5    have been turned over long before.

6          MR. QUAINTON:  I don't think that's right,

7    respectfully, Your Honor.  I think the request for

8    financial information, and I don't have it in front

9    of me, but I think that was a relatively recent

10   document request.  Mr. Salant can correct me, but I

11   think that was a request that was made, my

12   recollection is in connection with the deposition of

13   David Taxman, which was in February.  It's not

14   something that we've been sitting on for months and

15   months and months.  It's something that's a new

16   request that we initially opposed because we didn't

17   understand the basis for it.

18          But to the extent the Court's ruling is

19   that the bank statements and the data sets have to

20   be produced by tomorrow, I'll move heaven and earth

21   to move them.  That's -- I'm just saying I don't

22   think that's fair when these were issues that were

23   raised -- and again, David can correct me -- but

24   late in the game by Amazon.  And we've met and

25   conferred, as we were required to do, and talked

1    through the issues, and then following the meeting

2    and conferring, we've agreed to produce them,

3    subject to, the only thing I wanted to do was have a

4    chance to redact the financial statements because

5    there is information in there that we don't think

6    Amazon is entitled to.

7            And, again, I'm not trying to filibuster.

8    I just want to point out what Amazon has done.  They

9    produce thousands and thousands of hundreds, I

10   should say, of documents that are entirely redacted.

11   I gave some examples in my letter.  You know, we

12   should, I think, have the opportunity to redact as

13   well.

14           I mean, I can produce what we have,

15   attorneys' eyes only.  But I don't see why the

16   asymmetry really makes sense here, that Amazon gets

17   to redact what it wants to and we can't.  This is

18   not something we've been sitting on for months and

19   months.  The second data set, for example, that only

20   emerged as something Amazon wanted in the context of

21   Mr. Teaman's deposition, which was very recent.  I

22   think that was February 9 or February 6.  So that's

23   a very recent development.

24           Again, we have agreed to produce documents

25   that were recently requested, but the Court

1    shouldn't have the impression that we've just been

2    sitting on this for months and months and months.

3    That's not accurate.

4          THE COURT:  Mr. Salant, when were the

5    requests made?

6          MR. SALANT:  Your Honor, our requests for

7    production were served in March of 2023 and covered

8    financial information.  GateGuard's stories about

9    what financial information did and did not exist

10   have changed over time, and that's what we're trying

11   to follow up on, what they can give us.  And we did

12   learn in the, I think it was early February

13   deposition of David Teaman, Ari Teaman's father,

14   that these bank statements were readily available

15   and easy to pull down in minutes.  We learned that

16   he obtained data sets reflecting invoicing data.

17   There's a CEO who's not in prison named David Taxman

18   who said in his deposition that that's where the

19   data is.

20         So, you know, we're trying our best to get

21   whatever we can.  GateGuard has had different

22   stories about what does and doesn't exist.  What we

23   want is what exists.  We just want a ruling that

24   GateGuard has to give it over and that once fact

25   discovery ends, it can't bring new information to

1    bear.

2         THE COURT:  Mr. Quainton, it sounds like

3    you have these statements and you just need to

4    redact pieces of it?

5         MR. QUAINTON:  That's correct.

6         THE COURT:  Can you produce the statements

7    by Friday?

8         MR. QUAINTON:  If that's the order, Your

9    Honor, as I say, I'll move heaven and earth to

10   comply with any order.

11        It is very, very, very challenging right

12   now because of Mr. Teaman's son's medical condition

13   and the concern of the parents.  It's a small

14   startup that suffered severe economic damage, but

15   also the father, as you can understand, his son had

16   to have an emergency trip to an outside hospital

17   because of a complaint of severe testicular pain.

18   And this is very serious stuff.  I mean, I had a

19   client who died in prison after developing

20   testicular cancer.  Not a filibuster, just a data

21   point.  It's very important.

