Page 18

1  Mr. Aguilar relating to this conversation before the entry,
2  "Got a couple of minutes?"
3       MR. BELELIEU: Object to the form, Eden.
4       THE WITNESS: I don't recall.
5  Q. (By Mr. Quainton) Do you recall whether
6  conversations can just be -- can be initiated through Chime
7  without any prior notification?
8  A. Sorry. Could you repeat that?
9       MR. BELELIEU: I'm going to object to that also as
10 vague.
11 Q. (By Mr. Quainton) So I want to understand how Chime
12 works. When you type in something like, "Got a couple of
13 minutes," do you know whether your -- the person you are
14 addressing is online or, you know -- so let me strike that.
15      When you write in -- when you make an entry like,
16 "Got a couple of minutes," do you know if the person you are
17 addressing is -- is able to respond immediately?
18      MR. BELELIEU: Object to the form.
19      THE WITNESS: No, you don't know if they are able to
20 respond immediately.
21 Q. (By Mr. Quainton) Okay. If you receive a message,
22 do you get a -- an audible ping of some kind?
23 A. You get a -- if you have the window open, obviously
24 you would go there. You may get a notification on the bottom
25 of the screen similar to like an e-mail, I guess you'd say.

Page 19

1  Q. Is there -- sorry, go ahead.
2  A. Sorry. You can hide those notifications as well.
3  You don't have to -- there is different features in it.
4  Q. Is -- is there a list of users who are available that
5  you can -- that you can view when you are in the Chime
6  environment?
7       MR. BELELIEU: Object to the form. You can answer.
8       THE WITNESS: I guess what do you mean different
9  users you can view?
10 Q. (By Mr. Quainton) Well, just I'll give you an
11 example. When something like -- something like Zoom, if you
12 have a number of users who are -- you know, let's say in a law
13 firm you might have 50 or 100 users who are on Zoom, and those
14 who are available to chat might have a little green dot next
15 to their names, and those who aren't might have a -- you know,
16 something -- it might be red, or it might be stricken through.
17 So I am just wondering with Chime, when you are using Chime,
18 do you see a list of other users who are available to
19 communicate?
20      MR. BELELIEU: Object to the form again. Go ahead.
21      THE WITNESS: You can search through Chime by a
22 user's alias, whatever their employee alias is, if you want to
23 find them and have a message. On the left-hand side there may
24 be a list of recent messages of people you have either written
25 or have written you.

Page 20

1  Q. (By Mr. Quainton) I guess I'm trying to understand
2  this. When -- when you -- you wrote, "Got a couple of
3  minutes," do you recall whether you received a response?
4  A. I don't recall. My apologies. You mean a response
5  like written or -- I don't recall getting -- whether I got a
6  response or not.
7  Q. Okay. So the -- the -- the next written response is
8  three lines down at 17:07. Do you see that?
9  A. Uh-huh.
10 Q. It's the fourth entry, and so I guess -- so you have
11 answered that you don't recall whether you received any kind
12 of an oral response after you wrote, "Got a couple of
13 minutes?"
14      MR. BELELIEU: Objection. Mischaracterizes the
15 testimony.
16 Q. (By Mr. Quainton) Well, let me ask you: Do you
17 recall whether you received an oral response from Mr. Aguilar
18 after you received -- after you wrote, "Got a couple of
19 minutes?"
20 A. I get your question. I don't recall the ways of
21 communication, but I -- it generally looks like he would have
22 called me via Chime, but I don't know what time that would be.
23 Q. So your recollection is that -- well, strike that.
24      So you believe that you wrote, "Got a couple of
25 minutes" in Chime, and then he could -- Mr. Aguilar could have

Page 21

1  called you back on Chime?
2  A. Either I can call him, or he can call me.
3  Q. And that -- those -- those oral communications would
4  not be reported anywhere on -- in the -- in the Chime record
5  of the communications?
6  A. I don't believe so.
7  Q. So the next thing that this chat records is at
8  17:05:14, and you enter https://gateguard.xyz. Do you see
9  that?
10 A. Yes.
11 Q. Do you remember why you typed that in?
12 A. I was asked to source a -- this intercom system for
13 compatibility testing, and Alex had a relationship with
14 install providers, and so I was asking him if he would be able
15 to work with them to see if they can order the devices.
16 Q. And do you recall who it was who asked you to source
17 the GateGuard intercom system?
18 A. I can't be certain. I believe it was my boss, Gerry.
19 Q. That's Gerry Nievera?
20 A. Yeah.
21 Q. And do you recall -- I mean, sorry, Mr. Nievera asked
22 you to source the GateGuard device at -- some time before you
23 -- you made this entry in this Chime conversation, correct?
24      MR. BELELIEU: Objection. He already said he wasn't
25 sure. He said it might have been Nievera, so it

