**Eden P. Quainton**
**Quainton Law, PLLC**
2 Park Ave., 20th Fl.
New York, NY 10016
245 Nassau St.
Princeton, NJ 08540

Telephone (212) 419-0575, (609) 356-0526
Cell: (202) 360-6296
Eden.quainton@quaintonlaw.net

June 10, 2024

**VIA ECF**

Honorable Valerie Figueredo
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

>Re: <u>*GateGuard, Inc. v. Amazon,com, Inc. et al.*, 21-cv-9321</u>
><u>*Motion for Spoliation Sanctoins*</u>

Dear Judge Figueredo,

I represent Plaintiff GateGuard Inc., ("Plaintiff" or "GateGuard") in the above captioned-action. I write in further support of Plaintiff's pending motion for spoliation sanctions. Dkt. 123.

Set forth below is a brief chronology that we believe will assist your Honor in deciding the present motion.

- October 14, 2020—counsel for GateGuard notifies Amazon that GateGuard has discovered that Amazon has illegally accessed GateGuard's intercom in order to install the Amazon Key for Business (the "Key") inside of GateGuard intercoms and was damaging the intercoms by this access. Declaration of Eden P. Quainton, dated June 10, 2024 (the "Quainton Decl."), Ex. A.
- October 26, 2020—GateGuard's CEO meets with Gerry Nievera, by video conference to discuss a potential resolution of the illegal Key installations. Quainton Decl., Ex. B. Ex. C.
- November 10, 2020—Amazon notifies field representatives that they should cease installations of the Key at GateGuard properties. Quainton Decl., Ex. D; Ex. E; Ex. F. *See also* Ex. U.
- At some point prior to March 3, 2021—Gerry Nievera, head of Key Sales and Operations, instructs procurement to obtain GateGuard devices. Ex. G, Nievera Deposition, 62:5-7.
- On or about March 3, 2021—Christopher Berret passes order to Alex Aguilar, Ex, H, Berret Deposition 21:7-20; Berrett tells Aguilar to keep GateGuard order confidential, Berrett Deposition, 25:12-16.
- On or about March 15, 2021—Aguilar instructs Derek Stephenson to send devices to Ring and to Amazon research laboratory. Ex. I.

1

- On or about April 7, 2021—Stephenson expresses concern about what he is being asked to do. Ex. I.
- On or about May 3, 2021—Berret follows up with Stephenson re second GateGuard device. Ex. I.
- Berrett states goal of acquiring the two devices was to perform compatibility testing at Ring laboratory and at separate research laboratory. Ex. J, Berret Deposition, 23:11-22.
- Barrett follows up with Stephenson and tells Stephenson "our team would like to start working on the GateGuard device." Ex. K., Berrett Deposition, 61: 8-12; Ex. L.
- 2021—Amazon engaged in active program of testing third-party intercoms, both for compatibility with the Key and as part of the Ringtercom development process. Ex. M, Nievera Deposition, 81:17-21.
- 2021-2022—Amazon is developing new intercom commercial release, the "Ringtercom." Ex. N, Nievera Deposition, 83:8-15
- July 12, 2021,
  . Ex. O.
- Donovan testifies he took the Teman device out of its packaging, took a photo and replaced the device in the box on the same day. Ex. P, Donovan Deposition, 119:15-20, 120:3-5.
- At his deposition Nievera testifies he has no recollection of seeing a GateGuard device. Ex. Q, Nievera Deposition, 148:11-13.
- The GateGuard device ships in a brown cardboard box. Declaration of Ari Teman, dated June 10, 2024.
- Prior to Donovan deposition, Amazon represents Donovan does not have any photographs of the GateGuard device in his possession. Ex. R, Responses to Requests 1, 3, 5.
- July 12, 2021,
  Ex. O.
- Donovan testifies he did not remove the protective wrapping from the device. Ex. P. Donovan Deposition, 120:7-8. This is inconsistent with the Teman Decl. at ¶ 5(c)
- Donovan subsequently produced a photograph of the GateGuard device and instruction manual, with no identifying information (no date, no metadata, no evidence of capturing device, etc.). Ex. Pa.
- Donovan 30(b)(6) and 30(b)(1) deposition—testifies he did not receive a litigation hold and was not informed of pending GateGuard litigation until August 2023. Ex. S.
- Aguilar deposition—testifies he was not notified about the GateGuard litigation until he was told he would be deposed. Ex. T.
- Dustin Keller testifies his only recollection about GateGuard prior to the filing of the lawsuit was a communication that the Key should not be installed at GateGuard locations. Ex. U
- Niviera 30(b)(6) and 30(b)(1)—testifies he has no knowledge of any "litigation hold." Ex. V.

