```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
------------------------------:

GATEGUARD, INC.,                  : Case No.: 21-cv-9321

                    Plaintiff, :

        v.                        :

AMAZON.COM INC., et al.,          : New York, New York

                    Defendant. : May 28, 2024

------------------------------:
```

TRANSCRIPT OF STATUS CONFERENCE HEARING

BEFORE THE HONORABLE VALERIE FIGUEREDO

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

```
For Plaintiff:          QUAINTON LAW, PLLC
                        BY:  Eden P. Quainton, Esq.
                        2 Park Avenue - 20th Floor
                        New York, New York 10016


For Defendant:          GIBSON, DUNN & CRUTCHER LLP
                        BY:  David P. Salant, Esq.
                             Anne Champion, Esq.
                             Mark Aaron Takagaki, Esq.
                        200 Park Avenue
                        New York, New York 10166
```

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

AMM TRANSCRIPTION SERVICE  631.334 1445

```
1              THE DEPUTY CLERK:  This is the matter of
2    GateGuard, Inc. v. Amazon.com, Inc. et al.; Case
3    Number: 21-cv-9321.  The Honorable Valerie Figueredo
4    presiding.
5              Counsels, can you please make your
6    appearances for the record, starting with
7    plaintiff's counsel.
8              MR. QUAINTON:  Yes.  Good morning, Your
9    Honor.  Eden Quainton for the plaintiff, GateGuard,
10   Inc.
11             THE DEPUTY CLERK:  Defense?
12             MR. SALANT:  Good morning, Your Honor.
13   David Salant from Gibson, Dunn & Crutcher for the
14   Amazon defendants.  And I'm joined by my colleagues,
15   Anne Champion and Mark Aaron Takagaki.
16             THE COURT:  Good morning, everyone.  This
17   is Judge Figueredo.  Hope everyone had a nice, long
18   weekend.
19             I think we should start -- or, actually, I
20   guess what I'd be most interested in hearing folks
21   on is the motion for spoliation that GateGuard
22   brings at ECF 123, it's a letter from February 23rd.
23   And then there's a response from Amazon at ECF 138.
24   Excuse me.  It's a letter from February 27th.
25             And, you know, I'm happy to hear you,
```

1    Mr. Quainton, but I'm trying to understand this

2    device that was, you know, ordered through Clear

3    Home by Amazon.  They ordered it after you had

4    brought the claims; is that correct?

5        MR. QUAINTON:  That's not correct,

6    Your Honor.

7        So the sequence here is that on

8    October 14th of 2020 -- and this is actually, I

9    think, the first exhibit that Amazon produced in its

10   letter in response to our letter motion.

11       GateGuard's former counsel, Ariel Reinitz,

12   sent a letter to Amazon stating that there had been

13   tampering with GateGuard devices and asking that

14   that cease.  Then there was a conference call with

15   GateGuard representatives, including a person named

16   Christopher Barrett, who is one of the custodians in

17   this action, in which, you know, Mr. Tieman and

18   various Amazon representatives discussed

19   Mr. Tieman's complaints.  And also, Mr. Tieman had a

20   proposal to avoid litigation, but it was clear that

21   there was a potential litigation.  Indeed so much

22   so, that on November 10th -- this is also of 2020 --

23   Amazon sent out a memo to the field saying -- or a

24   letter to the field saying, please stop installing

25   the Amazon Key at GateGuard locations.

AMM TRANSCRIPTION SERVICE  631.334 1445

```
 1              And then what happened is -- so after there
 2       was notice of potential litigation, after Amazon had
 3       adverted to that potential litigation, both on a
 4       conference call and by sending out a notice that
 5       there should be a ceasing of any further
 6       installations of the Amazon Key at GateGuard
 7       locations, then Christopher Barrett, who had been on
 8       the call with Mr. Tieman, gave instructions that
 9       Clear Home purchase two devices from GateGuard.
10              And the one device was definitely
11       purchased.  That occurred in March, on March 12th of
12       2021.  So we're still -- whatever the number of
13       months is, you know, six, seven months from the time
14       the first complaint was filed at, you know, ECF 1,
15       which is 11-10.  So November 10, 2021, a year after
16       the first, sort of, memo to the field was sent out.
17       And about seven months after Amazon had acquired the
18       GateGuard device, which it then sent, or had sent to
19       its research laboratory, SJC13, where Mr. Paul
20       Donovan, who was also one of the custodians where he
21       works -- he's a senior engineer for the Amazon
22       Key -- and the most senior person at Amazon with
23       respect to the Key, also a custodian, Jerry Nievera,
24       in July of 2021.
25              So, again, we're still pre the filing of
```

1    the complaint, but after notice that there is

2    potential litigation.

3         Mr. Nievera contacts Mr. Donovan and asks

4    him, you know, where the GateGuard device is.  And

5    Mr. Donovan -- this is actually one of the problems

6    with the declaration that was provided.

7         Mr. Donovan said, well, I had it, but I

8    took it downstairs to the seventh floor.  And then

9    he goes and gets it, and then, allegedly, he takes a

10   photograph of it, takes it back to his office, and

11   keeps it in his office, offsite, outside of the

12   SJC13 until the middle of this litigation, August

13   1st of 2023.  And then he destroys -- or he throws

14   the device away.  And that's not disputed, that he

15   just threw it away.

16        I think the issues here are, you know,

17   number one, when did a duty to preserve evidence

18   attach?  What did it attach to?  To whom did that

19   duty run?  Was there any culpability in the manner

20   in which Amazon addressed its discovery obligations?

