# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

GATEGUARD, INC.

       *Plaintiff,*                                  Civil Action No. 21-cv-9321 (JGK) (VF)

    v.

AMAZON.COM, INC.,
AMAZON.COM SERVICES, INC.,
AMAZON.COM SERVICES, LLC,
AMAZON LOGISTICS, INC.

       *Defendants*.

---

## <u>GATEGUARD'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT</u>

QUAINTON LAW, PLLC
Eden P. Quainton
2 Park Ave., 20th Fl.
New York, NY 10016
212-419-0575
equainton@gmail.com
*Attorneys for Plaintiff GateGuard, Inc.*

**PRELIMINARY STATEMENT**

Amazon's Motion to Dismiss (the "Mot. Dismiss") GateGuard's Second Amended Complaint (the "SAC") represents an end-run around the well-reasoned decision of Magistrate Judge Valerie Figueredo, (the "Order for Leave") Dkt. 207, granting GateGuard's Motion for Leave to File a Second Amended Complaint, Dkt. 115 (the "Mot. for Leave"). Judge Figueredo carefully reviewed Amazon's arguments against the filing of the SAC with new causes of action for direct trade secrets copying and class-wide damages resulting from Amazon's unauthorized installation of the Key for Business (the "Key") and found them unavailing. Specifically, Judge Figueredo rejected Amazon's arguments that the filing of GateGuard's new claims would be futile because they would not survive a motion to dismiss. Order for Leave, at 10-19.

Now, rather than filing objections under Fed. R. Civ. P. 72, Amazon is attempting a second bite at the apple, repeating its already rejected arguments without so much as a reference to the decision of Judge Figueredo. This approach does not provide Amazon with the hoped-for result. GateGuard's direct trade secrets copying claim is based on evidence of access to the GateGuard device obtained during discovery when it was revealed that, not only had Amazon obtained a GateGuard device through one of its so-called "channel partners," but it had also sent the intercom to a top-secret research laboratory for analysis and then, in the middle of discovery, destroyed the device. GateGuard's proposed class claim is based on evidence obtained in discovery showing a widespread pattern of illegal conduct by Amazon that extends far beyond GateGuard itself.

**PROCEDURAL AND FACTUAL BACKGROUND**

This matter began with the filing of a Complaint on November 10, 2021. Dkt. 1. Following a pre-motion conference, Plaintiff filed a First Amended Complaint on January 24, 2022. Dkt. 2. Defendants filed a motion to dismiss on March 10, 2022, Dkt. 18, which was

denied in part and granted in part by order of Court on February 16, 2023 (the "Initial Mot. Dismiss Order"). Dkt. 30. After the denial of Amazon's motion to dismiss, on March 20, 2023, the District Court referred the matter to Magistrate Judge Valerie Figueredo for general pre-trial matters, including discovery and non-dispositive motions. Dkt. 35. Under Judge Figueredo's supervision, the parties engaged in discovery until the cut-off date of February 29, 2024. Dkt. 88. During discovery, Amazon revealed that it had ordered a channel partner, ClearHome, Inc. ("ClearHome"), to acquire two GateGuard intercoms and arrange for their shipment to a secret Amazon research facility in California and to its Key for Business operational headquarters in Las Vegas. Declaration of Eden P. Quainton, dated November 7, 2024 (the "Quainton Decl."), Ex. A, Extracts from deposition of Alex Aguilar, dated December 19, 2023 (the "Aguilar Dep."), 380:10-15.

The custodian of the GateGuard device at the Amazon research facility testified that, while discovery was ongoing, he had "thrown away" the GateGuard device that had been sent to him for analysis. Quainton Decl., Ex. B, Extracts from deposition of Paul Donovan, dated December 15, 2023, 120:25-121:1. In response, GateGuard filed a letter motion for spoliation sanctions on February 23, 2024. Dkt. 123. This motion is pending.

As a result of facts developed during discovery, GateGuard sought leave to file a proposed Second Amended Complaint (the "SAC") from Magistrate Judge Valerie Figueredo on February 23, 2024, Dkt. 115 (the "Mot. for Leave"). The SAC contains two broad new causes of action: (1) a direct copying claim and (2) a new class action claim based on Amazon's pattern of installing the Key for Business without authorization from what GateGuard defined as the "access rights holders," or those parties, whether property managers or owners or their delegates, such as GateGaurd, with the authority to determining whether to permit the installation of the Key. GateGuard's direct copying claim arises from Amazon's access to the

GateGuard device itself and its admitted desire to test the properties of the GateGuard intercom at the same time that it was developing an intercom of its own for introduction into the European market and expanding the functions of the Key to make it more attractive to the clients of parties such as GateGuard.

GateGuard's class claim is based on a plethora of evidence that Amazon systematically failed to obtain authorization from what GateGuard terms "access rights holders" – or those with the legal authority to authorize access to a building – for the installation of the Key, causing harm to the rights holders and misappropriating revenues to which these parties were entitled. *See* Quainton Decl., Ex. C.

