Ari B. Teman
1521 Alton Road, #888
Miami Beach, Florida 33139
212-203-3714
ari@teman.com


July 30, 2026

VIA ECF AND EMAIL TO CHAMBERS

The Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007


Re:  *GateGuard, Inc. v. Amazon.com, Inc.*, No. 21 Civ. 9321 (JGK)
　　 Request for Leave to File — Ari B. Teman, pro se

Dear Judge Koeltl:

I write pro se. I understand that the Court directed that no further motions be filed pending a ruling on my motion to intervene. I am not filing a motion. I am requesting the Court's leave to submit the letter attached to this request as Exhibit 1.

I make this request rather than filing the letter itself because I do not wish to act contrary to the Court's direction. If the Court denies leave, or prefers to take up the subject when it rules on the pending motion or at any conference the Court may schedule, I will abide by that and will submit nothing further on this subject.

The reason for the request is as follows. On July 24, 2026, counsel for Amazon wrote to GateGuard's counsel questioning the authenticity of an invoice GateGuard issued to ClearHome. I have no objection to that inquiry, and GateGuard has answered it. I am informed by GateGuard's counsel that during a subsequent meet-and-confer on July 30, 2026 concerning discovery in this action, counsel for Amazon raised the prospect of criminal prosecution arising from that invoice and stated that GateGuard's counsel personally faced potential liability for aiding and abetting a fraud. I was not a participant in that conference.

The attached letter sets out the relevant chronology, identifies the accounting correction GateGuard has made and disclosed, and asks only that the Court schedule a brief conference. It does not seek sanctions and does not ask the Court to make findings under any disciplinary rule.

I recognize that the Court is best positioned to determine whether and when this subject warrants its attention, and I submit the question to the Court accordingly.

I thank the Court for its consideration.

Respectfully submitted,

/s/ Ari B. Teman
Ari B. Teman
Pro se

cc:  All counsel of record via ECF

## EXHIBIT 1

Ari B. Teman
1521 Alton Road, #888
Miami Beach, Florida 33139
212-203-3714
ari@teman.com


July 30, 2026

The Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007


Re:  *GateGuard, Inc. v. Amazon.com, Inc.,* No. 21 Civ. 9321 (JGK)

Dear Judge Koeltl:

I submit this letter pro se. I am the founder of plaintiff GateGuard, Inc. and the proposed
intervenor in this action. I am not a party. I write to bring a matter to the Court's attention and to
request a brief conference.

**Background**

On July 22, 2026, GateGuard transmitted an invoice to Derek Stephenson of ClearHome
concerning ClearHome's March 2021 order of a GateGuard device, Order ID b6k22mt8. Copies
were sent to individuals at Amazon. The device ordered by ClearHome was shipped to an
Amazon facility, and the circumstances of that order are among the matters at issue in this action.
Copies of the invoicing records described below are attached as Exhibits A and B.

The billing relationship underlying that invoice is between GateGuard and ClearHome.
ClearHome is not a party to this action and is separately represented by its own counsel, Cannon
Law. ClearHome has not disputed the charges through the mechanism the parties' agreement
provides.

The agreement governing that order provides that disputes are resolved by binding arbitration
before the American Arbitration Association in Miami-Dade County, Florida. GateGuard has
invoked that mechanism, serving a demand for arbitration concerning these charges and copying
the American Arbitration Association. The statements described below followed that step.

**The July 24 Inquiry**

On July 24, 2026, David P. Salant of Gibson, Dunn & Crutcher LLP, counsel for Amazon, wrote
to GateGuard's counsel stating that Amazon had serious concerns about the authenticity of the

invoice and asking that GateGuard's counsel confirm whether it is an authentic and accurate GateGuard invoice. That correspondence is attached as Exhibit C.

I do not object to that inquiry. Counsel is entitled to question the authenticity of a document received in connection with pending litigation, and to press for an answer. That question has been answered, as set forth below.

**The July 30 Meet-and-Confer**

On July 30, 2026, counsel met and conferred concerning discovery in this action, including deposition scheduling and the parties' expert deadlines. I was not a participant in that conference.

I am informed by GateGuard's counsel, Eden P. Quainton, that during that conference counsel for Amazon raised the prospect of criminal prosecution arising from the invoice, and stated that Mr. Quainton personally faced potential liability for aiding and abetting a fraud. I report those statements as they were reported to me. Mr. Quainton participated in the conference and can address the matter directly if the Court wishes to hear from him.

**GateGuard's Response**

I did not wait for the Court's involvement before addressing the substance of Amazon's inquiry. GateGuard answered it in full on July 30, 2026, by letter to Mr. Salant and to counsel for ClearHome, enclosing the corrected invoicing records and the contemporaneous governing terms. That letter is attached as Exhibit D.

The answer is that the invoice is authentic and was generated in the ordinary course, but was not accurate in every particular. Two errors were identified. First, charges arising from later alleged breaches had been entered onto the existing invoice record for Order b6k22mt8 rather than onto a separate statement, producing a single document bearing the March 2021 invoice date that also contained charges asserted in October 2025. I entered those charges myself. Second, and more substantively, certain fee values had been drawn from a superseded edition of GateGuard's terms.

The source of the second error is documented. A $50,000 device tampering fee appearing on the statement derives from Section 5.L of GateGuard's Terms and Conditions last revised February 7, 2019, preserved in the Internet Archive. That edition was superseded in July 2020, approximately eight months before ClearHome placed its Order. The edition in effect when ClearHome ordered, likewise preserved in the Internet Archive in a capture dated March 7, 2021, the day before the Order, does not contain that provision. The same edition was transmitted to ClearHome as a PDF attachment to the order confirmation. Both captures are cited in Exhibit D and are independently verifiable.

GateGuard applied its own contractual rule against itself. Section 19.A provides that the parties abide by GateGuard's then-current terms, so the March 2021 edition governs ClearHome's Order and the 2019 fee does not apply. GateGuard withdrew that charge and two others for which the governing edition contains no supporting provision, and corrected the computation of a fourth. The amount claimed was reduced by $97,059.36, from $1,483,876.00 to $1,386,816.64.

The invoicing platform maintains an activity record logging every action taken on an invoice, with timestamps and originating IP addresses. That record has not been deleted, modified, or overwritten. It is preserved and will be available through ordinary discovery.

At no point did I attempt to conceal any error. Each was identified on review, corrected, disclosed in writing to counsel for both Amazon and ClearHome, documented on the face of the corrected records, and supported by contemporaneous third-party archives supplied by GateGuard itself.

**Why the Court's Attention Is Warranted**

I raise this narrowly. The invoice was issued to ClearHome, not to Amazon, and copies were sent to Amazon personnel. Amazon was entitled to raise a concern about a document it received, and GateGuard has now answered that concern in full and in writing. To the extent the document bears on matters at issue in this action, Amazon may test it through discovery here. Any dispute over the charges themselves is between GateGuard and ClearHome and belongs in the arbitration the agreement requires. GateGuard will meet either.

What prompts this letter is the introduction of criminal exposure into a conference convened to address discovery in this action, and in particular the reported statement that opposing counsel personally faces criminal liability in connection with his representation. The invoice concerns a billing relationship between GateGuard and ClearHome, a non-party represented by separate counsel, and is subject to a contractual arbitration provision that GateGuard has already invoked. If ClearHome disputes the charges, the agreement provides the forum for that dispute, and Amazon may test the document through discovery in this action.

I do not ask the Court to determine whether those statements violated any disciplinary rule, and I recognize that the Court has heard only one account of the conference, and that my account is secondhand. The point is narrower. Communications of that character are inconsistent with the cooperative conduct expected of counsel during discovery, and they impair the parties' ability to narrow and resolve discovery disputes without the Court's intervention, which is the purpose the meet-and-confer requirement serves. Rule 1 of the Federal Rules of Civil Procedure directs that the rules be employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.

The practical consequences are immediate. Statements of that character, directed at counsel rather than at a party, place counsel's obligations to his client in tension with his own interests, at a stage of this case that requires counsel's undivided attention to expert deadlines and deposition scheduling.

The sequence also matters. Amazon's written inquiry of July 24 was answered in full six days later, with documentation, a reduction in the amount claimed, and third-party archives supplied by GateGuard so that the explanation could be verified independently. Nothing about the inquiry required more than that. GateGuard raises the July 30 statements not to resist scrutiny of its records, which it has now volunteered, but because the introduction of criminal exposure into a discovery conference is a different matter from testing a document, and because it occurred before GateGuard had any opportunity to respond in writing.

Two further matters bear on why the reported statements concern me. I set them out to explain the context in which those statements were made, not to litigate their merits in this letter, and I do not ask the Court to resolve any of them here.

On June 10, 2025, Amazon publicly announced the Amazon Key Access Control System, a line of access-control products for multi-family buildings. Amazon's announcement describes one of those products, Intercom Plus, as a touchscreen-based solution allowing visitors to browse a resident directory or enter building access codes directly on the screen. GateGuard has asked its counsel to seek reconsideration of the prior spoliation ruling in light of that announcement and to pursue discovery concerning the development of those products.

GateGuard contends that the circumstances of the 2021 purchase bear on that request. The Order was not placed by Amazon. It was placed by ClearHome, and the device was directed to an Amazon research and development facility on delivery. GateGuard contends that discovery will show Amazon executives supplied the ordering link, specified the quantity, and directed ClearHome to complete the transaction. GateGuard does not ask the Court to resolve any of that here, and raises it only because it is the subject on which the reconsideration request will turn.

Separately, GateGuard contends that unauthorized installations at properties subject to GateGuard agreements have continued as recently as May 2026. The property owners have confirmed to GateGuard that they did not give permission for those installations and were not asked. A photograph of the panel at one such property, 143 West 140th Street, is attached as Exhibit E. GateGuard identifies the circled equipment as installed by or on behalf of Amazon, and states that its installation disconnected the GateGuard device serving that building. GateGuard has asked its counsel to seek injunctive relief.

GateGuard is a small company. It contends that the conduct at issue, the installation of access-control devices at residential buildings without the knowledge or consent of ownership, has been occurring since approximately 2019, and that this action, filed November 10, 2021, has been pending for more than four and a half years without that conduct being stopped. GateGuard does not attribute that to the Court. No motion for injunctive relief has yet been made, and GateGuard does not seek relief in this letter, in keeping with the Court's direction.

On scheduling, GateGuard notes that Mr. Teman has offered to be deposed immediately, either by video or in person in Tel Aviv, where he is awaiting ear surgery that his physician advises makes air travel medically inadvisable. Both options remain open. Amazon maintains offices and personnel in Israel.

The connection among these matters is the point of this letter. The invoice Amazon questioned is not an isolated commercial document. It arises from the ClearHome transaction through which GateGuard contends Amazon obtained the device at the center of this litigation. At the time GateGuard was preparing to seek reconsideration of the spoliation ruling, discovery concerning Amazon's recently announced competing products, and injunctive relief concerning installations continuing as recently as May 2026, Amazon's counsel is reported to have moved from a written inquiry about that invoice to raising the prospect of criminal prosecution, including criminal exposure for GateGuard's own counsel, in a conference convened to address discovery in this action.

I do not suggest that Amazon has invoked the criminal justice system. So far as I am aware there has been no referral, no charge, and no criminal proceeding. What is reported is that the prospect of criminal liability was raised in a civil discovery conference. The issue presented is therefore not whether the invoice was properly questioned. It was, and GateGuard has answered that inquiry in full. The issue is whether the reported introduction of potential criminal liability, directed at opposing counsel during a conference convened to address discovery, altered the character of what should have remained an ordinary civil discovery dispute. A line-item error in an invoice issued to a non-party, which GateGuard has since identified, corrected, and documented, does not appear proportionate to the response it drew.

Whether that inference is correct is not something the Court need decide on this letter, and I do not ask it to. It is why I ask for the Court's guidance. Those surrounding facts are relevant only because they explain why the timing of the reported statements matters. They are not offered as independent grounds for relief, and I ask the Court to decide none of them in connection with this request.

**Relief Requested**

I respectfully request a brief conference concerning the reported July 30 statements, together with any guidance the Court believes appropriate regarding the orderly conduct of discovery in this action.

If the Court holds such a conference, I respectfully ask it to consider inquiring of Amazon whether it or its contractors installed access-control equipment during 2026, including in May 2026, at properties subject to GateGuard agreements, and whether the owners of those properties consented in writing. I make that request because the answer is within Amazon's knowledge and can be given briefly.

Should the Court conclude that the remaining matters described above are better addressed through the ordinary motion process, GateGuard will proceed accordingly. I ask for no other relief in connection with this request.

I thank the Court for its attention to this matter.

Respectfully submitted,


/s/ Ari B. Teman
Ari B. Teman
Pro se

cc:  All counsel of record via ECF

# EXHIBIT A

---

## Invoice No. b6k22mt8_857

as restored to the charges arising from the March 8, 2021 transaction

GateGuard Inc logo

**GateGuard Inc**

Teman.com

support.team@teman.com

212-203-3714

1521 Alton Road, #888

Miami Beach, FL 33139

United States

## INVOICE

| | | | |
|---|---|---|---|
| Invoice Number | b6k22mt8_857 | **Derek Stephenson** | |
| Invoice Date | 03/10/2021 | 0181 | |
| Due Date | 03/10/2021 | United States | |
| Invoice Total | $5,637.75 | derek@clearhome.us | |
| Balance Due | $5,637.75 | | |
| Building Address | 135 S Mountain Way Dr, Orem, UT 84058, USA | | |

| Item | Description | Unit Cost | Quantity | Line Total |
|---|---|---|---|---|
| intercom | Intercom Panel | $3,499.00 | 1 | $3,499.00 |
| Security Deposit | Security Deposit | $849.00 | 1 | $849.00 |
| Gold Plan Monitoring | Gold Plan Monitoring 2 yrs upfront | $49.99 | 24 | $1,199.76 |
| Shipping | Device Shipping: (shipping to USA, includes packaging) | $89.99 | 1 | $89.99 |
| | | $0 | 1 | $0 |

**Invoice Terms:**

Buyer accepted and accepts terms at https://GateGuard.xyz

**Invoice**Ninja

| | |
|---|---|
| Net | $5,637.75 |
| Subtotal | $5,637.75 |
| Total | $5,637.75 |
| Paid to Date | $0.00 |
| Balance Due | $5,637.75 |

Please make checks payable to GateGuard INC.

# EXHIBIT B

---

## Invoice No. b6k22mt8_857_BREACH_002

as reissued July 30, 2026 and corrected



GateGuard Inc

Teman.com

support.team@teman.com

212-203-3714

1521 Alton Road, #888

Miami Beach, FL 33139

United States

## INVOICE

| | | | |
|---|---|---|---|
| Invoice Number | b6k22mt8_857_BREACH_002 | **Derek Stephenson** | |
| Invoice Date | 10/10/2025 | 0181 | |
| Due Date | 07/30/2026 | United States | |
| Invoice Total | $1,386,816.64 | derek@clearhome.us | |
| Balance Due | $1,386,816.64 | | |
| Building Address | 135 S Mountain Way Dr, Orem, UT 84058, USA | | |

| Item | Description | Unit Cost | Quantity | Line Total |
|---|---|---|---|---|
| Attorney Fees | (Retainers only, more will be due) | $250,000.00 | 1 | $250,000.00 |
| Speaking/Dealing with Attorney Fee | Executive Rate (Hourly) | $900.00 | 1,237 | $1,113,300.00 |
| 360 Month Agreement | Gold Plan 360 Month Agreement (per terms)(increases allowed by terms applied) ($20 per 2 months late * 1) | $69.99 | 336 | $23,516.64 |

| | |
|---|---|
| Net | $1,386,816.64 |
| Subtotal | $1,386,816.64 |
| Total | $1,386,816.64 |
| Paid to Date | $0.00 |
| Balance Due | $1,386,816.64 |

Reissued 07/30/2026 — charges as entered and transmitted 10/10/2025; separated from Invoice No. b6k22mt8_857.
Note: Some older Terms' line items were erroneously pulled into a prior version of this invoice. Those line items have been removed. The older, inapplicable terms, were archived at
https://web.archive.org/web/20190916143043/https://gateguard.xyz/legal/terms.php
. The relevant terms were attached to your order on March 8, 2021.
___
See email containing:
"Your order ID is **b6k22mt8**.
Order Date: **03/08/2021 16:43**
You can view and pay your order by https://gateguard.xyz/order/view/9qKgYrNA46OmjA8P/
We will notify you about installation, and send you additional instructions.

