UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
GATEGUARD, INC., :

: OPINION & ORDER

Plaintiff, 21 Civ. 9321 (JGK) (GWG)

:

-against-

:

AMAZON.COM, INC., et al, :

Defendant. :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff GateGuard, Inc., brought this suit against Amazon.com Inc., Amazon.com Services Inc., Amazon.com Services, LLC, Amazon Logistics, Inc., and Ring LLC (collectively, "Amazon"), alleging misappropriation of trade secrets and other claims. Amazon has noticed the deposition of GateGuard's principal, Ari Teman, and of GateGuard itself, to take place in the Southern District of New York. GateGuard has now moved for a protective order, requesting that the deposition take place remotely or in person in Tel Aviv, Israel, where Teman resides.[1] For the reasons stated below, GateGuard's motion for a protective order is denied and Teman is

---

[1] See Notice of Motion, filed August 20, 2026 (Docket # 372); Memorandum of Law in Support, filed Aug. 21, 2026 (Docket # 376) ("Mem."); Declaration of Eden P. Quainton, filed Aug. 21, 2026 (Docket # 374) ("Quainton Decl."); Memorandum of Law in Opposition, filed Sept. 3, 2026 (Docket # 378) (redacted version at Docket # 379) ("Opp."); Declaration of David Salant, filed Sept. 3, 2026 (Docket # 380) (redacted version at Docket # 381) ("Salant Decl."); Declaration of Dr. Darius Kohan, filed Sept. 3, 2026 (Docket # 382) (redacted version at Docket # 383) ("Kohan Decl"); Reply Memorandum of Law, filed Sept. 8, 2026 (Docket # 386) (redated version at Docket # 388) ("Reply"); Declaration of Ari Teman, filed Sept. 9, 2026 (Docket # 387) (redacted version at Docket # 389) ("Teman Decl."). All citations herein are to unredacted filings. We note that following the Court's rulings on the parties' motions to seal (Docket # 404), a number of documents have been re-filed with fewer or no redactions as set forth in Docket ## 408 and 409.

ordered to appear for his deposition in New York.

I. BACKGROUND

Teman is the CEO of GateGuard. Teman Decl. ¶ 1. GateGuard does not contest that Teman is "the sole witness to GateGuard's surviving claims of tortious interference and trade secret misappropriation." Opp. at 1.

For nearly three years, Amazon has attempted to get Teman to appear for his deposition. From the beginning, Teman gave various medical excuses for failing to appear. In December 2023, Judge Figueredo granted leave for Amazon to depose Teman while he was incarcerated in Florida after having been convicted on fraud charges unrelated to this lawsuit. See Order, filed Dec. 6, 2023 (Docket # 81). The deposition was scheduled for the week of March 11, 2024, and was to occur in person at the federal correctional institution located in Miami. Opp. at 4. The deposition did not occur, however, because Teman was allegedly suffering from "testicular pain," "severe allergies," "auto-immune reactions," and "the overall weakening effect of try[ing] to keep Kosher on a prison diet." Salant Decl. ¶ 5; Eden Quainton email, dated Mar. 1, 2024, annexed as Ex. A to Salant Decl. (Docket # 381-1). After Teman was released from prison and put on supervised release, Amazon noticed Teman for an in-person deposition to occur in New York City on July 9 and 10, 2024. Salant Decl. ¶ 6. GateGuard canceled on July 5, 2024, because Teman had allegedly contracted Covid. Id. ¶ 7; Eden Quainton Email, annexed as Ex. B to Salant Decl. (Docket # 381-2).

In June 2025, Teman violated the terms of his supervised release by failing to return to the United States from Israel. See Teman v. United States Prob. Serv., 2025 WL 1883841, at *1 (S.D.N.Y. July 8, 2025). He has since been declared a fugitive. Id. Because this litigation continued, the Court ordered GateGuard, with GateGuard's agreement, to "make Ari Teman

available for deposition in his personal capacity and as GateGuard's Rule 30(b)(6) designee" by July 17, 2026. Revised Joint Case Management Plan, filed Feb. 27, 2026 (Docket # 307) at 2. Amazon noticed Teman for a deposition to occur in New York City on June 23 and 24, 2026. Salant Decl. ¶ 11. Teman and GateGuard failed to appear for that deposition. See Letter from David P. Salant, filed June 29, 2026 (Docket # 356) at 2.