22        So candidly, Monday would probably be a

23   little more reasonable, but just because I would

24   like to review those financial statements to make

25   sure that we're not providing any confidential

1    business information that we just -- not the numbers

2    that are important to, that are relevant, but

3    confidential information about a supplier, for

4    example, which the kinds of stuff that Amazon has

5    redacted.  So --

6              THE COURT:  Okay.  So how about we do this,

7    since it sounds like at least the testimony that you

8    got in the deposition of either the father or the

9    new CEO, that the invoicing data and the statements

10   are easy to download or are readily available if you

11   can produce it by Monday, March 4.  But whatever is

12   not produced by Monday, March 4 on this issue,

13   again, given the closer practice, coverage won't be

14   able to be supplemented later.

15             MR. QUAINTON:  Thank you.  As I say, we'll

16   move heaven and earth to comply with that.

17             THE COURT:  The truncated and redacted

18   documents, did you all reach a resolution on that or

19   is that still pending?

20             MR. SALANT:  Your Honor, it's the same

21   issue.  We don't need GateGuard to untruncate its

22   documents.  We just want to know we have what it has

23   and that it can't rely on anything new.  So it's the

24   same issue, much less important than the financial

25   information.

```
 1                THE COURT:  Okay.  So I guess, Mr.
 2      Quainton, I don't know if you have these documents
 3      untruncated, but it sounds like if you're just going
 4      to rely on the truncated version of it, then we
 5      don't need to address the issue.
 6                MR. QUAINTON:  Yeah, I don't think there's
 7      anything material to our case.  I'll double check.
 8      But I think it's largely a sideshow.  So that sounds
 9      fine.
10                And the redaction in the confidentiality,
11      you saw the point, which is based on what they've
12      given me, it's sort of impossible to respond.  With
13      the confidentiality designations, they have a chart
14      that lists items that they think are wrongly
15      designated, but they don't give any reason for why
16      they're identified.  I addressed this in my response
17      on page 2, that they have identified, I think, five
18      or six documents, and they sort of give some reason.
19      They don't really give a reason in the sort of
20      reasoned reason.  They just sort of have a
21      parenthetical that says, well, this is supplier data
22      or something.
23                And so on that basis, I would be willing,
24      as I say in the letter, to de-designate or GateGuard
25      will be willing to de-designate.  But there's no way
```

```
 1    I can respond to a chart that just says, here's a
 2    list of improper designations with no argument and
 3    no basis.  So I'm not really sure what to do with
 4    that, to be honest.
 5            THE COURT:  Mr. Salant, is there anything
 6    you want to add?
 7            MR. SALANT:  No, Your Honor.  It's
 8    GateGuard's burden to get its confidentiality
 9    designations right.  If it wants to stand on its
10    confidentiality designations, there will come a time
11    where it will need to justify them under the Lugosch
12    standard, and so it's fine.  This is not something
13    that needs the Court's time.
14            THE COURT:  Okay.  So I guess the only
15    thing I will say on the confidentiality designations
16    is, Mr. Quainton, to the extent you just want to
17    confirm that some of these are actually attorneys'
18    eyes only, I think it behooves everyone.  Right,
19    because it would limit your ability to use these
20    documents later on in the case in terms of showing
21    them to witnesses.
22            MR. QUAINTON:  Understood.
23            THE COURT:  The last one I have before the
24    recent letters that came in is ECF 99, which raises
25    the issue of interrogatory number 8, number 9,
```

1    number 10, and specifically the identification of

2    the trade secrets.  And the response is at ECF 136.

3         Mr. Quainton, I'm happy to hear you out on

4    this one, but at least from the cases that I looked

5    at and the information that Amazon provided in its

6    letter, it does sound like there was a bit of

7    generality used in describing the trade secrets that

8    would be impermissible under at least various cases

9    cited by Amazon.

10        MR. QUAINTON:  So I guess I'm confused

11   about what they're actually asking for.  We've

12   identified what we believe are the trade secrets.

13   We are in discovery.  We've given our rationale for

14   why those are trade secrets.  We have an expert who

15   is going to say, Yes, those are trade secrets.  And

16   I think that you saw the cases that we cited that

17   indicate that each of those items is entitled to

18   trade secret protection.  So it's not appropriate to

19   foreclose us from having an expert say, Your system

20   of cabling, your design of the case, your system of

21   hinging, the way that you connect, the specific way

22   that you connect your router, the location of the

23   router, the placement of the router, the way that

24   the circuitry works between the motherboard and the

25   router, the location of the SIM card, there are --

1    lots of things in there that are proprietary to us.