6 (Pages 18 to 21)



Page 22

1  mischaracterizes the testimony.
2  Q. (By Mr. Quainton) The -- sorry, the person who asked
3  you to source the GateGuard intercom would have asked you at
4  some time prior to the time when you made this entry in -- in
5  the Chime conversation that we see recorded on March 3rd,
6  right?
7  A. Correct.
8  Q. Do you recall how long before you wrote, you know,
9  https://gateguard.xyz you had been asked to --
10 A. I do not.
11 Q. (By Mr. Quainton) -- to --
12    MR. BELELIEU: Let him finish the question.
13 Q. (By Mr. Quainton) -- you asked him to source the
14 GateGuard intercom?
15 A. I do not recall.
16 Q. Do you recall whether it was a matter of days or --
17 or weeks, if any? Any sense of the timing?
18 A. I don't recall.
19 Q. And you're -- I think what you -- what you testified
20 to is that you were asked to source the device for
21 compatibility testing; is that correct?
22 A. Correct.
23 Q. Were you given any other instructions that, you know,
24 accompanied the direction that you source the device --
25 GateGuard device?

Page 23

1     MR. BELELIEU: Object to the form. You can answer.
2     THE WITNESS: I am not sure what you mean by
3  directions. I was asked --
4  Q. (By Mr. Quainton) Sorry, go ahead.
5  A. Sorry, go ahead.
6  Q. Well, let me ask it this way: Do you recall anything
7  else about -- well, let's backtrack.
8     Do you recall whether the person who asked you to
9  source the GateGuard device communicated with you in writing?
10 A. I don't recall.
11 Q. Okay. Do you recall whether -- other than asking you
12 to obtain a device for compatibility testing, do you recall
13 whether the person who asked you to obtain the device
14 mentioned anything else about the GateGuard device that you
15 were asked to source?
16 A. I was just asked to source the two for compatibility
17 testing. One was to be sent to our engineering team in San
18 Jos and one to Las Vegas.
19 Q. So the person who asked you to source the
20 GateGuard -- I guess intercom -- asked you to source two
21 devices, correct?
22 A. Correct.
23 Q. And did the person say why you needed two devices?
24 A. No, it was just an ask for -- to source two.
25 Q. And did you -- did you wonder why you had been asked

Page 24

1  to source two devices?
2  A. I can't say that I recall my thought process back
3  then, but one would be going to Las Vegas, and one was going
4  to the engineering team.
5  Q. So the -- and the engineering team was in -- in
6  Sunnyvale, right?
7  A. Correct.
8  Q. And the other team, what was the -- what was the
9  nature of the other team that would get the second device?
10 A. The install operations team in Las Vegas.
11 Q. And do the -- does the install operations team in Las
12 Vegas have testing equipment to test compatibility of devices?
13 A. Yes, sorry.
14    MR. BELELIEU: Object to the form. You can answer.
15    THE WITNESS: Sorry, I was just going to say, yes, we
16 have means of compatibility testing.
17 Q. (By Mr. Quainton) Okay. So then going down, two
18 minutes later you say, "Remember that what we discussed was
19 confidential, so do not share with Matt." Do you see that?
20    MR. BELELIEU: It says "remainder," not "remember,"
21 just to correct that.
22 Q. (By Mr. Quainton) Okay. "Reminder that what we
23 discussed was confidential, so do not share with Matt." Do
24 you see that?
25 A. Yes.

Page 25

1  Q. And do you know who Matt is?
2  A. I do not recall who Matt is. I don't know if that's
3  -- I'm not sure who that is. I don't recall anybody on the
4  internal team that had the name Matt.
5  Q. Did people -- do people ever use, you know, aliases
6  in your team?
7  A. I'm sorry, what do you mean by aliases?
8  Q. You know, in other words, you don't recall anybody
9  named Matt. Is it possible that somebody was not named Matt,
10 but there was somebody who was referred to as Matt?
11 A. I -- I don't recall who Matt is.
12 Q. But it says, "Reminder we -- what we discussed was
13 confidential, so do not share with Matt." Do you recall what
14 you discussed -- sorry, let me back up. When it says,
15 "Remainder that what we discussed," now, this is what you
16 discussed with Mr. Aguilar, right?
17 A. Correct.
18 Q. And whatever you discussed was confidential, right?
19 A. I think I mentioned that just, yeah, keep it to
20 himself and not share with this individual.
21 Q. Do you remember what it was that you discussed that
22 was confidential?
23 A. I don't recall the specific nature of the
24 conversation -- you know, general conversations around
25 ordering the system -- the GateGuard systems.



MAGNA LEGAL SERVICES