2

- Berrett deposition—recalls receiving some sort of document requesting that he preserve documents relating to GateGuard, but does not recall timing. Ex. W.
- November 10, 2021—GateGuard files lawsuit.
- November 16, 2021—ClearHome instructs reps not to install the Key at GateGuard locations, Ex. X.
- March 1, 2024—Amazon refuses to provide information on dates and recipients of litigation holds. Ex. Y.
- March 26, 2024—Amazon produces legible records showing that Amazon representatives continued to install the Key at GateGuard locations continuously from late 2020 into 2023. Ex. Z.

The above chronology makes clear a number of points.

First, Amazon's acquisition of the GateGuard device occurred only few months after Amazon was both on notice of potential litigation and after GateGuard's CEO had offered to enter into a strategic transaction with GateGuard. *See* Teman Decl. at ¶¶ 5(e) and (f). Amazon's failure to preserve the device in this context was reckless. This recklessness was compounded by the apparently lackadaisical manner in which evidence was sought to be preserved in this case. The Amazon custodians testified virtually to a man either (a) that they had no knowledge of any litigation with GateGuard or Mr. Teman or (b) that they had no knowledge of any litigation hold. Amazon's counsel has refused to provide any evidence of when and to whom it distributed a litigation hold, further suggesting that Amazon did not comply with its duty to preserve evidence in this case. *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (gross negligence where no litigation hold issued for 15 months). Amazon and its counsel had no way of knowing that Judge Keltl would limit GateGuard's trade secrets claim to exclude direct copying and thus should have taken proactive steps to preserve all evidence, including physical evidence. Amazon and its counsel were reckless or worse in the manner in which they sought to preserve evidence in this case. *Mastr Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Est. Sec. Inc.*, 295 F.R.D. 77, 86 (S.D.N.Y. 2013), *aff'd*, No. 12 CIV. 7322 HB, 2013 WL 6840282 (S.D.N.Y. Dec. 27, 2013). *See also infra* at 4.

Second, Amazon witnesses' testimony with respect to the GateGuard device is riddled with inconsistencies and is not credible. Mr. Donovan testified under oath at his deposition that he took the GateGuard device out of the packaging box it came in without taking off the protective plastic around the device. However,

This black box was the GateGuard device not the packaging box, because the packaging box was a distinctive brown cardboard box no one would ever refer to as "black." Teman Decl. at ¶¶ 3,4. Mr. Donovan testified that he did not remove any plastic protective wrapping, but Mr. Teman has shown this is false. Teman Decl. ¶ 5(c). Mr. Nievera testified that he never saw the GateGuard device,

. Again,
. Mr. Donovan's story that he took the device out of its packaging box took a photograph, reinserted the device in the box and then took the device home before throwing it away does not match what Mr. Nievera and Mr. Donovan confirmed actually

3

happened:

. Mr. Donovan's photograph is undated so there is no what of knowing when it was taken. Amazon's inaccurate response to GateGuard's document demands – first insisting there were no photographs of the device, and then springing the revelation that a photograph did exist at Mr. Donovan's deposition – heightens the overall impression of what appears to be at best recklessness with respect to critical evidence, at worst bad faith. Furthermore, Amazon failed to produce all its communications with respect to the device, hiding in particular an email from Mr. Berret stating that Amazon's team "would like to start work on this (*i.e.*, the second device that was to be shipped to Las Vegas). Ex. K, produced by ClearHome, not Amazon. Moreover, Amazon never provided any coherent explanation as to why Christopher Berret told Alex Aguilar to keep communications about the GateGuard device "confidential" and not inform "Matt." Ex. H, Berrett Deposition, 25:12-16.