21        Was the evidence spoliated relevant or

22   inferentially relevant and/or prejudicial?  And what

23   the potential remedy for GateGuard should be.  I

24   think the law is pretty --

25        THE COURT:  Can I ask you a question?

```
 1              MR. QUAINTON:  Sure.

 2              THE COURT:  Because, I mean, this is, I

 3    guess, maybe what I was trying to understand, and

 4    it's that relevance/prejudicial prong that you

 5    talked about last.

 6              MR. QUAINTON:  Yep.

 7              THE COURT:  Given the timing of when they

 8    acquired the device, which was after October 14th of

 9    2020, when, you know, prior counsel had notified

10    them of these potential claims, if GateGuard was

11    alleging that Amazon had, you know, piggybacked,

12    somehow used the trade secrets for GateGuard to work

13    on its own Key for Business, that would have

14    happened before this device would have been

15    obtained, right?  Because you were already alleging

16    that in October.

17              MR. QUAINTON:  Not exactly, Your Honor.

18         So one of the other motions that's on for

19    today -- and by the way, I should just say the

20    motions to compel have essentially been resolved.

21    But one of them was to compel the deposition of a

22    person named Tara Dexter at a property management

23    company called Livingston Management.  And that

24    deposition did, in fact, occur on May 14th.

25         And Amazon produced, sort of, on the last
```

 1    day of discovery, information relating to properties
 2    that were managed by Ms. Dexter for a company, for
 3    Livingston Management.  Turned out that that
 4    production had, you know, legibility issues, and it
 5    was -- and then the pertinent -- the illegible
 6    information was reproduced on March 26th.  That
 7    information related to the installation of the
 8    Amazon Key at certain Livingston locations where the
 9    GateGuard device was installed.  And that
10    information indicates that the device was, in fact,
11    installed at those locations, which are at issue in
12    this litigation, in 2022.  I don't have the exact
13    month, but in 2022.
14            So, basically, what you have happening is
15    after the litigation, the device continues to be
16    installed at GateGuard locations.  And the reason
17    that Amazon has given for why it wanted to acquire
18    the device, the GateGuard device, is they said they
19    wanted to test it for compatibility because there
20    was an issue as to whether it was interfering with
21    the GateGuard device.
22            And the allegation is that, by getting the
23    device -- what they wanted to do is they wanted to
24    see how it worked.  They wanted to see how they
25    could make -- "it" being the GateGuard device.

1    Amazon wanted to see how the GateGuard device
2    worked, and they wanted to see how they could best
3    piggyback on that device.  And they continued to
4    piggyback after they had initially been on notice
5    that there was a problem with the way the devices
6    were interacting.

7            And although it's not entirely clear, it
8    appears that, after 2022, the device no longer -- at
9    least at Livingston -- no longer interfered with the
10   device.  And I say it's a bit unclear because the
11   testimony that Ms. Dexter gave was not clear.  She
12   didn't have a clear recollection.

13           The installation agreements for these
14   devices have -- Amazon has not been able to produce
15   them.  Ms. Dexter didn't have them.  And I can get
16   into a separate motion that I'd like to bring to get
17   permission to try to get those installation
18   agreements from a prior management company that had
19   control of the properties at issue.

20           But when Amazon got the device, they were
21   able to look at it and see how they could best make
22   sure that they could continue their piggybacking.
23   That's the core allegation.  They know there's a
24   problem with the piggybacking.  They've been on
25   notice of litigation, they get the device, and then

1    they continue to install the device.

2            We don't know, based on this record, what

3    they did with the device.  All we know is that

4    Mr. Donovan gives a self-serving affidavit saying he

5    threw the device away.  But if we go back to, you

6    know, the law, the law is that Amazon had a duty to

7    preserve information and evidence, including

8    property.  I think that the Key property case is --

9    it's actually cited in Amazon's papers.  It's

10   *R.F.M.A.S., Inc. v. Mimi So*; 271 F.R.D. 13.  And

11   that, you know, clearly says that the discovery

12   preservation obligations attach to property.

13           So if you go back to, sort of, the original

14   fact item that I gave, or the description of the

15   facts, where Mr. Barrett is on a call with a

16   potential litigant about an Amazon device, and then

17   Mr. Barrett is the very person who actually orders

18   the device, or has the device ordered from Clear

19   Home, the law would be that when you know that there

20   is potential litigation, a litigation hold should

21   have gone out.  A litigation hold should have gone

22   out to the people on that call.  It should have gone

23   out to Mr. Barrett, and Mr. Barrett should have been

24   on notice to preserve information, not -- and then

25   if he obtained relevant property, to preserve that

1    property.  Clearly, that didn't happen.  He got the

2    device.  The device was sent to the SJC13 location,

3    and then it was eventually thrown away.

4          Now, we asked Amazon to give us information

5    as to when the litigation hold or holds were sent in

6    the case, and they refused to answer.  They said,

7    that's discovery on discovery.  You're not entitled

8    to that information and we're not giving it to you.

9    And, in fact, they said, the only way we would give

10   you any information about when we issued our holds

11   and to whom -- not the substance, but simply the

12   dates that the holds or hold was issued and the

13   person or persons to whom the hold was issued --

14   they said, we'll only give that to you if the court

15   orders us to.  And so there's a conclusory statement

16   in their papers that they provided all the holds

17   that were appropriate, but we have no way of knowing

18   whether that's true.

19         And if it is true, if it is true that a

20   hold was sent to Mr. Nievera, and then he acquires a

21   device, or has a device acquired, and doesn't seek

22   to ensure that device is preserved, that's grossly

23   negligent, and that gets into the question of

24   relevance.

25         So there's one aspect of relevance, which

1    is what I said.  The device is relevant to see

2    whether Amazon used it to determine how best to

3    piggyback on that device after the litigation began

4    and after it knew that there were problems.  But

5    that's an element of assertive relevance.  That

6    would be helpful to us, to the plaintiff, to know

7    whether that, in fact, happened.