Amazon opposed the Mot. for Leave on the grounds, *inter alia*, that the filing of the Second Amended Complaint would be futile, as GateGuard could not state a claim on which relief could be granted with respect to its new claims. Dkt. 130 at 3, 11, 12-13. On July 10, 2024, Magistrate Judge Valerie Figueredo rejected Amazon's arguments and granted GateGuard leave to amend the FAC and file the SAC (the "Order on Mot. Amend"). Dkt. 207. Judge Figueredo first found that Amazon had failed to establish it would suffer cognizable prejudice from the filing of the SAC. Order on Mot. for Leave, at 6-9. Judge Figueredo then turned to what she termed the "crux" of Amazon's opposition to the Mot. Leave, namely, Amazon's claims of futility. Order on Mot. for Leave, at 10. With respect to GateGuard's class claims, Judge Figueredo ruled that the issue at the motion to dismiss stage is not whether plaintiff had adduced sufficient facts to certify a class, but whether there was a reasonable likelihood, based on the pleadings, that plaintiff would be able to prevail on a future motion for class certification. As Judge Figueredo wrote, "[t]o determine whether GateGuard's proposed class claims are futile, the Court must "evaluate the likelihood that [the] proposed class will be certified pursuant to [Rule 23(c)]." Presser, 218 F.R.D. at 56 (emphasis added); *see also Pierre*

*v. JC Penney Co., Inc.*, No. 03-CV4782 (JFB) (VVP), 2006 WL 407553, at *6 (E.D.N.Y. Feb. 21, 2006) (holding that when ruling on a motion to amend to include class claims, "the court is not deciding whether the instant action may proceed as a class action since that issue will ultimately be resolved . . . on a motion for class certification"). Order on Mot. for Leave, at 10. Applying the law applicable at the pleadings stage, Judge Figueredo found that, "viewing the proposed Second Amended Complaint in the light most favorable to GateGuard, it is likely that Plaintiff will be able to satisfy all of the requirements for class certification under Rule 23." Order on Mot. for Leave, at 11.

With respect to GateGuard's trade secrets claims, Judge Figueredo found that "GateGuard ha[d] supplemented its allegations to plausibly allege a trade secrets claim under federal and New York law." Order on Mot. for Leave, at 17. First, Judge Figueredo determined that GateGuard had sufficiently defined its trade secrets for pleading purposes: "GateGuard alleges that it is the combination of features and how those features function together in its "AI Doorman" intercom device—the intercom, mobile app, web-based online platforms, servers, communications devices, and operational data—that is the protected trade secrets." Order on Mot. for Leave, at 17. More importantly, Judge Figuerdo held that "although GateGuard's prior allegations concerning copying by Amazon were conclusory (*see* ECF No. 30 at 42), GateGuard has supplemented those allegations in its proposed Second Amended Complaint. GateGuard now alleges that Amazon wrongfully and without authorization gained access to a GateGuard device, allowing Amazon to examine the functioning of the device when Amazon was developing its own Ring Intercom system for sale in the European market." Order on Mot. for Leave, at 18. As Judge Figueredo noted, whether Amazon did or did not examine the device is a fact question that cannot be resolve at the pleading stage, particularly where, as here, GateGuard

has "adequately alleged a substantial similarity between Amazon's Ring Intercom and GateGuard's device." *Id.*

In the wake of Judge Figueredo's decision, the parties met and conferred, and agreed to mediate the dispute to assess whether a resolution was possible before substantial new costs were incurred in litigating the SAC, which would take the litigation to a whole new level. Quainton Decl. at ¶ 7. Accordingly, the parties sought a stay of discovery, Dkt. 213, and agreed to mediate the dispute before Judge Henry Pittman of JAMS. Quainton Decl. at ¶ 9. The mediation is scheduled for November 12, 2024. *Id.* at ¶ 10.

## STANDARD OF REVIEW

When a magistrate judge rules on a motion for leave to amend, this ruling is generally considered non-dispositive. *Utica Mut. Ins. Co. v. Century Indem. Co.*, No. 6:13-CV-995, 2015 WL 3429116, at *2 (N.D.N.Y. May 11, 2015). *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 341 (S.D.N.Y. 2009) ("the weight of authority appears to be that such motions are non-dispositive regardless of the outcome"). *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05 CV 3749 KMW DCF, 2009 WL 3467756, at *4 (S.D.N.Y. Oct. 28, 2009) (same); see also *Stetz v. Reeher Enters., Inc.,* 70 F.Supp.2d 119, 120 (N.D.N.Y.1999). Non-dispositive motions are subject to a clearly erroneous standard of review. *Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) (citing 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a)).

Here, the matter was referred to Judge Figueredo for all non-dispositive motions. *See supra* at 2; Dkt. 88. The proper course for Amazon would have been to object to Judge Figueredo's order Fed. R. Civ. P. 72. While a motion to dismiss under Fed. R. Civ. P. 12(b)(6) can be brought at any time, when a matter has been referred to a magistrate for non-dispositive matters, the magistrate judge's ruling is subject to review under a clearly erroneous standard. Amazon does not even address Judge Figueredo's thoughtful opinion in passing and simply

notes, in a single line, that leave to amend was granted. To be allowed in an amended pleading, any additional claims cannot be futile, which Courts have interpreted to mean that the claims must be capable of surviving a motion to dismiss. *Shargani v. New York City Dep't of Env't Protetion*, No. 21 CIV. 337 (AKH), 2022 WL 1046764, at *2 (S.D.N.Y. Apr. 7, 2022) ("whether amending a complaint is futile typically depends on whether the proposed amended complaint states a claim"). Judge Figueredo has already determined that claims in the SAC should be allowed and are thus, in her judgment, capable of surviving a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

In considering a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), the court must construe a complaint liberally, "accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556, U.S. at 678 (quoting *Twombly*, 550 U.S. at 556)). Stating a claim requires a complaint "with enough factual matter (taken as true) . . . to raise a reasonable expectation that discovery will reveal evidence" of unlawful conduct. *Twombly*, 550 U.S. at 556. To the extent a pleading contains any defects that can be cured, the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This is especially so where the Court has not previously weighed in on "the precise defects" of the pleading. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 191 (2d Cir. 2015).

## LEGAL ARGUMENT

I.    **THE SAC STATES A CLAIM FOR DIRECT COPYING**.

The Court has already held that GateGuard has sufficiently alleged the existence of trade secrets for its trade secrets claims under the Defend Trade Secrets and New York common law. Initial Mot. Dismiss Order, at 42-43.