## Client details

First Name: **Derek** Last Name: **Stephenson** Email: derek@clearhome.us Phone: **801-400-5000"**

## Invoice Terms:
Buyer accepted and accepts terms at https://GateGuard.xyz

**Invoice**Ninja

Please make checks payable to GateGuard INC.

# EXHIBIT C

**Correspondence of July 24, 2026**

From:    David P. Salant, Gibson, Dunn & Crutcher LLP

Date:    Friday, July 24, 2026 at 10:28 PM

Subject:  GateGuard invoice inquiry

To:    Eden P. Quainton, Quainton Law, PLLC

Cc:    Christopher D. Belelieu; Rachel I. Katzin

Dear Eden,

We are in receipt of the attached invoice, which Mr. Teman sent to individuals at ClearHome and Amazon on July 22, 2026.

First, we remind you once again that Amazon is a represented party in connection with its disputes with GateGuard.  All communications should be sent to Amazon's attorneys at Gibson Dunn and not directly to Amazon.

Second, having examined the invoice, we have serious concerns about the authenticity of this document.  Would you please confirm on behalf of GateGuard that this is an authentic and accurate GateGuard invoice?

Thank you,

David

**David P. Salant**
Partner

T: +1 212.351.2486 | M: +1 347.501.1830
DSalant@gibsondunn.com

**GIBSON DUNN**
Gibson, Dunn & Crutcher LLP
200 Park Avenue, New York, NY 10166-0193

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

--
Eden P. Quainton
Quainton Law, PLLC
2 Park Avenue, 20th Floor
New York, NY 10016
Tel: 212.419.0575
Fax: 212.376.5699.
Cell: 202.360.6296

245 Nassau St.
Princeton, NJ 08540
Tel: 609-356-0526
Cell: 202-360-6296
https://quaintonlaw.net

--
Eden P. Quainton
Quainton Law, PLLC
2 Park Avenue, 20th Floor
New York, NY 10016
Tel: 212.419.0575

# EXHIBIT D

---

## GateGuard's Response of July 30, 2026

Letter to counsel for Amazon.com, Inc. and ClearHome,
with its own enclosures, which are separately lettered within

GateGuard, Inc. v. Amazon.com, Inc., No. 21 Civ. 9321 (JGK)

# GATEGUARD, INC.
1521 Alton Road, #888
Miami Beach, Florida 33139

July 30, 2026

VIA ELECTRONIC MAIL

David P. Salant, Esq.
Gibson, Dunn & Crutcher LLP
Counsel for Amazon.com, Inc.

Joseph Cottle, Esq.
Cannon Law Group
Counsel for ClearHome

Re:  Invoice No. b6k22mt8_857 — Response to Inquiry of July 24, 2026

Dear Counsel:

Mr. Salant's letter of July 24, 2026 asked GateGuard to confirm whether the invoice transmitted on July 22, 2026 is an authentic and accurate GateGuard invoice. This letter answers that question directly. It is not a settlement communication.

## 1.  The short answer

The invoice is authentic. It was generated by GateGuard's invoicing system in the ordinary course of business and reflects charges GateGuard contends are owed by ClearHome under the agreement accepted when Order ID b6k22mt8 was placed on March 8, 2021.

It was not accurate in every particular. On review prompted by your inquiry, GateGuard identified an error affecting several line items. GateGuard has corrected it, and this letter explains what happened, how it happened, and what the corrected figures are. The correction reduces the amount claimed.

## 2.  Two corrections of presentation

First, charges arising from the later alleged breaches had been entered onto the existing invoice record for Order b6k22mt8 rather than onto a separate statement. The result was a single document bearing the March 2021 invoice date that also contained charges asserted in October 2025. That was a billing error. Invoice No. b6k22mt8_857 has been restored to reflect only the 2021 transaction charges, and the later charges now appear on a separate statement, Invoice No. b6k22mt8_857_BREACH_002, marked on its face as reissued on July 30, 2026 and carrying the October 10, 2025 date on which those charges were entered and first transmitted to Mr. Stephenson.

Second, and more substantively, certain fee values were drawn from a superseded edition of GateGuard's terms. That is the error your inquiry surfaced, and it is explained in full below.

### 3. The source of the error

The breach statement included a $50,000 device removal, disabling, and tampering fee, described as arising under contract language reading in relevant part that breaching the contract by vandalizing any device or intentionally causing any device or antennae not to operate costs $50,000.

That language is genuine GateGuard contract language. It appears at Section 5.L of GateGuard's Terms and Conditions last revised February 7, 2019. It is preserved in the Internet Archive at the following address:

https://web.archive.org/web/20190916143043/https://gateguard.xyz/legal/terms.php

That edition was superseded. GateGuard's Terms and Conditions were revised on July 7, 2020 and its Service Agreement was updated on July 28, 2020, approximately eight months before ClearHome placed its Order. The edition in effect when ClearHome ordered does not contain Section 5.L or the $50,000 figure. That edition is likewise preserved in the Internet Archive, captured on March 7, 2021, the day before the Order:

https://web.archive.org/web/20210307061024/gateguard.xyz/legal/serviceagreement.php

The same edition was transmitted to Mr. Stephenson as a PDF attachment to the order confirmation on March 8, 2021 and is available for comparison.

GateGuard has issued multiple editions of its terms. A fee value carried forward from a superseded edition into an invoice governed by a later edition is a billing error, and that is what occurred. GateGuard corrected it promptly after identifying it.

As to mechanism, the error appears to have originated in the line-item autocomplete feature of the third-party invoicing platform GateGuard uses. When a user begins typing a line item, the platform suggests previously saved items and populates the stored description and amount. Saved items from earlier editions of GateGuard's terms remained available for suggestion after those editions were superseded. GateGuard does not control the platform's autocomplete functionality, but is reviewing how to retire superseded items so that they are no longer offered.

### 4. Which edition governs, and why

GateGuard's own terms answer this. Section 19.A of the Service Agreement provides that each time a Subscriber places an Order it is the Subscriber's responsibility to review the then-current terms, and that the parties shall abide by GateGuard's then-current terms and conditions in the event of any dispute. Applying that provision consistently, the edition in effect on March 8, 2021 governs ClearHome's Order. The 2019 edition does not.

GateGuard applies that rule against itself here. The charges below have been conformed to the March 2021 edition.

### 5. Charges withdrawn

The following line items are withdrawn from the breach statement:

- Device Removal, Disabling and Tampering Fee, $50,000. Source is Section 5.L of the 2019 edition, superseded before the Order.
- Collections / Devices, $10,000.
- Use of attorney, $5,000 charged six times, $30,000.

The March 2021 edition contains no provision supporting the second and third items as stated. They are withdrawn.

Withdrawal of these items totals $90,000. Together with the reduction to the 360 Month Agreement line described immediately below, the breach statement is reduced from $1,483,876 to $1,386,816.64.

In addition, the 360 Month Agreement line was computed at a monthly rate of $91. That figure does not correspond to any computation under the applicable schedule, and GateGuard is reducing it to $69.99 per month. The basis is as follows. The pricing schedule in the March 2021 edition states a rate of $49.99 per month for a thirty-year term. Section 4.I.i provides that where a Subscriber misses two monthly payments during the Term, the monthly Subscription Fee increases by $20 per month for the remainder of the Term. GateGuard applies a single increase under that provision, producing a rate of $69.99. The term is stated as 336 months, being the 360-month term less the 24 months of monitoring invoiced in advance on the original invoice. The line therefore reduces from $30,576 to $23,516.64.

GateGuard notes that Section 4.I.i is capable of a broader application than the single increase applied here. GateGuard has elected the narrower reading.

The corrected invoices supersede the earlier versions solely to the extent of the corrections described in this letter.

## 6. Charges that stand, and their basis

The remaining charges rest on provisions contained in the March 2021 edition your client accepted:

- Executive time at $900 per hour. Schedule A, Labor Rates, provides that Teman executive team time is billed at $900 per hour. Schedule A, Court Appearance and Legal Fees, separately provides that GateGuard bills $500 per hour, and $900 per hour for executives, for speaking to any attorney.
- Attorneys fees. The same Schedule A provision states that GateGuard bills any and all attorneys fees incurred where the Subscriber's words or actions cause GateGuard to consult with counsel. Section 4.I.iii separately provides that upon breach or default GateGuard shall be awarded its costs and expenses of enforcement and collection, including attorney's fees.
- Contract value. Section 1.P defines Subscription Fees as incurred in full by the Subscriber on the date of each Order, and Section 8.D.i states that all Fees are incurred in full upon the Subscriber's Order and remain due and payable in the event of termination.

As to the quantum of executive time, some context is useful. The 1,237 hours reflected on the breach statement span the period from November 10, 2021 to October 10, 2025, when the charges were entered. That is 1,430 calendar days, or approximately 204 weeks.

Across that period the figure works out to approximately 0.87 hours per calendar day, approximately six hours per week, or approximately 1.2 hours per business day. Expressed differently, it represents roughly fifteen percent of one full-time person over nearly four years.

To be clear as to what that time consists of, a substantial portion of it concerns ClearHome's conduct outside the pending litigation between GateGuard and Amazon. That includes communications with counsel for property owners whose buildings were entered and whose GateGuard equipment was damaged, communications with GateGuard's counsel concerning those matters, and review of large volumes of documents in response to court-ordered discovery. GateGuard does not regard that rate of effort as excessive given the duration and complexity of the matters involved, and will produce records supporting it as required.

GateGuard will supply a schedule mapping each remaining line item to its governing provision on request.

### 7.  Continuing fees

Schedule A provides that GateGuard bills for executive and staff time spent dealing with attorneys, and for attorneys fees incurred, where a Subscriber's words or actions cause GateGuard to consult with counsel. Time of that character has continued to accrue since the breach statement was prepared, including time spent on the review that produced this letter, and it will be invoiced under those provisions in the ordinary course.

### 8.  Forum

ClearHome has not submitted a billing dispute through the mechanism the agreement provides. Section 21.D requires notice, a thirty-day good-faith negotiation period, and thereafter binding arbitration before the American Arbitration Association in Miami-Dade County, Florida. GateGuard has served a demand for arbitration and copied the Association. If ClearHome disputes any remaining charge, that is the forum, and GateGuard will meet the dispute there on the merits.

### 9.  Closing

GateGuard takes the accuracy of its invoices seriously. When your inquiry identified a problem, GateGuard investigated it, found the source, corrected the figures against itself, and is disclosing the correction together with the archived record that allows you to verify every step independently. GateGuard has not altered or deleted the activity history of the invoice record, which logs every action taken with timestamps and originating addresses, and that record is preserved.

GateGuard corrected the affected line items promptly after reviewing your inquiry. We ask that any remaining disagreement about the amounts owed proceed on the merits, in the forum the parties agreed to.

Nothing in this letter constitutes a waiver of any contractual or non-contractual claim, remedy, defense, or measure of damages available to GateGuard, all of which are expressly reserved. GateGuard reserves the right to supplement or amend its damages calculations as additional losses are incurred or identified.

A note on capacity. Mr. Quainton represents GateGuard in its litigation with Amazon. He does not represent GateGuard in its dealings with ClearHome, which is the counterparty to the Order and the invoice at issue. This letter is therefore sent by GateGuard directly. Mr. Quainton is copied for completeness.

Sincerely,


Ari Teman
Founder
GateGuard, Inc.


cc:  Eden P. Quainton, Esq., Quainton Law, PLLC

**Enclosures:**

- Exhibit A — Invoice No. b6k22mt8_857, as restored
- Exhibit B — Invoice No. b6k22mt8_857_BREACH_002, as reissued and corrected
- Exhibit C — Order confirmation of March 8, 2021, with the Service Agreement, Terms and Conditions, and the GateGuard website as it appeared at the time of the Order, as transmitted to Mr. Stephenson

# EXHIBIT A

---

## Invoice No. b6k22mt8_857

as restored to the charges arising from the
March 8, 2021 transaction

GateGuard Inc logo

**GateGuard Inc**

Teman.com

support.team@teman.com

212-203-3714

1521 Alton Road, #888

Miami Beach, FL 33139

United States

## INVOICE

| | | |
|---|---|---|
| Invoice Number | b6k22mt8_857 | **Derek Stephenson** |
| Invoice Date | 03/10/2021 | 0181 |
| Due Date | 03/10/2021 | United States |
| Invoice Total | $5,637.75 | derek@clearhome.us |
| Balance Due | $5,637.75 | |
| Building Address | 135 S Mountain Way Dr, Orem, UT 84058, USA | |

| Item | Description | Unit Cost | Quantity | Line Total |
|---|---|---|---|---|
| intercom | Intercom Panel | $3,499.00 | 1 | $3,499.00 |
| Security Deposit | Security Deposit | $849.00 | 1 | $849.00 |
| Gold Plan Monitoring | Gold Plan Monitoring 2 yrs upfront | $49.99 | 24 | $1,199.76 |
| Shipping | Device Shipping: (shipping to USA, includes packaging) | $89.99 | 1 | $89.99 |
| | | $0 | 1 | $0 |

**Invoice Terms:**

Buyer accepted and accepts terms at https://GateGuard.xyz

✉ **Invoice**Ninja

| | |
|---|---|
| Net | $5,637.75 |
| Subtotal | $5,637.75 |
| Total | $5,637.75 |
| Paid to Date | $0.00 |
| Balance Due | $5,637.75 |

Please make checks payable to GateGuard INC.

# EXHIBIT B

---

## Invoice No. b6k22mt8_857_BREACH_002

as reissued July 30, 2026 and corrected

GateGuard, Inc. — Response to Inquiry of July 24, 2026

GateGuard Inc logo

**GateGuard Inc**
Teman.com
support.team@teman.com
212-203-3714

1521 Alton Road, #888
Miami Beach, FL 33139
United States

## INVOICE

| | | | |
|---|---|---|---|
| Invoice Number | b6k22mt8_857_BREACH_002 | **Derek Stephenson** | |
| Invoice Date | 10/10/2025 | 0181 | |
| Due Date | 07/30/2026 | United States | |
| Invoice Total | $1,386,816.64 | derek@clearhome.us | |
| Balance Due | $1,386,816.64 | | |
| Building Address | 135 S Mountain Way Dr, Orem, UT 84058, USA | | |

| Item | Description | Unit Cost | Quantity | Line Total |
|---|---|---|---|---|
| Attorney Fees | (Retainers only, more will be due) | $250,000.00 | 1 | $250,000.00 |
| Speaking/Dealing with Attorney Fee | Executive Rate (Hourly) | $900.00 | 1,237 | $1,113,300.00 |
| 360 Month Agreement | Gold Plan 360 Month Agreement (per terms)(increases allowed by terms applied) ($20 per 2 months late * 1) | $69.99 | 336 | $23,516.64 |

| | | |
|---|---|---|
| | Net | $1,386,816.64 |
| | Subtotal | $1,386,816.64 |
| | Total | $1,386,816.64 |
| | Paid to Date | $0.00 |
| | Balance Due | $1,386,816.64 |

Reissued 07/30/2026 — charges as entered and transmitted 10/10/2025; separated from Invoice No. b6k22mt8_857.
Note: Some older Terms' line items were erroneously pulled into a prior version of this invoice. Those line items have been removed. The older, inapplicable terms, were archived at
https://web.archive.org/web/20190916143043/https://gateguard.xyz/legal/terms.php
. The relevant terms were attached to your order on March 8, 2021.
—
See email containing:
"Your order ID is **b6k22mt8**.
Order Date: **03/08/2021 16:43**
You can view and pay your order by https://gateguard.xyz/order/view/9qKgYrNA46OmjA8P/
We will notify you about installation, and send you additional instructions.

## Client details

First Name: **Derek** Last Name: **Stephenson** Email: derek@clearhome.us Phone: **801-400-5000"**

## Invoice Terms:
Buyer accepted and accepts terms at https://GateGuard.xyz

 **Invoice**Ninja

Please make checks payable to GateGuard INC.