Rather than impose sanctions on GateGuard, this Court instructed the parties to reschedule the deposition and stated that "if no agreement can be reached, either party may apply to the Court to set the deadline." Order, filed July 17, 2026 (Docket # 360). Unable to reach an agreement, Amazon asked the Court to set a deadline for September 30, 2026. See Letter Regarding Deposition Deadlines, filed July 31, 2026 (Docket # 361) at 1. In response, this Court issued an order ruling that "the plaintiff (including its principal)" was required to "appear in person for the deposition in the Southern District of New York, where plaintiff brought suit, unless the plaintiff can show that conducting the deposition in such manner 'imposes a meaningful burden.'" Order, filed Aug. 6, 2026 (Docket # 368). GateGuard then filed the instant motion seeking a protective order and requesting that Teman's deposition take place remotely or, alternatively, in person in Tel Aviv. See Mem. at 1.

GateGuard alleges that Teman cannot appear for a deposition in New York because he has been instructed not to fly due to his recent diagnosis of "Eustachian tube dysfunction" — a condition that, according to GateGuard's counsel, impairs the ear canal and makes one sensitive to pressure changes. Mem. at 3 n.1.[2] As described further below, GateGuard's presentation consists of medical records offered to substantiate his alleged medical hardship.

[2] The Court does not consider GateGuard's unsupported allegations regarding Teman's "low back pain," see Mem. at 4, because GateGuard concedes that its "motion did not rest on Mr. Teman's back condition." Reply at 14.

## II. LEGAL STANDARD

As a general rule, a "party noticing the deposition usually has the right to choose the location." Buzzeo v. Bd. of Educ., Hempstead, 178 F.R.D. 390, 392 (E.D.N.Y. 1998) (quotation marks and citation omitted). Nonetheless, a court for "good cause" may designate a time, place, and manner of a deposition that differs from what the deposing party seeks. See generally Fed. R. Civ. P. 26(c)(1)(B) ("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . [by] specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery."); Fed. R. Civ. P. 30(b)(4) ("[T]he court may on motion order . . . that a deposition be taken by telephone or other remote means.").

Good cause is "established when a party is able to show that a clearly defined, specific and serious injury will occur in the absence of [a protective order]." Qube Films Ltd. v. Padell, 2015 WL 109628, at *2 (S.D.N.Y. Jan. 5, 2015) (quotation marks and citation omitted); Republic of Turkey v. Christie's, Inc., 316 F. Supp. 3d 675, 677 (S.D.N.Y. 2018) ("To establish good cause under Rule 26(c), the court requires a particular and specific demonstration of fact, as distinguished from stereotypes and conclusory statements.") (quoting Jerolimo v. Physicians for Women, P.C., 238 F.R.D. 354, 356 (D. Conn. 2006)). The party seeking a protective order bears the "burden of showing that good cause exists." Gambale v. Deutsche Bank AG, 377 F.3d 133, 142 (2d Cir. 2004) (quotation marks and citation omitted). Importantly, "'[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning,' are not sufficient to satisfy the burden." McDonnell v. First Unum Life Ins. Co., 2012 WL 13933, at *1 (S.D.N.Y. Jan. 4, 2012) (quoting Cipollone v. Liggett Grp., Inc., 785 F.2d 1108, 1121 (3d Cir. 1986)). At the same time, a court must "strive to achieve a balance between claims of prejudice and those of

hardship." Normande v. Grippo, 2002 WL 59427, at *1 (S.D.N.Y. Jan. 16, 2002); accord Wei Su v. Sotheby's, Inc., 2019 WL 4053917, at *1 (S.D.N.Y. Aug. 28, 2019). The decision to grant or deny a protective order is left to the discretion of the court. Dove v. Atl. Cap. Corp., 963 F.2d 15, 19 (2d Cir. 1992); accord Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 155 (S.D.N.Y. 1997) ("[C]ourts retain substantial discretion to designate the site of a deposition.").

## III. DISCUSSION

We first address whether Teman has established that he would suffer a hardship if his deposition were to take place in the Southern District of New York, which is the sole basis for his assertion of good cause. We then discuss the prejudice to Amazon that would result from Teman's proposals to hold the deposition remotely by video or in Israel.