2    And our expert will say -- and their expert will say

3    the opposite.  But our expert is going to say, Yes,

4    these are custom features that are not off the

5    shelf, made in China, just repackaged.  That's not

6    the case.

7            As I explained, Mr. Teaman actually

8    designed the configuration of the inside of the

9    device and the case itself.  And the piggybacking

10   theory is that Amazon needed to see how that worked.

11   So they obtained a device, looked at it.  They say

12   they didn't.  They say, we'll get into that

13   separately, but you need to actually see how things

14   are laid out to figure out where you're going to put

15   your key device.  If you want to piggyback on it,

16   you got to see where the ports are.

17           Now, the experts may disagree, but at this

18   point, to say there's no trade secrets, that goes

19   too far at the discovery stage to just say what

20   we've alleged as trade secrets.  We've identified

21   them.  There's no question as to what we claim are

22   other trade secrets.  There's just a question as to

23   whether those trade secrets are entitled to trade

24   secret protection, which is why we're going to have

25   expert discovery.

```
 1              So I get that they say we don't think you
 2     have trade secrets, but the issue is whether we've
 3     identified those trade secrets, what we allege to be
 4     trade secrets, sufficiently to permit our expert to
 5     present testimony that, in his expert view, these
 6     are in fact trade secrets that provide a commercial
 7     advantage.
 8              So if Amazon is just trying to shut down
 9     the entire trade secrets, that's going way too far.
10              THE COURT:  Can I ask, with regards to
11     interrogatory number 9, have you disclosed the
12     agreements?
13              MR. QUAINTON:  Yes.  Those are public.
14     That's also on the website.
15              MR. SALANT:  Your Honor, I think counsel is
16     referring to GateGuard's terms of service with its
17     clients, not its agreements with the manufacturers
18     of the device abroad who prepare and send it to
19     GateGuard.
20              THE COURT:  Mr. Quainton, I think in terms
21     of the agreements that govern the relationship with
22     installers, manufacturers, repair technicians,
23     employees, investors, apartment dwellers, to
24     demonstrate how the trade secret was kept secret, is
25     that information you've produced?
```

1          MR. QUAINTON:  We have not produced that.

2     The answer is the way we've tried to keep the

3     information secret is to have very aggressive terms

4     and conditions and to seek to enforce those terms

5     and conditions very aggressively.  In terms of --

6          THE COURT:  Terms and conditions with who,

7     though?

8          MR. QUAINTON:  With users of the device.

9     That's the key to whether we've kept this secret,

10    right, is whether -- once we've obtained the trade

11    secrets.  The trade secrets are what is actually in

12    the box.  That's what we allege is the trade secret.

13    And that is what we keep secret.

14          The order to the manufacturer is not what's

15    inside the box.  That's not the trade secret.  The

16    identity of the suppliers and the nature of the

17    components, yes, we think that is a trade secret.

18    And they have actually, in discovery, they've

19    obtained the names of some of the suppliers.  But

20    the issue for determining whether we have trade

21    secrets is not our relationship with our

22    manufacturers.

23          The issue is if you look at this box, you

24    open up this box, is what's inside that box a trade

25    secret, and has GateGuard attempted sufficiently to

1    preserve the secrecy of what's inside the box.
2         And there's been some testimony about that.
3    Amazon may point to custodial issues on the
4    GateGuard side.  But I don't see the relevance at
5    all of the agreements with manufacturers for
6    purposes of determining what we actually put inside
7    the box and the way we keep that secret.  Again, we
8    keep that secret by aggressively enforcing terms and
9    conditions, even if it means taking on a company
10   like Amazon.
11        THE COURT:  And when you say what will you
12   put in the box, you mean the entire completed
13   device?
14        MR. QUAINTON:  Correct.
15        THE COURT:  Mr. Salant, at least it sounds
16   like with regards to interrogatory number 9, there
17   is nothing else.
18        MR. SALANT:  It does sound that way, Your
19   Honor.
20        And I'll just say GateGuard's colloquy is a
21   bit ridiculous.  If you don't govern your
22   manufacturing process with strict confidentiality
23   provisions, you do not have a trade secret.
24        So this is GateGuard, I think, giving away
25   that it has no trade secrets.  It's been clear from

1    the beginning.  And so, you know, again, it's a

2    preclusion backstop where if GateGuard doesn't

3    produce this stuff, it has to admit that they are

4    not part of the record of this case.