Third, the record shows overwhelmingly that Amazon continued to install the Key at GateGuard locations after it knew of the alleged incompatibility of the Key and the GateGuard device and after field representatives had been told to stop installing the Key at GateGuard locations. Ex. Z. In this context, and the context of described above, Amazon and its counsel knew or should have known that the preservation of physical evidence was critical to this case. *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 23–24 (S.D.N.Y.), *opinion adopted*, 271 F.R.D. 55 (S.D.N.Y. 2010) (party has duty to preserve physical evidence the party knows or reasonably should know is relevant to claims or defenses in the action, is reasonably calculated to lead to the discovery of admissible evidence, or is reasonably likely to be requested during discovery). Moreover,

. Ex 1b. This suggests that Amazon used its access to the GateGuard device to figure out how to modify the Key so as to continue "piggybacking" on the GateGuard device even after it had allegedly stopped installing the Key at GateGuard locations. Here, too, the production of documents showing Amazon's continued installation of the Key at GateGuard locations weeks after the close of discovery testifies to recklessness or bad faith. *Id*.

Fourth, Amazon clearly had a motive to access and then destroy the evidence of its conduct. At exactly the same time that Amazon was both modifying its Key device so that it could piggy-back on the GateGuard and other intercom systems more effectively, it was also developing its own proprietary intercom system, the Ring intercom that was launched commercially in 2022. Ex. N. Amazon had every motive to study the GateGuard device and use its technology, both to enable its continuing piggy-backing and to refine its own proprietary intercom. This is not some fanciful conspiracy theory. Amazon has a well-documented history of preying on startups.[1] As noted, Amazon Key business personnel had heard directly from Mr. Teman about the potential of his intercom; rather than paying Mr. Teman for his technology, it

---

[1] *See* D. Mattioli, *Amazon Met With Startups About Investing, Then Launched Competing Products*, Wall Street Journal, July 23, 2020, *available at* https://www.wsj.com/articles/amazon-tech-startup-echo-bezos-alexa-investment-fund-11595520249; S. Mitchel, R. Knox, Issue Brief: *How Amazon Exploits and Undermines Small Businesses, and Why Breaking It Up Would Revive American Entrepreneurship, Institute for Local Self-Reliance*, June 16, 2021, available at https://ilsr.org/articles/fact-sheet-how-breaking-up-amazon-can-empower-small-business/.

made more commercial sense to acquire the device, study it for free, and then discard it once Amazon had taken what it needed.

      In sum, Amazon's destruction of the key evidence in this case cannot be excused as an innocent mistake. The stories are too inconsistent, the witnesses are too lacking in credibility, the treatment of discovery obligations too inadequate. Amazon willfully destroyed material evidence and must be sanctioned. *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 439 (S.D.N.Y. 2010). Given the egregiousness of its conduct, GateGuard is entitled to an adverse inference that the GateGuard device was destroyed to hide evidence that Amazon had wrongfully used it, accessed its inner workings, either by opening it or illegally operating it, and misappropriated GateGuard's trade secrets. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 392 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).

      A party should not be permitted to destroy physical evidence and then, hand on heart, claim it never profited from the evidence or that the whole affair is the product of a heated imagination. Litigation cannot be fair without severe sanctions when any party willfully destroys material evidence or when a party with vast resources to grind down its adversary fails to use even a fraction of its power to comply with its obligations and ensure a level playing field.

      Respectfully submitted,

      *Eden Quainton*
      Eden P. Quainton

cc: All counsel of record (via ECF)