8        But, you know, assertive relevance can also

9    be established by gross negligence.  And, you know,

10   that's also in one of the cases that is cited by

11   Amazon.  That's the *Orbit One Communications, Inc.*

12   *V. Numerex Corp.* at 271 F.R.D. 429.  I think the

13   pincite is 439.  It's at the top of the page.  And

14   then that clearly says that, when there's gross

15   negligence, there's an inference of assertive

16   relevance, not just discovery relevance.

17       And by the way, there's an additional

18   aspect.  So the assertive relevance is obviously the

19   highest degree of relevance.  And if something is

20   assertively relevant, its absence -- if an item of

21   discovery is assertively relevant and it is

22   spoliated, there's a presumption of prejudice -- or

23   not even presumption.  Prejudice just sort of

24   follows logically because if it would have been

25   helpful to your case and it's not produced, then

1  you're prejudiced by its absence.

2          There's also just, you know, discovery

3  relevance.  And the way in which discovery was

4  handled with respect to this device is also very

5  troubling.  Amazon concedes that a GateGuard device

6  is relevant.  And they say, well, you know, we

7  wanted to get a device from you.  And so they said,

8  well, there are many other devices, what's special

9  about this device?  What's special about this device

10  is that it was in Amazon's possession.  And so the

11  question is, what did Amazon do with it?

12          And what's particularly troubling about the

13  way in which the information surrounding this device

14  was handled is that we specifically asked Amazon in

15  advance of the deposition of Mr. Donovan to produce

16  any information, e-mails, texts, sketches relating

17  to the GateGuard device, and photographs related to

18  the device.  And we were told there's nothing.

19          And then we go to the deposition.  So we

20  sent out our discovery requests on November 8th of

21  2023.  We get back the response saying Mr. Donovan

22  doesn't have anything.  And he's specifically asked

23  for photographs of the device.  He said, I don't

24  have anything.  We take the deposition, and he

25  said -- then we find out for the first time that,

AMM TRANSCRIPTION SERVICE  631.334 1445

1    not only did he have the device, but he threw it

2    away, and he did take a photograph of it.

3            And subsequently, although this is not in

4    the record, he sends us a picture of the photograph

5    along with the manual of instruction for how to use

6    the GateGuard device, which were the two things that

7    were in the package that Clear Home obtained and

8    then sent to Amazon.  And so, I mean, had we had

9    that photograph before the deposition, we could have

10   questioned Mr. Donovan about when he took it.  We

11   could have asked further for things that are

12   missing.  For example, there's no metadata on the

13   photograph.  We have no idea when it was taken.  And

14   it just raises questions as to the integrity of the

15   discovery process if we're told something doesn't

16   exist, then we find that it does exist.

17           And I think all of that goes to -- sorry.

18   Go ahead.  Sorry.

19           THE COURT:  Yeah, just a quick question,

20   just to streamline a bit the discussion.  Because

21   you had indicated there if you had known about this,

22   you could have questioned them in the deposition.

23   Isn't them just potentially -- because you're asking

24   for, you know, an adverse inference, which is, you

25   know, pretty drastic, I'm wondering if the solution

1   shouldn't just be reopening the deposition to ask

2   them the questions.

3          MR. QUAINTON:  Well, I think that that's a

4   key question, is what is the appropriate remedy?

5   And Your Honor is correct, that the adverse

6   inference is on the scale of potential remedies,

7   sort of, the next-to-most harsh.  The harshest

8   being, you know, just outright dismissal of the

9   case, or we outright win the case, and that's not

10  going to happen.  But the adverse inference, we

11  think, is appropriate.

12          The least severe sanction would be to order

13  further discovery.  And that least severe of

14  sanctions should, you know, at a minimum, respond to

15  the question of who was notified when.  When did the

16  litigation holds go out?  And, you know, I think

17  that's key to this question of gross negligence.

18          And, you know, I think there's a case that

19  I would draw Your Honor's attention to.  Actually,

20  there are two cases.  One of them is cited in a case

21  that Amazon cites, and it's the -- I'm just going to

22  spell it out -- S-E-K-I-S-U-I, *Sekisui America*

23  *Corporation v. Hart*.  And that's 945 F. Supp. 2d

24  494.  And that's a case where no litigation hold was

25  implemented for 15 months after there was notice of

1    potential litigation, and no litigation hold was

2    communicated to a vendor.

3         So it's kind of analogous to the failure to

4    communicate to Mr. Donovan.  He testified that he

5    had no idea that there was any litigation even

6    pending, so he had not received any sort of a

7    litigation hold notice because he had no idea that

8    there was even litigation until he testified a

9    couple of months before his deposition.  So that

10   would have put -- that puts you in -- his deposition

11   was on December 15th, so that would put you in

12   October 15th.  So that's more than two years after

13   Amazon is on notice of potential litigation.

14        And that *Sekisui* case -- I'm not sure if

15   I'm pronouncing that correctly -- finds that, you

16   know, that kind of a delay in implementing a

17   litigation hold is evidence of gross negligence.

18   And there's another case that I think is really

19   helpful to think about what the obligations are

20   here.  And I believe this is cited in Amazon's

21   papers, and this is the *Master Adjustable Rate*

22   *Mortgages Trust 2006-OA2 v. UBS Real Estate*

23   *Securities, Inc.*  And that's 295 F.R.D. 77.

24        And in that case, the court says, you know,

25   the way you discharge your obligations -- you don't

AMM TRANSCRIPTION SERVICE   631.334 1445

1    just send out a litigation hold, but you make sure

2    that there are people, both business people and

3    people on the legal side, who are following up and,

4    you know, monitoring compliance.

5         So, you know, what should have happened is

6    that a litigation hold should have gone out shortly

7    after there was notice of litigation.  It should

8    have included people like Mr. Barrett.  And there

9    should have been ongoing follow-up, both with

10   business folks and with the legal team, to make sure

11   that, you know, evidence was being procured.

12        You know, another very troubling issue here

13   is that Mr. Barrett spoke to one of his colleagues

14   in connection with the acquisition of the device.