Plaintiff's direct copying claim is based on the accumulation of evidence obtained during discovery, the most recent piece of which resulted from the deposition of Gerry Nievera, the Head Sales and Operations for the Amazon Key or Business (the "Amazon Key" or the "Key for Business"). *See* Quainton Decl., Ex. D, Extracts from deposition of Gerry Nievera, dated January 26, 2024 (the "Nievera Dep."). GateGuard had previously established that Amazon had procured a GateGuard device without GateGuard's consent through a company called ClearHome and, in or about March or April, 2021, had sent this device to a top-secret research center. Dkt. 114, Ex. B. In following up on the fate of its device, GateGuard learned that during the same year that Amazon unlawfully acquired the GateGuard device, (a) Amazon was actively procuring third-party intercoms for "compatibility" with a new intercom device known as the Ring Intercom that would soon thereafter be marketed and (b) Amazon was training its employees and agents on the means of "integrating" third-party intercoms with the Ring Intercom. Nievera Dep. at 81:13-21; 85:16-22, 86:1-7; 103:20-24. It is a reasonable inference that a core purpose of the testing and training activities were designed to improve the functionality of the Ring intercom device. In support of this inference, GateGuard further learned that Amazon's actual engineers are located at the SJC13 A2Z center to which Amazon sent the device for testing. Nievera Dep. 78:13-15.

Mr. Nievera then testified that he had personally taken possession of intercom devices from an unsecure location at Amazon's top secret research center on the seventh floor and had

placed these devices in the center's locked laboratory on the first floor, Nievera Dep. 148-149.

An Amazon engineer, Mr. Paul Donovan, testified that he "had it [the GateGuard device]

before, then it was moved." Donovan Dep, 159:7-9. This statement strongly supports the

inference that the GateGuard device was among those taken by Mr. Nievera to the locked

laboratory room on the first floor. Mr. Donovan then admitted that that the device was returned

to him at some point he could not remember and that, in August 2023, **in the middle of**

**discovery**, he had "thrown away" (*i.e.*, destroyed or spoliated) the GateGuard device, so that it

can no longer be verified whether or to what extent Amazon engineers analyzed the device and

exploited its inner architecture. Donovan Dep., 121:17-25 – 122:1. The SAC reflects this new

information learned during discovery. SAC, ¶¶ 135-142.

The actual Ring Intercom itself functions in a similar way to the GateGuard intercom,

using the same integrated video camera technology to record pictures and videos of persons

approaching and entering the door, and alerting the user of these events. SAC ¶¶ 12, 142-47.[1]

At the exact same time that Amazon had acquired the GateGuard device for testing, its initial

deployment of the Ringtercom was encountering difficulties in the operation of its "rich

notification" system, and it is a reasonable inference that it tested the GateGuard device to copy

superior features from GateGuard. SAC, ¶¶ 145-47.

In addition, during discovery GateGuard learned that Amazon had rolled out an

application that was intended to be directly marketed to property owners and that strikingly

resembled GateGuard's own Property Panel, the benefits of which Mr. Teman had pitched to

Amazon in October, 2020. SAC ¶ 15-16, 118-120.

---

[1] The order of the paragraphs was inadvertently inverted in the SAC. The text just before paragraph 143 was intended to appear just after paragraph 144. GateGuard submits the meaning is clear in context.

The timing of Amazon's research and development efforts with respect to the Ring Intercom and other Ring products, the sequencing of its product introductions after the acquisition of the GateGuard device, the similarities in features of the GateGuard system and features of the Amazon Key and Ring products, the obfuscation surrounding the acquisition of the GateGuard device, the apparent removal of the device to a locked laboratory, and the willful destruction of the intercom in the middle of discovery, all raise a plausible inference of direct copying sufficient to satisfy the pleading standards of *Iqbal* and *Twombly*.

The claim of copying alleged at this stage in the proceedings is plausible on its face, based on the new evidence uncovered during discovery that a GateGuard device was (a) wrongfully procured by Amazon, (b) sent to an ultra-secret research center, (c) apparently taken from an open area to a locked laboratory, and (d) destroyed during discovery, during the very period when Amazon was developing a new intercom system for the European market and rolling out new features for both its Ring and Amazon Key product lines, European market, all of which share features with the GateGuard device and system.

Amazon's arguments in the Mot. Dismiss merely retread old ground and do not add anything to the foregoing factual discussion and Judge Figueredo's analysis above. Amazon first argues that GateGuard fails to plead the existence of a trade secret. The Court has already rejected this argument. Initial Mot. Dismiss Order at 37-42. Amazon now argues that the same trade secrets identified in the First Amended Complaint (the "FAC"), and that the Court found sufficient for purposes of plaintiff's initial trade secret claim, are not sufficiently alleged when repeated verbatim in the SAC. *See* Mot. Dismiss at 9. *Compare* FAC, Dkt. 14, ¶ 86, 165 *with* SAC, Dkt. 223 ¶ 88, 178. The Court's determination on this issue as a matter of pleading is the law of the case and cannot be challenged on a second motion to dismiss. In addition, the SAC contains an expanded identification of the trade secrets at issue in this case, namely, the

combination of features and how those features function together in its "AI Doorman" intercom device—the intercom, mobile app, web-based online platforms, servers, communications devices, and operational data. SAC at ¶¶ 5, 9-11. This entire system constitutes a trade secret. *See* paragraph 11 of the SAC, which states:

> *GateGuard keeps the functioning of its system completely secret* and only a highly developed research lab, such as the one at which the GateGuard device was analyzed, examined and ultimately copied, would have the tools and experience to gain access.