# EXHIBIT C

## Order Confirmation of March 8, 2021

with the Service Agreement, Terms and Conditions,
and the GateGuard website as it then appeared

GateGuard, Inc. — Response to Inquiry of July 24, 2026

**Thanks Derek.**

Your order ID is **b6k22mt8**.

Order Date: **03/08/2021 16:43**

You can view and pay your order by https://gateguard.xyz/order/view/9qKgYrNA46OmjA8P/

We will notify you about installation, and send you additional instructions.

## Client details

First Name: **Derek**
Last Name: **Stephenson**
Email: **derek@clearhome.us**
Phone: **801-400-5000**

## You ordered

| 135 S Mountain Way Dr, Orem, UT 84058, USA | | |
|---|---|---|
| **Item** | **Quantity** | **Price** |
| Intercom Panel ($3,499) | 1 | 3,499 |
| Maintenance Security Deposit ($849) | 1 | 849 |

Legal notice: A copy of your contract (Terms) and the website as you used it is attached as a PDF,
which has also been sent to a 3rd party backup email for record keeping. Please retain this email.
Per the Terms, monthly fees may increase with inflation, govt fees, taxes.
There are no refunds or cancellations.

Questions? support.team@teman.com

teman : GateGuard   Features   Testimonials   Demo   Pricing   Tenants   Contact

Trusted by over 300 landlords & property managers

## Order GateGuard® Intercom & AI Doorman +FREE Internet for your building devices

**First name**

**Last name**

**Email**

**Mobile**

**What is your role?**   Select your role

**How many buildings do you own/manage?**   Select

**Enter an address you'd like to get a GateGuard:**

+ Add another property

☐ **I have read and accepted the Service Agreement (including Payment, Installation, Dispute, and all other subsections), Terms & Conditions, and privacy policy, and all sub-sections and sub-pages.**

**PLACE ORDER!**

Watch Demo Video (2 min)      Request Demo >

Have Questions? Call Us **212-203-3714**



"GateGuard is notably cheaper than most virtual doormen or voice intercom systems."

THE**REAL**DEAL

PANDO   abc7   DAILY•NEWS   NBC   THE REAL DEAL   CURBED

# Features

🔓 REMOTE UNLOCK          👤 FACE RECOGNITION (OPTIONAL)

💼 CATCH SUBLETS, NON-PRIMARIES          ||||| TRACKS DELIVERIES

🎥 VIDEO INTERCOM          ☰ LOGS EVERYTHING

## REMOTE UNLOCK

Staff & residents can unlock the door from their phone, smartphone, tablet, in-unit monitor (optional), or computer.

You control who has this feature, and every visitor and code use is logged and photographed.

No more running to the building to provide access, no



100% AUTOMATED          SAFE OUTDOORS

NO WIRING UNITS          VANDALPROOF

INTERNET INCLUDED        FULLY INSURED

+ FREE COMPLIANCE MONITORING

more lockouts, no more keys to copy or replace.

Plus, you can be sure vendors and brokers show up on-time.

## Unprecedented Insight

GateGuard autonomously tracks everyone who enters, buzzes, or uses a guest code, and generates logs you can view, filter, and print from any mobile, tablet, or computer.

Catch forbidden activity, illegal sublets, dorms, groups, parties, non-primaries, and use the logs in court to evict bad actors.



## Testimonials

GateGuard is the best solution we've seen for guest and delivery tracking, for unattended and attended buildings. The technology is superior and the team is always there to be helpful.

Chris DeWeaver
FIRST SERVICE RESIDENTIAL



Watch the video >          Request Demo >          **Order Now >**

## Press

     



## COVER STORY

The Real Deal featured GateGuard.xyz and our founder Ari Teman in its Feb 2018 cover story on real estate tech disruptors.



ABC NEWS
New Tool Helps Fight Illegal Sublets

Depending on where you stand, Ari Teman's new product is either a neat amenity or a big step toward total surveillance of tenants. Or maybe it's both.

GateGuard is similar to a virtual doorman: Installed at a



THE REAL DEAL
New tool allows landlords to track who goes in and out of rental apartments



PIX11 NEWS
About Sublet Spy

Watch the video
>

Request Demo >

Order Now >

# Frequent Questions

⊖ **When can I get a mine?**

These will ship about 90 days from your order (or less, we hope!). We test every device, check it with our cloud, put it through different temperatures, and ship them out.

⊕ **Who installs this?**

⊕ **Do I need WiFi or internet at the building?**

⊕ **How do I control and view activity?**

⊕ **Will you integrate with an existing intecom?**

⊕ **What about people with no smartphones?**

⊕ **Can I get a discount?**

⊕ **What if someone breaks it?**

⊕ **What if the device fails on its own?**

⊕ **Can people use this to host on sites like Airbnb / VRBO / Booking.com?**

⊕ **Can I use this on an office building?**

⊕ **Can I resell your stuff?**

⊕ **What makes you better?**

⊕ **Can I get a refund or return this?**

⊕ **What do you have against shnauzers?**

| Watch the video > | Request Demo > | **Order Now >** |
|---|---|---|

# Pricing

**Note:** due to COVID-19 and government restrictions, installation may be delayed up to 120 days.

| | |
|---|---|
| Installation: | **$849** In NYC, **$1429** in Miami,and LA |
| Device: | **$3,499 for 1+ devices**<br>**$2,499 for 3+ devices**<br>**$1,999 for 10+ devices**<br>**$1,499 for 20+ devices**<br>**$999 for 50+ devices** |
| Monthly plan: | Based on length of contract: |

| Term | Monthly rate, per device | Invoiced at installation |
|---|---|---|
| 3 Years | $199.99/mo | $7,199.64 |
| 4 Years | $179.99/mo | $8,639.52 |
| 5 Years | $159.99/mo | $9,599.40 |
| 6 Years | $139.99/mo | $10,079.28 |
| 10 Years | $119.99/mo | $14,398.80 |
| 30 Years | $49.99/mo | $17,996.40 |

Notes: See the Service Agreement for itemized pricing.

| | |
|---|---|
| Monthly plans are paid yearly. | **First 2 years upfront** |
| Security deposit: | **$849** |
| CAT5 to Basement/Utility Room: | **$849 for up to 5 hours** |
| Insurance: | **Included FREE ($698 deductible)** |
| 1GB Data included: | **$17/GB additional** |
| Per Resident/User import / setup fee | **$6** |
| 30 Days of records included | **Add 1 year +$99/mo** |

| | |
|---|---|
| Condo/Coop Service Fees | Due to the nature of the condominium/cooperative buying process involving much longer sales |

cycles, board meetings, etc. for much lower-volume sales we are unable to extend our free offer.
There will be a **$1,900** Condo/Coop Service Fee added to condo/coop orders and a **$79.99/mo**
additional Condo/Coop Support Service fee.

| | |
|---|---|
| Insurance (Free!): | Included in all plans. **$849 deductible**<br>If someone breaks your device (which is really tough to do!) we'll replace it. |
| Terms: | Shipping and tax may apply. Security deposit required for all devices.<br>120 months contract. 12 months paid upfront before install. No refunds or cancellations (Termination fees apply).<br>100+ units or use of fobs adds $99/mo service charge.<br>Fobs/Cards: $3.49/card + $0.55/mo/activated card for support.<br>We do **not** provide locks, electric strikes, doors, locksmith service, and the like included in the GateGuard device pricing and these will incur additional fees if we install, repair, or replace them, per the Service Agreement . |

# About Us

## Proactive, not reactive.

Teman is a mission-driven, engineer-led firm headquartered in New York City, with team across the USA, Tel Aviv, and Eastern Europe. We create proprietary, world-best technology that helps over 100 of the world's top landlords and management companies be proactive instead of reactive -- alerting them to issues before they become problems.





## SOLUTIONS

**GateGuard.xyz**
AI-powered autonomous concierge doorman catches forbidden activity + adds amenities

**PropertyPanel.xyz**
NYC's most comprehensive real estate platform. Find, Analyze, Manage, Service, Sell, Collaborate... all from one panel.

**SubletSpy.com**
catch illlegal sublets on sites like Airbnb

## ABOUT

Press

Terms & Conditions

Watch the video >

Request Demo >

**Order Now >**

Have Questions? Call Us **212-203-3714**

Copyright © 2021 GateGuard INC. All rights reservedBy using this site, you accept ourTerms & Conditions

**SERVICE AGREEMENT**
Last Updated July 28th, 2020, 12:12pm ET
Miami, Beach, FL

This Service Agreement ("Agreement") applies to any order for GateGuard Products and Services (individually and collectively, an "Order") mutually agreed upon and executed by GateGuard, Inc., a Delaware corporation with an address at **1520 Alton Road, Miami Beach, #888, FL 33139** ("Provider," "GateGuard" or "We") and the customer set forth on the applicable Order ("Subscriber" or "You"). Provider and Subscriber may each be hereinafter referred to as a "Party" and collectively as the "Parties".

NOTE: You are also bound by the Terms of Service ( https://gateguard.xyz/legal/terms.php ) and Privacy Policy ( https://gateguard.xyz/legal/privacy.php ).

NOTE: This contract includes a binding arbitration agreement. Please read it, and the entire contract, fully and carefully.

1. **DEFINITIONS**

A. "Affiliate" of a Person (as defined below) means any other Person that directly or indirectly (including through intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition only, "control" means the power to cause the direction or the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise, and "controlled by" and "under common control with" have correlative meanings.

B. "Authorized User" means Subscriber's employees, contractors, tenants, and third-party service providers who are authorized by Subscriber to access and use the Subscription Services (as defined below) that have been supplied user identifications and passwords by Subscriber (or by Provider at Subscriber's request) and who have agreed to Provider's standard terms and conditions for access and use of the Subscription Services.

C. "Confidential Information" means all technical and non-technical data or information as defined in Section 7.

D. "Documentation" means the end-user documentation for the Products and Services as made available by Provider.

E. "Effective Date" means the date this Agreement is entered into by the Parties (which may be indicated by Subscriber clicking on "agree" or any other synonymous language where this Agreement is agreed to electronically, or by placing an Order, by requesting Provider's Services, or by any other action demonstrating Subscriber's intent to enter into this Agreement.

F. "Fees" means the Product Fees and the Subscription Fees.

G. "Intellectual Property Rights" means all intellectual property rights and related proprietary rights arising under the laws of all jurisdictions worldwide, including: (a) patents and patent applications, including any continuation, continuation-in-part, divisional and provisional applications and any patents issuing thereon and any reissues, reexaminations, substitutes and extensions of any of the foregoing; (b) all registered and unregistered trademarks, service marks, trade or brand names, other proprietary indicia, logos, and symbols and all goodwill associated with any of the foregoing; (c) original works of authorship, registered and unregistered copyrights, and copyright applications; (d) designs, inventions (whether or not patentable), marketing and educational tools, formulae, processes, know-how, technology, and business methods; (e) software, database, and computer rights; and (f) trade secrets and other proprietary information or know-how.

H. **"Maintenance Security Deposit" means a non-refundable security deposit of $849 for each delivered Product, acting as a guarantee or protection that the Product will be protected or that monies due under this Agreement will be fulfilled by Subscriber. Provider may apply any or all of the Maintenance Security Deposit to cure Subscriber's default or breach of this Agreement, to cover damages or repairs, or to cover operational or maintenance expenses or costs Subscriber would otherwise be required to pay (*e.g.,* Labor Rates). In event the Maintenance Security Deposit falls below the required amount, Provider may require Subscriber to replenish the**

Maintenance Security Deposit and Subscriber shall replenish the Maintenance Security Deposit within seven (7) days of Provider's request.

I. "Person" means an individual, corporation, partnership, joint venture, limited liability entity, governmental authority, unincorporated organization, trust, association, or other entity.

J. "Product Fees" means the one-time fees for Products as set forth on an Order.

K. "Product Software" means the Provider software that is incorporated into the Products in object code form.

L. "Products" means those Provider products set forth on an applicable Order, including the Product Software incorporated therein.

M. "Professional Services" means implementation services and any other professional services that Provider may provide to Subscriber under this Agreement, and as may be set forth in more detail on an Order.

N. "Services" means the Subscription Services and Professional Services.

O. "Subscription Services" means the subscription services Provider will provide to Subscriber under this Agreement, and as set forth in more detail on an Order.

P. "Subscription Fees" means the recurring subscription fees for Subscription Services and as set forth on an Order, which are incurred in full by the Subscriber on the date of each Order and which may be paid for, in accordance with the terms herein, over the Term of the Subscription Services period

2. **PRODUCTS**

A. Subject to the terms and conditions of this Agreement, Provider shall supply Subscriber with the Products set forth on each applicable Order. All Orders shall be governed by this Agreement. In the event of any conflict between the terms contained in this Agreement and the terms contained in an Order, the terms of this Agreement shall control, unless the Order explicitly references a section of this Agreement to be superseded, in which case the terms of the Order shall control with respect to such section, but only to the extent of the conflict. The Parties may communicate regarding Orders via electronic means including electronic mail.

B. The MSRP of each Product (GateGuard intercom device) is **$8649**. Bulk orders are eligible for discounted pricing off the MSRP as follows:

| Quantity | Discount (off MSRP) | Discounted Price (per device) |
|----------|---------------------|-------------------------------|
|          |                     |                               |
| 3-9      | -$6150              | $2499                         |
| 10-19    | -$6650              | $1999                         |
| 20-49    | -$7150              | $1499                         |
| 50+      | -$7650              | $999                          |

C. **Your Discount Rate:**

One (1) Device/Product for $3699 (All other quantities as-is).

D. Product Fees for each Order are due in full within seven (7) days of submission of the Order. Upon receipt of full payment of the Product Fees, Provider will initiate shipment or delivery of the ordered Products to Subscriber. The Products will be deemed accepted by Subscriber upon delivery.

E. Within 30 days of delivery of the ordered Products, Subscriber may return the Products in the same condition in which they were delivered to Subscriber, reasonable wear and tear excepted. Delivery of the returned Products shall be via a method acceptable to Provider. Within 30 days of receipt of the returned Products, Provider shall return the Product Fees paid by Subscriber for the returned Products, provided that Provider reserves the right to charge a restocking fee of twenty-five percent (25%) of the MSRP price for each returned Product. No returns of Products will be accepted more than 30 days after delivery.

F. Within 30 days of the delivery of the ordered Products, Subscriber shall pay a nonrefundable Maintenance Security Deposit of $849 for each delivered Product.

G. Subject to the terms and conditions herein, Provider hereby grants to Subscriber a non-exclusive, non-transferable (except in accordance with Section 11.A. below) license, without the right to sublicense, to run the Product Software as incorporated into the Products during the Term solely for Subscriber's use of the Product in conjunction with any Services ordered under this Agreement. The Product Software is licensed, not sold to Subscriber.

3. **SERVICES**

A. Subject to the terms and conditions of this Agreement (a) Provider shall use commercially reasonable efforts to provide Subscriber with the Services set forth on each applicable Order; and (b) Provider hereby grants Subscriber a non-exclusive, non-transferable (except in accordance with Section 11.A.), non-sublicensable right during the Subscription Term to access and use the Subscription Services solely for the purpose of receiving the Subscription Services for Subscriber's internal business operations. Subscriber acknowledges and agrees that (i) use of Provider's hardware Products is subject to the additional terms and conditions set forth in the documentation for such Products, and (ii) use of Provider's end-user mobile application related to the Subscription Services is subject to additional terms and conditions set forth in the end user license agreement for such mobile application. Subscriber acknowledges and agrees that Provider may, at its discretion, display certain content via the Subscription Services and mobile application.

B. Unless otherwise noted on an applicable Order, Subscriber is solely responsible for the installation of all hardware Products. Provider shall have no liability to Subscriber or any third party related to the performance or non-performance of installation services by Subscriber or its third-party contractor. Subscriber is also responsible for the provision of adequate infrastructure for the operation of the hardware Products, including power, internet connectivity, and low-voltage electrical connections.