### A. Good Cause

Teman's claim regarding his medical condition must be considered in light of the evidence as to his credibility. Before he filed the instant motion, Teman had come up with two different sets of medical reasons to avoid his deposition. He canceled his deposition scheduled for the week of March 11, 2026 due to "severe ailments including a neurological condition . . . and extreme testicular pain . . . inflammation, allergies, and extreme sleep deprivation." Letter, dated Mar. 4, 2024, (Docket # 153) at 2. Then on July 5, 2024, he again canceled his deposition scheduled for July 9 and 10 because he "went to the emergency room last night and has been diagnosed with Covid." Salant Decl. ¶ 7.

In the criminal case against Teman, Judge Engelmayer also dealt with Teman's medical excuses to avoid appearing in this District. See United States v. Teman, 19 Cr. 696 (PAE), ECF No. 531, at 2–3 (S.D.N.Y. April 17, 2025) ("Engelmayer Dec."). Judge Engelmayer had

permitted Teman to travel to Israel during the term of his supervised relief. See generally id. After filing various unsuccessful motions, Teman eventually asserted that he could not travel from Israel back to New York to finish the term of his supervised release due to his sinus condition. Id. at 2. Judge Engelmayer noted that Teman had "repeatedly engaged in air travel since his conviction in January 2020, including having flown to and from Australia to perform comedy while his appeal was pending and to Israel while on supervised release." Id. Judge Engelmeyer found that his medical excuse was a "pretext." Id. at 7. As Judge Engelmeyer put it, "[e]very indication is that Teman is advancing this rationale for not traveling to the United States in a last-ditch effort to avoid return, which he has repeatedly stated he does not wish to do." United States v. Teman, 19 Cr. 696 (PAE), ECF No. 508, at 3 (S.D.N.Y. Feb. 27, 2025). Judge Engelmayer noted that:

> [(1)] as of February 25, 2025, Teman had not purchased a plane ticket for a trip he had been ordered to take by February 28, 2025 . . . [(2)] alongside the medical excuse, Teman articulated a series of frivolous alternative bases why he purportedly could not travel to the United States . . . [(3)] Teman's doctor's note pronounce[d] that [as of February 24, 2025] he [was] "well" and [did] not represent that Teman sought out a medical opinion regarding the compatibility of air travel with his sinusitis condition until four days before the deadline for his return . . . [( 4)] recently filed sworn affidavits submitted by Teman's two trial counsel, Joseph DiRuzzo, Esq., and Justin K. Gelfand, Esq., in connection with Teman's pending motion pursuant to 28 U.S.C. § 2255, . . . [had] refute[d] as factually untrue numerous representations Teman ha[d] made to the Court, . . . [and had] reporte[d] an attempt by Teman — rightfully rebuffed by his ethical counsel — to arrange for an anonymous call to be placed from a burner phone to the Federal Bureau of Investigation falsely claiming that a juror at his trial engaged in misconduct . . . [and (5)] the overall record of Teman's conduct in this case . . . reveal[ed] a regrettable but persistent pattern of Teman's making demonstrably false and self-serving statements and accusations.

Id. at 3–4.

While Judge Engelmayer allowed Teman to offer additional medical evidence, Judge Engelmayer ultimately concluded that "Teman's claim that air travel is medically risky is pretextual." Engelmayer Dec. at 7. As he put it:

> Numerous data points support that Teman invoked this in late February as a last-ditch excuse to avoid returning to the United States. These include those chronicled in detail in the Court's February 27 order; Teman's failure to abide by Court's orders to make a plane reservation for a return trip; Teman's non-compliance with other aspects of this Court's recent orders; Teman's offer of other bogus rationalizations for not traveling; and Teman's well-documented pattern in this case — now confirmed by the affidavits submitted by his trial counsel — of proffering bogus claims and accusations to suit his self-interest.

Id. Accordingly, Judge Engelmayer ordered Teman to return to the United States to finish his term of supervised release. Id. at 8. Teman never appeared and was declared a fugitive. Teman, 2025 WL 1883841, at *1 (S.D.N.Y. July 8, 2025). Judge Engelmayer's ruling was affirmed by the Second Circuit. See United States v. Teman, 2025 WL 4671324, at *1 (2d Cir. Oct. 6, 2025) (summary order) ("We conclude that Teman is a fugitive.").