5         And the only last thing I'll say on

6    interrogatory number 8 is, not only do we think

7    GateGuard did not specify any trade secret, it never

8    told us what we misappropriated.  We still don't

9    know what trade secret of GateGuard Amazon allegedly

10   misappropriated.  How can we investigate and respond

11   to the claims if GateGuard doesn't tell us this?  It

12   should not require an expert.  These devices are

13   installed in the field.  And so we need these

14   answers if GateGuard will have any semblance of a

15   claim.  And it seems like the answer is, it does

16   not.

17        MR. QUAINTON:  Your Honor, if I could just

18   respond to that.  We've told them repeatedly what

19   the claim is.  And I think what Mr. Salant is doing

20   is he's just confusing the issue of copying with the

21   issue of piggybacking.  The issue of copying is

22   different and really will arise, if it arises at

23   all, in the Second Amended Complaint.

24        Right now, the issue is piggybacking, and

25   they know exactly what we claim they're piggybacking

1    on.  They're piggybacking on the configuration of

2    our device so they can, without our consent, install

3    their device inside of our device.  Or if they don't

4    install the device itself, which they do very

5    frequently, they install what they call an extender.

6    To do that, they have to open up the box and see how

7    it's put together.  They have to figure that out.

8         All of that, that's what we're claiming

9    they are misappropriating.  They're misappropriating

10   by piggybacking on the configuration of our device.

11   If it were configured in a different way, for

12   example, they couldn't piggyback.  Their device

13   might not fit.  They have to see what the space is

14   like.  They do plug in their device to our device.

15   There's an Ethernet port.  They have to see where

16   that is.  Now they're saying, Well, every device has

17   an Ethernet port, but that's not the point.

18        The point is that the specific way we have

19   configured our device is they need to know that --

20   they call it compatibility testing.  They want to

21   get this device for compatibility testing.  What

22   does that really mean?  That means they want to open

23   it up and see how their device can fit with our

24   device and use our device so that their device can

25   operate, because their device can't operate unless

1    it's got another intercom or call box to work with.

2             So what Mr. Salant said about they don't

3    know our theory, I mean, that's just -- you know, I

4    don't want to trade adjectives here, but that's not

5    serious.

6             THE COURT:  I'm just looking at the

7    interrogatory responses, and I think you may have

8    filed the response redacted.  Because you said

9    you've identified this configuration of the device

10   is what was misappropriated.  So I was just looking

11   at the answer for number 8.  Is that what you've

12   indicated in number 8?  Because I think I have only

13   a redacted copy.

14            MR. QUAINTON:  Oh, you should have the copy

15   under seal as well, Your Honor, or did not --

16            THE COURT:  I'm on ECF now.

17            MR. SALANT:  Yes, Your Honor.  I believe

18   GateGuard's sealed response is at ECF 133.

19            MR. QUAINTON:  And 133-1, Your Honor,

20   reproduces in its entirety our response to the

21   interrogatory that's on pages 3, 4, 5, 6 and 7.

22            THE COURT:  So I briefly read through the

23   nine paragraphs in response.  I guess is this idea

24   that they misappropriated the configuration of the

25   device, is that, I guess, paragraph 7?

1          MR. QUAINTON:  Yeah, I guess the

2     explanation that I think articulates this is on

3     page 3 of document 135.  This is my sealed response.

4     Starting in the second paragraph.  Basically on the

5     previous paragraph, we identified the law that says

6     that Amazon has to be on notice of plaintiff's

7     claims and must be able to discern the relevancy of

8     discovery requests.  And we say they're on notice of

9     that because they place their device inside our call

10     box and they need to know how our call box is

11     configured to know how to piggyback on our device.