15   And he said, this is confidential -- the acquisition

16   of the device -- this is confidential.  He says,

17   don't mention it to Matt.

18        We couldn't figure out who Matt was, but he

19   says don't -- but there's something, you know,

20   troubling about the internal communication, that the

21   acquisition of this device is confidential.  It's

22   sort of inconsistent with the duty that, you know,

23   *Master Adjustable Rate Mortgages* indicates, where

24   you have an ongoing duty to monitor, both on the

25   business side and the legal side, compliance with a

1    litigation hold really doesn't seem to have been

2    done here.

3         And one of the other people who's involved,

4    Mr. Alex Aguilar, who communicated with Clear Home

5    and followed the instructions of Mr. Barrett, he

6    says he didn't know anything about the litigation

7    either until several months before his deposition.

8    So he never received a litigation hold notice.

9         Now, he was only added as a custodian later

10   in the litigation, but the number of people who were

11   involved with the Key for Business at a senior

12   level, you know, are relatively few.  And

13   Mr. Aguilar is extremely knowledgeable and very

14   senior.  He should have been notified of the

15   litigation given his position.

16        So, yes, I think, you know, at a minimum

17   there should be further discovery.  We should know

18   when these litigation holds went out so we can

19   assess, you know, assertive relevance, whether there

20   is, you know, sufficient culpability for that, to

21   make an inference of that, without even getting

22   into, you know, the actual relevance of the device

23   itself, which I've argued why I think it's relevant.

24        With respect to Mr. Donovan, yes, I think

25   further discovery would be necessary to determine

```
 1    what the metadata is on his phone.  I mean, he's not
 2    a credible witness.  He says in his declaration that
 3    Your Honor has -- he says that he got the device,
 4    and then he took it out of the box, took a
 5    photograph, and then took it offsite.  That's not
 6    what happened.  He got the device.  He removed it to
 7    another floor of the building.  Then he went back
 8    and recuperated it at the instruction of
 9    Mr. Riviera, and then he removed it to its device.
10    He doesn't get into any of that in his declaration.
11         But, you know, I think there's enough here
12    for the Court to consider a more severe sanction.  I
13    mean, I would, you know, accept the idea that
14    further discovery is necessary.
15         The other piece of discovery that would be
16    necessary, I think, to nail this down -- you know,
17    as I said, there is evidence that emerged in
18    connection with the deposition of Tara Dexter from
19    Livingston Management that the GateGuard device was
20    installed after the litigation began and after
21    Amazon knew that there was a problem and after that
22    they had had an opportunity to examine the GateGuard
23    device and potentially make tweaks that would
24    prevent further interference, but we don't have the
25    installation agreements.  Amazon hasn't provided
```

1    them.  Ms. Dexter didn't have them.  And she thought

2    that, perhaps, although there's no certainty, that

3    the predecessor management company that managed the

4    GateGuard properties until sometime in 2022 was a

5    bit unclear exactly when the transfer occurred --

6    that company might have the installation agreements.

7    And I think that would be highly relevant to find

8    out, you know, whether these devices were, in fact,

9    installed -- beyond the internal records of Amazon.

10   You know, I think that the best evidence would be

11   the actual installation agreements -- after Amazon

12   knew that there was an issue and after they had

13   acquired this device.

14          THE COURT:  Okay.

15          MR. QUAINTON:  I also think just -- if I

16   could add one other thing, I think if we're going to

17   go down the road of, you know, additional discovery

18   along those lines, there's an issue of cost and

19   burden to plaintiff.  As Your Honor knows, plaintiff

20   is a small startup with limited resources, and all

21   this is very costly.  So that's, you know, also one

22   of the -- you know, on the scale, I think, the

23   *R.F.M.A.S.* case has a good articulation of the

24   progressively severe sanctions that can be imposed,

25   and I think the one right above discovery is an

1    award of costs, which I think would be appropriate.

2              THE COURT:  Okay.  Thank you, Mr. Quainton.

3              And, actually, before I hear from

4    Mr. Salant, the last time we talked, Mr. Quainton,

5    and you had indicated that Mr. Tieman was having

6    health issues.  Is he doing better?

7              MR. QUAINTON:  Mr. Tieman?

8              THE COURT:  Yes.

9              MR. QUAINTON:  Actually, I don't know the

10   answer to that, Your Honor.  Sorry.  I know he's

11   doing better in the sense that, as Your Honor knows,

12   he was incarcerated and he has been released.  And

13   the most recent information I have is that he's

14   working on getting the relevant appointments with

15   his doctors.  He was very -- I have to say, he was

16   very upbeat when I last spoke to him.  So I don't

17   know specifically what the word from the doctors is,

18   but I think being out is a big relief.

19             THE COURT:  Okay.  Well, that's good to

20   hear.

21             Mr. Salant, do you want to respond?

22             MR. SALANT:  Yes.  Thank you, Your Honor.

23             There was absolutely, positively no

24   spoliation here.  GateGuard is seeking discovery of

25   a device that is not relevant, that was not opened,

                AMM TRANSCRIPTION SERVICE  631.334 1445

1    that was not used, as supported by undisputed sworn

2    testimony we have provided to GateGuard.

3         GateGuard made a number of points in the

4    past half hour.  Many of them are not briefed or

5    before the Court, so we'll try to quickly address

6    them as best we can.

7         GateGuard mentioned the sequence of the

8    complaints about the devices in the field.  The

9    original complaint, that GateGuard reference, that

10   first put Amazon on notice, were complaints about

11   compatibility; that the Key for Business device was

12   allegedly interfering with the GateGuard device out

13   in the field.  GateGuard could not provide evidence

14   of where or how that was happening, and so that is

15   why Amazon, as it does for other intercom devices,

16   ordered a device to test its compatibility.  That's

17   what the undisputed testimony says.