Amazon argues that virtually any internet-enabled device will have the features of the GateGuard system as a whole. This is not true. GateGuard's system was "uniquely designed to provide an access control solution used by tenants/visitors, property owners/managers, and delivery services." SAC ¶ 9. This unique system "enable[s] building managers to autonomously track everyone who enters, buzzes, or uses a guest code" SAC ¶ 6. An autonomous – or AI based – tracking system is *not* widely available. Similarly, the system generates "real-time logs of these activities [entering, buzzing, etc.]  that managers can view, filter, and print from any mobile phone, tablet, or computer, which are accessible via built- in cellular modems that connect the units to the Internet." SAC ¶ 7. Such a real time logging system, included as part of the GateGuard "Property Panel" is also *not* widely available. Indeed, Amazon itself introduced its own version of the GateGuard Property Pane, launched after Amazon had illegally acquired the GateGuard device for inspection at its research lab as a "new Web based portal" that would provide property managers with new reasons to install the Key. SAC ¶ 15. Similarly, GateGuard "rich notifications," also available as part of the GateGuard system as a whole, are not common and widely available. Amazon's introduction of a similarly function as part of its roll-out of the Ring Intercom was riddled with bugs and glitches, demonstrating that a well-functioning "rich notification" system such as GateGuard could not be acquired off-the-shelf and even a multi-billion-dollar company such as Amazon struggled with the technology

necessary to present a smoothly functioning rich notification system to consumers. SAC ¶¶ 118, 142-47. GateGuard's trade secret counts make clear that they are not limited solely to the hardware features the Court has already held to be sufficiently pled for trade secret purposes by incorporating by reference all previous paragraphs and using the word "including" to underscore that the features that the features identified in the trade secrets counts are not exhaustive. SAC ¶ 178.

Amazon then argues that the SAC does not contain any allegations that raise a plausible inference of economic value in the GateGuard system. This is completely unpersuasive. First, if the GateGuard intercom and system had no value, Amazon's surreptitious acquisition of the GateGuard device and the shipment of the device to a top-secret research laboratory for analysis would not make sense. Second, and relatedly, the timing of the illegal acquisition of the device demonstrates the value of the device and the system, since Amazon went out of its way to acquire two GateGuard intercoms at precisely the moment it was developing its own intercom and just before it would introduce its own version of the GateGuard Property Panel. Third, Amazon's own marketing materials make clear the value it saw in features in the GateGuard system. For example, Kaushik Manu, the self-described inventor of the Key and one of the developers of the Ring Intercom, describes the value added of the Ring Intercom as follows: "If someone was to ask me why they should get a Ring Intercom, I'd say, it makes it so much easier to open the door without getting to the door."[2] As noted, the bugs in the initial roll-out of

---

[2] The Court can take judicial notice of this quotation from Mr. Manu's publicly available Linked-In page. https://www.linkedin.com/search/results/all/?keywords=kaushik%20mani%20ring%20europe&origin=GLOBAL_SEARCH_HEADER&sid=eHC. Another portion of Mr. Manu's Linked-In profile states: "Kaushik Mani is the Director of Amazon Key. After founding Amazon Key's devices business, he scaled it to be one of Amazon's largest property technology businesses." https://www.linkedin.com/in/kaushik-mani-970b57b/. *See also* SAC ¶ 12. Mr. Manu's deposition should be taken to probe further his knowledge of the links between the Key, the Ring Intercom and the GateGuard device and system.

the Ring Intercom make clear that having a well-function system of rich notifications was central to the "ease of opening the door without getting to the door" and studying how the GateGuard intercom achieved this result of obvious value to Amazon. Similarly, Amazon's marketing materials relating to its version of GateGuard's Property Panel make clear that a well-functioning system for tracking entries, exits and deliveries to their buildings delivered real value to the Key's customers. *See* SAC ¶ 15. GateGuard had been offering its Property Panel for years before Amazon rolled out its version of a "property management portal for real estate managers," *id.,* and being able to study the code and actual function of the GateGuard system on the research workbench would be obvious value to Amazon, as demonstrated by the lengths to which Amazon went to obtain a device surreptitiously.[3]

This point brings the Court to the heart of the matter: the inference of direct copying raised in the SAC and supported by discovery. Amazon argues that GateGuard's allegations of copying are "conclusory." Mot, Dismiss at 12-14. But it has been established that Amazon acquired a GateGuard device, sent the intercom for testing and analysis to its top-secret research lab—and then destroyed the device. SAC ¶¶ 135-147. The best evidence of copying would be the GateGuard device itself and the physical evidence that could be gleaned from the device showing whether it was opened by Amazon researchers, what components were removed and separately studied, what specific tests were performed on the device, how and when it was connected to the Internet, among other matters. But none of the questions can be answered because Amazon destroyed the device. Amazon's hand-on-heart assertion that it never opened the device and threw it away because it was of no interest to Amazon makes no sense given the lengths Amazon went to acquire the device surreptitiously. Even more fundamentally, whether

Amazon opened, used, analyzed, tested and copied the device raises a fact question that now can now **_only_** be decided by further discovery because of Amazon's conduct in destroying the device itself. As Judge Figueredo rightly saw, whether Amazon's research team gained access to the inner workings of the device and the GateGuard system raises a fact question that cannot possibly be decided on a motion to dismiss. Order on Mot. for Leave, at 18. And, as Judge Figueredo also rightly saw, GateGuard does plausibly allege substantial similarity. *See* SAC ¶ 15-17, 140, 143-47. Denying GateGuard the right to proceed on its amended trade secrets claim would amount to rewarding a powerful economic actor for its conduct in acquiring the device of another manufacturer without consent and then burying its tracks by destroying the evidence of its potential theft of trade secrets. Such a result would be at odds with the fundamental principles of a fair legal system and an efficient marketplace that rewards inventors and developers, not those who cut corners by using greater financial resources to obtain the secrets and know-how of smaller actors with illegal behavior and underhanded conduct.[4]

## II.    GATEGUARD'S CLASS CLAIM IS PROPERLY STATED

While GateGuard suspected a widespread pattern of wrongful conduct with respect to the installation of the Amazon Key, it lacked sufficient evidence to bring a plausible class claim until discovery was well-advanced, which changed the scope of GateGuard's claims. First, Amazon produced a number of installation agreements that looked suspicious on their face.