C. Provider may, at its sole discretion, offer optional installation services. Installation Fees for such services will be quoted to Subscriber upon request. Sample Installation Fee quotes are provided for referenced below and are subject to change.

| City | Installation Fee (Estimate) |
|---|---|
| New York City | $849 + parts and materials |
| Los Angeles | $1429 + parts and materials |
| Miami | $1429 + parts and materials |

D. Each Device is equipped with cellular data capabilities. Currently, the Subscription Fees detailed in Section 4 include up to 1 GB of cellular data usage per month. If Subscriber exceeds 1 GB of cellular data usage in a given month, Subscriber will be billed at a rate of $17 per additional GB of cellular data used (price subject to change). Subscriber Acknowledges that, in the future, GateGuard's current agreement(s) with existing cellular provider(s) may change or expire, such that GateGuard itself may not be able to provide data service in the future. In such a scenario, GateGuard will provide Subscriber with 30 days notice or, in the event Provider is unable to provide 30 days' notice, then GateGuard will provide reasonable notice given the circumstances to Subscriber, and provide Subscriber with guidance and support to enable Subscriber to independently obtain cellular service necessary to maintain the Device's operability.

E. Subscriber shall not use the Subscription Services: (a) in violation of this Agreement; (b) to infringe, misappropriate, or violate the Intellectual Property Rights of any third party or any rights of publicity or privacy; or (c) to violate any law, statute, ordinance or regulation. In addition, Subscriber shall not interfere with or attempt to interfere with or disrupt the integrity, security, functionality or operation of the Subscription Services, or access the Subscription Services by any means except those provided by Provider.

F. Subscriber is responsible for maintaining the confidentiality and security of the account information provided to it by Provider or created by Subscriber for its Authorized Users. Subscriber is fully responsible for all activities that occur under such account information (except for activities caused by the gross negligence or willful misconduct of Provider). In event Subscriber suspects or becomes aware of any unauthorized use of its account information, Subscriber shall immediately notify Provider of the same.

4. **FEES AND PAYMENT**

A. Product Fees and Maintenance Security Deposits are invoiced as outlined in Section 2.

B. Within 30 days of the installation of each ordered Product, Subscriber shall pay a one-time Setup Fee. The Setup Fee is computed as $6 for each resident Subscriber enrolls to use the Product.

C. Subscription Fees for the full duration of the Subscription Term are invoiced in advance once the Products are installed based on the below pricing table.

    i. We also estimate how much a typical building will save assuming they are able to eliminate $250/mo in expenses (such as by eliminating internet bills, Uber trips to unlock the door, overbilling by vendors, intercom repair costs, etc.), labeled as "Approximate SAVINGS". However, these savings are not in any way guaranteed and may be different or non-existent for some buildings, largely dependent on the work building management puts-in to generate such savings.

| Subscription Term | Subscription Fees (monthly rate, per device) | Subscription Fees (invoiced at installation) | Approximate SAVINGS (assuming $250/mo savings) |
|---|---|---|---|
| 3 Years | $199.99/month | $7199.64 | $9,000 |
| 4 Years | $179.99/month | $8639.52 | $12,000 |
| 5 Years | $159.99/month | $9599.4 | $15,000 |
| 6 Years | $139.99/month | $10,079.28 | $18,000 |
| 10 years | $119.99/mo | $14398.8 | $30,000 |
| 30 years | $49.99/mo | $17,996.4 | $90,000 |

D. Discounted Subscription Fees per your discount code will be:

NONE APPLIED HERE

E. Subscriber shall pay all Fees within thirty (30) days after receipt of an invoice thereof. Subscriber may pay amounts due under this Agreement by credit card or check mailed to Provider's address as set forth in the preamble of this Agreement. Subscriber is financially responsible for any affiliated credit card fees. No payment received by Provider constitutes payment to Provider until such payment is actually collected in full by Provider and credited to Subscriber's balance or account; provided, however, Subscriber is financially responsible for all chargebacks processed by Provider during the Term, resulting from Subscriber's dishonored payments.

F. Provider reserves the right to change Product Fees at any time and Subscription Fees upon renewal of Subscriber's Subscription Term, provided Provider provides Subscriber with thirty (30) days prior written notice of any such changes.

G. All undisputed Fees are non-cancelable and non-refundable. Subscriber must email any billing disputes to invoices@GateGuard.xyz within thirty (30) days of receipt of the applicable invoice, and Subscriber waives any disputes not made within that time.

H. Provider will invoice Subscriber for all reasonable and pre-approved travel expenses and other out-of-pocket expenses Provider incurs in providing any Services at any Provider property or facility, and Subscriber shall pay all such invoices within thirty (30) days of receipt of the same.

I. Late payments will accrue interest at a rate of one and one-half percent (1.5%) per month, or the highest rate allowed by applicable law, whichever is lower. In the event Provider delivers an invoice for any Fees or interest payments owed hereunder to Subscriber, Subscriber shall pay the invoiced amounts within thirty (30) days of receipt of such invoice.

    i. In the event Subscriber misses two (2) monthly payments at any point during the Term, Subscriber's monthly Subscription Fee increases by $20 per month, for the remainder of the Term.

ii. Notwithstanding anything to the contrary herein, if any payment obligation under this Agreement is not paid when due, the remaining unpaid balance and any accrued interest shall become due and payable immediately, at the option of the Provider. No failure or delay by Provider in exercising Provider's right under this section constitutes a waiver of such right.

iii. The Parties agree any provisions related to fees and/or accrued interest incurred due to defaults of, or late, payment, and any acceleration provision are not considered penalty provisions; rather, these provisions are designed to ensure full and timely payment of the terms herein. The Parties further agree such provisions are a material part of this Agreement and were bargained for as valuable consideration in order for the Parties to enter into this Agreement. The Parties agree the amounts included in any payment default provisions are the best forecast that can currently be used for damages Provider will suffer should Subscriber fail to make timely and complete payments as agreed upon hereunder, because precise measure of damages in the event of default or breach are not ascertainable at the time this Agreement is entered into. If breach or default occurs, Provider shall be awarded its costs and expenses incurred related to enforcement of this provision and for collection, including its attorney's fees, as well as any other relief agreed upon herein.

J. The Fees do not include any sales, use or similar local, state, federal, government, or foreign taxes, levies or duties of any nature ("Taxes"). Subscriber is responsible for paying any and all all Taxes, excluding only taxes based on Provider's income. Subscriber is responsible for paying any and all related costs and expenses not expressly agreed upon herein.  If Provider has the legal obligation to pay or collect Taxes for which Subscriber is responsible under this section, the appropriate amount shall be invoiced to and paid by Subscriber unless Subscriber provides Provider with a valid tax exemption certificate authorized by the appropriate taxing authority.

K. Subscriber shall, at all times during the Term, at Subscriber's expense, maintain applicable insurance policies, including general commercial liability insurance, in occurrence forms. All policies required by this section shall: (i) be in forms, and issued by carriers, reasonably acceptable to Provider, and shall be admitted to do business in the state where Products are to be delivered; (ii) be in an amount of at least one (1) million Dollars (US$1,000,000.00) per occurrence and at least two (2) million Dollars (US$2,000,000.00) in aggregate coverage. These coverages are minimum required amounts and Subscriber shall carry higher amounts if it is commercially reasonable to do so. Subscriber shall provide Provider with a copy of all Insurance policies, as well as certificates of insurance and an endorsement naming Provider as an additional insured at least thirty (30) days prior to the first shipment of Products under this Agreement, and Subscriber shall further provide Provider with proof of payment of Insurance premiums whenever requested. All insurance policies shall contain provisions requiring at least thirty (30) days' prior written notice to Provider prior to any cancellation or modification, and shall also contain commercially reasonable waiver of subrogation provisions. In addition to the insurance coverages listed in this Section, Subscriber shall also carry any other coverages which are consistent with commercially reasonable practices.

5. **TERM AND TERMINATION**

A. The term of this Agreement commences upon the Effective Date of the applicable Order and, subject to earlier termination as set forth herein, continues until the expiration of the last-to-expire Order for Services (the "Term"). Each Order for Services shall continue for the subscription term specified therein ("Subscription Term"), and will automatically renew for subsequent Subscription Terms unless either Party notifies the other of its intent not to renew such Subscription Term no less than thirty (30) days prior to the expiration of the current Subscription Term.

B. **Subscriber may terminate any Order, or this Agreement and all Orders, for convenience at any time upon ninety (90) days prior written notice to Provider. There are fees for terminating. Please read carefully, as acceptance of this Agreement expressly accepts these termination fees.**

i. **Device/Product Termination Fees**: After installation, the full retail cost of the device, minus any device fees paid, is due upon termination, and any discounts are no longer applicable. That is, if you terminate after paying $1000 toward the device (as an example only), but the retail price of the device is $8649, you will owe $7649. That is because discounts (even bulk discounts) are offered to our subscribers with the understanding that we will be earning continual recurring revenue while providing you with the services and products agreed upon in this Agreement, for the agreed upon duration.

ii. **Service Termination Fees**: After installation, the full contract value of your Agreement is due, minus $18/month. That is, if you have 1000 months remaining at $49 a month, you owe us 1000 times $41. That is because devices which are installed cannot be used elsewhere (opportunity cost to us).

C. Either Party may terminate an Order, or this Agreement and all Orders, effective upon written notice to the other Party, if the other Party materially breaches an Order or this Agreement and does not cure the breach within thirty (30) days after the non-breaching Party notifies it in writing of the breach. In addition, either Party may terminate this Agreement and all Orders, effective immediately upon written notice to the other Party, if the other Party (a) infringes, misappropriate or violates the Intellectual Property Rights of the non-breaching Party; (b) becomes the subject of a petition in bankruptcy or any proceeding relating to insolvency, receivership, or liquidation for the benefit of creditors; or (c) commits any breach of this Agreement that is incapable of cure. Provider reserves the right to limit or suspend Subscriber's access to and use of the Services if Subscriber fails to pay any undisputed Fees when due, or otherwise breaches this Agreement or any Service Order. Provider shall have no liability to Subscriber for any limitation, suspension or termination of access to or use of the Services pursuant to this Section.

D. The following Sections shall survive the expiration or termination of this Agreement: 1, 4 (with respect to any amounts that remain outstanding), 5.D., 6, 7, 8, 9, 10 and 11.

## 6. INTELLECTUAL PROPERTY

A. Subscriber acknowledges any and all Intellectual Property Rights in the Products and Services and are and shall remain the property of Provider, and Subscriber shall not at any time during the Term or after the expiration or termination of this Agreement in any way question or dispute the ownership thereof by Provider. To the extent Subscriber obtains any rights in the Products or Services or any Intellectual Property Rights therein, Subscriber hereby assigns all of its right, title and interest in and to the same to Provider. All rights not expressly granted under this Agreement are reserved to Provider.

B. As between Provider and Subscriber, Provider shall own all data collected, generated, processed or stored by the Products and Services (excluding the personal identifying information of Subscriber's personnel or residents), and may use such data for its business purposes, provided that Provider shall not share any data with any third party in a non-anonymized or non-aggregated manner without Subscriber's consent.

C. Except as otherwise specifically permitted under this Agreement, or as otherwise agreed by the Parties in writing, Subscriber shall not (as applicable) use, copy, modify, create derivative works of, distribute, sell, pledge, sublicense, lease, loan, rent, timeshare or provide access to the Products or Services nor permit any third party to do any of the foregoing. Subscriber acknowledges that the Products and Services contain the valuable trade secrets of Provider; consequently, except as may be expressly permitted by applicable law, Subscriber shall not (a) derive or attempt to derive the source code of all or any portion of the Product Software or Services by any means, (b) reverse engineer, decompile, disassemble, or translate the Products or Services or any portion thereof, or (c) sublicense, transfer and/or assign the Products or Services to any third party (except in accordance with Section 11.A.), whether with or without consideration, (d) render any services to third parties using the Products or Services; (e) remove or in any manner alter any product identification, proprietary, trademark, copyright or other notices contained in the Products or Services; or (f) permit any third party to do any of the foregoing.

D. Feedback. Any and all suggestions for correction, change and modification to the Products or Services and other feedback Subscriber provides to Provider (collectively "Feedback") are and will remain the property of Provider. Subscriber acknowledges and expressly agrees that any contribution of Feedback does not and will not give or grant Subscriber any right, title or interest in the Products or Services or in any such Feedback. All Feedback becomes the sole and exclusive property of Provider, and Provider may use and disclose Feedback without further notice or compensation to Subscriber and without retention by Subscriber of any proprietary or other right or claim. Subscriber hereby assigns to Provider any and all right, title and interest that Subscriber may have in and to any and all Feedback. At Provider's request and expense, Subscriber will execute any document, registration or filing required to give effect to the foregoing assignment.

E. Subscriber shall reasonably assist Provider with marketing support and/or activities at no third-party cost or expense to Subscriber. Such marketing support

and/or activities shall include serving as a public reference for Provider with respect to customer use, participating in questionnaires and surveys in connection with case studies, and cooperating with press releases with respect to Subscriber's use of Provider's Products and Services. Without limiting the foregoing, Subscriber may grant upon written request from Provider permission to publish Subscriber's names, corporate logos and/or service marks in any form of media in connection with any advertising, marketing and other promotional materials developed by Provider. Notwithstanding the foregoing, Provider, upon request by Subscriber, will cease to use Subscriber's names, corporate logos and/or service marks in any marketing materials which are printed subsequent to such request and shall, upon such request, remove such names, corporate logos and/or service marks from its web site.

## 7. CONFIDENTIALITY

A. A Party receiving Confidential Information (the "Receiving Party") shall hold all Confidential Information in strict confidence and shall not disclose any Confidential Information to any third party, without prior written approval of the Disclosing Party, which shall be made on a case-by-case basis and in the Disclosing Party's sole discretion. Notwithstanding the foregoing, either Party may disclose this Agreement to its professional advisors and potential and actual investors and/or acquirers, provided such persons are subject to written confidentiality obligations no less protective than the terms of this Section. In addition, the Receiving Party will use at least the same standard of care as it uses to protect its own Confidential Information of similar nature to protect the confidentiality of the Confidential Information of the Party disclosing such Confidential Information (the "Disclosing Party"), and in no event less than reasonable care. The Receiving Party agrees to promptly notify the Disclosing Party upon discovery of any unauthorized use or disclosure of the Confidential Information. The restrictions on disclosure will not apply to Confidential Information which is required to be disclosed by a court, government agency or regulatory requirement, provided that Receiving Party shall first notify the Disclosing Party of such disclosure requirement or order and use reasonable efforts to obtain confidential treatment or a protective order. The Receiving Party acknowledges the Disclosing Party is neither responsible nor liable for any business decisions made by the Receiving Party in reliance upon any Confidential Information disclosed pursuant hereto.

B. All obligations of the Receiving Party regarding Recipient's use and disclosure of Confidential Information continues until such time as the Confidential Information becomes publicly known through no action of the Receiving Party. Confidential Information does not include information: (i) proven to have been known to the Receiving Party prior to its receipt, pursuant to this Agreement; (ii) in the public domain at the time of disclosure to the Receiving Party or thereafter enters the public domain without breach of the terms of this Agreement;; (iii) was or is received from a third party with no obligation of confidentiality owed to Disclosing Party; or (iv) is independently developed by or at the direction of Receiving Party without any use of the Confidential Information. All Confidential Information is and shall remain the property of the Disclosing Party. By disclosing Confidential Information to the Receiving Party, the Disclosing Party does not grant any express or implied right to the Receiving Party to the Disclosing Party's patents, copyrights, trademarks, trade secret information, or any other Confidential Information. The Parties agree any Confidential Information is made available "as is" and no warranties are given or liabilities of any kind are assumed with respect to the quality of such Confidential Information; including, but not limited, to its fitness for the purpose, non-infringement of third-party rights, accuracy, completeness, or correctness.

C. The Receiving Party understands and agrees the Disclosing Party would suffer immediate and irreparable harm in the event of any breach of any of the Receiving Party's obligations under this Agreement, that monetary damages would not be an adequate remedy for any breach of this Agreement and, therefore, that the Disclosing Party shall be entitled to appropriate equitable relief, including an injunction and an order for specific performance, as a remedy for any such breach in addition to any other relief to which it is entitled, including but not limited to monetary damages, and that Disclosing Party shall not be required to post a bond or other security to obtain such equitable relief.