It is against this background that we examine GateGuard's presentation, which relies on medical records that in turn rely on Teman's self-reports of his symptoms. These records show that on April 24, 2025, Dr. Amit Wolfovitz  diagnosed Teman with "Eustachian tube dysfunction" and recommended that Teman "avoid flying for 3 months" and "schedule visit for inspection before approving traveling abroad." Id. Dr. Amit Wolfowitz Clinical Notes, dated April 24 and November 3, 2025, annexed as Ex. 11 to Quainton Decl., filed Nov. 3, 2025 (Docket # 374-11) ("Wolfowitz Notes") at 4. On November 3, 2025, Teman went back to Dr. Wolfovitz for a check-up on his condition. Id. Teman's tests showed no signs of impairment in his ears, eardrums, or hearing. Id. Dr. Wolfovitz did not recommend any flight restrictions and noted that Teman has "no difficulty compared to pressure [changes] (flights and the like) previously." Id. Dr. Wolfovitz recommended Teman undergo a balloon dilation procedure and

referred Teman to Dr. Shapira for this purpose.[3] Mem. at 4. Teman saw Dr. Shapira on August 13, 2026. Id. Dr. Shapira performed various physical examinations on Teman, all of which came back normal. Shapira Consultation Summary, dated Aug 13, 2026, annexed as Ex. 1 to Quainton Decl., filed Aug. 21, 2026 (Docket # 374-1) ("Shapira Summary") at 3. But given Teman's reported symptoms, Dr. Shapira referred Teman for a balloon dilation and, "until recovery — recommends avoiding flying." Id. The Sheba Medical Center's appointment system has now assigned Teman a pre-procedure appointment for July 19, 2027. Mem. at 4.

GateGuard contends that this documentation is sufficient to show that conducting Teman's deposition in New York would impose a meaningful burden justifying a protective order. Mem. at 6–8.[4]

While GateGuard assumes the doctors' recommendation to "avoid" flying is enough to satisfy its burden, a "[c]ourt may not abdicate its responsibility by unquestionably accepting a doctor's summary opinions." Medlin v. Andrew, 113 F.R.D. 650, 653 (M.D.N.C. 1987). Instead, there must be "specific articulated facts," PC-41 DOE v. Poly Prep Country Day Sch., 2022 WL 420619, at *3 (E.D.N.Y. Jan. 20, 2022), about the risks as "protective orders are generally not granted where the contentions of a treating physician are conclusory or speculative in nature," Qube Films, 2015 WL 109628, at *2 (citing Campos v. Webb Cnty. Tex., 288 F.R.D. 134, 136–37 (S.D. Tex. 2012) (collecting cases)).

---

[3] A balloon dilation is a "minimally invasive, outpatient procedure" that takes approximately 30 minutes. Kohan Decl. ¶¶ 18–19. It involves inserting a balloon into the ear canal (specifically the Eustachian tube) and inflating the balloon so that the Eustachian tube can remain dilated for a few minutes. Id

[4] Amazon takes issue with the fact that the doctors' reports are unsworn. Opp. at 11. We believe, however, that in the context of a discovery motion, a court has discretion to consider unsworn medical reports and notations

Here, the reports by Teman's doctors are not based purely on objective signs of impairment. See Wolfowitz Notes at 4; Shapira Summary at 3. Instead, they turn on Teman's self-report of symptoms. See Wolfowitz Notes at 4 ("[s]till in pain in the right ear, fairly constant . . . [r]eports difficulty in closed rooms"); Shapira Summary at 3 ("[i]n light of the persistence of symptoms recommended right sided balloon dilation"). As we have already discussed, and as will be discussed further below, we have grave doubts regarding Teman's credibility for the same reasons articulated by Judge Engelmayer. See also GateGuard v. Goldmont Realty Corp., No. 20 Civ. 1609 (VEC), ECF No. 216, at 2 (S.D.N.Y. Nov. 17, 2025) (Judge Caproni's finding that Teman had "lied to the Undersigned, Judge Furman, or both" regarding his role at GateGuard).

Moreover, and less importantly, the doctors' recommendations have not been consistent. In November 2025, Dr. Wolfovitz appears to retract his earlier recommendation against flying by stating that Teman has "no difficulty compared to pressure [changes] (flights and the like) previously." Wolfowitz Notes at 4. Yet at Teman's August 2026 visit with Dr. Shapira, Dr. Shapira recommended that Teman avoid flying. Shapira Notes at 3. No explanation was provided for the changed restriction; nor were the specific reasons to avoid flying, and the risks entailed, ever disclosed. Such inconsistent, speculative, and conclusory statements are insufficient to demonstrate good cause for a protective order. See, e.g., Kiss v. Kenny, 2025 WL 1532744, at *1 (S.D.N.Y May 29, 2025) (plaintiff's psychiatry records were insufficient because "the records are silent regarding Plaintiff's alleged need for a remote deposition or any possible harm he would sustain from attending an in-person deposition."); Jennings v. Family Mgmt., 201 F.R.D. 272, 275 (D.D.C. 2001) ("The report is also notable for its conclusory nature . . . it does

not state with specificity how or why" her symptoms will worsen or "how specifically her health will be threatened by the deposition process.").