12          And specifically in the second paragraph on

13     page 3, we identify various things that are

14     necessary.  They need to look at the interior of the

15     device to determine the precise location of the

16     router, the way the router is connected to the

17     motherboard so it can be identified and plugged and

18     the key can be plugged in.  The nature of the device

19     modem, like which modem is being used so that

20     repairs can be affected quickly.

21          And here we have, it's a customized modem.

22     The location of the SIM card, the nature and

23     functioning of the internal wiring.  So that if you

24     have somebody who's trying to insert a device into

25     our device, they need to know how our wiring works

1    to make sure they're not putting their wires in the

2    inappropriate place.  And in fact, one of the

3    problems is that when they didn't have access to the

4    inside of the device, it was causing a shorting out

5    of our device or blowing out of power.

6         And so Amazon needs to see how the device

7    is actually configured to make sure they put the

8    device in the right place, so that it's connected in

9    the right manner, that they're not interfering with

10   existing wiring.  They also need to examine how the

11   device is set out internally to make sure that it's

12   not going to be damaged by water or other -- their

13   device that requires certain protections.

14        Their device has its own case that they

15   sometimes use and that case is waterproofed.  But

16   the device itself, when you take it out of the case

17   and put it inside somebody else's box, you need to

18   make sure the other person's box has a sufficient

19   system of waterproofing.  That's our custom designed

20   rills around the edge of the device.  That does

21   cause the water to drop to fall off and not go into

22   the device itself.

23        They need to figure out how our antenna

24   system works because they have their own antennas.

25   And we need experts, frankly, we've told them about

1    this, and Mr. Salant is not correct in saying it's

2    just a power issue.  That's not the testimony.

3    There's a use of our Internet connection, our

4    router, our modem, and that would obviate their need

5    to have their separate, what they call a puck

6    antenna, which is a separate device.  So they need

7    to see how our device is configured to know whether

8    they can dispense with their puck device, which is

9    one of their antenna or their stick antenna.  They

10   need to look at the inside of the device and to

11   figure out if they can basically call the

12   piggybacking effectively use.  To effectively use

13   our device, they have to look at the inside.  They

14   have to see how all these components are put

15   together.  The way we've done it, we allege, is

16   secret.  We've tried to keep it secret.  But they

17   want to use everything we've done so they can put

18   their device inside of our device and make sure that

19   their device works without even telling us about it.

20          So they know exactly what our claim is.  I

21   don't know how we could be more clear.  And that's

22   what Judge Koeltl sustained as a claim.  He said,

23   You haven't shown me enough.  There's actual

24   copying, but yeah, it's clear they are piggybacking

25   on your device, or there's enough evidence of

1    piggybacking for this to proceed.  And I think
2    there's sufficient evidence to have experts say,
3    Yes, we know they are piggybacking.  We know that to
4    be a fact.  But are they piggybacking on trade
5    secrets?  That's the expert question.  Is everything
6    that I've just read, do those amount to trade
7    secrets?  I've tried to identify a law that says it
8    is, but I don't think that's a question for fact
9    discovery.  I think that's a question for expert
10   discovery.
11        THE COURT:  But Mr. Quainton, and I may
12   have missed it because I'm looking at the response
13   now, and so just in terms of identifying what Amazon
14   misappropriated, where in the answer to
15   interrogatory number 8 would that be?
16        MR. QUAINTON:  So actually, that's in
17   Judge Koeltl's order that there's a theory of -- and
18   Amazon knows this -- there's a theory of
19   misappropriation which is wrongfully using somebody
20   else's device, somebody else's protected property.
21   So that's what we're trying to explain.  It's
22   wrongfully using the configuration of our device
23   without our consent is wrongful.  There's no basis
24   for it.
25        THE COURT:  I guess, what is the specific