18        Copying claims were made later.  GateGuard

19   later made claims about copying and IP

20   misappropriation.  And those claims, by the way,

21   were dismissed by Judge Koeltl on our motion to

22   dismiss.  So the copying claim was not a part of the

23   case.  The fact that an engineer, who, by the way,

24   is not an Amazon employee, but a third-party

25   contractor, had and discarded one of those devices

1    is not relevant.  Nor is the device that is gone

2    relevant to what happened in the field, which is

3    what GateGuard's complaint is and was about.

4          GateGuard has had more than adequate

5    opportunity to question witnesses and obtain

6    discovery on all of the individuals that he's

7    mentioned so far.  Each of them, we've listed, it

8    looks like, four people that GateGuard claims were

9    involved in this situation.  GateGuard deposed each

10    of them at length.

11          Mr. Donovan, for example, was questioned at

12    length about the photograph and what he did with the

13    discarded GateGuard device.  And so GateGuard had

14    the opportunity to question these individuals, as

15    well as to see their ESI.  We gave GateGuard eight

16    custodians, 66 search terms.  If there were any hint

17    of GateGuard's IP or the fruits of piggybacking in

18    the ESI of any of our custodians, they would have

19    been found, and they're not there in discovery.

20          So GateGuard has not been able to

21    demonstrate the relevance of the device.  Certainly,

22    not the prejudice of the device, of not having this

23    device, why this unexamined device means anything to

24    any of his claims, let alone his currently operative

25    claims.  And it's underscored by sworn testimony

1   that we've provided.

2          There's more we can say.  I mean,

3   Your Honor can tell us what questions you have, and

4   we can discuss it.  I don't really want to belabor

5   it.  We've put in our opposition.  It's docketed at

6   ECF number 138.  We don't think any of the prongs of

7   spoliation are met under the law.  It's just simply

8   not a relevant device.

9          They started pivoting, trying to obtain

10  discovery relief when it's unable to advance claims

11  that there was any interference between the two

12  devices, and so it's proffering new and different

13  theories to try and elongate discovery.

14         So I'll stop there.  And, of course, if

15  there are any questions about particulars, we're

16  prepared to answer whatever Your Honor would like us

17  to.

18         THE COURT:  No.  So, I mean, the spoliation

19  motion is rather straightforward.  I don't have any

20  questions.  I'm going to give you a written decision

21  on this, Mr. Quainton.  If there's anything you want

22  to add -- otherwise, I'm happy to move on to the

23  other issues.

24         MR. QUAINTON:  Yes.  Just a couple of

25  things, Your Honor.  I'm not going to belabor what I

```
 1    said, but there are some conclusory statements, that
 2    the device was unexamined, and that's not
 3    undisputed.  That's very much disputed.  There's a
 4    statement from a witness who is not credible because
 5    he contradicted himself, that he didn't examine the
 6    device.  But if that were enough to overcome a
 7    spoliation issue, then you could always just say,
 8    well, sorry, you know, it's gone, and I didn't do
 9    anything with it.  And I just don't think that's the
10    right result.
11            Just the other thing I did mention in the
12    letter from -- that Amazon produced in response to
13    our motion was that Amazon took -- this is on page 3
14    of their letter -- well, sorry.  I guess it's page 2
15    of the letter, page 3 of the filing.
16            Sorry.  No, page 3 of the letter, 3 of 4.
17    They say -- this is down the middle of the
18    paragraph -- "Amazon took reasonable steps to issue
19    timely litigation holds."
20            We have no idea if that's true at all.  And
21    Amazon flatout refused to provide information with
22    respect to litigation holds.  And there is ample law
23    that a party is required to provide information
24    about its litigation holds.  Not the substance, just
25    the timing and the parties to whom the holds were
```

```
 1   directed.
 2          Also, there's a footnote on page 2 of 4 --
 3   this is Amazon's response -- where Amazon states
 4   that the various witnesses stated they did not have
 5   further communication with Mr. Donovan.  That's not
 6   what they stated.  The witnesses stated they
 7   couldn't recall that.  They did not say, no, we
 8   didn't.  They said, we can't recall.  And I think
 9   that's significant.
10          One other point.  And I know Your Honor is
11   thinking of -- or is contemplating a written
12   decision.  Mr. Salant was correct, that I did make
13   some points that were not in the previous briefing,
14   which was just a letter motion for a discovery
15   conference.  I would welcome the opportunity for a
16   full briefing on this topic, given its importance,
17   but, of course, that's -- I leave that to Your
18   Honor.
19          THE COURT:  I just want to make sure I
20   heard you.  You want to submit more briefing on the
21   spoliation motion?
22          MR. QUAINTON:  I would welcome that
23   opportunity.  Yes, Your Honor.  I would welcome the
24   opportunity to because I did make -- Mr. Salant is
25   absolutely correct.  In oral argument, I raised
```

```
 1    points for which there hadn't been prior briefing.
 2    And I do think, given the importance of the issue,
 3    that full briefing would be appropriate, if
 4    Your Honor is so inclined.
 5         If you look at many of the cases, by the
 6    way, that are cited, I mean, the record before the
 7    magistrate, and sometimes before the district court,
 8    you know, reviewing a magistrate's decision is quite
 9    fulsome.  I think one of the cases -- I can't
10    remember which one -- so there had been, sort of,
11    eight rounds of briefing on the spoliation issue.
12         So, you know, enough said on that.  I think
13    it would be helpful to the Court to have further
14    briefing on this issue.
15         THE COURT:  Why don't we do this -- you
16    know, I can give you a decision based on the two
17    letters you've given me.  You know, I'm always
18    hesitant to stop a party from giving me more
19    briefing if that's what they want to do.
20         If you want to submit another letter, I'm
21    happy to take it.  I don't think you need to, but if
22    you -- I wouldn't order full motion briefing on
23    this.  I think the letters are sufficient.  The
24    standard on spoliation is well established.  I don't
25    need that discussion, you know, made more fulsome.
```

1          I understand, like, the facts as the

2     parties have laid them out, but if you want to

3     submit another letter raising anything else, you

4     know, I won't stop you.  But that being said, I

5     don't know that it's necessary.