---

[4] Amazon argues that the Ring and the GateGuard "look nothing alike." Mot. Dismiss at 13. However, this is not a "look and feel case." This issue is the inner workings of the two devices, which contrary to Amazon's claims, discovery has not been able to probe because GateGuard only discovered the use to which its device was allegedly put in the course of discovery. Kaushik Mani's statement of what he views as the differentiating feature of the Ring Intercom makes clear this feature is exactly the same as the core functionality of the remotely operated GateGuard Intercom. *See supra* at 12. In addition, Amazon knew from the GateGuard Terms and Conditions, of which it was already on notice at the time it acquired the GateGuard intercom, SAC ¶ 135, that its channel partner was not contractually permitted to acquire and then transmit to Amazon for testing any of GateGuard's devices.

But it was not until GateGuard began deposing the actual superintendents who had allegedly "authorized" the installation of the Amazon Key for business that it became indisputable that properties were being signed up in a completely fraudulent manner. One superintendent, Odalis Tiburcio, testified that he was never given any documents to sign and that the signature that appeared on the Installation Agreement he had purportedly executed was forged. Quainton Decl. Ex. E, Extracts from Deposition of Odalis Tiburcio, date January 30, 2024 (the "Tiburcio Dep."), 65:19-25, 66:1-4.

Although Mr. Tiburcio testified that he had requested authorization from the property manager, the General Counsel for the real estate company in question stated to Mr. Quainton that the property manager was unaware of any Key for Business ever being installed. Quainton Decl. ¶ 17. Another superintendent who was deposed testified that he had not sought or obtained the authorization **of anyone** and that the Amazon installers had presented themselves in a manner that implied, falsely, the installation had already been approved. Quainton Decl., Ex. F, Extracts from Deposition of Ramon Rodriguez, dated January 30, 2024 (the "Rodriguez Dep."), 11:2-25, 12:1-7.  Mr. Rodriguez made clear the "Amazon representatives" never asked him if for permission or if he was authorized to let them install the "black box" and no-one ever confirmed with him whether he was authorized, contrary to Amazon's supposed "policy," to allow the installation of the Key. *Id.*, 28:7-20, 29:1-5. Mr. Rodriguez also testified that shortly

after the installation of what he described as the "Amazon black box," the GateGuard intercom, which had worked "perfectly" before the Key was installed, stopped working and "never worked again." *Id.*, 32:15-25.

      Placing the depositions of Mr. Tiburcio and Mr. Rodriguez in proper context depended on understanding the general context during which the Amazon Key for Business had been installed. It was only when GateGuard finally took the deposition of Paul Southam, the President of Amazon's largest "channel partner" and also the entity Amazon had turned to when it wanted to secretly obtain a GateGuard device for its research laboratory, that the scope of Amazon's plan became clear. At his deposition, Mr. Southam testified that ClearHome generated "in the ballpark of 30 to 40 million bucks, maybe 50 million bucks" from installations of the Key. Quainton Decl., Ex. G, Extracts from Deposition of Paul Southam, dated January 18, 2024 (the "Southam Dep.") 18:1-2.

      ClearHome only generated a very small amount of revenue per unit, on the order of $10-11 per residential unit, or approximately $500 for a 50-unit building. To generate $50 million in revenues, the majority of which came from new installations rather than servicing or maintenance fees, Southam Dep. at 57:17-21 (servicing fees were not "meaningful"), a company such as ClearHome would need to sign up a huge number of new properties very fast, on the order of 80,000 new properties per year. The economics incentivized the pattern of shady, misleading, deceptive and downright fraudulent conduct GateGuard has uncovered during discovery. Of the hundreds of thousands of new properties covering millions of new tenants, GateGuard believes there are hundreds, if not thousands, of properties at which no authorization was obtained, or authorization was obtained on a deceitful basis, frequently with resulting disruptions to service whose cause was hidden from landlords who had no reason to suspect the installation of a device that could interfere with the existing intercom system.

. Nothing suggests that this overwhelming ratio is unique to GateGuard. GateGuard's CEO has had conversation with a major Chicago-area property owner and manager who testified to "many" problems caused by the Amazon Key. *See* Declaration of David Taxman, dated February 9, 2024, Dkt. 121, ¶ 3. Plaintiff's counsel was contacted on an unsolicited basis by a multi-family property owner in California who had discovered the installation of the Amazon Key and the resulting disabling of the building's door strike. Quainton Decl. ¶ 4. The general counsel for the real estate property group at which Mr. Rodriguez testified to the proximity in time between the disabling of the building intercom and the installation of the "Amazon black box" stated unequivocally that his company had no knowledge of any installation of the Amazon Key at either location covered by Mr. Tiburcio and Mr. Rodriguez. *Id*. ¶ 3. Another significant property owner in New York with 32 multi-family residential buildings stated to Plaintiff's counsel that the Amazon Key caused the amplifiers at the buildings where it was installed to "blow out" and disable the buildings' intercoms. *Id*. ¶ 5. There is a more than plausible basis to believe that a significant class of potential victims of Amazon's shady practices could be certified.