## 8. WARRANTY AND DISCLAIMER

A. Each Party represents and warrants that (a) it has the full corporate right, power and authority to enter into this Agreement, (b) the execution of this

Agreement by and the performance of its obligations and duties hereunder do not and will not violate any agreement to which it is a party or by which it is bound, (c) this Agreement constitutes the legal, valid and binding obligation of such Party, in accordance with their terms; and (d) it will comply with all applicable law in the performance of its obligations and duties hereunder.

B. Provider hereby represents and warrants that (a) it will provide the Services in a manner consistent with general industry standards applicable to services similar to the Services and in accordance with the service levels set forth in Schedule A attached hereto; and (b) it and its third party service providers that host the Subscription Services will maintain administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Subscriber's electronic data and information submitted by or for Subscriber to the Subscription Services or collected and processed by or for Subscriber using the Subscription Services. In the event of a breach of the warranty in (a), Provider shall, as its sole and exclusive obligation and Subscriber's sole and exclusive remedy, promptly reperform the affected Services at no additional cost to Subscriber. In the event of a breach of the warranty in (b), Provider shall, as its sole and exclusive obligation and Subscriber's sole and exclusive remedy, at Provider's option and expense, (x) modify the affected Products or Services so that they are no longer infringing; (y) replace the affected Products or Services with substantially similar alternate products or services; or (z) if neither of the options in (x) or (y) is commercially practicable as determined in Provider's sole discretion, accept a return of the affected Products or Services and issue Subscriber a pro-rated refund of any amounts Subscriber paid therefor.

C. Provider shall have no liability or obligation for any breach of the warranties set forth in this Section resulting from: (a) the use or combination, by Subscriber, of the Products or Services with any other software or hardware not supported by Provider; (b) causes external to the Products or Services, such as problems with the hardware, network, power or other infrastructure of Subscriber; (c) unauthorized or improper use of the Products or Services by Subscriber; or (d) any modification of the Products or Services by anyone other than Provider.

D. SUBSCRIBER REPRESENTS AND WARRANTS SUBSCRIBER IS AWARE AND ACKNOWLEDGES PROVIDER IS A NEWER BUSINESS AND THE PRODUCTS AND SERVICES PROVIDED HEREUNDER UTILIZE NEWER TECHNOLOGY; AS SUCH, PRODUCTS AND SERVICES HEREUNDER MAY NO LONGER BE ABLE TO BE PROVIDED DUE TO LEGAL CHALLENGES, BUSINESS OR FINANCIAL CHALLENGES, CHANGES IN GOVERNING RULES OR REGULATIONS, OR OTHER OCCURRENCES OUT OF PROVIDER'S CONTROL.

   i. The Parties agree, in event this Agreement is terminated due to any of the reasons provided in the foregoing paragraph, Provider shall provide Subscriber with written notice and, within reasonable time, remove Provider's Products, in accordance with this Agreement. Subscriber is hereby reminded all Fees are incurred in full upon Subscriber's Order and remain due and payable in event of termination.

E. EXCEPT AS EXPRESSLY PROVIDED ABOVE IN THIS SECTION, THE PRODUCTS AND SERVICES ARE PROVIDED TO SUBSCRIBER "AS IS" AND "AS AVAILABLE" AND WITHOUT WARRANTY OF ANY KIND. PROVIDER HEREBY DISCLAIMS ALL OTHER WARRANTIES WITH RESPECT TO THE PRODUCTS AND SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PROVIDER DOES NOT WARRANT THAT THE PRODUCTS OR SERVICES WILL MEET SUBSCRIBER'S REQUIREMENTS, OPERATE WITHOUT INTERRUPTION OR DOWNTIME OR BE SECURE OR ERROR FREE. EXCEPT AS SET FORTH IN SECTION 9. WITH RESPECT TO SUBSCRIBER CLAIMS, PROVIDER IS NOT RESPONSIBLE OR LIABLE FOR SUBSCRIBER'S OR ITS AUTHORIZED USERS' USE OF THE PRODUCTS OR SERVICES, INCLUDING, WITHOUT LIMITATION, WHICH PERSONS SUBSCRIBER OR ITS AUTHORIZED USERS ALLOW OR DO NOT ALLOW TO ENTER SUBSCRIBER'S PROPERTY.

9. **INDEMNITY**

A. Subject to this Agreement, Provider shall at its expense defend Subscriber and its officers, directors and employees ("Subscriber Indemnified Parties") against any claims brought against any Subscriber Indemnified Party arising from or related to a third party claim that the Products or Services, as used in accordance with these Terms, infringe any valid and registered U.S. patent, copyright or trademark (each, a "Subscriber Claim"), and shall pay any damages finally awarded by a court or agreed to by Provider in a settlement with respect to

such Subscriber Claim, provided that Subscriber (a) promptly gives written notice of the Subscriber Claim to Provider; (b) gives Provider sole control of the defense and settlement of the Subscriber Claim (provided that Provider may not agree to any settlement that imposes any liability or obligation on Subscriber); and (c) provides to Provider, at Provider's cost, reasonable assistance in connection therewith.

B. Subject to this Agreement, Subscriber shall at its expense defend Provider, its Affiliates and its and their respective officers, directors and employees ("Provider Indemnified Parties") against any claims made or brought against any Provider Indemnified Party arising from or related to Subscriber's violation of this Agreement or use of the Products or Services in a manner not contemplated hereunder (each, a "Provider Claim") and shall pay any damages finally awarded by a court or agreed to by Subscriber in a settlement with respect to such Provider Claim, provided that Provider (a) promptly gives written notice of the Provider Claim to Subscriber; (b) gives Subscriber sole control of the defense and settlement of the Provider Claim (provided that Subscriber may not agree to any settlement that imposes any liability or obligation on Provider); and (c) provides to Subscriber, at Subscriber's cost, reasonable assistance in connection therewith.

C. Subscriber acknowledges and agrees that while Provider may make an intense effort  to protect our devices, networks, connections, and data, Subscriber accept there is no possible way to ensure the security, trustworthiness, and reliability of any device, service provider, connection, ISP, chip maker, chip, code, component, or any item, individual, organization, country, or entity involved in any way or used in any way in the creation of any technology product. Therefore, Subscriber agrees Provider in no way responsible if any malicious or unintentional act or omission of any third party causes any damage to the device, Subscriber's property, Subscriber, anyone at or near Subscriber's property, Subscriber's business, or in any other way that Subscriber may feel harms Subscriber. Subscriber accepts that despite any and all efforts made, this technology is in constant "beta" state and subject to error, updates, hacking, and other failures, partial or complete. Subscriber acknowledges and agrees that any information Subscriber sends or receives during Subscriber's use of the Product or otherwise during the Term may not be secure and may be intercepted or later acquired by unauthorized third parties.

10. **LIMITATION OF LIABILITY**

A. EXCEPT FOR SUBSCRIBER'S BREACH OF SECTION 3.E. OR SECTION 6.C., EITHER PARTY'S BREACH OF SECTION 7 (CONFIDENTIALITY), THE PARTIES' INDEMNIFICATION OBLIGATIONS UNDER SECTION 9 (INDEMNITY), AND A PARTY'S INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS, LOSS OF USE, COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, MULTIPLE, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

B. EXCEPT FOR SUBSCRIBER'S PAYMENT OBLIGATIONS FOR PRODUCTS AND SERVICES UNDER THIS AGREEMENT, SUBSCRIBER'S BREACH OF SECTION 3.E. OR SECTION 6.C., EITHER PARTY'S BREACH OF SECTION 7 (CONFIDENTIALITY), AND A PARTY'S INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE LESSER OF (A) THE AMOUNTS ACTUALLY PAID BY SUBSCRIBER TO PROVIDER HEREUNDER FOR THE TWELVE (12) MONTH PERIOD THAT PRECEDED THE EVENT THAT GAVE RISE TO LIABILITY, OR (B) TEN THOUSAND DOLLARS ($10,000) (THE "CAP"). NOTWITHSTANDING THE FOREGOING, THE PARTIES' RESPECTIVE LIABILITY WITH RESPECT TO THEIR INDEMNIFICATION OBLIGATIONS UNDER SECTION 9 (INDEMNITY) SHALL NOT EXCEED AN AMOUNT EQUAL TO THREE (3) TIMES THE CAP.

11. **MCI / CAPITAL IMPROVEMENT / DHCR / OTHER AGENCIES**

A. **While Subscriber may apply for a capital improvement (*e.g.,* MCI, Master Capital Improvement) rent increase in NYC, and may be able to make such**

**similar applications in other cities, we do not recommend or not recommend doing so; however, as always, it is always best to discuss such matters with a legal professional or a professional well versed in this field. You understand Provider makes no guarantees that any city agency will approve or deny use of our devices, Products, or Services and the full contract costs, including any and all Fees are incurred upon execution of this Agreement, thus remain due and payable by Subscriber to Provider. It is Subscriber's responsibility to research such improvements prior to entering this Agreement and Subscriber expressly understands and agrees to the terms of this paragraph.  Subscriber further understands that each building and jurisdiction and agency and inspector and judge and court and the like are different and previous outcomes do not guarantee future results. For the avoidance of doubt, Provider reiterates that Provider does <u>not</u> guarantee results with any agency, court, service, or the like and all such responsibilities, including fiscally, are those of the Subscriber.**

12. **INTERNET CONNECTIVITY & PERMISSION TO INSTALL CONNECTIVITY DEVICES**

A. Subscriber agrees GateGuard's entry system requires broadband internet access capable of uploading video clips at high speed. Subscriber agrees Provider may take related actions and install devices to provide connectivity in the area, and/or to strengthen the connectivity in the area.

B. GateGuard, its partners, or affiliates shall have the right to install ancillary equipment and antennas on the rooftop of the facility for the transmission and reception of communications signals, in support of GateGuard's services and general security at or around the Building, and the installation, construction, maintenance, operation, repair, replacement of its communications fixtures and related equipment, cables, accessories and improvements, as well as the right to test, survey and review title on the Property.  Recipients hereby grants to any utility company providing utility services to GateGuard, its partners or affiliates, a non-exclusive easement over the Property, from an open and improved public road to the Premises, and upon the Premises and upon GateGuard's or a utility company's request, Recipients will execute a separate recordable easement evidencing this grant, at no cost to Provider, its agents or the public utility.

C. Subscriber agrees to provide internet access and bring a CAT5 Ethernet cable and power supply (grounded outlet, and UPS, ot 12V 5AMP) to any door to which Subscriber will have Provider install the Product if asked, at Subscriber's expense. Subscriber agrees that if Subscriber asks Provider to handle such installation Subscriber  will be billed at Provider's rates (see Pricing).

D. Subscriber agrees to have redundant power (UPS, Uninterrupted Power Supply) and that any internet or power failures and any damage resulting from such are not the responsibility of GateGuard. You may order an Uninterrupted Power Supply (UPS) to be installed with GateGuard. If GateGuard decides your building will require a UPS then GateGuard will provide one of our choosing, for the price of $285 including transportation & installation. All buildings serviced by Con Edison in New York City require a UPS due to many brownouts and blackouts that may affect your service.

E. Subscriber agrees GateGuard may install WiFi routers, repeaters, and has the right to install any equipment necessary to provide such connectivity, and necessary wiring, throughout your building to provide connectivity to remote panels (such as for Rent Regulated tenants who demand an in-apartment door monitor (not included in price)). You agree that GateGuard may bring internet to the building and sell or resell connectivity to the tenants from this network. You agree not to restrict or limit in any way GateGuard's ability to connect internet to the building. GateGuard may bring internet to the building via: Fiber Optic line, DSL, Cable, Cellular, Satellite, or any other method and install any devices, equipment, wiring, cameras, or other such technology as required to provide connectivity, monitoring, and security for GateGuard equipment as GateGuard sees fit.

F. In the event you exceed 800MB of data transferred over a SIM card installed by Provider, you will be billed at a rate of $17 per GB (gigabyte), rounded up to the nearest half gigabyte (500 MB), regardless of the reason for exceeded the allotted amount of data (including whether caused by you, tenant, stranger, Provider, contractor, etc.)

G. GateGuard may give or sell bandwidth and/or other usage of connectivity devices we install or have installed or our affiliates install as we choose and we are not required to share in any revenues, fees, or other profits or gains, from the above.

H. You agree GateGuard may drill, cut, screw, cement, anchor, bolt, glue, fasten, place, stick and otherwise modify and/or attach to your building in any way it

sees fit to install its system and services and connectivity devices. You assume any and all liability for this.

I. You agree to never interfere, move, adjust, touch, paint, modify, block, occlude, cover, or otherwise change or impact or harm our connectivity equipment and antennae. You agree not to place any antenna(e) or connectivity devices on your roof or building exterior without our written permission. You agree we may plug into and use the nearest electric source at your building at your expense for any devices or connectivity devices or antennae. You agree we may transfer the rights of any devices we place for connectivity to anyone at our sole discretion.

J. You agree we may access your properties 24/7/365.5 (always, at any time), and you will provide access on request within 30 minutes at any time. You agree we may install, break, drill, replace, and/or modify locks which provide access to any area of your property where we have placed or wish to place equipment or items of any kind. You agree to provide GateGuard access to any room, section, floor, hallway, elevator, shaft, or area of your building at any time we demand, and within 90 minutes notice. You agree that any time over 90 minutes will be billed to you at our hourly rates.

K. In event of a loss of 4G or cellular service availability for any reason you agree to provide Ethernet (with CAT6 or better cable drawn to the device), Mobile Data (via an alternative 4G LTE GSM SIM Card provider), and/or WiFi connectivity at your cost. If you do not provide it, GateGuard may enter the building and provide it, at the Standard Labor Rates at the time of services. We will not discount our rate due to any lack of connectivity.

13. **PACKAGE AND DELIVERY MANAGEMENT**

A. The goal of this system is to remove the burden and liability of package management from the management company, building officers, and staff, and to remove risks associated with package management. As such, GateGuard will have control over all aspects of package delivery, from who can deliver into the system, to when, and what. For example, GateGuard may require certain packages to be brought to a holding facility to be delivered overnight (12am to 6am) instead of during peak traffic where they pose a nuisance and/or risk to tenants. The preceding is only intended as one example.

B. GateGuard may allow or disallow any delivery service, courier, or other organization or individual from accessing the service, or placing items into any package area . GateGuard may disallow any product or item into package area, such as but not limited to hazardous, oversized, or overweight items that may pose a risk to equipment and humans.

C. GateGuard may require any or all Services to deliver to Holding Locations. This is for logistical reasons, such as to avoid overload, or traffic, or annoying residents at peak times, or excessive burden on the system or financials of the system. GateGuard may charge services a fee for usage of holding services. (Services will be able to deny this charge if they choose to hold the package themselves and re-deliver it at an approved time or return the package to its source).

D. GateGuard may deliver to the building between the hours of 12am and 6am. To maintain order, GateGuard has exclusive rights to serve as courier during these hours. GateGuard may charge services a fee for deliveries during this time. (Services will be able to deny this charge if they choose to hold the package themselves and re-deliver it at an approved time).

E. Packages left in lockers for a long period of time, which shall be at GateGuard's discretion, but in no event less than 3 days, may be moved to a holding facility  and/or charged fees for longer storage, retrieval, or re-delivery. The fees will be disclosed at the location and the tenant notified of the impending fees should they fail to retrieve their package.

F. Management will give GateGuard a list of tenants and others allowed to access the system. GateGuard may also give access to the system at its discretion. GateGuard may integrate with management's computer systems so as to sync tenant information.

G. GateGuard may remove and/or replace and/or modify any other package receptacles and storage systems and package management systems in-place.

H. Liability for packages remains with the  courier unless the package is in the GateGuard locker and it is stolen or damaged through technical fault of GateGuard.

I. GateGuard may access these devices and the floors they are in at any time. GateGuard may access the stairs, elevators, lobbies, loading areas, trash areas, laundry areas, storage areas, hallways, roofs, and other areas at any time.

J. Where a building is physically or legally impossible to install into, for GateGuard, or where GateGuard decides they cannot install into, it shall not nullify the rest of the Agreement.

K. To prevent the "smuggling" of illegal objects, from packages to suitcases, GateGuard shall be the exclusive provider of guest management and tracking, access management, and surveillance services. Subscriber's Management company staff must ask guests to check-in with the GateGuard system. Subscriber'sManagement company must require the use of GateGuard systems for access control and surveillance and replace existing systems with GateGuard-enabled systems when required by GateGuard.