Further, the recommendation of a flight restriction must be weighed against the analysis of Dr. Darius Kohan, an otolaryngologist (or "ear, nose and throat surgeon") Amazon engaged to opine on Teman's diagnosis and Eustachian tube dysfunction generally. Kohan Decl. ¶ 2. Dr. Kohan explains that "[p]atients with Eustachian tube dysfunction fly on commercial airplanes all the time," and that he "do[es] not tell [his] patients with Eustachian tube dysfunction that they cannot fly." Kohan Decl. ¶ 20. Moreover, after analyzing Teman's symptoms and doctor reports, Dr. Kohan is "highly confident that Mr. Teman could fly safely to New York." Id. ¶ 3.

While GateGuard offers no specific rebuttal to the opinion provided by Dr. Kohan, it contends nevertheless that requiring a flight still constitutes a meaningful burden because, as Dr. Kohan notes, Teman's "realistic worst possible outcome is pain." Reply at 1 (citing Kohan Decl. ¶ 24). Even so, the mere possibility or even certainty of pain would not justify the relief GateGuard requests here. Nothing suggests that the pain Teman may experience would be severe or prolonged. "Eustachian tube dysfunction is . . . one of the most common reasons patients visit an ENT doctor" and "[a]lmost everyone experiences some degree of Eustachian tube dysfunction at some point in their lives." Kohan Decl. ¶ 11. Thus, we find that Teman's self-reported symptoms and conclusory doctors' reports fail to demonstrate that traveling to New York City would impose a meaningful burden.

But there is an overriding issue that renders the doctors' reports of limited importance: namely, Teman's lack of credibility and the overwhelming evidence that his claimed symptomology is entirely pretextual. GateGuard has known that Amazon intends to depose Teman in person, yet despite the parties' "years-long correspondence about Mr. Teman's

depositions," GateGuard is only now raising these particular health concerns. Opp. at 16. For example, in April 2026 — after Teman had already been diagnosed with Eustachian tube dysfunction — Amazon notified Teman that his deposition was scheduled for June 2026, in person and in New York City. Id. But rather than reference Teman's purported Eustachian tube problem, Teman simply failed to show up. Id. This obvious gamesmanship further calls into question Teman's credibility and the motives behind this motion. See also Dubai Islamic Bank v. Citibank, N.A., 2002 WL 1159699, at *14 (S.D.N.Y. May 31, 2002) (parties' reliance on medical conditions to avoid their depositions deemed waived for failing to raise them for at least a year); A.I.A. Hldgs., S.A. v. Lehman Bros., 2002 WL 538833, at *5 (S.D.N.Y. Apr. 10, 2002) (denying protective orders due to failure to raise preexisting medical conditions before depositions were noticed).

When viewed in conjunction with the well-supported findings of Judge Engelmayer that Teman's medical excuse for not flying is pretextual, the Court has no trouble concluding that the same claim made in this case is equally pretextual. Our conclusion is bolstered by rulings from Judge Caproni and Judge Liman.

In GateGuard v. Goldmont Realty Corp., No. 20 Civ. 1609 (VEC), ECF No. 214-1, ¶ 3 (S.D.N.Y. Nov. 17, 2025), Teman claimed that his Eustachian tube condition prevented him from complying with his obligation to appear for an arbitration in the United States. Id. Judge Caproni found that "Teman's self-serving representation about his illness . . . is yet another fabrication." Id. ECF No. 216 at 2.

In a recent ruling, Judge Liman was faced with an application identical to the one before this Court: a motion to require Teman to appear in this district for his deposition. See Teman v. Zeldes Needle Cooper, LLP, No. 24 Civ. 9830 (LJL), ECF No. 117 (S.D.N.Y. Oct. 9, 2026).