1  trade secret they misappropriated?  Because wasn't
2  Judge Koeltl's order on a motion to dismiss?
3          MR. QUAINTON:  Correct.  And so that's what
4  I'm trying to answer.  All of the things that we've
5  identified, they need to use all of that.  They need
6  to use the wiring, they need to use the cabling,
7  they need to use the inside of the device, they need
8  to use the way that it's designed.  They need to use
9  all of that for their device to work.
10          If they opened up the box, for example, and
11  they saw that it leaked and that it didn't have a
12  custom design to protect the device from water, they
13  wouldn't use it.  They only want to use what they
14  think is useful.  If there wasn't enough space for
15  their device to fit, if we configured it
16  differently, they wouldn't be able to piggyback.  So
17  what they're using is everything that we have
18  designed without our consent.  They're using all of
19  that to make sure their device can be plugged into
20  ours and can fit within ours.  It's every single
21  thing that we've identified.  If we designed it
22  differently, they wouldn't be able to piggyback.
23          THE COURT:  Mr. Salant, I'm happy to hear
24  from you if you wanted to respond.
25          MR. SALANT:  Your Honor, we're having

1    trouble following what counsel is saying.  What

2    we're hearing, it sounds like, is that GateGuard is

3    saying that Amazon allegedly misappropriated the

4    configuration of the device and the way a key for

5    business device would wire into connect to a

6    GateGuard device.  If that's the specification of

7    what we allegedly misappropriated, that's fine.  We

8    can work with that because we don't think that's

9    trade secret.  And GateGuard should be precluded

10    from coming up with some new story later.

11         So if we're understanding correctly, that

12    would be an all right state of affairs and would

13    resolve the issue, and then we can move on.

14         THE COURT:  Okay.  So again, Mr. Quainton,

15    I also heard you to be talking about the

16    configuration of the device in what you've said just

17    now.  I wasn't entirely clear from your response at

18    interrogatory number eight that that's what you were

19    focused on.  But again, given this deadline

20    tomorrow --

21         MR. QUAINTON:  I think that's overly

22    simplistic.  It's what we have identified.

23         I mean, for example, let's take the

24    components, the types and nature of the components.

25    How do they piggyback on that?  We have not

1    disclosed publicly, and we do keep secret who our

2    suppliers are and what the components that we use

3    are.

4         When they install the key for business

5    without our consent, they need to know who our

6    suppliers are so if there's a problem they can

7    source parts.  So they've opened up the hood to see

8    what's inside the hood.  You know, it's like any

9    other device that the manufacturer of the device

10   wants to keep secret who its suppliers are and what

11   the components are.  That's secret.  And the

12   infringing party opens it up and it says, Okay, I

13   see.  So now that I know who your suppliers are, now

14   that I know what these components are, I can repair

15   it without your consent.

16        It further enables the using of the device

17   without our consent.  That's misappropriate.  To the

18   extent we have intellectual property rights and the

19   law is very clear that we do in components, the

20   nature of components, and the suppliers, they

21   piggyback, they misappropriate on that information

22   when they open our device without our consent and

23   find out who those suppliers are, what those

24   components are, because that enables them then to

25   repair and replace devices.  So that's a

1    piggybacking.

2            If they use our USB cable, so they're

3    cables that they use, and frankly, the testimony --

4    we had extensive testimony from Mr. Aguilar, who was

5    very knowledgeable and the way in which the

6    specifics of the interior of the devices are used is

7    highly complicated.  Amazon, we learned, has

8    hundreds, if not thousands, of devices that they're

9    looking at to see how they all work.

10            So I can't tell you exactly I'd want an

11    expert to say, yeah.  Amazon needs, for example, the

12    three wire USB cable that links the router to the

13    surface of the board.  That's a trade secret.  We

14    allege that's a trade secret.  Does Amazon need to

15    use that to install the device properly?  That I'm

16    not sure about.  But that's an expert question.

17            The question now is, do I have enough to

18    say, Yeah, here's a custom designed wiring system.

19    Somebody -- I mean, imagine it's the hood of a car.

20    It's a custom designed car.  You open up the hood

21    and inside -- and you want to put in something in

22    that hood, a tracking device of some kind.  I don't

23    know.  You think you would get valuable information.