6          MR. QUAINTON:  Understood.

7          If that were to happen, when would

8     Your Honor want that to be submitted?

9          THE COURT:  So, you know, I'm flexible.  So

10    if there's an amount of time you'd like to submit

11    another letter, you know, I can give you that time.

12         MR. QUAINTON:  I assume Gibson Dunn would

13    like the chance to respond to that.  I mean -- so I

14    don't know.  I'm just assuming they would like that.

15         But if I could have -- I don't know.  I

16    mean, I just have a very busy calendar right now.  I

17    don't know if I could have ten days.  Is that too

18    much?

19         THE COURT:  No.  I mean, as I said, I'm

20    open to giving you as much time as you need for

21    this.

22         So ten days would be -- ten days, unless I

23    counted wrong, is June 7th.  But if you need more

24    time, that's fine, too.

25         MR. QUAINTON:  Yes.  Maybe to the end --

```
 1    what is that?  Is that the end of the week or the
 2    beginning of the week?  I can't --
 3              THE COURT:  That's a Friday.  June 7th is
 4    the end of a week.
 5              MR. QUAINTON:  So the following Monday
 6    would be -- that's when I tend to catch up on a lot
 7    of work, is over the weekend, so the following
 8    Monday would be ideal.
 9              THE COURT:  Sure.  So why don't you submit
10    anything else, any other letter, not a full brief,
11    that you'd like to submit by June 10th.
12              MR. QUAINTON:  Okay.  Is there a page limit
13    that Your Honor would like me to keep within?
14              THE COURT:  I mean, I'll take whatever you
15    give me.  I just -- you know, I would encourage you
16    not to write a full brief.
17              MR. QUAINTON:  Understood.
18              THE COURT:  Mr. Salant, do you want time to
19    respond?
20              MR. SALANT:  Yes, Your Honor.
21              Our view is additional briefing is not
22    needed, but we would take the opportunity to respond
23    to whatever GateGuard writes.  We'd comply with your
24    local rules, which require three-page letters.
25              THE COURT:  Okay.  So, you know, I'm happy
```

1    to give you as much time as you want.  Do you want

2    another, I think, 12 days?

3              MR. SALANT:  Five days would be just fine.

4              THE COURT:  Okay.  So I think that puts you

5    on a weekend.  So how about we say June 17th?

6              MR. SALANT:  Sure.  That's fine with us,

7    Your Honor.

8              THE COURT:  Okay.  Great.

9              And, again, just to make this clear, I

10   think I can give you a decision based on the letters

11   you have, but, you know, if there's something else

12   the plaintiff wants to put forth, I'll take it.  I

13   don't necessarily, you know, want to -- well, I

14   think I've made it clear.

15             So, again, Mr. Quainton, if you want to

16   submit anything, you have until June 10th.  And if

17   Amazon wants to respond, they can respond by

18   June 17th.

19             MR. QUAINTON:  Thank you, Your Honor.

20             Just to be clear, I understand that brevity

21   is the best approach here, but just to be clear

22   there, the three-page limit is not a mandatory.  Do

23   I have that right, or not?

24             THE COURT:  I won't reject it if you go

25   over three pages.

AMM TRANSCRIPTION SERVICE  631.334 1445

```
 1              MR. QUAINTON:  Okay.  Thank you,
 2    Your Honor.
 3              THE COURT:  I mean, I think we've been --
 4    we've had enough of these conferences.  I'm
 5    generally pretty flexible, but I -- you know, I
 6    don't think you need more than three pages, so you
 7    could -- I would certainly urge you to stick to
 8    three pages, but given that you want to write more,
 9    you know, I will take it and I'll read it.
10              MR. QUAINTON:  Thank you, Your Honor.
11              THE COURT:  Is there any -- do we want to
12    move on to the next part topic, which I think --
13              MR. SALANT:  Yes, Your Honor.
14              Before we move on to the next topic, we
15    understand that counsel for some of the third
16    parties who are the subject of GateGuard's motions
17    to compel might be on the line.  We thought if
18    GateGuard is, indeed, not moving forward with those
19    motions, it might be helpful to just let -- to say
20    so and let those counsel go, if they like.
21              THE COURT:  Yeah, I think that would make
22    the most sense.  I didn't realize they were on the
23    line.
24              And, Mr. Quainton, I think you had said
25    that some of the motions had been resolved.
```

```
 1              MR. QUAINTON:  Yes.  Let me just go through
 2    that quickly.  I'll start with the one for the
 3    person who is on the call, and that's Mr. Holland, I
 4    guess, for Captain Horse.  I guess, if he needs to
 5    say anything, he can say anything.
 6              And, yes, we have spoken, and we are not
 7    moving forward with that, with the motion to compel.
 8    What we are planning on doing -- and GateGuard has
 9    met and conferred with Amazon.  So, just so
10    Your Honor knows, the issue with respect to
11    Mr. Holland's client, which is JET, J-E-T, which
12    stands for Just Eat Takeaway -- Just Eat Takeaway is
13    the parent company for, at least in the United
14    States, better known as Grubhub.  And Grubhub has an
15    agreement with Amazon, pursuant to which Grubhub
16    pays Amazon for access to buildings, including
17    properties that are under contract with GateGuard.
18    And Mr. Holland has taken the position that that
19    information is within the custody and control of
20    Amazon and should be requested from Amazon.
21              I won't belabor the issue.  We've met and
22    conferred.  And I will be submitting a short letter
23    motion under 16(b) for permission to reopen
24    discovery for, you know, the limited purpose --
25    actually, there are two limited purposes; one of
```

1    which I alluded to, which is to obtain the

2    installation agreements, if they exist, from the

3    predecessor to Livingston Management.  And the other

4    is to obtain the Key Access Program Agreement with

5    Grubhub that is in Amazon's custody and control.

6         We've met and conferred.  Amazon opposes --

7    will oppose both of those motions.  I don't know if

8    we need to get into the merits of that.  But as far

9    as Mr. Holland goes, unless he feels the need to add

10   anything, I think we can let him go because the

11   plaintiff is not pursuing the motion to compel

12   against his client.