Here, there is no doubt that Plaintiff has adequately stated a claim. Although Amazon reiterates its argument that GatgeGuard's brought a non-existent "Frankenstein" claim (never acknowledged as such, contrary to Amazon's assertions), Mot. Dismiss at 14, Judge Figueredo had no difficult seeing the core of the claim asserted by GateGuard. *See* Order on Mot. for Leave at 13.[5]

---

[5] GateGuard could easily separate Count XI into three counts for clarity if the Court deems that such a clarification could cure a flaw in the pleading.

Amazon asserts that Gateguard's claims of damages are not "plausibly allege[d]," Mot. Dismiss at 15, are "implausible," *id.* at 16, and are "pure speculation." *Id*. But Amazon deliberately – and knowingly – misconstrues GateGuard's class claim. Leaving labels aside , GateGuard alleges (i) a physical, unauthorized intrusion into devices either owned or controlled by parties other than Amazon and known to require the authorization of such parties and (ii) damages resulting from (a) physical harm to the devices intruded upon and (b) and a loss of revenue stemming

where Amazon's conduct demonstrates it knows it is interfering with the economic and/or contractual rights of the true owners of access control. These allegations are sufficient to state a claim class wide trespass, conversion and tortious interference.

Amazon concedes that physical unauthorized intrusion into physical devices states a plausible predicate for trespass and conversion claims. Mot. Dismiss at 15 (acknowledging that the Court has already sustained GateGuard's individual claim on this basis). Amazon likewise acknowledges that physical harm to devices can serve as a basis for conversion and trespass claims. *Id.* Order on Initial Mot. Dismiss at 21-24. As the court also noted, knowingly interfering with existing contract rights such as those GateGuard had with its customers, constitutes an adequate predicate for a tortious interference claim. Order on Initial Mot. Dismiss at 24-29. Amazon disingenuously pretends that discovery has not revealed any additional facts that would support extending the conversion, trespass and tortious interference claims to class members other than Amazon. However, in its Mot. for Leave, GateGuard highlighted for the Court evidence confirming the widespread intrusion into GateGuard devices at many different locations and evidence of such intrusion in Chicago and California, including from an unsolicited source who had reached out to counsel to complain about such damaging intrusion. *See supra* at 16. But the most glaring omission in Amazon's retelling of the facts are the

specific contracts Amazon enters into with third parties,

Quainton Decl. Ex. C.

Amazon acts as though there is something fanciful, implausible, or speculative about charging for access to properties when ***Amazon itself***

GateGuard's Terms and Services expressly contemplate that GateGuard has the exclusive rights to control third party commercial access to its buildings.

It is not fanciful or speculative to believe that many other property owners, managers and access control providers would want contractual protections before permitting third party commercial access through the Key. It may be that some property owners would be willing to waive their economic rights to access control (or entry) rights, but this does not mean that in an open and transparent marketplace, many or most access control rights owners would not insist

,

. Judge Figueredo looked through the labels of GateGuard's class claim and recognized that the claim was plausibly alleged and should be permitted to proceed.[6]

---

[6] If the Court gives GateGuard permission, it would be happy to redraft Count XI to separate it into three separate class counts.

III.    **GATEGUARD HAS MET THE TECHNICAL REQUIREMENTS FOR PLEADING A CLASS CLAIM.**

Perhaps knowing that its attacks on the merits of GateGuard's class claims are unlikely to gain traction, Amazon devotes the bulk of its opposition to GateGuard's class claims to technical arguments already rejected by Judge Figuered that are obviously premature at the pleading stage.

**A.    Numerosity**. Amazon first argues that GateGuard cannot "demonstrate" "that its putative class is "so numerous that joinder of all members is impracticable." Mot. Dismiss at 17 (citing Fed. R. Civ. P. 23(a)(1). According to Amazon, GateGuard "does not identify any person or entity other than itself claiming KfB installations injured its 'access rights.'' Mot. Dismiss, at 18. This is flatly wrong. The high volume of installations without any evidence of authorization or with bogus authorization, *see supra* at 16-17, combined with the economics of channel partner installation that virtually require high volume, pressure-driven customer acquisition tactics, *see supra* at 15, add increased plausibility to GateGuard's claim that there are likely to be hundreds or thousands of potential class members with the right to authorize the installation of the Key and from whom no authorization was ever obtained.[7] This is all the Court needs to decide at this stage. *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, No. 07 CIV. 8375 GBD, 2013 WL 4516788, at *7 (S.D.N.Y. Aug. 23, 2013); *Dover v. GNC Cmty. Fed. Credit Union*, No. CV 09-810, 2009 WL 10689507, at *1 (W.D. Pa. Oct. 6, 2009); *Lewis v. Wells Fargo & Co.*, No. C 08-02670 CW, 2009 WL 1033823, at *2 (N.D. Cal. Apr. 16, 2009).

Like these cases, *Shayler v. Midtown Investigations, Ltd.*, No. 12 CIV. 4685 KBF, 2013 WL 772818, at *1 (S.D.N.Y. Feb. 27, 2013), cited by Amazon on page 17 of the Mot. Dismiss,

---

[7] Based on her assessment of all the materials presented in support of the SAC and the allegations in the SAC, Judge Figueredo concluded that GateGuard had adequately alleged numerosity in the SAC. Order for Leave, at 12-13.

involves a motion for class certification, not a motion to dismiss, and is thus of no help to Defendants. The only case Amazon cites that is remotely on point is *PFT of Am., Inc. v. Tradewell, Inc.*, No. 98 CIV. 6413 (RPP), 1999 WL 179358, at *2 (S.D.N.Y. Mar. 31, 1999), in which the Court found that the plaintiff's class allegations were so lacking in any evidentiary support that plaintiff was subject to Rule 11 sanctions. This is obviously not the case here. *See, e.g.*, Order on Mot. for Leave, at 12.