14.  **AMENITIES AND SERVICES**

A. You agree that GateGuard may sell through the site, apps, panels, wifi, and any other contact method or platform additional services directly to your tenants. These may include, but are not limited to, such things as insurance, rent payment services, internet connectivity, delivery services, cleaning services, online platforms, etc. GateGuard is not responsible to share any revenue from these services. Subscriber has no veto rights over such services.

B. GateGuard will not revenue share with you in any way in any area for any service, item, product, device, or anything from which we earn revenue at any time.

15. **NOT A SECURITY SYSTEM OR SECURITY GUARD REPLACEMENT**

A. Provider's Products, Devices, Services, or Provider itself are not a replacement for security, nor a security device and will not keep bad actors out of your property. Subscriber is aware and acknowledges all Products and Services provided hereunder are not a replacement for a security system, or security guard service.

16. **RIGHT TO SURVEIL OUR DEVICES & OPERATION**

A. In order to ensure the security of our staff, equipment, team, vendors, courier partners, network, and to understand and improve the usage of our systems and operations we may install cameras to monitor the usage of our system and building activities. We may also ask our staff, employees and contractors, and partners and vendors, to wear body cameras or recording devices to ensure safety.

B. We have the right to place and install cameras in any and all public spaces and frontage of your building at our discretion. In the event of vandalizing of any of our equipement, we have the right to charge you for the installation and cost of our camera system and cameras (as listed on our website and in our terms).

C. Our staff and vendors have the right to wear body-cameras, audio recorders, and similar devices on their person when accessing your building, including when entering utility rooms, offices, private spaces, public spaces, units, and the like and you agree you will disclose and gain consent for that when asking us to access any private spaces. You agree that when you invite or provide us access to private spaces you are representing that you have gotten such permission for us to to access these spaces wearing such recording devices.

17.  **NO COPYING. NON COMPETE**

A. You agree not to enter into, partner with, invest in, purchase, fund, or otherwise engage in any access control business (smart locks, intercoms, door locks). You agree that if you do, personally, by any entity in which you hold shares or any control, by any entity which you advise or otherwise engage with, the full capital (all shares) of that entity and the intellectual property related to any access control systems or products becomes ours immediately.

B. You agree not to open, modify, photograph, publish, post, and/or share in any way the designs and/or details of any of our products.

C. You agree that any and all designs, technology, systems, methods, algorithms, brands, logos, molds, code that we represent as ours is in-fact ours and that you do not and will not make any intellectual property claims against us. You agree that you give us full and completely unlimited license to use, transfer, and gift your intellectual property to anyone.

18. **PERSONAL GUARANTEE**

A. You understand, acknowledge, and agree you are entering into this Agreement on behalf of an entity or entities, for which you have or have been given permission, and you hereby personally guarantee this Agreement, any and all debts and payments due, and any liabilities incurred. You agree Provider may place a lien on any and all property of you and/or your entity and/or entities and force the sale of properties at will, at our discretion to pay debts Provider claim are past-due. Provider may, in its discretion, choose to send you a personal guarantee form subsequent to this Agreement, for you to execute and return; however, such form is not required to establish your personal guarantee of the obligations hereunder.

19. **UPDATES TO TERMS OF AGREEMENT**

A. **Each and every time Subscriber places or otherwise agrees to an Order, it is Subscriber's sole responsibility to review the terms and conditions prior to agreeing and entering into an Order,** *each and every time,* **as Provider's terms and conditions may change in between Subscriber's Orders. The Parties shall abide by Provider's then-current terms and conditions in event of any dispute, questions, or concerns. Provider is not required to provide Subscriber with notice of changes to terms and conditions, unless expressly agreed upon in this Agreement or required by governing local, state, or federal law. The Parties agree this paragraph is a material condition of this Agreement, whereas, Subscriber hereby expressly agrees, by entering into this Agreement and upon placing each and every Order or request for Services, Subscriber shall be acknowledging Subscriber reviewed and agrees to Provider's terms and conditions, and, in event of any changes, modifications, or updates to such terms and conditions, Subscriber expressly accepts those changes, modifications, or updates by placing or otherwise agreeing to an Order or any type of request for Services or performance by Provider.**

B. Notices of Provider's updated terms may go into Subscriber's spam folder, so please add Provider's email address to your inbox, along with the obligations agreed upon in the preceding paragraph.

20. **TERMS OF USE AND PRIVACY POLICY**

A. **By entering into this Agreement, which is generally only accessible via Provider's website [gateguard.xyz or its related affiliates sites] (individually and collectively, "Website"), Subscriber acknowledges and agrees to Provider's Website's terms and conditions and privacy policy, which may be found at the following destinations:**

   i. **Terms and Conditions: [ENTER HYPERLINK]**
   ii. Privacy Policy:   [ENTER HYPERLINK]

B. **Subscriber acknowledges and agrees that any use of Provider's Website, including but not limited to placing an Order or requesting Services, expressly indicates Subscriber's acceptance of Provider's Website's terms and conditions and privacy policy, which may be updated from time to time. It is Subscriber's responsibility to periodically review Provider's terms and conditions and privacy policy for any changes or modifications. If Subscriber continues to use the Website, places an Order, requests Provider's Services, or takes any other action indicating acceptance, Subscriber shall be legally bound by all terms and conditions herein and therein. DO NOT USE THE WEBSITE IF YOU DO NOT AGREE TO BE BOUND BY PROVIDER'S TERMS AND CONDITIONS.**

C. In the event Subscriber continues to use the Website after any changes or modifications of the terms and conditions, privacy policy, or PSA are posted on the Website, Subscriber will be considered to have accepted, and legally bound by, such changes and/or modifications.

21. **MISCELLANEOUS**

A. Neither Party shall assign any of its rights or delegate any of its obligations under this Agreement, in each case whether voluntarily, involuntarily, by operation of law or otherwise, without the other Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, either Party may assign its rights and delegate its obligations under this Agreement to an Affiliate or in connection with a merger, consolidation or reorganization involving such Party or a sale of all or substantially all of the assets or stock of such Party or business to which this Agreement relates without the other Party's prior written consent, provided that the assignee agrees in writing to be bound by the terms and conditions of this Agreement. Any purported assignment or delegation in violation of this Section is void and a material breach of this Agreement. This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective permitted successors and assigns.

B. This Agreement, together with its attached Schedules, Exhibits, and Orders constitutes the entire understanding of the Parties, and supersedes all prior negotiations, commitments, and representations with respect to the subject matter hereof.

C. If Provider is unable to perform any of its obligations hereunder due to any act of God, fire, casualty, flood, war, strike, shortage of labor or materials, or any other cause beyond its reasonable control (a "Force Majeure Event"), then Provider's performance shall be excused and the time for its performance shall be extended for the period of delay or inability to perform.

D. Any dispute, controversy, or claim arising out of or relating in any way to this Agreement, including without limitation any dispute concerning the construction, validity, interpretation, enforceability or breach of this Agreement, shall be exclusively resolved by binding arbitration upon Provider's or Subscriber's submission of the dispute to arbitration. In the event of a dispute, controversy, or claim arising out of or relating in any way to this Agreement, the complaining party shall notify the other party in writing thereof. Within thirty (30) days of such notice, representatives of both parties shall attempt to resolve the dispute in good faith. Should the dispute not be resolved within thirty (30) days after such notice, the complaining party shall seek remedies exclusively through arbitration which shall be administered by the American Arbitration Association under its Commercial Arbitration Rules, before a single arbitrator, mutually selected by the parties, in Miami-Dade County, Florida and Florida law shall apply. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Demand for arbitration shall be made within a reasonable time after a claim, dispute, or other matter in question has arisen, and in no event shall it be made after two years from when the aggrieved party knew or should have known of the controversy, claim, dispute or breach. No party to this Agreement will challenge the jurisdiction or venue provisions as provided in this section. Nothing contained herein shall prevent the party from obtaining an injunction.

E. This Agreement and any dispute arising from the construction, performance or breach hereof shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without reference to its conflict of law principles. The Parties hereto agree that the exclusive jurisdiction and venue for any action brought between the Parties under these Terms shall be the state or federal courts located in Miami, Florida, and each of the Parties hereby agrees and submits itself to the exclusive jurisdiction and venue of such courts for such purpose, to the exclusion of all other venues, forums or jurisdictions.

F. Headings used in this Agreement are intended for convenience or reference only and shall not control or affect the meaning or construction of any provision of this Agreement. This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing an instrument to be drafted. As used in this Agreement, the words "include" and "including" and variations thereof will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation."

G. Except for the Parties' indemnification obligations under Section 9, nothing in this Agreement shall confer any rights upon any Person other than the Parties, and each such Party's respective successors and permitted assigns.

H. All notices under this Agreement shall be in writing and shall be deemed to have been given upon: (a) personal delivery; (b) the second business day after mailing; (c) the second business day after sending by confirmed facsimile; or (d) upon confirmation of receipt if sent by email. Notices to the Parties shall be sent to their respective addresses set forth in the applicable Order. Either Party may change the address to which notices, requests, demands, claims and other

communications hereunder are to be delivered by giving the other party notice in the manner set forth herein.

I. The relationship between the Parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, joint venture or other form of joint enterprise, employment or fiduciary relationship between the Parties, and neither Party shall have authority to contract for or bind the other Party in any manner whatsoever.

J. No failure or delay by either Party in exercising any right under this Agreement shall constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in effect.

IN WITNESS THEREOF, this Agreement is entered and agreed to by the Parties upon the Effective Date.

# SCHEDULE A

1. **SUPPORT AND MAINTENANCE; SERVICE LEVELS**

A. Provider will support and maintain the Subscription Services so that they operate substantially in accordance with their specifications as set forth in the Documentation, and will promptly repair or replace, without any additional charge, the Subscription Services or any portion thereof that do not perform in accordance with such specifications.

B. Provider will update the Subscription Services and make available to Subscriber any and all patches, enhancements, updates, upgrades and new versions of the Subscription Services that Subscriber makes generally commercially available ("Updates"). Any such Updates will be deemed part of the Subscription Services that as term is used herein and will be covered by the support services set forth in this Schedule.

C. Provider will provide phone and email technical support for the Subscription Services for up to three (3) Subscriber representatives per Subscriber property or facility from 9 am – 7pm Eastern Standard Time without additional charge. Provider's support personnel will provide Subscriber with remote assistance for help in using and operating the Subscription Services and to accept reports of errors in the Subscription Services. Provider personnel performing support services will be experienced, knowledgeable and qualified in the use, maintenance and support of the Subscription Services. Support services do not include additional training, custom programming or services for problems, errors or inquiries relating to the equipment and ancillary services necessary to access and use the Subscription Services, including hardware, software, wireless devices, and telecommunication services or their interoperation with the Subscription Services.

D. Contact information for technical support is as follows:

E-Mail: **help.team@GateGuard.xyz**

Phone: **212-203-3714**

E. Provider may change any of the foregoing contact information from time to time by not less than thirty (30) days prior written notice to Subscriber, so long as at least one number or address is at all times available for each means of contact.

F. Provider will, at all times during the Term, use commercially reasonable efforts to maintain the following service levels for the Subscription Services (collectively, the "Service Levels").

i. System Availability Service Level - Provider will make the Subscription Services available 99% of the time during each one-month period during the Term, excluding any Subscription Services maintenance or Force Majeure Events that result in the Subscription Services not being available to Subscriber, as measured and monitored from Provider's facilities ("Service Availability"). Service Availability will be calculated on a monthly basis using the following formula: Actual Availability divided by Total Scheduled

Availability multiplied by 100%. The following definitions will apply with respect to the calculation of Service Availability:

ii. "Actual Availability" means Total Scheduled Availability minus Downtime, in minutes.

iii. "Downtime" means the time (in minutes) that the computing infrastructure that hosts the Subscription Services is online and available to receive application requests from the public internet. Downtime does not include any unavailability of the Subscription Services and system due to System Maintenance or a failure or defect arising out of a Force Majeure Event, or any inability of an Authorized User to access the Subscription Services due to such Authorized User's loss of power, internet connectivity, or other cause unrelated to the Subscription Services.

iv. "System Maintenance" means time (in minutes) the Subscription Services are not accessible to Subscriber due to maintenance of the Subscription Services, including for maintenance and upgrading of the software and hardware used by Provider or its service providers to provide the Subscription Services. System Maintenance includes scheduled maintenance and unscheduled, emergency maintenance. Provider will use commercially reasonable efforts to provide Subscriber with at least five (5) business days' prior written notice of any scheduled maintenance or sixty (60) minutes' advance written notice for unscheduled, emergency maintenance. Provider will provide such notices to Subscriber by email to an address provided by Subscriber. System Maintenance in any given month will not exceed three (3) hours per month. Any time during which the Subscription Services are unavailable to Subscriber due to maintenance or other activity by Provider for which Provider fails to give notice, which exceeds the permitted time allotment, or which occurs outside of the foregoing permitted hours will be included in the calculation of Downtime.

v. "Total Scheduled Availability" means seven (7) days per week, twenty-four (24) hours per day, excluding System Maintenance, in minutes.

2. **LABOR RATES: STANDARD LABOR RATE:**

*(minimum 2 hours for all labor, plus travel time & expense)*

G. Low Voltage Technician : $189/hour
H. Low Voltage Technician Helper : $90/hour
I. Low Voltage Technician Supervisor : $240/hour
J. Day Rate: 2 Low Voltage Installers: $1499; Each additional installer $750;
K. Teman Executive Team (if required to be on-site or coach labor via phone or video): $900 /hour
L. Teman Associates : $250 / hour
M. Teman VPs & Directors : $500 / hour

3. **ADDITIONAL ITEM PRICING:**

N. Teman TAB 700 : $139, and available in sets of 100 (200 minimum order).
　　i. You are required to use only our SIM card on the Device. The Device is locked to our app unless a tenant or Subscriber pays Provider to unlock it on either a monthly or yearly basis, as agreed upon.
O. Teman TAB 700 Wall Mount : Plastic : $12.50 (sold in sets of 200  minimum)
P. Teman TAB 700 Wall Mount : Metal : $29.99 (sold in sets of 200 minimum)
Q. UPS Battery Backup (400 KHH), not installed: $149
R. UPS Battery Backup (400 KWH), installed: $289
　　i. **Battery backup required** in NYC, Miami, LA, Chicago, if you do not already have one at time due to unreliable power in these cities. We may require the installation and use of one in other cities at our own discretion. This is important to protect the device, and to ensure uptime.
S. UPS replacement battery: $39; (shipping not included; labor not included)
T. **UPS replacement battery *with*** labor: $179; (required every 36 months)
U. 45-degree angle bracket: $289. Installed at our discretion.
V. Sheet metal for covering existing holes: $180-2499. Installed at our discretion (an amount up to $699).

4. **HOTSPOT AND WIFI ROUTER, SWITCHES, ACCESS POINT PRICING:**

**(Service & Installation not Included)**

W. 4G Wifi Hotspot (Rugged): $449
X. 4G Wifi Hotspot (Non-Rugged): $279
Y. 4G SIM CARD : $5.99  (service & installation not included)
Z. 4G DATA : $16/GB (pooled for all your devices) (rounded up to the nearest 500 MB);
  i. In event Provider's vendor or service provider raises the data price, price to Subscriber shall increase by the amount of Provider's price increase, plus 20%.

5. **NETWORK EQUIPMENT:**

A. SWITCH (16 PORT POE): $399
B. SWITCH (8 PORT POE): $299
C. SWITCH (32 PORT POE): $599

6. **WIRING:**

A. CAT5 1000 FEET BOX (RISER): $169
B. CAT5 1000 FEET BOX (PLENUM): $229
C. 1000  FEET LOW VOLTAGE WIRE BOX: $419
D. CONDUIT (2" x 10ft): $24.50 / piece
E. CONDUIT (1.5" x 10ft): $15.50 / piece
F. CONDUIT (1" x 10ft): $9.50 / piece
G. CONDUIT (3/4" x 10ft): $9.20 / piece
H. CONDUIT (connectors, junction boxes, etc) :  Our cost plus 25%
I. All other wire our cost plus 20%;
J. ENCLOSURES: $249-849 (will depend on side & location)
K. BATTERY BACKUP (UPS) : $289 (one required)
L. SHEET METAL COVERS FOR EXISTING INTERCOMS:
M. STAINLESS: $550 and up.
N. PLAIN STEEL UNPAINTED (YOU WILL  PAINT): $450 and up.