Judge Liman's cogent marshaling of evidence in support of his finding of pretext, ultimately resulting in an order that Teman's deposition to take place in New York, is worth quoting at length:

> [T]here is reason to question the credibility of [Teman's medical] reports and whether Plaintiff's report of an ear condition is, at least in part, pretextual. Plaintiff is currently a fugitive from the United States, a status he acquired after he failed to appear for an arraignment on a violation of the terms of his supervised release that were imposed as a result of his fraud conviction. See Teman v. United States, 2025 WL 1883920, at *1 (S.D.N.Y. July 8, 2025). In September 2024, while on supervised release, Plaintiff sought permission to travel to Israel to visit family. See United States v. Teman, 2025 WL 296330, at *1 (S.D.N.Y. Jan. 24, 2025). Judge Engelmayer, who oversees Plaintiff's criminal case, allowed him to do so with a scheduled return date in November 2024. Id. at *2. But Plaintiff never returned and, instead, obtained numerous extensions to his return date on a variety of grounds before that court declared him a fugitive in July 2025. Crim. Dkt. No. 567 at 1. At one point, Plaintiff pointed to "missile and drone attacks upon Israel from Houthi rebels and the reduction of air travel to Israel as a result of ongoing wars." Id. He claimed that airfare was "prohibitively expensive." Id. At other points, he submitted a letter from a rabbi stating that it was a religious "commandment" for him to remain in Israel, Crim. Dkt. No. 502-2 at 1, and invoked the medical advice of spinal surgeons and urologists, Crim. Dkt. No. 471 at 2. He also submitted at least two letters from Dr. Budow. In the first, submitted in February 2025, the doctor acknowledged that Plaintiff was in good health but that flying risked triggering "acute sinusitis" (*i.e.*, a sinus infection). Crim. Dkt. No. 502-1 at 1. And the second, submitted the next month in March 2025, indicated that in January 2025 (prior to Dr. Budow's first letter), Plaintiff suffered an injury to his ear as a result of hyperbaric oxygen therapy, and, accordingly, should not fly until at least June 1, 2025. Crim. Dkt. No. 513 at 6. Tellingly, in his July 2026 letter, Dr. Budow makes no reference to acute sinusitis or hyperbaric oxygen therapy and offers no explanation to account for the changing ailments that he, at various points, has claimed Plaintiff suffers from. Finally, in May 2025, Plaintiff filed Dr. Wolfovitz's clinical notes showing his diagnosis of Eustachian tube dysfunction and his recommendation that he not fly for 90 days. Crim. Dkt. No. 534 at 2–3; Crim. Dkt. No. 534-1. The number and mutability of the justifications Plaintiff attempted to rely on to avoid returning to the United States led Judge Engelmayer to conclude that Plaintiff's "claim that flying was medically contra-indicated [w]as contrived," Teman, 2025 WL 1883920, at *2, and the Second Circuit concurred, United States v. Teman, 2025 WL 4671324, at *1 (2d Cir. Oct. 6, 2025) (summary order) (agreeing "with the district court that Teman's proffered medical reason for failing to comply with the district court's orders to return to the United States is pretextual").

Teman v. Zeldes Needle Cooper, LLP, 2026 WL 3135913, at *3–4 (S.D.N.Y. Oct. 20, 2026).

The burden is on plaintiff to prove its entitlement to a protective order. That burden has not been met because the Court finds that Teman's factual assertions relating to his medical condition, including his claims regarding the severity of his symptoms, are unworthy of belief. Our finding is further supported by the fact that Teman has a powerful motive to create an excuse not to return to New York for his deposition: namely, his obvious desire to avoid the potential of being incarcerated for his violation of the terms of his supervised release. Because we find that his assertions in regard to his medical condition are a pretext for avoiding a deposition in New York, we find that there is no medical impediment to his appearance in this District for a deposition.

B. Prejudice to Amazon

GateGuard proposes two alternatives to Teman's deposition in New York City: (1) a remote deposition, or (2) an in-person deposition in Tel Aviv, Israel. Mem. at 1. While Teman has failed to show that his being deposed in New York poses any medical hardship, we recognize that there is an inconvenience attendant to traveling to New York from Israel. Accordingly, we will examine GateGuard's proposed alternatives to determine the prejudice they would impose on Amazon.

1. Remote Deposition

GateGuard contends that a remote deposition of Teman is sufficient to satisfy Amazon's needs, relying on the notion that "remote depositions are now routine." Mem. at 9. It also emphasizes that nearly every witness in this case has been deposed remotely so far. Id. It thus argues that "[a] party that has obtained the benefit of remote examination for its own corporate designees, and conferred it on an opposing witness abroad, is poorly positioned to argue that the

identical format would deprive it of anything material when the shoe is on the other foot." Id. GateGuard is mistaken in several respects. First, "[t]he party noticing the deposition usually has the right to choose the location." Winfield v. City of New York, 2018 WL 840085, at *11 (S.D.N.Y. Feb. 12, 2018) (quoting 7 Moore's Federal Practice § 30.20 [1] [b] [ii]). GateGuard therefore could have requested any or all of its depositions to occur in person. Its decision not to avail itself of remote alternatives has no bearing on Amazon's ability to notice an in-person deposition.