24    You get valuable tracking information if you

25    surreptitiously installed your device under the hood

1    of somebody else's car.  And so you open up the

2    hood, you want to see how it's configured.  You see,

3    Oh, look, there's this three-pronged cable.  And

4    without saying that you're copying it, you may need

5    to evaluate whether that's going to interfere with

6    your intended use, which is to install your tracking

7    device inside the other person's -- under the hood

8    of the other person's car.

9         So I can't tell you exactly how Amazon --

10    the exact importance of the way in which Amazon is

11    connecting the key.  That's an expert question.  But

12    I can tell you it's not just the configuration.  So

13    I don't agree with Mr. Salant's oral statement.  I

14    think what we're alleging is the trade secrets.

15    What they've used, we allege, are the items that

16    I've listed in the response.  And the expert can

17    tell us, No, you know what, that doesn't make sense.

18    When we install the device, we bypass feature number

19    three entirely.  It doesn't matter to us.  Our

20    expert says, GateGuard, sorry, you may have a trade

21    secret in your custom cable, but that's irrelevant

22    to what Amazon is doing.

23         I don't know the answer to that.  And we

24    have an extensive deposition with Mr. Aguilar how

25    this all works without actually having an expert

1    open it up and walk us through how the key is

2    connecting.  We can't resolve right now.

3         But I think the key point is Amazon is on

4    notice of what we're alleging, that they're using

5    all of the elements inside of our device to their

6    advantage without our consent.  They're

7    misappropriating it.

8         And to the extent, number one, we have

9    trade secrets to protect, and number two, they need

10   to use any of those devices to connect properly,

11   they're misappropriated.

12        THE COURT:  So I guess the one thing I'm a

13   little confused by is if GateGuard brings this

14   lawsuit claiming that Amazon was misappropriating

15   aspects of its system, I guess I would have thought

16   there would have been some investigation in the

17   front end to figure out what exactly was being used,

18   if anything.  But I think it sounds like that hasn't

19   gone on.  But it sounds like for purposes of

20   resolving this issue now, if you're relying on what

21   you said on interrogatory number 8, you can

22   certainly rely on that, but there wouldn't be an

23   opportunity later to come back with a different

24   theory of misappropriation.

25        MR. QUAINTON:  Understood.  That's fair.

1    Subject to whatever the Court decides on the Second

2    Amendment Complaint.  That's separate.  Yeah, I

3    agree with that.

4              THE COURT:  Mr. Salant, does that work for

5    Amazon?

6              MR. SALANT:  Your Honor, we would just --

7    we don't think it depends on the motion to amend.

8    GateGuard should give a full accounting of its trade

9    secrets and what it thinks Amazon misappropriated

10   regardless of what happens later.  This should be

11   it.

12             THE COURT:  Yeah, so I didn't mean to

13   suggest.  I guess that was my fault.

14             To the extent Mr. Quainton said subject to

15   the motion to amend, I understood that to only be

16   for any new claims that come in.  So whatever this

17   Ring device issue is.

18             MR. SALANT:  Understood and that resolution

19   makes sense to us.

20             THE COURT:  Okay.  So I think then the only

21   issues that remain are things that came in.  So the

22   motion to amend the complaint and the spoliation.