13        THE COURT:  Mr. Holland, did you want to

14   add anything?

15        MR. HOLLAND:  No.  I have nothing to add.

16   But thank you for getting to this sooner than maybe

17   it otherwise would have gotten to, so I appreciate

18   that.

19        THE COURT:  Yeah.  No.  Apologies.  I could

20   have done it earlier.

21        MR. HOLLAND:  No, I didn't want to

22   interrupt.  I didn't want to interrupt the flow that

23   you maybe had planned, but I appreciate getting to

24   it now.  And I'll be dropping off the line, unless

25   there's anything else you need from me.

AMM TRANSCRIPTION SERVICE  631.334 1445

1          THE COURT:  I don't think we need anything.

2    Thank you very much.

3          MR. HOLLAND:  Okay.  Take care.

4          THE COURT:  Okay.  So, Mr. Quainton, the

5    motion at ECF 143, which is the motion to compel

6    Just Eat Takeaway, for all the reasons you

7    indicated, you're not moving forward with that one.

8          MR. QUAINTON:  Correct.

9          THE COURT:  Okay.  And you had indicated

10   that ECF 141, which was the motion to compel Tara

11   Dexter, has been resolved.

12         MR. QUAINTON:  That is correct, Your Honor.

13         THE COURT:  Any other ones that have been

14   resolved?

15         MR. QUAINTON:  So there are two that are

16   remaining.  One is for -- was directed to Robert

17   Ezrapour at K&R Realty.  And I have spoken to -- I

18   think it's Mr. Ezrapour's son.  And they have

19   indicated that they don't have any documents, but

20   they will be providing a declaration, which I don't

21   have yet.  And so given that, we will not be

22   proceeding with a motion against them.

23         The only one that remains is the motion

24   directed to Baruch Hirsch at a company called

25   New Amsterdam.  And I'm not sure what to do with

AMM TRANSCRIPTION SERVICE  631.334 1445

1   that.  I mean, Mr. Hirsch was served with a

2   subpoena, and the affidavit of service of the

3   subpoena is on the docket.  My colleague, Jonathan

4   Gross, served him with the motion to compel.  And I

5   think he has a certificate of service for that.  I

6   don't know if it's on the docket.  But I have not

7   been able to get any response from Mr. Hirsch.  And

8   I was told that there is no such person, even though

9   he's listed as a principal.  There is a Brad Hirsch,

10  and I haven't been able to reach him.

11      So I think if Your Honor could give me two

12  more weeks to see if there's anything that I can get

13  out of Mr. Hirsch, or at least to make -- I haven't

14  been able to make contact with them.  They've

15  ignored my calls, so I'm not sure I'll have any

16  success.  But, you know, that's the only one.  If I

17  could have a little more time to see if I can get

18  some response from them, that would be appreciated.

19      THE COURT:  Yeah, so that one, ECF 142, the

20  certificate of service is on the docket.  I could

21  give you two more weeks to try to see if you get

22  this resolved.  If not, I can issue a relatively

23  short order on this.

24      MR. QUAINTON:  That would be fine,

25  Your Honor.  Thank you.

```
 1              THE COURT:  So two weeks -- why don't you
 2    just -- if you could send me a letter update by June
 3    11th, letting me know what you'd like to do with the
 4    motion at ECF 142.
 5              MR. QUAINTON:  Thank you, Your Honor.
 6              THE COURT:  Is there anything else we need
 7    to discuss?
 8              MR. SALANT:  Yeah.  Yes, Your Honor.  There
 9    are a few items that are on the docket that we could
10    review quickly, if you don't mind.
11              The first is, of course, GateGuard's
12    pending motion to amend.  Fact discovery closed in
13    February, and there was a schedule for expert
14    discovery that had been agreed and so ordered, but
15    the Court stayed expert discovery pending resolution
16    of GateGuard's motion for leave to file a second
17    amended complaint.  Once that motion to amend is
18    decided, we, you know, would seek to reinstate an
19    expert discovery schedule and a summary judgment
20    schedule to move this case forward.  That's the
21    first main thing on the docket.
22              And then the last thing on our -- oh,
23    pardon me.  I'm sorry if I was cutting you off.
24              THE COURT:  Oh, no, I didn't say anything.
25              MR. SALANT:  The other item on the docket
```

 1   is the dispute over the Court's ruling that

 2   GateGuard had waived attorney-client privilege over

 3   its document productions.

 4        At ECF number 163, GateGuard moved for

 5   reconsideration of the Court's ruling.  And at ECF

 6   number 167, Amazon opposed that motion for

 7   reconsideration.  I believe GateGuard put in a

 8   reply, and so that motion for reconsideration is

 9   fully briefed.

10        THE COURT:  On the motion for leave to

11   amend, I don't need argument on that, unless the

12   parties, you know, want to request it.  And that

13   would be a written decision, which, you know, I'll

14   get to as soon as I can.  I realize that it, sort

15   of, puts the case on hold, so I'll try to prioritize

16   it, but I don't really need argument on that,

17   unless, again, the parties really want to argue it.

18        MR. SALANT:  We agree, Your Honor.  It has

19   been briefed quite fulsomely.

20        MR. QUAINTON:  Your Honor, this is Eden

21   Quainton for GateGuard.  I apologize.

22        Actually, I would welcome the opportunity

23   for briefing -- for oral argument.  It doesn't have

24   to be long and it -- but I think it would be -- I

25   think it's always helpful, even if the papers are

1    clear.  So plaintiff would request the opportunity

2    for all argument.