     **B.** ***Commonality and Predominance***. Amazon mischaracterizes the common questions of law and fact. The threshold class question is not the existence of "access control rights" (a perfectly legitimate concept, not at all "invented"), but simply whether the Key was installed without authorization. This would be the threshold common question of fact: property managers, owners or their delegates who could establish that a Key was installed without any authorization would be presumptive class members. Putative class participants whose installation agreements did not authorize third party agreements of the type Amazon has been monetizing would also be class eligible for class membership. Amazon argues illogically that whether the Key was installed without authorization defeats commonality and predominance, when this is precisely the common and predominant issue.

     In support Amazon cites *Mazzei v. Money Store*, 829 F. 3d 260, 273 (2d Cir. 2016) and *Saleem v. Copr Transp. Grp. Ltd.*, 2013 WL 6061340 (S.D.N.Y Nov. 15, 2013). In *Mazzei*, the Court initially *certified* the putative class and then, after the plaintiff *failed to prove* class-wide privity of contract between class members and the defendant, decertified the class, an approach upheld by the Second Circuit. *Mazzei*, 829 F.3d at 265 (2d Cir. 2016). *Mazzei* does not suggest the initial certification was improper, much less than any motion to dismiss before a class certification motion had been made would have been successful.

*Saleem* also did not involve a motion to dismiss but a motion for certification after class discovery. In that case, the Court conditionally certified a lawsuit claiming unpaid overtime benefits for certain cab drivers as a "collective action" under Section 216(b) of the FLSA. *Saleem v. Corp. Transp. Grp., Ltd.*, No. 12 CIV. 8450 JMF, 2013 WL 6061340, at *3 (S.D.N.Y. Nov. 15, 2013). After 273 drivers filed forms consenting to join the lawsuit, the plaintiffs moved for class certification under Fed. R. Civ. P. 23. *Id.* The Court denied the motion on commonality grounds because there was an individualized fact question as to whether each individual driver was an independent contractor or employee. *Saleem*, 2013 WL 6061340 at *5. Here, Plaintiff alleges that the Key was installed in a huge number of cases without any authorization and without consent for the monetization of Key access to third parties. It can easily be determined (a) whether an installation agreement exists and (b) whether any agreement exists authorizing the monetization of third-party access by Amazon. These common questions predominate over any individual issues of whether the Key damaged class members' property or deprived them of revenues appropriated by Amazon. *See* Order on Mot. for Leave at 17.

Amazon's argument that proving "intentionality" will require mini hearings is also unconvincing. Mot. Dismiss at 19. There is a common threshold question of whether the absence of installation agreement reflects a *de facto* policy of Amazon or the result of a company-wide failure to monitor the activities of Amazon's agents, such that the failure of Amazon to have any record of authorization amounts to the willful condoning of unauthorized installation.

Finally, Amazon's damage-related arguments are also unconvincing. Amazon claims that GateGuard offers "no common mechanism for modeling damages." Mot. Dismiss at 20. A motion to dismiss is not the appropriate vehicle for assessing the validity of a "mathematical or

formulaic calculation of damages," *Steering Comm. v. Exxon Mobil Corp.*, 461 F. 3d 598, 602 (5th Cir. 2006), or the damages suffered by "every class member," *Chow v. Shorefront Operating LLC*, 694 F. Supp. 3d 247, 254 (E.D.N.Y.), cited by Amazon on page 20 of its Mot. Dismiss. In *Steering Comm*, the Court considered an exhaustive factual record involving hundreds of putative class members suffering from a wide range of individual medical and emotional damages resulting from the effects of hazardous smoke following a fire at an Exxon facility before concluding that a class should not be certified. *Steering Comm.*, 461 F.3d at 602. Similarly, in *Chow*, the court found that widely different staffing needs of individual patients at a nursing facility could not be efficiently established on a class-wide basis, and declined to certify a class. *Chow*, 694 F. Supp. 3d at 255. In contrast, damage to intercoms or door strikes resulting from the installation of the Key

. A model could easily be constructed to determine that either all or a portion of the Amazon revenues should be shared with the true access rights owner (property owner, manager or delegate). Either way, however, now is not the time to make this determination.

    **C.**   <u>**Ascertainability**</u>. Amazon argues that the putative class is not ascertainable because a geographical limit is not specified. Here, the class is nationwide, which does not provide a basis for the pre-emptive striking of class action pleadings before a motion for class certification. *See e.g.*, *Covillo v. Specialtys Cafe*, No. C-11-00594 DMR, 2011 WL 6748514, at *7 (N.D. Cal. Dec. 22, 2011) (motion to strike nation-wide class allegations held premature); *Tietsworth v. Sears*, 720 F. Supp. 2d 1123, 1148 (N.D. Cal. 2010) (withholding judgment as to manageability of nation-wide class action); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 358 (2011); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Al Haj v. Pfizer Inc.*, 338 F.

Supp. 3d 815, 819–20 (N.D. Ill. 2018). As to a limitation in time, the Court can take judicial

notice that the Key was introduced in 2017, so the temporal issues are readily manageable.[8]

      **D.**    **Typicality**. Amazon arguments are also unconvincing here. GateGuard is

obviously arguing that the Key was installed without its authorization at properties at which it

had the right to control third party access. This is typical of the claim of any potential class

member with respect to whom the Key was installed without authorization. Amazon claims

that that GateGuard is adverse to building owners because it has been engaged in disputes with

building owners as to GateGuard's payment terms. Mot. Dismiss at 22. But none of the

disputes referenced by Amazon have anything to do with the question of authorization to

permit the installation of the Amazon Key. *Id.* As a result, these disputes are irrelevant to the

typicality of GateGuard's claims against Amazon, which are based on damage resulting from

Amazon's unauthorized installation of the Key, and the claims of the putative class members,

based on exactly the same underlying factual predicate.