7. **CAMERA KITS:**

A. $4,200 includes 4 IP cameras, 16CH NVR, and CAT5, 1 day labor, 2 men.
B. Conduit requires additional material costs and often a 2nd day of labor.

8. **SHIPPING:**

A. At current courier (UPS, DHL, FEDEX, or other) Rates plus packing materials, plus 15% for handling.

9. **COURT APPEARANCE & LEGAL FEES**

A. We bill $500/hour ($900/hour for executives) for speaking to any attorney. We bill any and all attorneys fees if you decide to consult with an attorney based on your words or actions.

B. We bill $2000 ($4000 for executives) plus $500 per hour ($900/hour for executives) for any court appearances requested by you or resulting from your actions.

C. We charge $500 to review and sign any affidavits, and $500 an hour if we must edit or write them.

10. **SUPPORT & SERVICE CALL LIMITS**

A. Varied based on your service plan level. Monthly Gold service plan includes up to five (5) calls and/or emails or a total of three (3) hours of phone or email support per device per month, with every additional call costing $29.99 per call or email. Monthly Platinum service plan includes up to five (12) calls and/or emails or a total of three (5) hours of phone or email support per device per month, with every additional call costing $29.99 per call/email.

B. In the event you report a device is not functioning, but the issue turns out to be the result of your or someone else's actions (a Superintendent unplugging the device, another vendor damaging a lock or wire, someone moving the device, etc.) other than our own team, we will bill you at our above labor rates for site visits, with a minimum of 2 hours. We strongly recommend and encourage you to have your super or manager instead do a video call with our support team.

For any questions with respect to the rates or terms in this Schedule, please contact Provider.

# TERMS & CONDITIONS

**GateGuard INC**

**Last Revised: July 7, 2020,**

**11:15 AM ET (MIAMI BEACH, FL, 33139)**

**HI THERE!**

**PLEASE READ THESE TERMS CAREFULLY AS THEY CONTAIN IMPORTANT INFORMATION REGARDING YOUR LEGAL RIGHTS, REMEDIES, AND OBLIGATIONS.**

**GateGuard INC, a Delaware Corporation (hereinafter referred to as "GateGuard", "we", "us", or "our") welcomes you ("User(s)" or "you") to our website at: http://GateGuard.xyz or https://teman.com** (the "Site") which can be used to acquire a facial-recognition and amenities building entry system (the "Service(s)").

You may use the Site and any Services acquired by you from GateGuard ONLY in accordance with the terms and conditions hereunder. It is hereby made clear that the term "Site" shall also include any "Services" provided by GateGuard, whether subscribed for through the Site or offline.

In the event you make a purchase and/or subscribe to any service you are agreeing to be bound by our "Service Agreement", linked and described below.

You are also required to read and accept our Privacy Policy, linked in described below.

Terms documents, as is industry standard, may link to additional pages of Terms on this or other websites, and those sections are also binding.

Please note: Section 15 of these Terms contains an arbitration clause and class action waiver that applies to all GateGuard users, including you. If your country of residence is the United States, this provision applies to all disputes with GateGuard. If your country of residence is outside of the United States, this provision applies to any action you bring against GateGuardin the United States. It affects how disputes with GateGuard are resolved. By accepting these Terms, you agree to be bound by this arbitration clause and class action waiver. Please read it carefully.

### Table of Contents

1. **Terms** (references additional sub-page(s))
2. **Service Agreement** (references additional sub-page(s))
3. **Intellectual Property Rights**
4. **Monitoring and Enforcement; Termination**
5. **Disclaimer**
6. **Limitations**
7. **Revisions**
8. **Links**
9. **Privacy** (references additional sub-page(s))
10. **Governing Law**
11. **Indemnification**
12. **Availability**
13. **Waiver and Severability**
14. **Changes to Terms of Use**

15. **Arbitration Agreement** (references additional sub-page(s))

16. **Entire Agreement** (references additional sub-page(s))

17. **Questions**

*This website contains information that is the property of GateGuard. We keep all the rights on those materials, which are placed on the website for your convenience. Information on this website is provided "as is", without any additional support or warranty. GateGuard is not responsible for any possible problems or losses in case of using this information for any purpose. We do not provide any rights to reproduce, re-distribute, sell, publish, broadcast or circulate any materials contained in this website to anyone, except for personal purposes. We reserve the right, in our discretion, to add, modify, or remove portions of these Terms of Use at any time and for any reason.*

*If you visit our website, you accept to be bound by these Terms of Use. If you do not agree with any of these terms, you are prohibited from using or accessing this website or any data or services provided through the website; and you should exit the website immediately.*

**1. Terms**

1.1. By accessing this website, you are agreeing to be bound by these website Terms of Use, all applicable laws and regulations, and agree that you are responsible for compliance with any applicable local laws. By registering as a user of website or by using of website, you agree to:

● maintain no more than a single user account by providing the most accurate, complete and recent information for creating and maintaining said account;

● not bring about harm to any of the other users, third parties, GateGuard;

● comply strictly with these Terms of Use;

● not violate intellectual property rights of third parties;

● not violate privacy rights of other individuals;

● that any purchase and/or subscription will be bound by our **Service Agreement** at https://gateguard.xyz/legal/serviceagreement.php and any and all sub-pages and/or sub-sections of the Service Agreement and/or its sub-pages and sub-sections.

● the processing of your personal data according to the **Privacy Policy** at https://gateguard.xyz/legal/privacy.php .

1.2. You will not use this website or any data or services provided through the website for, or to encourage, any unlawful purpose; nor post or transmit on the website inaccurate, incomplete or false information (including in the case of candidates, biographical information about yourself and/or information about your ability to work in certain countries); nor will you post or transmit on the website any libelous, abusive, threatening, harmful, vulgar, obscene or otherwise objectionable material. You confirm that you will not post or transmit on the website any material which contains any virus or other disabling devices which interferes or may interfere with the operation of the website; or which alters or deletes any information which you have no authority to alter or delete; or which overloads the website by spamming or flooding it. You will not use any device, routine or software to crash, delay, or otherwise damage the operation of this website. You will not use the website in a manner that could damage, disable or impair the services or content being provided by GateGuard. You must not attempt to gain unlawful or unauthorized access to the website, other resource material, computer systems or networks connected to any server associated with the website through hacking, password mining or any other improper or illegal means.

1.3. If you are provided with a user name, password, or any other piece of information as part of our security procedures, you must treat such information as confidential, and you must not disclose it to any other person or entity. You also acknowledge that your account is personal to you and agree not to provide any other person with access to this website or portions of it using your user name, password, or other security information. You are solely responsible for all activities that occur in connection with your account and must not bring about harm to any of the other users, third-parties, or GateGuard. You agree to notify us immediately of any unauthorized access to or use of your user name or password or any other breach of security.

1.4. We have the right to disable any user name, password or other identifier, whether chosen by you or provided by us, at any time if, in our opinion, you have violated any provision of these Terms of Use and we otherwise determine is in our best interests.

**2. Service Agreement**

2.1. In the event you make a purchase and/or subscribe to GateGuard's services, you must read and agree to our Service Agreement at https://gateguard.xyz/legal/serviceagreement.com, including any and all sub-sections and linked sub-pages.

2.2 You understand and accept that it is industry standard, and often required by vendors, for online services to have multi-page terms documents, and that you will not *and may not* pick-and-choose which sections apply to you. All sections of all terms linked on this website, including but not limited to: this page, and the "Service Agreement", and the "Privacy Policy", and any other linked terms documents, be they ours or third-party, apply to you and it is your responsibility to read and understand them before submitting any order with us.

3.3. It is your responsibility to check for updates and re-read the terms and conditions, and understand them, before upgrading or adding additional services from us.

3.4. Terms may not be changed or negotiated via email or phone. You sending us mark-ups, suggestions, requests, objections, comments, or anything regarding the Terms does not constitute notice of non-acceptance. If you click to accept

our Terms and place an order, only the terms you've clicked to accept apply, with no changes or modifications regardless of any previous statement by email, phone, in-person, at a trade-show, etc.

3.5. The only terms available to you are the ones online at the time you sign up, and/or upgrade, and/or accept the most-current terms and conditions during login. Thus, the only "Service Agreement" available to you is the one online at the time you sign up, and/or upgrade, and/or accept the most-current terms and conditions during login.

3.6. Sales people and resellers of GateGuard, and any team members including the CEO, are not permitted to make modifications to the terms and conditions. Special contracts/agreements between GateGuard and you must only be done with both parties represented by attorneys

**3. Intellectual Property Rights**

3.1. The materials contained in this website and its entire contents, features and functionality (including but not limited to all information, software, text, displays, images, video, podcast and audio), and the design, selection and arrangement thereof, are owned by GateGuard, its licensors or other providers of such material and are protected by United States and international copyright, trademark, trade dress, trade secret and other intellectual property or proprietary rights laws. The material in this site is provided for lawful purposes only.

3.2. The trademarks, logos and service marks (collectively the "trademarks") displayed on the website are registered trademarks of GateGuard.

3.3. Nothing contained on the website should be construed as granting, by implication, estoppel, or otherwise, any license or right to use any trademark displayed on the website without written permission of GateGuard. Your use of the trademarks or any other content on the website is strictly prohibited, unless specifically authorized. You are advised that GateGuard will aggressively enforce its intellectual property rights to the fullest extent of the law.

3.4. Permission is granted to temporarily download the materials for personal, non-commercial use, for purposes of expanding your knowledge or education only. This is a grant of a license, not a transfer of title, and under this license you may not:

- remove any copyright or other proprietary notations from the materials;
- transfer the materials to another person or "mirror" the materials on any other server;
- modify or copy the materials;
- download, upload print, display, perform, reproduce, publish, license, post, transmit, modify, adapt, or distribute any content in whole or in part without GateGuard written authorization.
- use the materials for any commercial purpose, or for any public display (commercial or non-commercial);
- attempt to decompile or reverse engineer any software contained on this website;

3.5. This license shall automatically terminate if you violate any of these restrictions in this Section 2 and may be terminated by GateGuard at any time. Upon terminating your viewing of these materials or upon the termination of this license, you must destroy any downloaded materials in your possession whether in electronic or printed format.

3.6. In the event that you notice a violation of GateGuard's copyrights on any third party website, please send a report of such copyright of third parties please send a report of copyrights violations to **help.team@gateguard.xyz.**

3.7. You agree that you will not:

 (a) submit material that is copyrighted, protected by trade secret or otherwise subject to third party proprietary rights, including privacy and publicity rights, unless you are the owner of such rights or have permission from the legal owner to post the material and to grant to GateGuard all of the license rights granted herein;

(b) publish falsehoods or misrepresentations that could damage GateGuard or any third-party;

(c) submit material that is unlawful, obscene, defamatory, libelous, threatening, pornographic, harassing, hateful, racially or ethnically offensive, harmful to children, in violation of any third party's rights or encourages conduct that would be considered a criminal offense, give rise to civil liability, violate any law, or is otherwise inappropriate;

(d) post advertisements or solicitations of business; and

(e) submit or transmit any viruses, worms, Trojan horses and other harmful or malicious code, files, scripts, agents or programs.

(f) Whereas, GateGuard believes that Stevie Nicks ruined Fleetwood Mac, you agree you will not upload or play her music on our systems or near our team. This line (3.7(f)) is a joke much like the Van Halen "Brown M&M's" clause, but we still encourage you to listen to the Original Fleetwood Mac, knowing you will agree with us that it was a much better band before she showed up and caused all that drama.

GateGuard does not endorse any user submissions or any opinion, recommendation, or advice expressed therein, and GateGuard expressly disclaims any and all liability in connection with user submissions.

GateGuard does not permit copyright infringing activities and infringement of intellectual property rights on the website or the services, and GateGuard will remove all content and user submissions if properly notified that such content or user submission infringes another's intellectual property rights.

You acknowledge that GateGuard and its designees shall have the right (but not the obligation) in their sole discretion to pre-screen, refuse or remove content and user submissions without prior notice.

GateGuard also reserves the right to terminate a user's access to the website and services, if they are determined to be a repeat infringer. A repeat infringer is a user who has been notified of infringing activity more than twice and/or has had a user submission removed from the website and/or the services more than twice.

GateGuard also reserves the right to decide whether content or a user submission is appropriate and complies with these Terms of Use for violations other than copyright infringement and violations of intellectual property law, such as, but not limited to, pornography, obscene or defamatory material, or excessive length.

GateGuard may, at its sole discretion, remove such user submissions and/or terminate a user's access for uploading such material in violation of these Terms of Use at any time, without prior notice.

3.8. GateGuard doesn't own content you submit to this website. GateGuard can use the content you've submitted. You grant to GateGuard the worldwide, non-exclusive, perpetual, irrevocable, royalty-free, sublicensable, transferable right and license to use, reproduce edit, modify, reformat, excerpt, delete, translate, perform, distribute, exercise, commercialize and disclose to third parties any such content. You represent and warrant that you own or control all rights in and to your contributions to the website and have the right to grant the license granted above to us.

3.9. You understand and acknowledge that you are responsible for any user contributions you submit or contribute, and you, not GateGuard, has full responsibility for such content, including its legality, reliability, accuracy, and appropriateness.

**4. Monitoring and Enforcement; Termination**

4.1. We have the right to:

(i) take any action with respect to any information you submit to the website that we deem necessary or appropriate if we believe that such information violates the Terms of Use, infringes any intellectual property right or other right of any person or entity, threatens the personal safety of users of the website or the public, or could create liability for the GateGuard;

(ii) take appropriate legal action, including without limitation, referral to law enforcement, for any illegal or unauthorized use of the website; and/or

(iii) terminate or suspend your access to all or part of the website for any or no reason, including without limitation, any violation of these Terms of Use.

4.2. Without limiting the foregoing, we have the right to cooperate fully with any law enforcement authorities or court order requesting or directing us to disclose the identity or other information of anyone posting any materials on or through the website. YOU WAIVE AND HOLD HARMLESS GateGuard FROM ANY CLAIMS RESULTING FROM ANY ACTION TAKEN BY GateGuard DURING, OR TAKEN AS A CONSEQUENCE OF, INVESTIGATIONS BY EITHER GateGuard OR LAW ENFORCEMENT AUTHORITIES.

4.3. However, we cannot review all material before it is posted on the website, and cannot ensure prompt removal of objectionable material after it has been posted. Accordingly, we assume no liability for any action or inaction regarding transmissions, communications, or content provided by any user or third party. We have no liability or responsibility to anyone for performance or nonperformance of the activities described in this section.

**5. Disclaimer**

5.1. The material in this website could include technical inaccuracies or typographical errors. GateGuard may make changes or improvements at any time. THE WEBSITE AND ITS CONTENT ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, EXCEPT AS EXPRESSLY PROVIDED HEREIN, GateGuard DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES OF ANY KIND EXPRESSED, IMPLIED OR STATUTORY, TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS AND FITNESS FOR A PARTICULAR PURPOSE.

GateGuard DOES NOT WARRANT OR MAKE ANY REPRESENTATIONS REGARDING THE USE OF OR THE RESULT OF THE USE OF THE MATERIAL IN THIS WEBSITE IN TERMS OF THEIR CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE. YOU (AND NOT GateGuard) ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. THE FOREGOING EXCLUSION DOES NOT AFFECT ANY IMPLIED WARRANTY WHICH CANNOT BE EXCLUDED OR LIMITED UNDER APPLICABLE LAW.

GateGuard DOES NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE WEBSITE WILL BE SECURE, COMPLETE, UNINTERRUPTED OR ERROR-FREE, THAT DEFECTS WILL BE CORRECTED, OR THAT THIS WEBSITE OR THE SERVER THAT MAKES IT AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS OR THAT THE WEBSITE WILL OTHERWISE MEET YOUR NEEDS OR EXPECTATIONS.