Second, although conducting depositions "remotely is becoming the 'new normal,'" Rouviere v. DePuy Orthopadics, Inc., 471 F. Supp. 3d 571, 574 (S.D.N.Y. 2020) (citation omitted), the inquiry does not end there. Instead, context is critical, and GateGuard fails to recognize that Teman comes with substantial credibility concerns. As Judge Liman noted:

> Plaintiff was previously convicted of bank and wire fraud. See United States v. Teman, No. 19-cr-696 (S.D.N.Y.); see also United States v. Teman, 2023 WL 3882974 (2d Cir. June 8, 2023) (summary order) (affirming judgment of criminal conviction). The instant case is unrelated to Plaintiff's criminal prosecution, but a prior conviction for fraud "bear[s] directly on credibility." United States v. Puco, 453 F.2d 539, 543 n.12 (2d Cir. 1971); see also United States v. Davis, 2014 WL 5305984, at *13 (D. Vt. Oct. 15, 2014) ("The law recognizes that crimes of dishonesty are central to evaluating credibility."). Where credibility is at issue, there is a particular value in a deposition being conducted in person.

Teman, 2026 WL 3135913, at *2.

Further, Teman has been found to have given pretextual and fabricated information to multiple judges in this district, as already discussed, and is currently a wanted fugitive. Teman has also exhibited animosity towards Amazon by not only targeting Amazon personnel by email but also announcing that he was referring Amazon to the FBI and DOJ for criminal prosecution. See Teman Emails, filed Apr. 10, 2026, annexed as Ex. F to Declaration of David Salant (Docket

# 320-6), at 13–14; Teman Emails, filed June 29, 2026, annexed as Ex. 3 to Letter from David Salant (Docket # 356-3), at 2–3.

Case law recognizes that where a key witness is at issue, "there is nothing extraordinary or inappropriate about seeking to take a deposition in person." United States v. M/Y Amadea, 2024 WL 4799887, at *5 (S.D.N.Y. Nov. 15, 2024) (collecting cases); accord Kiss, 2025 WL 1532744, at *2 (requiring an in-person deposition because "Plaintiff is the key (and only) witness able to support his claim" and that "as a key witness, Plaintiff's credibility is a matter of critical importance that necessitates an in-person deposition") (citation and punctuation omitted). This conclusion is even more apt where the witness has already displayed serious credibility issues. See, e.g., Arora v. Standard Chartered Bank, 2026 WL 810387, at *2 (S.D.N.Y. Mar. 23, 2026) ("ability to assess the credibility of Plaintiff — an obvious key witness in this case — necessitates an in person deposition") (quotation marks and citation omitted); Gersh v. Anglin, 2019 WL 4453062, at *4 (D. Mont. Apr. 5, 2019) ("As the named defendant, Anglin will also likely serve as a key witness and his credibility will presumably be a central issue . . . [p]laintiff would be prejudiced if Anglin is not required to appear for an in-person deposition.").

GateGuard argues that a remote deposition is sufficient to address Amazon's credibility concerns. Mem. at 9–10; see also Reply at 17–18. In support, it cites cases finding that a remote deposition was sufficient to address a witness's demeanor. Mem. at 9–10. But this does not mean a remote deposition is always appropriate. As Eletson Holdings Inc. v. Levona Holdings Ltd., 2025 WL 1950728 (S.D.N.Y. July 16, 2025), noted:

> [I]n terms of the truth-seeking function of a deposition, a remote video deposition is not a substitute for the in-person, face-to-face confrontation between adversaries. See Charr v. King, 2023 WL 9792732, at *2 (S.D. Fla. Nov. 3, 2023) (noting that "[r]emote depositions preclude in-person confrontation"); Tsien v. Bd. of Regents of Univ. Sys. of Georgia, 2021 WL 6617307, at *3 (S.D. Ga. Nov. 12, 2021), aff'd, 2021 WL 6617308 (S.D. Ga. Dec. 20, 2021) (same). "Apart from credibility assessments, a remote deposition would also present logistical challenges. The opportunity for mischief arises when a deponent logs into a remote deposition without counsel or a court reporter physically present in the same room." Tsien, 2021 WL 6617307, at *3. An oath administered in the physical presence of the designated officer has an immediacy and gravity that may not be felt over the internet. See Fed. R. Civ. P. 30(b)(5)(A).