23             The motion to amend the complaint, as I

24   said, it's going to require a written decision.  So

25   I didn't want to cover it in this conference simply

```
 1    because I don't know that I need oral argument on
 2    something like this.  And this isn't something I'm
 3    going to be able to give you an oral ruling on.  But
 4    if anybody has anything they want to add to that
 5    motion, I'm happy to hear you out now.
 6              MR. QUAINTON:  Your Honor, the only
 7    question I have about that, I think that motion is
 8    on the sort of the normal motion cycle.  So I
 9    believe GateGuard's response to the opposition would
10    be due on this Friday, if I'm not mistaken.  I just
11    want to make sure that I'm correct on that.  So I
12    don't think it would be helpful to have oral
13    argument before all the papers are in.  Unless I'm
14    missing something and the Court had something else
15    in mind.  But I was assuming that since we were on
16    the normal cycle, we filed on the 9th and Amazon
17    opposed on the 23rd, and I think we would reply to
18    the opposition a week from that deadline.  Again,
19    unless I'm missing something.
20              THE COURT:  No.  I mean, again, it's a
21    normal motion on the regular briefing schedule.
22    It's given that there's a few things that have to
23    get done this week.  If you want more time on the
24    reply, I'm happy to give you that because I'm not
25    going to be able to turn to this motion.
```

```
 1              Well, I certainly won't be able to turn to
 2    this, I don't think before the end of March given
 3    other motions that are pending that are older.  So
 4    if you need more time for the reply, I don't have a
 5    problem giving you more time.
 6              MR. QUAINTON:  I would very much appreciate
 7    more time.  Whatever the Court can give me, I'm
 8    willing to take.  So that -- there is a lot to do.
 9    If I could have two weeks, that would be ideal.
10              THE COURT:  Yeah.  I mean, that's fine.
11              Again, as I said, given other motions that
12    have to be decided by the end of March, I won't be
13    able to turn to this realistically before then.  So
14    two weeks from today is March 13, I think.  Is that
15    okay?
16              MR. QUAINTON:  That's fine.  Yeah.
17              THE COURT:  Okay.  And then it there's
18    exfoliation, which came in on February 23.  And so
19    for that one, I'd like to just either look at the
20    letter brief.  I haven't had a chance to review that
21    one just because of all the other ones that we
22    covered today.  And so I can see if I can give you a
23    decision based just on the papers.  If not, I can
24    schedule a conference.  But I recognize that that
25    would be the one issue.  That's one issue that I
```

1    wasn't able to get to before today's conference.

2              MR. SALANT:  Yes, we understand, Your

3    Honor.  And that makes sense.  We just filed our

4    response early at ECF 138 just so you had it before

5    hearing from us today.

6              THE COURT:  Yeah, and I apologize.  There

7    was a lot of letters for today.  So I will look at

8    those and then either schedule another conference or

9    give you a decision.  And then I'll wait for the

10   March 13th reply from GateGuard, and then I'll give

11   you a written decision on the motion for the leave

12   to amend the complaint.

13             MR. SALANT:  Thank you very much, Your

14   Honor.

15             MR. QUAINTON:  Your Honor, sorry, I know

16   that you're eager to move on to other things.  Just

17   in terms of the motion for the -- spoliation motion.

18   GateGuard would request oral argument on it,

19   because -- and I think the Court would benefit from

20   that because it's a relatively confusing issue, I

21   think, in terms of the fact pattern.  So that would

22   just be our request that if the Court could schedule

23   a conference for oral argument, we would appreciate

24   that.

25             THE COURT:  Okay.  I'm happy to give you a

```
 1    conference.  So I will find a date and schedule a
 2    conference for that motion at ECF 123.
 3              MR. SALANT:  Thank you, Your Honor.  And
 4    from Amazon, may we trouble you to just post a
 5    written confirmation of your orders of today, your
 6    rulings of today on the docket?  It's very helpful.
 7              THE COURT:  Yeah, given all the ones that
 8    we went through, I think it would be helpful to
 9    document it.  So I will issue something
10    memorializing what went on, and then I would just
11    request that the parties also ask for the transcript
12    and post it on the docket.
13              MR. SALANT:  Yes, Your Honor, will do.
14              THE COURT:  Okay.
15              MR. QUAINTON:  Thank you, Your Honor.
16              THE COURT:  Thank you so much, everyone.
17
18
19
20
21
22
23
24
25
```

1                     C E R T I F I C A T E

2

3        I, Marissa Lewandowski, certify that the

4    foregoing transcript of proceedings in the case of

5    GateGuard, INC. v. AMAZON.COM, INC., et al., Docket

6    #21-cv-9321, was prepared using digital transcription

7    software and is a true and accurate record of

8    the proceedings.

9

10

11    Signature  *Marissa Lewandowski*
                 _____

12                  Marissa Lewandowski

13

14    Date:      February 29, 2024

15

16

17

18

19

20

21

22

23

24

25