3           THE COURT:  Why don't we do this, because I

4    also don't want to needlessly have the parties incur

5    costs.  If I have any questions that I think need

6    answers, I'll schedule oral argument on the motion

7    to amend.

8           MR. QUAINTON:  Very well, Your Honor.

9           MR. SALANT:  Thank you.

10          THE COURT:  For the motion to reconsider, I

11   have it as a letter motion to reopen discovery at

12   ECF 146.

13          Is that the one, Mr. Salant, that you were

14   talking about?

15          MR. SALANT:  No, Your Honor.  That is yet a

16   separate issue, I suppose.

17          What I was referring to was GateGuard's

18   motion at ECF 163, which was a motion for

19   reconsideration of the Court's ruling at ECF 155,

20   that GateGuard had waived privilege over its

21   document productions.

22          THE COURT:  Okay.  So, I guess, just to

23   keep things rolling -- and I realize you guys have a

24   few things that have, sort of, been pending for a

25   bit of time.  I apologize for the delay on our end.

1    We had a trial that took most of April, and then
2    we're trying to catch up.
3          So I will turn to these, both the motion
4    for reconsideration, and then the motion at ECF 146,
5    which was to reopen discovery -- I'll turn to those
6    and try to get you answers as quickly as possible.
7          I did have a question for Mr. Quainton on
8    the motion at ECF 146.
9          MR. QUAINTON:  Yes, Your Honor.
10         THE COURT:  In your letter, it's the last
11   full paragraph on the first page.  It starts with
12   "separately."
13         MR. QUAINTON:  Hold on.  Let me pull that
14   up, Your Honor, if I may.  I didn't --
15         THE COURT:  It's all right.
16         MR. QUAINTON:  So sorry.  Yes.  Go ahead.
17         THE COURT:  You mentioned in that paragraph
18   discussions with Mr. Tieman.
19         MR. QUAINTON:  Oh, right.  Yes.  So --
20         THE COURT:  I'm just curious because I
21   thought at the last conference we had in February,
22   he was -- I think it was February 28th.  You had
23   said that he was ill and in prison, and so -- and
24   you hadn't had, you know, these types of discussions
25   with him.  So I'm curious as to when the discussion

AMM TRANSCRIPTION SERVICE  631.334 1445

1    would have occurred, that the information came out.

2         MR. QUAINTON:  I'd have to check my

3    records.  I think it came out after that conference.

4    My understanding was, as I indicated at the last

5    conference, and then -- again, I have to check my

6    notes, but I think I spoke with Mr. Tieman's father

7    and realized that there may be some nondisclosure

8    agreements.  And so, you know, I want to just to

9    have the opportunity to correct that.

10        I certainly didn't say anything, you know,

11   knowing that it was incorrect.  I represented to the

12   Court what I thought was true, but then I -- I

13   believe what I did -- and this has been a while now,

14   but I think I double-checked and realized that there

15   were some, or was told there were some, and then

16   subsequently filed this letter.

17        THE COURT:  Okay.  So the double-checking

18   and the conversations happened after our February

19   28th conference.

20        MR. QUAINTON:  Yes.

21        THE COURT:  Okay.

22        MR. QUAINTON:  That's the purpose of this.

23   That's why this was filed.

24        MR. SALANT:  And, Your Honor, for Amazon,

25   I'll just note that we opposed that letter motion at

1  ECF number 148.

2           THE COURT:  148, yes.  I have the letter.

3           MR. SALANT:  All right.  So you know our

4  position.  And it's only become more clear in the

5  months since fact discovery closed that fact

6  discovery should not be reopened.  Your Honor gave

7  GateGuard numerous chances, and then issued a

8  written order saying they had one last chance, which

9  they blew.

10          MR. QUAINTON:  I don't think that's

11 entirely fair.  I mean, that's exactly why I filed

12 this.  And I didn't -- I wanted to get guidance from

13 the Court before submitting anything further.

14          THE COURT:  Okay.

15          Okay.  So are there any other open issues

16 that I need to address?  Because, otherwise, I know

17 the ones that need a ruling from me, which I will

18 give you as quickly as possible.  But if there's

19 something else we need to discuss, let me know.

20          MR. QUAINTON:  The only other thing,

21 Your Honor, is what I alluded to earlier, is a 16(b)

22 motion with respect to the Grubhub, KAP and the

23 Westminster installation agreements.  And I'll try

24 to have that, obviously, as soon as possible.  And

25 it will be, you know, the short request for a

AMM TRANSCRIPTION SERVICE  631.334 1445

1  discovery conference.  And I will lay out the

2  diligence on my end.  And I understand GateGuard

3  will oppose, but I'll try to get that in by the end

4  of this week, if at all possible.

5          MR. SALANT:  From Amazon, Your Honor, we

6  have nothing further.  If and when GateGuard files

7  another letter motion to reopen fact discovery, we

8  will oppose it when it comes in.

9          THE COURT:  Okay.

10          Okay.  So, Mr. Quainton, if you just want

11  to get that letter in, and then, you know,

12  potentially, we can address it at another

13  conference.

14          MR. QUAINTON:  Thank you, Your Honor.

15          THE COURT:  Okay.  Thank you very much,

16  everyone.

17          MR. SALANT:  Thank you, Your Honor.

18

19                      0o0

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4        I, Adrienne M. Mignano, certify that the

5    foregoing transcript of proceedings in the case of

6    Gateguard Inc. v. Amazon.com Inc., Docket #21CV9321

7    was prepared using digital transcription software and

8    is a true and accurate record of the proceedings.

9

10

11   Signature  ___*Adrienne M. Mignano*_____

12                   ADRIENNE M. MIGNANO, RPR

13

14   Date:      May 29, 2024

15

16

17

18

19

20

21

22

23

24

25