      For the same reason, Amazon's standing argument does not make sense. The standing

question in class action lawsuits turns on whether the lead plaintiff's and class members'

claims "implicate the same set of concerns". Mot. Dismiss at 22 (citing *Fletcher v. ConvergEx

Grp. LLC*, 388 F. Supp. 3d 293, 297 (S.D.N.Y. 2019). Here, like the class members,

GateGuard has an interest in proving that Amazon had a policy or practice of permitting the

unauthorized installation of the Key based either on express approval or a highly culpable

"head in the sand" practice of deliberately ignoring the conduct of its representatives. Indeed,

proving that Amazon's gross negligence rises to the level of fraud will be facilitated by class-

---

[8] https://www.theverge.com/2017/10/25/16538834/amazon-key-in-home-delivery-unlock-door-prime-cloud-cam-smart-lock

wide proof and each individual class member will benefit from discovery it would be difficult for any individual plaintiff to establish on its own.

       **E.**    **<u>Adequacy</u>**. Amazon's attacks on GateGuard and its CEO do not move the needle towards a "disfavored" pre-emptive strike on GateGuard's class pleadings before a motion for certification. *First*, GateGuard's lawsuits against MVI Systems, LLC and Goldmont Realty Corp, referenced on page 23 of the Mot. Dismiss, have nothing to do with the class claims raised by GateGuard in the SAC. With respect to MVI, GateGuard alleges that MVI misappropriated its trade secrets, but there is no indication that MVI was ever damaged by the Key or has any interest in joining the putative class. *See GateGuard v. MVI Systems, LLC*, 19-cv-2472, Dkt. 104 (Third Amended Complaint). With respect to Goldmont, GateGuard alleges that Goldmont failed to honor a contract for a bulk delivery of intercoms. *GateGuard v. Goldmont Realty Corp.*, 20-cv-1606, Dkt. 1, Ex. A, but GateGuard learned in discovery that Goldmont had consented to the installation of the Amazon Key so it is obvious it would not be a class member. Quainton Decl. at ¶ 15.

       *Second*, litigation between a class representative and a class member on an unrelated matter does not automatically create a conflict of interest rendering the putative class representative inadequate to serve in that capacity. Rather, this is an issue that is necessarily speculative at the motion to dismiss stage and should not weigh in the balance in deciding the motion.

       *Third*, Amazon baselessly questions GateGuard's "improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit." Mot. Dismiss. at 23. Judge Figueredo, who has been supervising the litigation, has already definitively disposed of this argument. Order on Mot. Leave at 15. Judge Figueredo also disposed of the argument that Mr. Teman's criminal case rendered GateGuard inadequate as a class representative. *Id.* at 14.

*Fourth*, Amazon's highly misleading attribution of language from a case to the ambiguous wording of an email between Mr. Teman and his counsel, Mot. Dismiss at 14 cannot serve as a basis to disqualify GateGuard, not only because the case cited has no relationship to Mr. Teman's actual words, but also because whatever Mr. Teman told his counsel is irrelevant to whether GateGuard should be entrusted with defending the interests of the class. Among other things, there is no guarantee that Mr. Teman will even be CEO of GateGuard at the time GateGuard makes a motion for class certification. Nor does Mr. Teman's comment to a reporter establish that he is animated by such personal animosity against Amazon that, were he CEO at the time of any potential future settlement, he would be unable to put his personal feelings aside, in contrast to *Finocchiaro v. NQ Mobile, Inc.*, No. 15 CIV. 6385 (NRB), 2016 WL 7031613, at *3 (S.D.N.Y. Dec. 1, 2016), where the plaintiff stated to individual defendants, among other things, "I vow to take all your asses down one way or another."

Finally, Amazon's disparaging comments directed at GateGuard's counsel also fall flat. GateGuard's attorney has served as class counsel in various class actions in New York and New Jersey, and is also a former partner with Skadden, Arps, Slate, Meagher & Flom, a large New York City law firm. *See* Order on Mot. for Leave, at 14. Moreover, there is currently no motion for class certification before the Court. At the time the motion for class certification is made, counsel may well be joined by co-counsel with additional class action experience and the Court should not prejudge the adequacy of class counsel at this juncture.[9]

---

[9] Amazon's also distorts the record with respect to GateGuard's privilege log. Mot. Dismiss at 24-25. GateGuard has not "flouted" anything. GateGuard has disagreed with the Court as to the issue of waiver and exercised its valid remedies. Dkt. 229. Unlike Amazon, GateGuard proceeded in accordance with the Rule 72. It would be unfair to subject non-dispositive decisions of Judge Figueredo affecting GateGuard to a clearly erroneous standard of review but to apply a more lenient standard (or no review at all, as Amazon would have it) to Judge Figueredo's decisions affecting Amazon.

## CONCLUSION

For the reasons set forth above, the Court should deny Amazon's Motion to Dismiss. In the event the Court has the conviction that GateGuard has a substantive claim for copying and class-wide damage, but that the SAC suffers from pleading defects, GateGuard should be given an opportunity to address any pleading issues in a revised complaint.

Dated: New York, New York
       November 7, 2024

Respectfully submitted,

QUAINTON LAW, PLLC

By: *Eden P. Quainton*
      _____

Eden P. Quainton
2 Park Ave., 20th Floor
New York, New York 10016
Telephone: 212-419-00575
Email: equainton@gmail.com

*Attorneys for Plaintiff GateGuard, Inc.*