You understand that we cannot and do not guarantee or warrant that files available for downloading from the Website will be free of viruses or other destructive code. You are responsible for implementing sufficient procedures and checkpoints to satisfy your particular requirements for anti-virus protection and accuracy of data input and output, and for maintaining a means external to our Website for any reconstruction of any lost data.

WE WILL NOT BE LIABLE FOR ANY LOSS OR DAMAGE CAUSED BY A DISTRIBUTED DENIAL-OF-SERVICE ATTACK, VIRUSES OR OTHER TECHNOLOGICALLY HARMFUL MATERIAL THAT MAY INFECT YOUR COMPUTER EQUIPMENT, COMPUTER PROGRAMS, DATA OR OTHER PROPRIETARY MATERIAL DUE TO YOUR USE OF THE WEBSITE OR TO YOUR DOWNLOADING OF ANY MATERIAL POSTED ON IT, OR ON ANY WEBSITE LINKED TO IT.

5.2. This website contains downloadable materials as well as links to external websites. GateGuard is not responsible for, and has no control over, the content of such downloadable materials or external websites.

5.3. You acknowledge that the transmission of information over the internet is inherently insecure, and we cannot guarantee the security of data sent over the internet.

5.4. Unless specified otherwise, any information you submit in connection with this website shall be considered as non-confidential and non-proprietary. You represent that you have the lawful right to submit such information. By supplying such information, you give to GateGuard the right to use it on an unrestricted basis. We do not require any 'sensitive' data in our online recruitment process. We therefore kindly request you not to communicate any personal details revealing racial or ethnic origin, political opinions, religious or philosophical beliefs, trade-union membership, health or sex life, litigation or judicial convictions. If you nevertheless provide us with such sensitive data, you agree that we may process it for our recruitment purposes.

5.5. GateGuard does not guarantee that any employer or client will ask for a candidate's information that was submitted through this website, or will interview or hire a candidate, or that any candidates will be available or will meet the needs of any employer or client. We make no representation or warranty as to the final terms and duration of any appointment obtained through this website. We do not guarantee that any employer or client will keep confidential any candidate information or data provided to them.

5.6. The documents provided on this website and in communications from us may or may not contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Any such forward-looking statements include information about possible or assumed future results of our business and financial condition, as well as the results of operations, liquidity, plans and objectives. In some cases, you can identify forward-looking statements by terminology such as "believe," "may," "estimate," "continue," "anticipate," "intend," "should," "plan," "expect," "predict," "potential," or the negative of these terms or other similar expressions. We may also make forward-looking statements in other reports, in presentations, in material delivered to shareholders and in press releases. In addition, our representatives may from time to time make oral forward-looking statements. Such statements are based on the current expectations and certain assumptions of GateGuard's management, of which many are beyond GateGuard's control. These statements are subject to, without limitation, the risk factors discussed under the heading "Risk Factors" in GateGuard's Annual Report on Form 20-F for the year ended March 31, 2017 and other documents filed with or furnished to the Securities and Exchange Commission by GateGuard. Except as required by law, GateGuard undertakes no obligation to publicly update any forward-looking statements for any reason after the date of any such news release whether as a result of new information, future events or otherwise.

Due to rounding, numbers presented throughout this and other documents may not add up precisely to the totals provided and percentages may not precisely reflect the absolute figures.

**6. Limitations**

6.1. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL GateGuard, ITS AFFILIATES OR THEIR LICENSORS, SERVICE PROVIDERS, EMPLOYEES, AGENTS, OFFICERS OR DIRECTORS BE LIABLE FOR DAMAGES OF ANY KIND, UNDER ANY LEGAL THEORY, ARISING OUT OF OR IN CONNECTION WITH YOUR USE, OR INABILITY TO USE, THE WEBSITE, ANY WEBSITES LINKED TO IT, OR ANY CONTENT ON THE WEBSITE OR SUCH OTHER WEBSITES, INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING BUT NOT LIMITED TO, PERSONAL INJURY, PAIN AND SUFFERING, EMOTIONAL DISTRESS, LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF USE, LOSS OF GOODWILL, LOSS OF DATA, AND WHETHER CAUSED BY TORT (INCLUDING NEGLIGENCE), BREACH OF CONTRACT OR OTHERWISE, EVEN IF GateGuard OR ITS AUTHORIZED REPRESENTATIVE HAS BEEN NOTIFIED ORALLY OR IN WRITING OF THE POSSIBILITY OF SUCH DAMAGE. GateGuard WILL NOT BE LIABLE FOR ANY DAMAGES OR INJURY CAUSED BY, INCLUDING BUT NOT LIMITED TO, ANY FAILURE OF PERFORMANCE, ERROR, OMISSION, INTERRUPTION, DEFECT, AND DELAY IN OPERATION OF TRANSMISSION, COMPUTER VIRUS, OR LINE FAILURE.

THE FOREGOING DOES NOT AFFECT ANY LIABILITY WHICH CANNOT BE EXCLUDED OR LIMITED UNDER APPLICABLE LAW. THE TOTAL LIABILITY OF GateGuard TO YOU FOR ALL LOSSES, DAMAGES, AND CAUSES OF ACTION (IN CONTRACT, TORT (INCLUDING WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE) WILL NOT BE GREATER THAN THE AMOUNT YOU PAID TO ACCESS THIS SITE.

**7. Revisions**

The materials appearing on this website could include technical, typographical, or other errors. GateGuard does not warrant that any of the materials on its website are accurate, complete, or current. GateGuard may make changes to the materials contained on its website at any time without notice.

We may revise these terms of use for its website at any time without notice.

By using this website you are agreeing to be bound by the current version of Terms of Use.

**8. Links**

8.1. This website contains downloadable materials as well as links to external websites and resources provided by third parties; these links are provided for your convenience only. GateGuard is not responsible for, and has no control over, the content of such downloadable materials or external websites.

All such content is solely the responsibility of the person or entity providing such content. If you decide to access any of the third-party websites linked to this Website, you do so entirely at your own risk and subject to the terms and conditions of use for such websites.

8.2. The inclusion of any link does not imply endorsement by GateGuard.

8.3. We are not responsible, or liable to you or any third party, for the content or accuracy of any materials provided by any third parties.

**9. Privacy**

9.1. Any personal information that you provide to us on this website is subject to our **Privacy Notice** which is incorporated into these Terms by reference, as if set forth fully herein.

9.2. GateGuard is obliged to comply with governmental requests, subpoenas, and court orders and has the right to ensure the integrity of operations. Taking in account above written you are hereby notified that GateGuard may disclose any information and content considered necessary to disclose by government body or court on the basis of written requests, subpoenas, and court orders without limitation.

9.3. Our "Privacy Policy" applies and is viewable at  https://gateguard.xyz/legal/privacy.php. You must read, understand, and accept this policy before continuing use of our site, and before making any purchase or subscription with GateGuard.

**10. Governing Law**

Any claim relating to this website or materials shall be governed by, and interpreted in accordance with, the laws of the State of Florida without regard to its conflicts of law principles.

**11. Indemnification**

You agree to defend, indemnify and hold website, and its subsidiaries, affiliates, officers, directors, employees, representatives, proprietors, partners, shareholders, servants, principals, agents, predecessors, successors, assigns, co-branders, licensees, members and attorneys harmless from and against any and all suits, actions, claims, demands, proceedings (whether judicial, regulatory, or administrative), damages, settlements, judgments, injuries, liabilities, losses, risks, costs, and expenses (including reasonable attorneys' fees and litigation expenses) relating to or arising from the website, your use of the website, your fraud, violation of law, or willful misconduct, and any breach by you of these Terms of Use.

**12. Availability**

We use reasonable efforts to ensure that the website is generally available. However, there will be occasions when access to the website will be interrupted or unavailable. We will use reasonable commercial efforts to minimize such disruption where it is within our reasonable control.
You agree that we shall not be liable to you for any modification, suspension or discontinuance of the website.
You are responsible for obtaining access to the website and that access may involve third-party fees (such as Internet service provider or airtime charges). You are responsible for those fees. In addition, you must provide and are responsible for all equipment necessary to access the website.

**13. Waiver and Severability**

No waiver by GateGuard of any term or condition set forth in these Terms of Use shall be deemed a further or continuing waiver of such term or condition or a waiver of any other term or condition, and any failure of the GateGuard to assert a right or provision under these Terms of Use shall not constitute a waiver of such right or provision.
If any provision of these Terms of Use is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of these Terms of Use remain in full force and effect.

**14. Changes to Terms of Use**

GateGuard may at any time and at its sole discretion modify these Terms of Use, including Privacy Notice with or without notice to the User. Any such modification will be effective immediately upon public posting.
Your continued use of website, services following any such modification constitutes your acceptance of these modified Terms of Use.
You are expected to check this page periodically to take notice of any changes, as they are binding on you.

**15.** Dispute Resolution and Arbitration Agreement

15.1 This Dispute Resolution and Arbitration Agreement shall apply if your (i) country of residence or establishment is in the United States; or (ii) your country of residence or establishment is not in the United States, but bring any claim against GateGuard in the United States (to the extent not in conflict with Section 21).

15.2 Overview of Dispute Resolution Process. GateGuard is committed to participating in a consumer-friendly dispute resolution process. To that end, these Terms provide for a two-part process for individuals to whom Section 15.1 applies: (1) an informal negotiation directly with GateGuard's customer service team, and (2) a binding arbitration administered by the American Arbitration Association ("AAA") using its specially designed Consumer Arbitration Rules (as modified by this Section 19 and except as provided in Section 15.6). Specifically, the Consumer Arbitration Rules provide:

- Claims can be filed with AAA online (www.adr.org);
- Arbitrators must be neutral and no party may unilaterally select an arbitrator;
- Arbitrators must disclose any bias, interest in the result of the arbitration, or relationship with any party;
- Parties retain the right to seek relief in small claims court for certain claims, at their option;
- The initial filing fee for the consumer is capped at $200;
- The consumer gets to elect the hearing location and can elect to participate live, by phone, video conference, or, for claims under $25,000, by the submission of documents;
- The arbitrator can grant any remedy that the parties could have received in court to resolve the party's individual claim.

15.3 Pre-Arbitration Dispute Resolution and Notification. Prior to initiating an arbitration, you and GateGuard each agree to notify the other party of the dispute and attempt to negotiate an informal resolution to it first. We will contact you at the email address you have provided to us; you can contact GateGuard's customer service team by emailing us. If after a good faith effort to negotiate one of us feels the dispute has not and cannot be resolved informally, the party intending to pursue arbitration agrees to notify the other party via email prior to initiating the arbitration. In order to initiate arbitration, a claim must

be filed with the AAA and the written Demand for Arbitration (available at www.adr.org) provided to the other party, as specified in the AAA Rules.

15.4 Agreement to Arbitrate. You and GateGuard mutually agree that any dispute, claim or controversy arising out of or relating to these Terms or the applicability, breach, termination, validity, enforcement or interpretation thereof, or to the use of the GateGuard Platform, the Host Services, the Group Payment Service, or the Collective Content (collectively, "Disputes") will be settled by binding individual arbitration (the "Arbitration Agreement"). If there is a dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you and GateGuard agree that the arbitrator will decide that issue.

15.5 Exceptions to Arbitration Agreement. You and GateGuard each agree that the following claims are exceptions to the Arbitration Agreement and will be brought in a judicial proceeding in a court of competent jurisdiction: (i) Any claim related to actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights; (ii) Any claim seeking emergency injunctive relief based on exigent circumstances (e.g., imminent danger or commission of a crime, hacking, cyber-attack).

15.6 Arbitration Rules and Governing Law. This Arbitration Agreement evidences a transaction in interstate commerce and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. The arbitration will be administered by AAA in accordance with the Consumer Arbitration Rules and/or other AAA arbitration rules determined to be applicable by the AAA (the "AAA Rules") then in effect, except as modified here. The AAA Rules are available at www.adr.org or by calling the AAA at 1–800–778–7879.

15.7 Modification to AAA Rules - Arbitration Hearing/Location. In order to make the arbitration most convenient to you, GateGuard agrees that any required arbitration hearing may be conducted, at your option, (a) in the county where you reside; (b) in San Francisco County; (c) in any other location to which you and GateGuard both agree; (d) via phone or video conference; or (e) for any claim or counterclaim under $25,000, by solely the submission of documents to the arbitrator.

15.8 Modification of AAA Rules - Attorney's Fees and Costs. You and GateGuard agree that GateGuard will be responsible for payment of the balance of any initial filing fee under the AAA Rules in excess of $200 for claims of $75,000 or less. You may be entitled to seek an award of attorney fees and expenses if you prevail in arbitration, to the extent provided under applicable law and the AAA rules. Unless the arbitrator determines that your claim was frivolous or filed for the purpose of harassment, GateGuard agrees it will not seek, and hereby waives all rights it may have under applicable law or the AAA Rules, to recover attorneys' fees and expenses if it prevails in arbitration.

15.9 Arbitrator's Decision. The arbitrator's decision will include the essential findings and conclusions upon which the arbitrator based the award. Judgment on the arbitration award may be entered in any court with proper jurisdiction. The arbitrator may award declaratory or injunctive relief only on an individual basis and only to the extent necessary to provide relief warranted by the claimant's individual claim.

15.10 Jury Trial Waiver. You and GateGuard acknowledge and agree that we are each waiving the right to a trial by jury as to all arbitrable Disputes.

15.11 No Class Actions or Representative Proceedings. You and GateGuard acknowledge and agree that, to the fullest extent permitted by law, we are each waiving the right to participate as a plaintiff or class member in any purported class action lawsuit, class-wide arbitration, private attorney general action, or any other representative proceeding as to all Disputes. Further, unless you and GateGuard both otherwise agree in writing, the arbitrator may not consolidate more than one party's claims and may not otherwise preside over any form of any class or representative proceeding. If the "class action lawsuit" waiver or the "class-wide arbitration" waiver in this Section 15.11 is held unenforceable with respect to any Dispute, then the entirety of the Arbitration Agreement will be deemed void with respect to such Dispute and the Dispute must proceed in court. If the "private attorney general action" waiver or the "representative proceeding" waiver in this Section 15.11 is held unenforceable with respect to any Dispute, those waivers may be severed from this Arbitration Agreement and you and GateGuard agree that any private attorney general claims and representative claims in the Dispute will be severed and stayed, pending the resolution of any arbitrable claims in the Dispute in individual arbitration.

15.12 Severability. Except as provided in Section 15.11, in the event that any portion of this Arbitration Agreement is deemed illegal or unenforceable, such provision shall be severed and the remainder of the Arbitration Agreement shall be given full force and effect.
15.13 Changes. Notwithstanding the provisions of Section 14  ("Changes to Terms of Use"), if GateGuard changes this Section 15 ("Dispute Resolution and Arbitration Agreement") after the date you last accepted these Terms (or accepted any subsequent changes to these Terms), you may reject any such change by sending us written notice (including by email) within thirty (30) days of the date such change became effective, as indicated in the "Last Updated" date above or in the date of GateGuard's email to you notifying you of such change. Rejecting a new change, however, does not revoke or alter your prior consent to any earlier agreements to arbitrate any Dispute between you and GateGuard (or your prior consent to any subsequent changes thereto), which will remain in effect and enforceable as to any Dispute between you and GateGuard.
15.14 Survival. Except as provided in Section 15.12 and subject to Section 15.8, this Section 15 will survive any termination of these Terms and will continue to apply even if you stop using the GateGuard website or terminate your GateGuard account(s).

**16. Entire Agreement**

The Terms of Use and our Privacy Policy and our "Services Agreement" and any and all sub-pages, sub-sections, and linked-pages with additional terms, constitute the sole and entire agreement between you and GateGuard regarding the website and supersede all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding the website.

**17. Questions**

You may reach GateGuard with questions via  help.team@teman.com. Legal service not accepted by email.

# EXHIBIT E

---

## Photograph of Panel at 143 West 140th Street

Equipment identified by GateGuard as installed
by or on behalf of Amazon, May 2026



Panel at 143 W. 140th st

Panel at 143 West 140th Street, New York, New York

Circled equipment identified by GateGuard as installed by or on behalf of Amazon.
The property owner confirms that no permission was given and that no request was made.

EXHIBIT E