Id. at 2. Once again, given Teman's history of fraud, dishonesty, and evasiveness, there is an unusually high need to protect the truth-seeking function of a deposition here. Moreover, Teman is the key witness, has demonstrated animosity towards Amazon, and has already shown his willingness to exploit an "opportunity for mischief" by fleeing the United States and becoming a fugitive. Accordingly, GateGuard has failed to show that the burden Teman faces from traveling to New York outweighs Amazon's need to conduct Teman's deposition in person.

2. Deposition in Israel

In the alternative, GateGuard has offered to cover the expense of an in-person deposition in Tel Aviv. Mem. at 11. GateGuard contends this option eliminates any "cost or prejudice" to Amazon. Id. At the outset, this alternative raises feasibility concerns because there is doubt as to whether GateGuard truly has the means to cover the costs of a deposition in Tel Aviv which Amazon estimates at $20,000 to $40,000. Opp. at 9. Previously, GateGuard represented to Amazon that it "has no money," and therefore could not cover any of the $2,334.95 Amazon incurred as a result of Teman's failure to appear for his June 2026 deposition. Salant Decl. ¶¶ 23–24. Since then, GateGuard has provided no evidence of its financial condition or any explanation as to how it intends to cover the costs of this proposed deposition. GateGuard's

hollow assertion that it "stands ready to bear th[ese] costs," Reply at 20, provides little assurance in light of its prior representations.

Even if GateGuard advanced the deposition and travel costs in full, Amazon would not be relieved of all burdens. Rather, a deposition in Tel Aviv would force Amazon's attorneys to put their personal and professional lives on pause, travel to a foreign nation, and devote significantly greater time towards taking this deposition — time and energy that could be directed toward other more productive ends. Accordingly, the hardship Teman would face from traveling to New York does not outweigh the burden that Amazon would suffer if forced to travel to Israel.

GateGuard briefly suggests that it or Teman is a "nonresident." Mem. at 6; see also Reply at 4. But GateGuard has regularly conducted business in New York, and Teman resided here when Amazon's alleged misconduct occurred. See Motion to Intervene as Plaintiff, filed Mar. 19, 2026 (Docket # 312), at 9–10; see also GateGuard v. Goldmont Realty Corp., No. 20 Civ. 1609 (VEC), ECF No. 164-1 (S.D.N.Y. Apr. 21, 2023). The cases GateGuard relies on to support its claim that it should not be bound to appear in the forum where it filed suit, Mem. at 8; Reply at 4, are distinguishable. In Spiegler v. Mish Mish Inc., 719 F. Supp. 3d 374, 376 (S.D.N.Y. 2024), the plaintiff resided outside the United States before the lawsuit. In Packard v. City of New York, 326 F.R.D. 66, 67 (S.D.N.Y. 2018), the plaintiff moved to another country but not as part of an effort to avoid legal obligations. And in Abdullah v. Sheridan Square Press, Inc., 154 F.R.D. 591, 592–94 (S.D.N.Y. 1994), the plaintiff resided in the U.K. and risked forfeiting their asylum application if they left. Here, the only reason Teman is still in Israel is because he is a fugitive who has violated a Court order requiring his return to the United States. So, while GateGuard believes that Teman "is in a stronger position than the Abdullah plaintiffs,"

in fact a wanted fugitive bears no relation to those who lawfully reside elsewhere and are lawfully seeking asylum in another country. Mem. at 8.

Accordingly, none of the arguments advanced by GateGuard demonstrate a burden meaningful enough to overcome Amazon's "right to conduct the deposition in person if that's the chosen path." Stapleton v. Prince Carpentry, Inc., 2023 WL 1785547, at *1 (E.D.N.Y. Feb. 6, 2023).

CONCLUSION

For the reasons set forth above, GateGuard's motion for a protective order (Docket # 372) is denied. Within 7 days of the date of this Order, GateGuard shall provide to defendants three dates that Teman is available to appear in this district for deposition, such deposition dates to be within 30 days of the date of this Order. When a date is chosen, Amazon has leave to present a proposed order to the Court directing the deposition to take place on the chosen date.

SO ORDERED.

Dated: November 13, 2026
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge